| | | |
|---|---|---|
| KAREN MCNEIL, LESLEY JOHNSON, | ) | |
| TANYA MITCHELL, INDYA HILFORT, | ) | |
| and SONYA BEARD, | ) | |
| On behalf of themselves and all others | ) | Case No.:  1:18-cv-00033 |
| similarly situated | ) | |
| | ) | JUDGE CAMPBELL/ |
| Plaintiffs, | ) | JUDGE FRENSLEY |
| | ) | |
| v. | ) | |
| | ) | JURY DEMAND |
| COMMUNITY PROBATION SERVICES, | ) | |
| LLC; COMMUNITY PROBATION | ) | |
| SERVICES, L.L.C.; COMMUNITY | ) | |
| PROBATION SERVICES; | ) | |
| PROGRESSIVE SENTENCING, INC.; | ) | |
| PSI-PROBATION II, LLC; PSI- | ) | |
| PROBATION, L.L.C.; TENNESSEE | ) | |
| CORRECTIONAL SERVICES, LLC; | ) | |
| TIMOTHY COOK; GILES COUNTY, | ) | |
| TENNESSEE; PATRICIA MCNAIR; | ) | |
| MARKEYTA BLEDSOE; HARRIET | ) | |
| THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT COMMUNITY PROBATION SERVICES, LLC AND PATRICIA MCNAIR'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Introduction

Plaintiff Indya Hilfort is asking this Court to effectively but indirectly enjoin the practices of the Tennessee state courts with jurisdiction in Giles County.  Plaintiffs have refused to make the State of Tennessee a party to the suit and have refused to give notice to the Tennessee Attorney General as required by Fed. R. Civ. P. 5.1, to respond to Plaintiffs' challenge to an entire statutory scheme involving bond for convicts accused of violating their probation.  Instead, they are attempting an end-run around these obvious issues, by asking the Court to enjoin any county officials from actually enforcing valid state court orders.  Worse, they are asking the non-attorney officials to try and discern what factors the state court judges may have considered,

1

what kind of hearing the state court judges conducted prior to ruling, and other issues, before these non-attorney officials judge for themselves whether to ignore a particular state court order. This is an impossible situation, and the Court should reject the Plaintiff's demand for a fatally indefinite and undecipherable injunction. The Court should abstain from exercising jurisdiction directly challenging these state court actions.

Further, even if the Court were to exercise jurisdiction, the Court should find that the state court actions of the 22nd Judicial District of Tennessee, which encompasses several counties including Giles County, is proper and constitutional in all respects. The Plaintiff's challenge to the state court administration of justice is based on the plaintiff's conclusory and incorrect assertion that there is some sort of "fundamental" implicated in this case, then furthering the fallacious logical argument by saying that strict scrutiny applies. Plaintiffs are incorrect, and the very authority they cite along with numerous other cases prove that rational basis review is the appropriate review of the state court actions. Further, the Plaintiffs cite district court cases that have been reversed by the respective Circuit Courts of Appeal, some like *Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1265 (11th Cir. August 22, 2018) more than once.

Plaintiff's also rely almost heavily if not exclusively on an interlocutory order from Judge Sharp, in a case *Rodriguez v. PCC and Rutherford County*, 3:15-cv-01048 (M.D.Tenn. 2015) in a case against a different private probation company that voluntarily ceased operation, and which case was later settled. But the facts of that case, and the practices challenged in that case, are entirely different from those in Giles County at issue at bar. That case is vastly and categorically distinguishable to the point that it is largely irrelevant to consideration here. That case certainly was never developed to the point of meaningful review even by Judge Sharp, and the later settlement prevented review by the Sixth Circuit. But Plaintiffs aggressively beat the drum of that case, hoping to influence the Court to simply follow Judge Sharp's broad holding in an apparently complicated case, rather than looking at the specific, distinct, and fully constitutional

2

practices here. The Court should not supplant its independent judgment to enact social change sought by the Plaintiffs; and doubly should not do so by enjoining officials from enforcing valid state court orders over which they have no input, control, direction, or even meaningful ability to inquire. The Court should instead reject the Plaintiff's challenge. If the Plaintiffs want to challenge the state system, they should bring the challenge directly, and not try this end-run against county officials.

Here, though, the state system at issue is proper in all respects. Indeed, the proof will show that the judges make individualized, personal determinations upon the presentation of a warrant illustrating that a convict who is out of prison on probation, has violated his or her probation. The judges make individualized, personal determinations on bail, considering mandatory factors established by Tennessee statute. The judges then routinely immediately arraign detainees, and appoint attorneys to give these detainees an opportunity to be heard on any issue, including issues of indigency. This is a constitutional, meaningful process, and this Court should not entertain Plaintiff's attempt to destroy this longstanding process, which Plaintiffs seek without ever making the State or these state court judges part of this case. Instead, Plaintiffs seek to place the county officials and others in the completely impossible situation to try and figure out what the state judges were thinking, and then decide which court's orders should be followed.

This Court should categorically reject this blatant attempt to declare an entire state statutory scheme unconstitutional, without ever involving the State or its officials.

## ARGUMENT

I. **Plaintiff's Constitutional Arguments Fail, Because the Practices of the State Courts of the State of Tennessee's 22nd Judicial District, which includes Giles County, are Constitutional and Proper in All Respects.**

Turning directly to the substance of Plaintiff's Constitutional challenge to the state court process, it is clear that the Plaintiff's proposed paradigm of "strict scrutiny" and "fundamental

3

rights" are not implicated in this situation at all. Instead, the proper standard is rational basis review. Plaintiff's error lies in their attempt to conflate distinct, independent constitutional issues into a single argument. While Plaintiffs' brief sounds like a substantive argument, in reality, it is simply a broad generalization that does not withstand analysis.

**A.      Plaintiff Erroneously Conflates Three Distinct Constitutional Concepts and Their Analysis.**

Specifically, the failure of Plaintiffs arguments all derive in large part from their attempt to conflate three discrete constitutional concepts: Substantive Due Process, Equal Protection, and Procedural Due Process. The procedural and substantive aspects of the Fourteenth Amendment are distinct concepts and must be analyzed separately.

**1.      Substantive Due Process and Equal Protection.**

Substantive Due Process looks at certain fundamental rights, which have been very narrowly defined by the Supreme Court. The distinction drawn by the Plaintiff between what Plaintiffs describe as "wealth" and "indigency" is not now, and never has been a fundamental right or a fundamental distinction. Indeed, this is not even capable of distinction, as the spectrum between genuine wealth and true poverty has every point in between, and is based not only on assets, income, and resources, but also obligations, expenses, and needs. But Plaintiff never addresses this concept squarely, instead only generalizing that strict scrutiny must apply. But only when a "fundamental right" is involved does strict scrutiny actually apply. *See e.g.*, *Moore v. City of East Cleveland*. In all other cases, the standard of review is true rationality, more commonly known as the rational basis review. *See e.g.*, *Washington v. Glucksburg*, 521 U.S. 702 (1997). In other words, when no "fundamental right" is involved, the salient question is whether the alleged deprivation is rationally related to a legitimate government interest.

Here, of course, there is clearly a legitimate governmental interest in securing the attendance of a convict at his or her probation revocation hearing, where probable cause has been

established that he or she has abused the chance at freedom from jail that accompanies the original grant of probation. There is no "right" to release after conviction <u>at all</u>, according to the Supreme Court. *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Further, there is clearly a rational basis to impose a monetary bond to ensure attendance of the convict at his or her probation hearing. But the State scheme goes further, and allows release even without the payment of money bond: if two sureties will simply sign for the convict, then he or she can be released without ever paying a cent. Tenn. Code Ann. § 40-11-122(2).

Equal Protection analysis is parallel with Substantive Due Process, but it serves a different purpose. Equal Protection protects from arbitrary classifications that are suspect; therefore the level of scrutiny depends on whether the classification is deemed inherently suspect, quasi-suspect, or non-suspect. Equal Protection demands strict scrutiny only when the government creates an impediment with respect to the exercise of a "fundamental right" on the basis of an arbitrary classification. But absent a suspect class or fundamental right, rational basis review applies, meaning that the government can draw non-suspect class distinctions with respect to the exercise of liberty interests. This is particularly significant in the case at bar, where there is no identifiable point on the spectrum where one becomes "wealthy" or "impoverished" or something altogether different. There is no "class" into which any person even consistently fits; and certainly there is no suspect classification of some point on that spectrum.

Conceptually, the Supreme Court, in *Bearden v. Georgia*, 461 U.S. 600 (1983), recognized the overlap in Substantive Due Process and Equal Protection, and opted to apply a hybrid substantive-and-procedural due process analysis with respect to those claims. However, as the Supreme Court later held in *Graham v. Connor*, 490 U.S. 386 (1989), when there is a textually explicit source of Constitutional protection covering the claims at issue, courts should

5

analyze them under the rubric of the demonstrably textual provision in lieu of the "more generalized notion" of substantive due process. *Id.* at 395.

Because Equal Protection analysis invokes both "fundamental rights" and suspect classification inquiry, the Equal Protection Clause is the appropriate guiding provision with respect to Plaintiffs' substantive claims in this case. And once again, under Equal Protection, rational basis review is applicable, as there is no suspect class or fundamental right at issue in the case at bar. Plaintiff's attempt to gloss over this and lead the Court directly to the concept of strict scrutiny is unavailing, and unsupported by authority.

### 2. Procedural Due Process.

Procedural Due Process looks at whether an individual has a meaningful opportunity to be heard, and receives all the process that is due, when the government lawfully deprives that person of life, liberty, or property. "Liberty" interests for this purpose are not the same as "fundamental rights" invoked by Equal Protection and Substantive Due Process. Instead, "liberty" under Procedural Due Process analysis is clearly subject to deprivation, so long as the reason for doing so is rationally related to a legitimate state interest, and there are adequate procedures in place to guarantee fundamental fairness.

Indeed, in the case at bar, Plaintiffs and each of those in their purported class were convicted of a crime, for which they have been granted the conditional leniency of probation rather than jail. Their liberty has already been deprived, as they continue to serve their criminal sentence. When Plaintiffs violate these conditions, the revocation process begins. Here, probable cause has been established that the convict failed to live up to the standards imposed as part of his or her criminal sentence: such as to stay off drugs or to refrain from committing other crimes.

The procedures required by the Constitution in each particular situation may vary. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("due process is flexible and calls for such

procedural protections as the particular situation demands.").  Indeed, a pre-deprivation hearing is not always required if there is an adequate post-deprivation remedy, such as access to the court system in the case at bar.  Here, the judges have testified that they make a personalized determination as to the amount of the bond to be set, considering all the mandatory statutory factors.  They do not simply pick a number off a list or use some inflexible schedule.  They certainly do not permit anyone other than they – the judges themselves – to set the amount of the bond *or even suggest* the amount of the bond.  And Judge Richardson immediately appoints an attorney for every person who did not make bond, and timely responds to any motion from any such attorney for release, whether based on indigency or any other factor that may be applicable to a particular person.

### B.    The State Court Judge's Individualized Decision to Set Bond is Entirely Constitutional and Appropriate.

The Plaintiffs use the term "Preset Money Bond" as if it were some sort of recognized legal concept.  It is not.  Here, the state court judges are presented with affidavits asserting that probable cause exists to believe that a convict has violated his or her probation.  The state court judges make an independent determination as to whether such probable cause exists.  The state court judges then determine what bond, if any, should be set using the criteria required by Tennessee law.  The state court judges make these individualized determinations based on the nature of the alleged violation, whether the violation has occurred before, and the other factors in Tenn. Code Ann. § 40-11-115.  Specifically, the judges testified that they follow the statutory mandate and set the amount that they judicially determine "will reasonably assure the appearance of the person as required" *Id*.  The bond is not "preset," it is determined by the judges, based on the statutory criteria in the individual situation.

### 1.    Monetary bond does not violate the Fourteenth Amendment.

There is no "fundamental right" under the Fourteenth Amendment to release on recognizance while awaiting a revocation hearing. Nor are the poor a suspect class. Therefore, rational basis review applies to Plaintiffs' claims. Because money bond is rationally related to the legitimate State interest in protecting the public, ensuring the violator's presence at a revocation hearing, and meeting the penal goals of effective punishment and deterrence, Plaintiffs' challenges fail.

Moreover, the converse of Plaintiff's proposal illustrates why there can be no Equal Protection violation in this context. If Plaintiffs get their way, and any indigent person has an automatic right to go free with no security, but a non-indigent person of just modest means does not, then that, too, would be treating two classes of people differently based on money. The person of means would have a right to complain that their resources were being deprived without a legitimate basis as well. Why should they surrender their hard earned money if others do not have to? And, again, there is a huge spectrum of "wealth." Perhaps the person of means in this example is a working class person with very limited resources; or perhaps it is a wildly rich person with hardly any limit at all. Where is the line drawn, or is there a line at all? To cure the converse equal protection violation, would everyone simply be entitled to just go free? Or should bond be set based on overall assets minus liabilities, ignoring the Tennessee statute's mandate for the factors to consider?

And once again, the courts that set the bond are not parties to this case, and any injunction cannot control their practice. The State statutory scheme has not been challenged, and notice has not been given to the Tennessee Attorney General. Nor have Plaintiffs raised these issues in their ongoing criminal proceedings in state court. Instead, the Plaintiffs want the Court to ignore the statutory scheme and the foregoing considerations, and simply enjoin the county officials from enforcing these state court orders. The Court should decline.

8

**a. There is no "fundamental right" to release on recognizance while awaiting a revocation hearing.**

"Fundamental rights" under the Fourteenth Amendment are those that are deeply rooted in Anglo-American legal history and tradition, or implicit in the concept of ordered liberty and so fundamental to one's dignity, autonomy, and ability to self-actualize that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702 (1997).

The Supreme Court has held that the right to be free from bodily restraint "is not absolute," *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997). Moreover, convicts on probation do not possess the "absolute liberty to which every citizen is entitled," but only a "conditional liberty" interest, which is "properly dependent on observance of special . . . restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). If one's bodily liberty becomes "conditional" upon conviction and release on probation, that right can no longer be considered "fundamental," such that "neither liberty nor justice would exist if [it] were sacrificed." *Glucksberg*, 521 U.S., at 721. Indeed, the Supreme Court has stated in explicit terms:

> **There is no constitutional or inherent right of a convicted person to conditionally released before the expiration of a valid sentence.** The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. **But the conviction, with all its procedural safeguards, has extinguished that liberty right: '[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.'**

*Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)).

Plaintiffs, and all members of the putative class, have been duly convicted for their crimes and are able to remain conditionally free from confinement, only so long as they comply with the terms of their conditional release. Conviction has constitutionally extinguished any fundamental liberty interest they possess in freedom from confinement, pending completion of their terms of probation and/or satisfaction of the conditions thereof.

9

The foregoing principles are consistent with federal constitutional and also Tennessee law, which provides that release on bond prior to revocation hearing is not a matter of right, even in a misdemeanor case, and the decision whether to grant bond at all is a matter for the trial judge's discretion. *See* Tenn. R. Crim. P. 32(g); Tenn. Op. Atty. Gen. No. 99-199.

Plaintiffs also assert what they call a "right against wealth-based detention." The Supreme Court has never recognized any such right as "fundamental" for purposes of the Fourteenth Amendment or otherwise. And contrary to Plaintiffs' exhortation, the Supreme Court does not impliedly recognize "fundamental" rights for purposes of Due Process and Equal Protection. Rather, the "analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The district courts certainly should not create new fundamental rights as a matter of social activism, and this Court should decline Plaintiffs' invitation to do so.

Instead, Plaintiffs must demonstrate that an asserted right has deep roots in the history and tradition of our Republic. *Glucksberg*, 521 U.S., at 723–24. They cannot. On the contrary, the modern money bail system is deeply rooted in Anglo-American legal history and tradition, predating the founding of our Republic. Throughout that long history, there have always been those who could not afford to post bail. As the Supreme Court recognized in *Ross v. Moffitt*:

> Despite the tendency of all rights to declare themselves absolute to their logical extreme, there are obviously limits beyond which the equal protection analysis may not be pressed without doing violence to principles recognized in other decisions of this Court. **The Fourteenth Amendment does not require absolute equality or precisely equal advantages, nor does it require the State to equalize economic conditions.**

417 U.S. 600, 611–12 (1974) (citing *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24 (1973), and *Griffin v. Illinois*, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring)) (internal quotation marks and citation omitted).

While two states—New Jersey and California—have recently **legislatively** abandoned the centuries-old tradition of monetary bail in favor of non-secured conditions of release, the remaining forty-eight utilize monetary bail, and always have.

Plaintiffs, apparently unwilling or unable to obtain a legislative change like those that occurred in New Jersey and California, have instead turned to this Court to effect their desired social change. What the Plaintiffs are asking this Court to do is to order the Sheriff of one county to begin ignoring court orders that they feel are unfair. Plaintiffs have not sued the State to change the state courts' decision process; they have not sued the judges asking for the state courts to conduct some hearings; they have not sued for the state courts to make some preferred findings; they have not sued for the state courts to take some required steps within some period of time. The Plaintiffs cannot ask for any of those things because the courts, the judges, and the State are not parties to the suit.

Instead, they want the county Sheriff to ignore those orders for which it might appear to a non-lawyer Sheriff did not have their desired considerations—an impossible task for the Sheriff to undertake, even if this Court orders it. The system just does not work this way.

But this Court should not create an affront to the entire state judicial system simply to effect a social change sought by the Plaintiffs that they have not sought legislatively. The history of money bond in this country, which pre-dates even the Bill of Rights, ought to certainly suggest that this is not the type of situation that was contemplated by the Eighth Amendment or even the Fourteenth Amendment, and neither Due Process or Equal Protection are implicated by the centuries old bail system in this country.

Moreover, there is no modern trend to recognize such a "new right." Coastal experimentation in New Jersey and California does not by any means demonstrate an emerging trend in the collective attitude of the American people, such that release on recognizance pending a revocation hearing should be considered a "fundamental right" under the Fourteenth

11

Amendment. *See Glucksberg*, 521 U.S., at 723 (declining to recognize physician-assisted suicide as a fundamental right, reasoning "we are confronted with a consistent and almost universal tradition that has long rejected the asserted right, and continues explicitly to reject it today[.] **To hold for respondents, we would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State**").

Plaintiffs have made no attempt whatsoever to analogize the nebulous "right against wealth-based detention" to a right declared "fundamental" by the Supreme Court[1]—or any binding authority, for that matter. Quite tellingly, the "right against wealth-based detention" does not fit with any such fundamental right recognized by any court.

Plaintiffs gloss over all of this analysis, confidently but unconvincingly relying on language in the *Bearden* line of cases and point to a handful of district courts that have all considered entirely different situations. Indeed, one such district court case relied on by Plaintiffs was reversed by the Eleventh Circuit twice. See *Walker v. City of Calhoun*, 682 Fed. Appx. 721 (11th Cir. 2017) and *Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018). The Sixth Circuit has admonished against generalizations in the seeking of a fundamental right. *United States v. Lanier*, 73 F.3d 1380, 1388 (6th Cir. 1996) (vacated on other grounds, 520 U.S. 259 (1997); vacated for rehearing en banc, 114 F.3d 84 (6th Cir. 1997)).

The burden is on the Plaintiffs to demonstrate why an indigent person has a right to be released on recognizance after violating the terms of his or her probation that is commiserate

---

[1] Such as rights the Supreme Court has declared "fundamental" which include the right to oversee the upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390 (1923); the right to cohabitate with blood relatives, *Moore v. City of East Cleveland* 431 U.S. 494 (1977); the right to engage in consensual sexual activity in the home, *Lawrence v. Texas*, 539 U.S. 558 (2003); the right to marry, *Boddie v. Connecticut*; 401 U.S. 371 (1971); the right to procreate, *Skinner v. Oklahoma* 316 U.S. 535 (1942); the right to contraception, *Griswold v. Connecticut* 381 U.S. 479 (1965); the right to terminate a pregnancy, *Eisenstadt v. Baird*, 405 U.S. 438 (1972), *Roe v. Wade*, 410 U.S. 113 (1973); the right to refuse unwanted medical treatment, *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 (1990); the right to vote, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966); and the right to interstate travel.

with those already deemed "fundamental" by the Supreme Court. Plaintiffs cannot carry any such burden, because no fundamental right exists.

### b. Rational basis review applies because the indigent are not a suspect class.

It is well-settled law that the indigent are <u>not</u> a suspect class, and that rational basis review applies to their Equal Protection claims. For instance, in *Wilson v. Yaklich*, the Sixth Circuit summarized the relevant standard as follows:

> The plaintiff claims that he is now treated differently than non-indigent prisoners or indigent non-prisoners as a result of the application of [a statute]. Because **neither indigents nor prisoners are a suspect class,** however, *Harris v. McRae,* 448 U.S. 297, 323 (1980); *Hampton v. Hobbs,* 106 F.3d 1281, 1286 (6th Cir. 1997), such differentiation is permissible as long as even a rational basis for the differing treatment can be shown. *United States v. Kras,* 409 U.S. 434, 446 (1973).

148 F.3d 596, 604 (6th Cir. 1998); *see also Ortwein v. Schwab*, 410 U.S. 656, 660 (1973)

More recently, in *Johnson v. Bredesen*, the Sixth Circuit held:

> Plaintiffs argue that the district court erred by testing their equal protection challenge using the rational basis test, rather than strict scrutiny, because the re-enfranchisement statute: (1) burdens their fundamental right to vote; and (2) improperly discriminates against the indigent. Plaintiffs' arguments miss the mark. The state may, within the bounds of the Constitution, strip convicted felons of their voting rights. *Richardson v. Ramirez,* 418 U.S. 24 (1974). Having lost their voting rights, Plaintiffs lack any fundamental interest to assert. [Citation omitted]. **And contrary to Plaintiffs' other contention, wealth-based classifications do not discriminate against a suspect class.** *See Papasan v. Allain,* 478 U.S. 265, 283–84, 106 (1986); *Maher v. Roe,* 432 U.S. 464, 470–71 (1977). **Accordingly, because Tennessee's re-enfranchisement law neither implicates a fundamental right nor targets a suspect class, <u>the district court properly applied rational basis review, not strict scrutiny, to Plaintiffs' equal protection challenge.</u>** *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 29, 93 (1973).

624 F.3d 742, 746 (6th Cir. 2010).

This Court should apply rational basis review and uphold the practices of the courts.

### c. Plaintiffs' own authority is consistent with the application of rational basis review.

The applicable test is rationality, not strict scrutiny. The principal cases Plaintiffs rely on—*Williams v. Illinois*, 399 U.S. 235 (1970), *Tate v. Short*, 401 U.S. 395 (1971), and *Bearden v. Georgia*, 461 U.S. 600 (1983)—are all entirely consistent with this principle.

The Supreme Court's opinion in *Williams* stands only for the proposition that confinement for nonpayment of fines and court costs cannot exceed the statutory maximum prison sentence for the underlying offense. The Supreme Court specifically stated: **"The mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense does not, of course, give rise to a violation of the Equal Protection Clause."**

The *Williams* case demonstrates a straightforward application of rationality review—the State has no legitimate penal interest in keeping people in jail for longer than the maximum sentence their crimes would otherwise allow. Here, though, the state does have a clear legitimate interest in the posting of money bonds to ensure that a convict accused of violating his or her probation will actually attend a revocation hearing, where he or she could be promptly sent to jail. There is also a legitimate interest even in securing the payment of criminal fines, *Id*. at 244, n. 20, and imprisonment for failure to do so is rationally related to that interest, up to the maximum period of confinement that the governing statute allows for the crime.

There is nothing in *Williams* articulating a "fundamental" right to be free from wealth-based distinctions, and certainly no application of strict scrutiny. As the Court made clear:

> **The State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction.**

*Id*. at 244.

The Supreme Court's decision in *Tate v. Short*, 401 U.S. 395 (1971) is equally unavailing to Plaintiffs' purpose. *Tate* merely expounds upon the holding in *Williams* that there

is no rational basis or legitimate state interest in confining an indigent person *when the substantive offense would not allow it*, solely for failure to pay court costs and fines. *Id.* at 399. In other words, if you could not go to jail under the statutory scheme for a speeding ticket, you could not then be jailed simply failing to pay the fine either. Just as in *Williams*, the Court in *Tate* applied rational basis review to find that imprisoning an indigent person for failure to pay a speeding fine violated Equal Protection where speeding was not otherwise punishable by prison time under the authorizing statute. The Court did not purport to create a "fundamental right," and it certainly did not purport to apply strict scrutiny. The Court reasoned that:

> Imprisonment in such a case is not imposed to further any penal objective of the State. It is imposed to augment the State's revenues but obviously does not serve that purpose; the defendant cannot pay because he is indigent and his imprisonment, rather than aiding collection of the revenue, saddles the State with the cost of feeding and housing him for the period of his imprisonment.

*Id.*

Like *Williams*, this is merely a straightforward application of rational basis review. The *Tate* decision identifies a legitimate state purpose (the collection of revenue), and concludes that jailing people who cannot pay speeding fines bears no rational relationship to the State's legitimate interest in revenue collection, because it imposes a cost burden on the state. Therefore, it violated Equal Protection only because it was arbitrary and capricious, not because the state violated some "fundamental right" never to be imprisoned for failure to pay criminal fines, fees, and costs. Plaintiff's characterization as a fundamental right is not supported by *Tate*.

Next, *Bearden* says that automatically revoking probation **solely** for nonpayment of fines and costs, **if** a convict on probation has made **all** reasonable efforts to pay, is arbitrary **if** there are other adequate ways of serving the state's interest in punishment and deterrence.

What Plaintiffs mistake for strict scrutiny is really just a procedural due process analysis, setting the minimum procedural requirements necessary to assure the adequacy of the factual predicate for revocation. *See Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1265 (11th Cir.

15

August 22, 2018).  *Bearden* merely requires a hearing as to the reasons for nonpayment before a

sentence of probation can be summarily converted to incarceration for failure to pay fines.

Finally, Plaintiffs argue that *Pugh v. Rainwater*, a forty year old Fifth Circuit case,

recognizes their asserted right against wealth-based detention. 572 F.2d 1053 (5th Cir. 1978).

On the contrary, *Rainwater* explicitly states that "[r]ules under which personal liberty is to be

deprived are limited by the constitutional guarantees of all, be they moneyed or indigent,

befriended or friendless, employed or unemployed, resident or transient, of good reputation or

bad." *Id*., at 1057.  Nothing in *Rainwater* creates a special right for the indigent or anyone else to

be free from confinement because they might not be able to post bail.  Instead, *Rainwater*

reiterated the principle that the Fourteenth Amendment protects *all persons* from government

action that is fundamentally arbitrary and capricious.  That is the very concept of rationality.

Likewise, the Eleventh Circuit has recently held that these cases do not warrant

heightened scrutiny, rejecting a district court's application of heightened scrutiny in a similar

case because it "[ran] headlong into *Rainwater*." *Walker v.  City of Calhoun, Ga.*, 901 F.3d 1245,

1260 (11th Cir.  August 22, 2018).  Noting that the court in *Rainwater* "approved the utilization

of a master bond schedule," which "provided 'speedy' release to those who could meet its

requirements," and therefore "necessarily provided less speedy release to those who could not,"

the court found "*Rainwater*'s conclusion" to be "consistent with Supreme Court case law on how

differential treatment by wealth is analyzed under the Equal Protection Clause." *Id*., at 1260–61

(citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S.  1 (1973) as "[t]he definitive

explanation").  The *Walker* court explained:

> The ***sine qua non*** **of a *Bearden*- or *Rainwater*-style claim, then, is that the**
> **State is treating the indigent and the non-indigent categorically differently.**
> **Only someone who can show that the indigent are being treated**
> **systematically worse 'solely because of [their] lack of financial resources,'—**
> **and not for some legitimate State interest—will be able to make out such a**
> **claim.  <u>Those who simply find their own bail conditions too onerous must</u>**

**proceed under the Eight Amendment's Excessive Bail Clause unless they can point to a separate due process violation.**

*Id.*, at 1260 (quoting *Bearden*, 461 U.S., at 661) (internal cite omitted).

### d. Monetary Bond Set by the State Court Judges Upon Issuance of the Warrant is Rationally Related to a Legitimate State Interest.

Here Plaintiffs want to challenge the state judges' policy and practice of setting bond amounts contemporaneous with the issuance of violation warrants (without actually challenging the state judges, the state, the statute, or anything else about the process). Plaintiffs claim this practice (of these non-parties) amounts to invidious discrimination because it operates to confine them solely on the basis of wealth. As discussed above, there is no fundamental right to release on recognizance pending an initial revocation hearing, nor are the indigent a suspect class. Therefore, to succeed on the merits, Plaintiffs must prove that this practice bears <u>no</u> rational relationship to any legitimate State interest. *McGinnis v. Royster*, 410 U.S. 263, 270 (1973). Plaintiffs' Equal Protection challenge must fail unless "there is [no] reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Plaintiffs cannot meet this burden.

To the contrary, the State has a legitimate interest in securing the convict's appearance at a violation hearing, and requiring security is rationally related to that end. When the State judge sets a convict's bond on a violation warrant, the judge is making a reasoned determination based on the circumstances and the statutorily required factors. Tenn. Code Ann. § 40-11-115.

Probationers, by definition, are convicted criminals serving out their sentences on conditional release. The severity of the underlying crime, the nature and frequency of the violation, the severity of the violation, and the convict's prior criminal history are all relevant <u>and required</u> considerations—entirely independent of wealth—that are rationally related to setting money bond in an amount that will secure the individual's presence at a violation hearing. Those who are able to post bond are able to secure their release while having provided adequate

17

assurance that they will attend their hearing. Equally importantly, those who are not able to pay the bond, *irrespective of wealth*, may nevertheless be released if upon the signature of two sureties <u>without ever paying a dime</u>. Tenn. Code Ann. § 40-11-122(2).

Even then, those with no resources and no one to sign as surety may nevertheless be released by simply requesting a hearing. Judge Richardson testified that he immediately appoints an attorney to those who cannot make bond, and those attorneys may file a motion (based on indigency or any other factor) which the Judge testified will be promptly heard.

If the convict is unable to post the properly determined bond considering the factors such as ties to the community in Tenn. Code Ann. § 40-11-115, and is unable even to have the sureties sign at no cost under Tenn. Code Ann. § 40-11-122(2), then they may still be released upon demonstrating to the state court judge that a lesser bond or no bond will be sufficient, a process the state court judges testify is prompt. Until one of these things happens, detention to assure attendance of the convict at his or her revocation hearing is rationally related to the State's legitimate interest. *See McGinnis v. Royster*, 410 U.S., at 273 (rejecting an Equal Protection challenge based on inability afford bond, because the state's legitimate interest in rehabilitation provided "a rational justification"—independent of wealth—for the distinction).

Because money bail may be imposed upon considerations independent of wealth that are rationally related to the State's articulated interest, it cannot be shown that the policy and practice here categorically discriminates against the indigent in way that is arbitrary and capricious. *Walker*, 901 F.3d, at 1260. Convicts who violate the terms of their conditional release have demonstrated that they are unwilling or incapable of abiding by the rules, and the State has a legitimate interest in adjudicating the alleged violation.

Indeed the sole movant Plaintiff here, Indya Hilfort, was issued a violation warrant <u>because she took her small children with her to sell drugs at a drug deal</u>. Undoubtedly, Ms. Hilfort did not report this income from her drug sales on her indigency application.

18

The Seventh Circuit in *Doyle v. Elsea* rejected the Equal Protection claim of a parole violator who allegedly received a greater sentence because he was financially unable to make bail and thereby obtain an immediate revocation hearing. 658 F.2d 512, 518 (7th Cir. 1981). The court construed *Williams* and *Tate* narrowly, reasoning that **those cases "do not stand for the . . . sweeping proposition. . . that, whenever a person spends more time incarcerated than a wealthier person would have spent, the equal protection clause is violated."** *Id.* The court went on to apply rational basis review, reasoning that incarceration upon execution of a violation warrant, notwithstanding one's ability to pay, was "a rational means of attaining the . . . dual objective, on the one hand to encourage rehabilitation by permitting parolees who can live peaceably in society to continue to do so, and, on the other hand, to protect society from those parolees who demonstrate that they cannot or will not abide by the rules." *Id.* at 518–19.

Likewise Tennessee's probation system serves the dual purpose of empowering the convicted by allowing them to serve their time outside of jail, as well as protecting the public from the chronic deviance of those unwilling to rehabilitate outside of prison. Commensurate with this dual purpose, the State of Tennessee has an interest in adjudicating the alleged violation so that those capable of rehabilitation can continue to repay their debts to society on conditional release, and those who are not can be locked away in the interest of public safety and welfare. *See Gagnon v. Scarpelli*, 411 U.S. 778, 785 (1973); *Bearden*, 461 U.S., at 670. Monetary bond is a rational and non-invidious means of securing a convict's presence at a violation hearing, which is necessary for the speedy and efficient adjudication of the alleged violation. The practice is rationally related to the State's interest in efficient administration of the probation system and meeting the twin goals of rehabilitation and public safety. *Doyle*, 658 F.2d, at 518–19.

Central to the State's criminal justice system is the policy of punishment and deterrence. The State has a legitimate penal interest in assuring that actual consequences are brought to bear when one is convicted of a crime, and that those consequences are serious enough to deter the

19

convicted person, and others, from similar conduct.  *Bearden*, 461 U.S., at 669 (**"The State, of course, has a fundamental interest in appropriately punishing persons–rich and poor–who violate its criminal laws.  A defendant's poverty in no way immunizes him from punishment."**).  When a sentence of probation is imposed, the terms of conditional release serve both as a punishment for the underlying crime by restricting the convict's freedom, and as a deterrent from future criminal activity by imposing the possibility of detention and revocation.  "The decision to place the defendant on probation, however, reflects a determination by the sentencing court that the State's penal interests do not require imprisonment." *Id.*, at 670.  But the convict knows that if she violates the terms of her conditional release, a violation warrant will issue and she may be detained, because "[a] probationer's failure to make reasonable efforts to pay [her] debt to society may indicate that this original determination needs reevaluation, and imprisonment may now be required to satisfy the State's interests." *Id.*  Detention comes with the natural consequence of paying a bond or being confined in the intervening time between arrest and preliminary revocation hearing.  The possibility of revocation and the attendant procedures––including arrest, detention, and bond—is part of the State's punishment scheme that serves a deterrent purpose.  Convicts are more likely to conform their conduct to social norms if they know they will be arrested and have to pay a bond or suffer confinement until a preliminary revocation hearing.  Monetary bond allows speedy release for those who can afford it; those who cannot may obtain release by the signatures of two sureties under Tenn. Code Ann. § 40-11-122(2), or they may continue to suffer confinement until they ask for an adjustment, or they may utilize the constitutionally permissible secondary option of requesting an immediate bail hearing.  In either case, convicts suffer some inconvenience and temporary confinement.  This inconvenience and confinement is incidental to the punishment scheme of placing liberty restrictions on probationers as conditions of release, and serves a rational deterrent purpose.  Money bond is rationally related to the State's penal interest in punishment and deterrence.

20

The mere fact that one of the Plaintiffs may spend more time in confinement than someone who is able to secure speedy release by posting a bond or someone who has two persons sign for him or her without ever paying a dime does not violate the Equal Protection Clause. *See ODonnell v. Goodhart*, 900 F.3d 220, 225, 228 (5th Cir. Aug. 14, 2018) (*ODonnell II*); *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978); *Walker v. City of Calhoun,* 901 F.3d 1245, 1260 (11th Cir. August 22, 2018); *Williams*, 399 U.S., at 243 ("The mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense does not, of course, give rise to a violation of the Equal Protection Clause"); *Doyle v. Elsea*, 658 F.2d 512, 518 (7th Cir. 1981); *McGinnis v. Royster*, 410 U.S. 263 (1973).

### 2. Money Bond Set by the State Court Judges Upon Issuance of the Violation Warrant Comports with the Requirements of Due Process.

Plaintiffs claim that the practice of setting bond (by the non-party judges) upon issuance of violation warrants constitutes a due process violation by these judges and deprivation because they will not be able to afford to secure their release when they are arrested.

### a. Plaintiffs have not been deprived of a liberty or property right protected by the Fourteenth Amendment.

As an initial matter, the concept of a "substantive right against wealth-based detention" is entirely made up. *ODonnell II*, 900 F.3d 220, 228 (5th Cir. Aug. 14, 2018) (chastising the district court—"**In sum, the expansive injunction entered on remand repeats the mistake of the original injunction: It 'amounts to the outright elimination of secured bail for indigent misdemeanor arrestees.' But there is 'no such . . . fundamental substantive due process right to be free from any form of wealth-based detention. The sweeping injunction is overbroad**.'") (quoting *ODonnell I*, 892 F.3d 147, 163 (5th Cir. Jun. 1, 2018)). Plaintiffs have cited no authority creating any such substantive right or recognizing it as a protected liberty interest for the purposes of procedural due process. This does not state a claim.

21

In Tennessee and under the constitution, release on bond prior to revocation hearing is not a matter of right for anyone, even in a misdemeanor case, and the decision whether to grant bond at all is a matter for the trial judge's discretion.  *See* Tenn. R. Crim. P. 32(g); Tenn. Op. Atty. Gen. No. 99-199.  Importantly, "Absent state interference with a protected [liberty or property] interest, [Plaintiff] is entitled to no pre-deprivation process whatsoever." *Cutshall*, 193 F.3d, at 478; *see also Bd. of Regents of State Colleges v.  Roth*, 408 U.S.  564 (1972).

  **b.  Probationers receive all the process that is due.**

  Even if inability to afford a bond determined by the state court judge at the time of the issuance of the warrant deprives Plaintiffs of a protected liberty or property interest, the current bail procedure satisfies the requirements of due process. The constitutional adequacy of the preset bond procedure warrants balancing.  That three-part test considers: (1) the nature of the private interest; (2) the risk of erroneous deprivation, and the probable value, if any, of additional procedural safeguards; and (3) the government interest, including the fiscal and administrative burdens of adopting new or alternative procedures.  *Mathews*, 424 U.S., at 335 (1976).

  As a preliminary matter, it bears mentioning that, "where the State has preserved what has always been the law of the land, the case for administrative safeguards is significantly less compelling." *Ingraham*, 430 U.S., at 679 (internal quote and citation omitted).  "At common law it was customary. . . for an arrested person to be brought before a justice of the peace shortly *after* arrest," who would "determine whether there was reason to believe the prisoner committed a crime.  If there was, the detainee would be committed to jail or bailed pending trial. . . . The practice furnished the model for criminal procedure in America immediately following the adoption of the Fourth Amendment, and there are indications that the Framers of the Bill of Rights regarded it as a model for a 'reasonable' seizure.'" *Gerstein*, 420 U.S., 114–16.

  Due process requires only that "some minimal inquiry" be conducted "as promptly as convenient after arrest." *Morrissey*, 408 U.S., at 485.

This is exactly what the state court judges testified was the process in the 22nd Judicial District, which includes Giles County. Those judges testified that they promptly see those incarcerated, and Judge Richardson immediately appoints them an attorney. Both judges promptly conduct hearings, including the requests for reduction or modification of the bond amount, and including such requests as based on indigency. And the violation warrants in this case have all been issued upon the determination that probable cause exists. The Supreme Court has long recognized that states' compelling interest in protecting public safety permits even *warrantless* arrest and detention. *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

Further, holding a suspect for even 48 hours without a warrant or even probable cause hearing is presumptively constitutional, irrespective of the nature of the offense. *Id*; *see also Atwater v. City of Lago Vista*, 532 U.S. 318 (2001). And the 48-hour presumption—even without probable cause—is not a ceiling in this case because "we deal here, not with the right of an accused. . . in a criminal prosecution, but with the more limited due process right of one who is a probationer or parolee only because he has been convicted of a crime." *Gagnon*, 411 U.S., at 789; *see also ODonnell I*, 892 F.3d, at 160–61, and *Walker*, 901 F.3d, at 1266–67 (setting the same presumptive limits to pretrial detention without a bail hearing). And because a probable cause determination has been made, there is less risk of erroneous incarceration.

This is a "practical compromise" that "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975). This compromise is necessary because "requiring a magistrate's review of the factual justification prior to any arrest. . . would constitute an intolerable handicap for legitimate law enforcement." *Gerstein*, 420 U.S., at 113. Thus, it is clear that the individual here may be temporarily seized like any other free person, and while his everyday freedom is limited by the conditions of probation, "[t]he natural desire of an individual to be released is indistinguishable from the initial resistance to being confined." *Meachum*, 427 U.S., at 224.

In Giles County, convicts detained on a violation warrant have numerous mechanisms for a hearing on release pending their revocation hearing, and the judges testified that they conduct extremely prompt hearings for such detainees, such that every detainee who wants one will have a hearing in just a few days, if not the very next day. Further, there are numerous alternatives for an indigent probationer to secure release even sooner. For instance, the judges testified that they may write a letter requesting a bail hearing, and the courts generally accommodate these requests as quickly as the next day; judges routinely hold open-docket hearings early in the week, typically on Mondays; sometimes judges hold hearings at the jail to accommodate detainees.

Importantly, there are less-burdensome alternatives for those who find their bond amount too onerous, including simply having two sureties sign under Tenn. Code Ann. § 40-11-122(2), without anyone ever tendering a dime. Plaintiff Hilfort herself has secured release using a bondsman in the past. Although she claims she had to borrow money from family and friends to make bail, that is not beyond the scope of those sufficient bona fide efforts contemplated by *Bearden*. *See e.g.*, 461 U.S., at 660 ("If the probationer. . . has failed to make sufficient bona fide efforts to seek employment or borrow money to pay, the State is justified in using imprisonment as a sanction to enforce collection.

Furthermore, "[I]n situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake. . . postdeprivation remedies might satisfy due process." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). When there is a need for speed **or providing meaningful predeprivation process is impracticable, a postdeprivation remedy is constitutionally adequate**. *Ingraham v. Wright*, 430 U.S. 651 (1977). Likewise, where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures. . . are sufficiently reliable to minimize the risk of erroneous determination, a prior hearing may not be required. Accordingly, we look to the public interest. "This includes

the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right," a pre-arrest hearing in all cases. *Mathews*, 424 U.S., at 347.

This alternative procedure also presents enforcement problems. How would the court compel attendance at a bond hearing prior to the execution of a violation warrant? The obvious incentive would be to dodge one's bail hearing if the constitution says the government cannot arrest one before a full trial-type hearing on what bond one can afford to pay. That would be clearly unworkable from every perspective but the scofflaw's.

Another alternative would be to arrest violators and issue a uniform hold without bond order until the court can conduct individualized bail hearings. That would drastically increase the cost of housing detainees, many of whom would have been able to secure their immediate release by posting the bond or obtaining a release by signatures of sureties. Further the court would be required to have additional needless hearings, which absorb administrative expense.

And because "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decisionmaking process," *Mathews*, 424 U.S., at 343–44, either people would be held for a lot longer, or the court would have to expedite the hearings, which would increase the likelihood of error. Cases have cautioned against implementing this type of sea change through the courts, rather than the legislative changes such as those in New Jersey and California that Plaintiffs seek to implement judicially in Tennessee:

> Elimination or curtailment of corporal punishment would be welcomed by many as a societal advance. But when such a policy choice may result from this Court's determination of an asserted right to due process, rather than from the normal process of community debate and legislative action, the societal costs cannot be dismissed as insubstantial.

*Ingraham*, 430 U.S., at 681 (Harlan, J. concurring).

This Court should reject Plaintiff's attempt to effect social change by asking this Court to judicially impose social change without the benefit of legislative consideration. This is doubly true when Plaintiffs seek to impose their social change via an end-around, challenging the

practices of state court judges without bringing the State, the Tennessee Attorney General, or anyone else associated with the policies they challenge into court.

The practices of the courts of the 22nd Judicial District are Constitutional and proper in all respects, and the Court should reject Plaintiff's request for a preliminary injunction.

## II. This Court is without jurisdiction to enjoin nonparties, and any order enjoining the execution of a warrant unless stated procedures are followed prior to issuance would constitute abuse of discretion and violate the specificity requirements of Fed. R. Civ. P. 65.

Plaintiffs challenge the policy and practice of setting bond amounts on violation of probation warrants, but have not joined the state court judges or the State of Tennessee who set those bond amounts and who engage in the challenged practice. Instead, Plaintiffs ask this Court to enjoin Giles County and the County Sheriff from complying with the state court orders, if these non-lawyer officials determine that the state court judges "determined [the bond amount] without an inquiry or findings concerning ability to pay, consideration of alternatives, or a finding that pre-revocation detention [meets strict scrutiny]."

Assuming, *arguendo*, that these procedures and findings are required by the Constitution, this is not a policy of the County or its Sheriff. The procedure for setting bail is a policy of the State, pursuant to a complete statutory scheme. That policy is applied and carried out by State court judges in their discretionary capacity as judicial officers of the State of Tennessee.

Moreover, how is the county sheriff supposed to determine what factors the judges considered when they issued the warrants? If the State courts were parties, perhaps this Court could order specific findings of fact and conclusions of law to make such things clear. But they are not parties, and no injunction issued in this case can require any such action. Instead, Plaintiffs ask this Court to enjoin Giles County and its Sherriff—neither of whom have any control over the policy and practice of the State and its judicial officers, to try and "figure out" what the state court judges did or didn't do, and then second guess those judges' decisions.

This Court is without jurisdiction to enjoin nonparties, and any order purporting to enjoin enforcement of a nonparty judge's lawfully issued warrant would constitute an abuse of this Court's discretion. *See Tesmer v. Granholm*, 333 F.3d 683, 702–04 (6th Cir. 2003) ("**Our deepest concern with the equitable relief fashioned by the district court is that it enjoins non-party judicial officers** . . . The court must still follow the statutes, rules, and case law governing the issuance of injunctions. We hold that with respect to Judge Kolenda, a non-party to the original suit, and to the unnamed and uncertified putative class of Michigan judges, the injunction cannot issue.") (rev'd and remanded on other grounds sub nom, *Kowalski v. Tesmer*, 543 U.S. 125 (2004)).

Furthermore, any injunction requiring the County Sheriff to make a standardless determination of which state court orders to follow and which to ignore would be facially indefinite in violation of Rule 65. *See* Fed. R. Civ. P. 65(d)(1); *Walker v. City of Calhoun, Ga.*, 682 F. App'x 721 (11th Cir. 2017) (per curiam) (vacating district court's preliminary injunction on similar facts). This Court should not acquiesce to Plaintiffs' attempt to reverse-engineer the result they want without first requiring them to litigate with those responsible for setting and applying the policy and practice they challenge. Because this Court cannot, within the bounds of its discretion and consistent with the Rules governing preliminary injunctions, grant the relief sought, Plaintiff's motion should separately be denied.

### III. This Court should abstain from exercising jurisdiction under both *Younger* and *Rooker-Feldman*, and because the Plaintiffs are collaterally estopped from raising these issues in a separate federal suit.

Plaintiff Hilfort's Motion for Preliminary Injunction is a challenge to the state court's administration of its judicial system. Her Motion asks the Court to enjoin county officials from following the orders of the state courts in circumstances entirely beyond the county actors' control. Such an injunction is impossible for a non-lawyer county official to comply with, because these county officials cannot identify the factors that the state courts used to make the

27

determinations. For example, Plaintiff seeks to enjoin enforcement of any order from the state court where the state court judge did not consider alternative factors to monetary bond. The factors considered by the state court judges are not known to the county officials, and these county officials have no way to know which orders to follow and which they should not.

The *Rooker-Feldman* doctrine exists for this very reason. Plaintiff asserts that the state court's action is unconstitutional. This is the specific situation contemplated by the Supreme Court in *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 476 (1983). The District Courts are not permitted to challenge the decisions of state courts in judicial proceedings. The Supreme Court explained: "[District Courts] do not have jurisdiction, however, over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional." *Id*. at 486.

Instead, the Plaintiff's remedy is to challenge the alleged unconstitutional practice within the state court system, following the process available to them. Indeed, in this case, Judge Richardson testified that every person who does not make bail is immediately appointed an attorney by the Court. That attorney can and perhaps should file a motion for release, based on indigency or any other factor that may be applicable to that detainee. No plaintiff should wait, refuse to file something in their pending state court criminal action, then turn to this Court for relief. Yet that is exactly what the Plaintiffs are seeking in this suit.

The Sixth Circuit has followed the *Rooker-Feldman* doctrine, emphasizing that if the state court action is the "source of the injury" suffered by the plaintiff, then the *Rooker-Feldman* bar is raised. *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006), cert. denied, 552 U.S. 828 (2007).

The Sixth Circuit stated in *McCormick* that if the challenge is that the state court action is itself unconstitutional, or the suit seeks rejection of a state court judicial decision then *Rooker-*

*Feldman* bars the claim, reasoning that the proper mechanism to appeal through the state court system, and if necessary, appeal to the Supreme Court under 28 U.S.C. § 1257.

The Court began its analysis with these words:

> *Rooker* and *Feldman* exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments ... precludes a United States district court from exercising subject-matter jurisdiction .... In both cases, the losing party in state court filed suit in federal court after the state proceedings ended, **complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment**. Plaintiffs in both cases, alleging federal-question jurisdiction, **called upon the District Court to overturn an injurious state-court judgment.**
>
>     \*          \*          \*
>
> **The inquiry then is the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker–Feldman* doctrine would prevent the district court from asserting jurisdiction.**
>
>     \*          \*          \*
>
> The *Rooker–Feldman* doctrine prevents a party who loses in state court from appealing that decision to the lower federal courts, as only the Supreme Court has appellate jurisdiction over state court decisions.

*McCormick v. Braverman*, 451 F.3d 382, 391–92 (6th Cir. 2006). Likewise, the Plaintiffs here call upon the District Court to overturn an injurious state court judgment, namely, the decision to issue a violation warrant and make an individualized judgment about the bond required to secure their presence at a revocation hearing. If Plaintiffs wish to challenge the judgment of the state court action as unconstitutional, the proper mechanism is to appeal through the state court system or further to the Supreme Court, pursuant to 28 U.S.C. § 1257. Instead, Plaintiffs call on the District Court to step in and substitute its discretion for that of the judicial officers of the State of Tennessee. This is exactly what *McCormick* says they may not do.

Likewise, the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), reinforces this principle. "[F]ederal and state courts are complementary systems for administering justice in our Nation. Cooperation and comity, not competition and conflict, are essential to the federal design." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586 (1999). The *Younger* doctrine prevents a

state criminal defendant from asserting ancillary challenges to ongoing state criminal procedures in federal court. As previously discussed, Plaintiffs have ongoing criminal proceedings and ample avenues to raise their constitutional challenges in those proceedings. Moreover, there are no "extraordinary circumstances" requiring federal intervention. The Supreme Court recognized in *Kowalski*, 543 U.S. 125, 133, that the Sixth Circuit correctly—and unanimously—applied *Younger* to bar the indigent plaintiffs' § 1983 action in *Tesmer v. Granholm*, 295 F.3d 536 (6th Cir. 2002), and again on rehearing en banc in *Tesmer v. Granholm*, 333 F.3d 683 (6th Cir. 2003). The Court summarized the procedural posture of the case as follows:

> A challenge to the Michigan practice was filed in the United States District Court for the Eastern District of Michigan. The named plaintiffs included the two attorney respondents and three indigents who were denied appellate counsel after pleading guilty. Pursuant to Rev. Stat. § 1979, 42 U.S.C. § 1983, they alleged that the Michigan practice and statute denied indigents their federal constitutional rights to due process and equal protection. They sought declaratory and injunctive relief against the practice and the statute.

> A day before the statute was to take effect, the District Court issued an order holding the practice and statute unconstitutional. *Tesmer v. Granholm*, 114 F.Supp.2d 603 (2000). **It ultimately issued an injunction that bound all Michigan state judges, requiring them not to deny appellate counsel to any indigent who pleaded guilty.** 114 F.Supp.2d 622 (2000). <u>**A panel of the Court of Appeals for the Sixth Circuit reversed.**</u> *Tesmer v. Granholm*, 295 F.3d 536 (2002). The panel held that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), abstention barred the suit by the indigents but that the attorneys had third-party standing to assert the rights of indigents. It then held that the statute was constitutional. The Court of Appeals granted rehearing en banc and reversed. *Tesmer v. Granholm*, 333 F.3d 683 (2003). The en banc majority agreed with the panel on standing but found that the statute was unconstitutional. Separate dissents were filed, challenging the application of third-party standing and the holding that the statute was unconstitutional. We granted certiorari. 540 U.S. 1148, 124 S.Ct. 1144, 157 L.Ed.2d 1041 (2004).

> *                    *                    *

> We also are unpersuaded by the attorneys' "hindrance" argument on a more fundamental level. If an attorney is all that the indigents need to perfect their challenge in state court and beyond, one wonders why the attorneys asserting this § 1983 action did not attend state court and assist them. We inquired into this question at oral argument but did not receive a satisfactory answer. See Tr. of Oral Arg. 28–29, 35–40. <u>**It is a fair inference that the attorneys and the three indigent plaintiffs that filed this § 1983 action did not want to allow the state process to take its course. Rather, they wanted**</u>

**a federal court to short circuit the State's adjudication of this constitutional question. That is precisely what they got.**

    *                    *                    *

**In this case, the three indigent criminal defendants who were originally plaintiffs in this § 1983 action were appropriately dismissed under *Younger*. As the Court of Appeals unanimously recognized, they had ongoing state criminal proceedings and ample avenues to raise their constitutional challenge in those proceedings**. 333 F.3d, at 690–691. There also was no extraordinary circumstance requiring federal intervention. Ibid. An unwillingness to allow the *Younger* principle to be thus circumvented is an additional reason to deny the attorneys third-party standing.4

*Id*., at 132–33. The Court further noted how the lower courts, in allowing the plaintiffs' attorneys to circumvent *Younger* by granting them third-party standing, offended the very notion of comity:

**The mischief that resulted from allowing the attorneys to circumvent *Younger* is telling. By the time the Michigan Supreme Court had a chance to rule on even the prestatutory practice, (holding the practice constitutional), the Federal District Court had ruled the prestatutory practice and the impending statute itself unconstitutional. It also had issued an injunction against all Michigan judges, instructing them to appoint counsel (regardless of what their own Supreme Court said). Thus, the Federal District Court effectively trumped the Michigan Supreme Court's ruling; caused unnecessary conflict between the federal and state courts; and caused confusion among Michigan judges attempting to implement these conflicting commands.**

*Id*., at 133, n. 4. (citations omitted). Plaintiffs—and their attorneys—want to create similar mischief here by creating conflict: which state or federal court orders is the Sheriff supposed to follow? The Plaintiff's effort to indirectly outlaw the practice is barred by *Younger*.

Moreover, Justice Ginsburg also made clear that the majority and the unanimous Sixth Circuit were correct in applying *Younger* to bar the claim, noting:

I agree with the Court that *Younger* would force the indigent defendants to pursue their claims in state court, as *Younger* has a stricter impediment requirement than the third-party standing doctrine. *Younger v. Harris*, 401 U.S. 37, 53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (requiring "extraordinary circumstances" before allowing federal intervention).

*Id*., at 144, n. 6. (Ginsburg, J., dissenting).

31

The Court should abstain from creating the conflict between the state and federal courts in this context, and require the Plaintiffs and their purported class to utilize the court system available to them to challenge an unlawful practice.

**IV.     Class-wide relief is improper before class certification.**

Plaintiffs attempt to circumvent class certification by asking this Court to grant injunctive relief on behalf of an uncertain number of unnamed and unverified putative class members. This Court has not yet addressed the complicated preliminary questions of numerosity, typicality, and whether Ms. Hilfort will adequately represent the interests of the putative class of "indigent" probationers in Giles County; yet Plaintiffs ask for a sweeping injunction ordering the County Sheriff and judicial officers of the State of Tennessee not to perform their lawful duties. This is entirely improper.

Absent class certification, a preliminary injunction may properly cover only the named plaintiffs. *National Center for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1371 (9th Cir. 1984); *see also Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003); *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974); *Tape Head Co. v. RCA Corp.*, 452 F.2d 816, 819 (10th Cir. 1971); *Suster v. Marshall*, 951 F. Supp. 693, 701 n. 12 (N.D. Ohio 1996), aff'd and remanded, 149 F.3d 523 (6th Cir. 1998).

The Court must conduct a "rigorous analysis" of the prerequisites for class certification in order to protect the rights of class members whose rights may be affected by the class certification. *Gen. Tele. Co. of the S.W. v. Falcon*, 457 U.S. 147, 160–61 (1982). Without a "rigorous analysis" to assure the necessary requirements of class certification is met, granting a sweeping class-wide injunction would be improper.

In order to certify a class of indigent probationers in Giles county who have standing to sue, the burden is on Plaintiffs to establish to the Court's satisfaction that (1) those with standing to sue are so numerous that joinder is impractical, (2) there are common questions of law and

fact with respect to the entire class, (3) the claims and defenses of the class representatives are typical of those of the class, and (4) the class representative will fairly and adequately represent the interests of the class. Plaintiffs have not even attempted to establish a factual basis for class certification, nor can they.

Indya Hilfort claims to represent a class of indigent probationers in Giles County who were held on a bond they could not pay, and solely on that basis. But that has never been the case for Ms. Hilfort. On the contrary, Ms. Hilfort was arrested in Giles County on February 6, 2018 and secured her release that same day by using a bail bondsman. On July 9, 2018, Ms. Hilfort was arrested in Lawrence County on felony charges after she allegedly took her children with her to sell drugs. She secured her release that same day by paying a bondsman. Monetary bond allows speedy release for those, like Ms. Hilfort, who can afford it. Those who cannot may obtain release by the signatures of two sureties under Tenn. Code Ann. § 40-11-122(2), or they may continue to suffer confinement until they ask for an adjustment, or they may utilize the constitutionally permissible secondary option of requesting an immediate bail hearing. In any event, it seems unlikely, given these various options, that the class of persons Ms. Hilfort seeks to represent is too numerous to make joinder practical.

Moreover, contrary to the very foundation of this entire lawsuit, Ms. Hilfort has never been confined solely because of her wealth. Nor has her probation been extended solely for failure to pay fines, fees, or costs. Ms. Hilfort's probation was revoked because she committed crimes and failed a drug screen while on probation, not because of her "indigency." Ms. Hilfort is not even indigent. Most recently, she was apparently declared only partially indigent in Lawrence County and ordered to pay at least a portion of her appointed attorneys' fees. How can Ms. Hilfort adequately represent the interests of the putative class of indigent probationers who have been confined solely for their failure to pay fines, fees, and costs, when she herself does not meet that criteria?

Indigency is a moving point on a spectrum. That is why individualized determinations are so important, and why the state courts are best suited to remediate these grievances on a case-by-case basis. The Court cannot possibly certify a class of "indigent" probationers without taking a hard look at the factual basis underlying Plaintiffs' claims. The Rule 23 criteria requires a "rigorous analysis" for this very reason.

Ms. Hilfort's underlying theory on this motion is that an inquiry into one's ability to pay is so important that a significant, individual hearing on the question must be required by the Constitution before she can be arrested. And yet, Plaintiffs are asking this Court to use its discretion to fashion an equitable remedy that would broadly hobble the enforcement power of the state courts without any meaningful inquiry, narrow or broad, into the pervasiveness of the alleged defect, with no individual hearings at all.

All of these factors—notwithstanding that Plaintiffs' claims utterly and completely fail on the merits—require that the Court should deny this motion, or otherwise withhold judgment until a class of plaintiff is properly certified. Strictly in the alternative, however, should an injunction issue, the Court should draw it narrowly, only as to cover the named Plaintiff, Ms. Hilfort—the only person known to have an interest in this motion, however spurious.

**V.    Plaintiff's reliance on *Rodriguez v. Rutherford County* is misplaced, as Judge Sharp faced completely different facts and legal issues than those presented by the Plaintiff's motion for preliminary injunction here.**

Plaintiffs have relied heavily, if not almost exclusively, on an interlocutory opinion rendered by Judge Sharp in *Rodriguez v. Rutherford County*, 3:15-cv-01048 (M.D.Tenn. 2015). But in *Rodriguez*, the state court judge had apparently been allowing the probation company in that case to set the amount of the money bond (Id.at *3), a practice which has never been present in Giles County.  Instead, the judges who testified in this case at bar indicated that they would <u>never</u> let that happen, and would not even allow a probation officer to even suggest an amount. In addition, the principal challenge in *Rodriguez* related to Plaintiff's claim in that case that the

probationers were routinely being violated *solely* for non-payment of fines and costs, and Judge Sharp made a factual finding that probationers were often required to pay money bonds (Id. at *4). In the case at bar, though, the judges testified that they did not require a money bond when the only violation is non-payment, instead routinely setting "ROR" (release on own recognizance), and the only two instances that the Plaintiffs have submitted with their motion were from 2016 (and outside the statute of limitations), despite the Plaintiffs' attorneys apparently having been monitoring the Giles County courts for months; thus it is clearly not frequent if it ever occurs at all, in the case at bar.

Moreover, the sole movant in the case at bar, Indya Hilfort, did not receive a violation warrant for non-payment; she received a violation warrant because she was charged with felonies in neighboring Lawrence County, where she allegedly took her children with her to deal drugs. These issues of violation for non-payment in *Rodriguez* have no bearing whatsoever to the issues in this case.

Further, Judge Sharp made a specific factual finding in *Rodriguez*, that clearly aggravated him, about fees being charged of probationers for such activity as litter removal, which fee Judge Sharp found to be $132, where he stated "those who wish to satisfy this condition but cannot afford to pick up trash are in violation of the conditions of their probation" (Id. at *3). This practice does not exist in Giles County. Moreover, in the case at bar, prior to even accepting a plea that includes probation, Judge Parkes testified that he affirmatively requires the convict probationer to confirm their ability to pay the probation fees, to preclude a probationer from getting into a situation he or she cannot afford.

Additionally, Judge Sharp found in Rutherford County that those who could not afford the bond were simply kept in jail until the eventual revocation hearings (Id. at *4), which may be 30-60 days after the arrest (Id. at *5). That practice also does not exist in Giles County. On the contrary, the judges in this case testified that they immediately get those arrestees in for a

35

hearing, and Judge Richardson automatically appoints an attorney for anyone who cannot make their bond, without waiting for them to even ask.

Finally, Judge Sharp found most "troubling" the prospect of "jailhouse guilty pleas" in *Rodriguez* where the arrestees are immediately permitted to plead to the revocation in order to avoid the 30-60 day delay waiting for a hearing (Id. at *5).  But in the case at bar, Judge Richardson testified that he never allows any such sort of jailhouse plea.  Instead, as stated, he automatically appoints an attorney for everyone who cannot make their bond, and then allows the attorneys to file motions to reduce or waive the bond, or negotiate with the district attorney in prompt but due course.

These facts distinguish *Rodriguez* completely from the issues presented by this lawsuit. The practices of the private probation companies bear no resemblance to the practices of the private probation company in *Rodriguez*.  The Plaintiffs' attorneys are aware of these distinctions, but continue to beat the drum of the *Rodriguez* case hoping to induce the Court to simply follow Judge Sharp, rather than independently analyzing the issues.  The Plaintiff's want social change, and Judge Sharp was troubled by what he heard.  But what Judge Sharp heard is not the same as the practice in Giles County, or the practice of these probation company defendants.  This Court should independently analyze this case from the factual, constitutional, and procedural factors uniquely at issue in this case, and reject the Plaintiff's demand for relief in this entirely distinguishable case.

Respectfully submitted,

MOORE, RADER,
FITZPATRICK AND YORK, P. C.


By /s/ Daniel H. Rader IV, BPR 025998
By /s/ Randall A. York, BPR 010166
      DANIEL H. RADER IV
      RANDALL A. YORK
      Attorneys for Defendants,
      Community Probation Services,
      LLC; Community Probation
      Services, L.L.C.; Community
      Probation Services; and
      Patricia McNair, by special
      and limited appearance only,
      P. O. Box 3347
      Cookeville, TN  38502
      (931-526-3311)
      B.P.R.No. 025998


## CERTIFICATE OF SERVICE

     The undersigned attorney herby certifies that on October 15, 2018, a true and exact copy of the foregoing pleading was filed electronically.  Notice of this filing was sent by operation of the Courts electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties my access the filing through the Court's electronic filing system.

Mr. Chirag Badlani
Ms. Kate E. Schwartz
Mr. Matthew J. Piers
Hughes, Socol, Piers, Resnick & Dym Ltd.
70 W Madison Street
Suite 4000
Chicago, IL 60602

David W. Garrison
Scott P. Tift
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900 Nashville, TN
37219

Ms. Elizabeth Anne Rossi
Mr. Eric Halperin
Mr. Jonas Wang
Civil Rights Corps
910 17th Street NW
Suite 500
Washington, DC 20006

Mr. Kyle F. Mothershead
The Law office of Kyle Mothershead
414  Union Street
Suite 900
Nashville, TN 37219

Mr. Brandt M. McMillan
Tune, Entrekin & White, P.C.
315 Deadrick Street
Suite 1700
Nashville, TN 37238


Ms. Cassandra M. Crane
Ms. Robyn Beale Williams
Farrar & Bates
211 Seventh Avenue, North
Suite 500
Nashville, TN 37219

Mr. John Christopher Williams
Williams Law and Mediation Group
101 S 1st Street
Pulaski, TN 38478

Timothy N. O'Connor
Tune, Entrekin, & White, P.C.
315 Deaderick St., Ste. 1700
Nashville, TN 37238-1700
p: (615) 244-2770

Heather Ross
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207 (615) 532-2559

Joseph Ahillen
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207 (615) 532-2559

D. Andrew Saulters
330 Commerce St., Ste 110
Nashville, TN 37201
(615) 256-9999

This the 15th day of October, 2018.

MOORE, RADER,
FITZPATRICK AND YORK, P. C.


By /s/ Daniel H. Rader IV, BPR 025998
        DANIEL H. RADER IV
        Attorneys for Defendants,
        Community Probation Services,
        LLC; Community Probation
        Services, L.L.C.; Community
        Probation Services; and
        Patricia McNair, by special
        and limited appearance only,
        P. O. Box 3347
        Cookeville, TN  38502
        (931-526-3311)
        B.P.R.No. 025998

38