IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| **KAREN MCNEIL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:18-cv-00033** |
| | ) | |
| **COMMUNITY PROBATION** | ) | **JUDGE CAMPBELL** |
| **SERVICES, LLC, et al.,** | ) | **MAGISTRATE JUDGE FRENSLEY** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

### I. Introduction

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 51).

Through the Motion, Plaintiffs seek preliminary injunctive relief on Count 15 of their Amended

Complaint (Doc. No. 41). In that Count, Plaintiff Indya Hilfort, on behalf of herself and others

similarly situated, alleges Defendants Giles County and Sheriff Kyle Helton (the "County

Defendants") violate the Fourteenth Amendment by detaining indigent individuals who are unable

to pay the secured bail amount pre-pre-printed on violation-of-probation arrest warrants.[1] The

Motion requests a classwide preliminary injunction on Count 15 enjoining:

---

[1] Count 15 specifically alleges:

560. The Fourteenth Amendment's Due Process and Equal Protection clauses have
long prohibited keeping a person in jail because of the person's inability to make a
monetary payment.

561. Defendants have a policy and practice of violating probationers' substantive
right against wealth-based detention by enforcing secured financial conditions of
release that are pre-printed on violation-of-probation arrest warrants and that are
determined without an inquiry into or findings concerning ability to pay, without
any pre-deprivation process, assessment of alternatives to detention, inquiry into

Defendant Giles County, the Sheriff, and their officers, agents, employees, servants, attorneys, and all persons in active concert or participation with them from enforcing against any person on misdemeanor probation in Giles County any secured financial condition of release on a violation of probation warrant determined without an inquiry and findings concerning ability to pay, consideration of alternatives, or a finding by an appropriate judicial officer that pre-revocation detention is necessary to meet a compelling government interest.

(Doc. No. 51).[2]

The Court held a hearing on the Motion on January 31, 2019, where the parties to the Motion[3] submitted exhibits and argued their respective positions. The parties filed Joint Stipulated Facts (Doc. Nos. 212, 213) for purposes of the Motion shortly before the hearing.

---

whether the Plaintiffs pose a danger to the community or a risk of flight, or any findings regarding the need for detention in light of any particular government interest. Because the monetary amounts are predetermined without reference to the person's ability to pay, they operate to detain only those indigent misdemeanor-probationer arrestees who cannot afford them, but without any findings that pre-revocation, wealth-based detention is necessary to meet a compelling government interest. If the Plaintiff could pay the monetary amount, she would be released immediately.

562. These violation-of-probation warrants are routinely issued for the arrest of indigent misdemeanor probationers who, like Named Plaintiff Indya Hilfort, are supervised on probation only because they cannot afford to pay in full their court costs and probation fees.

(Doc. No. 41, at 116-17).

[2]  The Court entered a temporary restraining order early in the litigation, which the parties agreed to extend pending a ruling on the preliminary injunction motion. (Doc. Nos. 45, 50).

[3]  For purposes of the preliminary injunction motion on Count 15, the "parties" are the Plaintiffs and the County Defendants. Other Counts of the Amended Complaint name as defendants, in addition to the County Defendants, two private probation companies and certain individual employees of those companies.  Before the preliminary injunction hearing, the Court ruled that these private defendants should not participate in the hearing, except by proposing relevant questions for witnesses. (Doc. No. 197). No witnesses were called at the hearing, but the Court permitted counsel for the private defendants to present argument on several points during the hearing. Also, the County Defendants have incorporated the arguments made in the briefs of the private defendants. (Doc. No. 112, at 1, n 2).

## II. Stipulated Facts[4]

A. Named Plaintiff Indya Hilfort

1. Named Plaintiff Indya Hilfort is a 27-year-old mother of four children under age 10. She lives with her mother and children outside of Pulaski, Tennessee.

2. She completed a GED, obtained her Certified Nursing Assistant certification, and works currently as a cashier at a gas station and makes roughly $250 to $500 per week.

3. Ms. Hilfort struggles to provide basic necessities—like food, clothing, and electricity— for herself, her mother, and her children. Her electricity has been shut off several times in the last six months due to her inability to pay the bill.

4. Ms. Hilfort was convicted of a misdemeanor offense in Giles County General Sessions Court on December 8, 2016 and sentenced to 11 months and 29 days in jail. She was required to serve 10 days in jail. The remaining jail sentence was suspended for an 11-month-and- 29-day term on probation, beginning December 8, 2016. She was subsequently convicted of a misdemeanor offense in Giles County Circuit Court on September 25, 2017 and sentenced to 11 months and 29 days in jail, which was suspended for an 11-month-and-29-day term on probation.

5. For both offenses, Ms. Hilfort was placed on supervised probation with Defendant Community Probation Services, LLC ("CPS").

6. On July 9, 2018, Ms. Hilfort was arrested pursuant to a warrant issued in Lawrence County for an incident that allegedly occurred in July 2017. She was released from custody after arrest because she borrowed money to pay a discounted up-front fee of $300 to a commercial

---

[4] The Court omits the footnote citations to the record contained in the parties' Joint Stipulated Facts (Doc. No. 212).

bondsman. She agreed to pay the money back and promised to pay the bondsman another $300 when she received a paycheck. After her release, Ms. Hilfort pawned her car title and used money from her next paycheck to pay the bondsman $300, but she still owes most of the rest of the money she borrowed.

7. As required by her terms of probation, Ms. Hilfort informed a CPS probation officer about the Lawrence County arrest the next day, on July 10, 2018.

8. On July 11, 2018, Ms. Hilfort learned that a violation-of-probation arrest warrant had been issued in Giles County with a $2,500 bond amount on it as a result of the Lawrence County arrest.

9. No one had asked Ms. Hilfort if she could afford $2,500.

10. At all times the arrest warrant was active, Ms. Hilfort could not afford to pay $2,500, or even the $287.50 nonrefundable fee (ten percent of the bond, plus an additional $37.50 fee), which is what a commercial bonding company would have charged her, to be released.

11. Ms. Hilfort states that at all relevant times for this claim her income has been insufficient to pay the secured financial condition of release.

12. If Ms. Hilfort is unable to pay a secured bond amount required for release, she will be kept in jail until, at the earliest, the Thursday after she is arrested, when she will be taken to court for a violation-of-probation hearing.

13. If arrested on a violation-of-probation warrant requiring her to pay $2,500 for her freedom and unable to pay bond, Ms. Hilfort will be separated from her children and will miss shifts at her job.

B. Misdemeanor Violation-of-Probation Warrants in Giles County

14. The General Sessions and Circuit Court judges issue misdemeanor VOP warrants alleging violations of probation.

15. Warrants alleging violations of misdemeanor probation in Giles County either (1) designate a secured financial condition that the arrestee must pay in order to be released from jail (*i.e.*, an amount of "money bail"); or state (2) "hold," meaning that the person will not have an opportunity to pay money bail to be released, and she will be detained until, at the earliest, her first court appearance; (3) "ROR," which is an abbreviation for "release on recognizance" and means that the person who is arrested must be released immediately after booking on the condition that the person promises to appear in court; or (4) "cite," meaning that the person who is the subject of the warrant cannot be arrested and instead must be informed of a court date and released following an encounter with law enforcement.

16. There are five judges in Giles County from the 22nd Judicial District and General Sessions Court who determine conditions of release on misdemeanor violation-of-probation warrants. Judge Robert Richardson determines conditions of release for all people whose misdemeanor cases are being heard in General Sessions Court. Four Circuit Court Judges determine conditions of release for all people whose misdemeanor cases are assigned to Circuit Court.

17. If issued by Circuit Court, warrants solely for nonpayment may authorize arrest and, in three instances in 2018, required a secured money bail amount to be paid as a condition of release following arrest.

18. There is no evidence in the record for this motion [sic] of General Sessions misdemeanor violation-of-probation warrants issued solely for nonpayment issued in 2018 that require secured money bail as a condition of release.

19. VOP arrest warrants that allege violations *other* than, or in addition to, nonpayment may designate a secured financial condition that the arrestee must pay in order to be released from jail (*i.e.*, an amount of "money bail").

### C. Secured Money Bail May Be Required as a Condition of Release Following Arrest for Allegedly Violating Misdemeanor Probation

20. The money bail amounts designated on violation-of-probation arrest warrants are determined prior to arrest, and without an opportunity for the probationer to be heard or present evidence regarding ability to pay or conditions of release. The probationer is not present when the bond amounts are determined.

21. Sometimes the judicial officer reviews materials and financial information available in the probationer's case file and considers that information when determining conditions of release. The judge does not make factual findings concerning the person's ability to pay, the necessity of detention, or the adequacy of alternative conditions of release.

22. When asked, "When setting a bond, do you make an inquiry into the petitioner's ability to pay that bond?" Judge Richardson responded, "No." (Richardson Dep. 30:18–20.) When asked, "So how are you assessing at this point, when a violation of probation warrant is ought, whether that person is indigent or not?" Judge Richardson responded, "Well, again, I'm not in a position to make that [assessment] at that time." (Richardson Dep. 49:13–17.)

23. When asked, "[W]hen you decide to set a money bond, do you make an inquiry into the probationer's ability to pay bond?" . . . Judge Parkes responded, "If your question is do I ask the probation if—do I somehow ask the probationer, 'Are you going to be able to make this bond,' the answer is no." (Parkes Dep. 46:1–15.)

24. Conditions of release, including money bond amounts, cannot be altered by anyone other than a General Sessions or Circuit Court Judge.

### D. People Arrested for Allegedly Violating Misdemeanor Probation Who Do Not Pay Secured Money Bail Amounts

25. Individuals who are able to pay money bail will be informed of a date to appear in court for arraignment by the Sheriffs' deputies and released from custody. Those who cannot afford to pay money bail are kept in jail while they wait for a court date to be set by the General Sessions Court or Circuit Court.

26. General Sessions Court Judge Richardson conducts arraignment proceedings by video on Mondays, Tuesdays, Wednesdays, and Fridays for recently arrested misdemeanor probationers whose cases were filed in General Sessions Court.

27. During the arraignment proceeding, the General Sessions judge asks whether the person can afford the bond amount listed on the arrest warrant. If she cannot, the judge appoints a public defender and, because counsel has been appointed, refuses to consider reducing the monetary payment required for release or releasing the person on her recognizance at the arraignment. There is no opportunity during General Sessions arraignment for the person to obtain a bond reduction or seek alternative conditions of release, and counsel is not present at the arraignment. The Judge does not make any factual findings about the necessity of detention or the adequacy of alternatives in light of any compelling government interest.

28. Individuals with cases in General Sessions Court who cannot pay money bail will typically be scheduled for a probation-revocation hearing within 10 to 14 days of arraignment.

29. Circuit Court arraignments occur by video, with the arrestee located in the jail while the judge is physically located elsewhere, once a month.

30. No attorney is assigned to an individual prior to arraignment. The public defender is present in the jail, but does not meet with misdemeanor VOP arrestees (or any other arrestees) until after the arraignment proceedings conclude.

31. An individual arrested on a Circuit Court misdemeanor violation-of-probation warrant who cannot pay money bail will be detained between the time of arrest and arraignment—which could be up to 30 days—without seeing a judge.

32. As a matter of practice, with respect to misdemeanor cases in General Sessions Court, public defenders do not visit their clients prior to the revocation hearing, and arrestees do not know who represents them—and therefore do not know whom to contact. With respect to misdemeanor cases in Circuit Court, arrestees do not have a public defender assigned to represent them until *after* the jailhouse arraignment proceeding, which proceeding occurs up to 30 days after arrest. For all people detained in the jail, phone calls to lawyers cost money. If an arrestee is able to obtain paper, envelopes, and stamps, she can mail a letter, subject to the postal service's delivery practices and timing.

33. If an arrestee whose case is assigned to Circuit Court wishes to seek a bond reduction, she will typically have to wait until the next date that Circuit Court is scheduled to be in session, which is usually about two weeks after arraignment, for the motion to be heard.

34. Circuit Court is in session three days per month, but the sessions are not evenly spaced throughout the month: two of the three monthly sessions are typically on consecutive days.

35. The first in-court proceeding for General Sessions arrestees occurs 10 to 14 days after arrest, and for Circuit Court arrestees, 30 days or more after arrest.

E. The Sheriff Enforces Secured Money Bail Amounts Required for Release Following Arrest Pursuant to a Misdemeanor VOP Warrant

36. The Sheriff enforces every money bail amount designated on any VOP warrant, including VOP warrants issued solely for nonpayment.

37. The Sheriff does not know whether money bail amounts are set according to any inquiries or factual findings made by a judicial officer concerning ability to pay or the need for detention.

38. The Sheriff enforces the money bail amounts designated on VOP warrants even though the condition of release is unaccompanied by a record showing that a judicial officer provided an inquiry and findings regarding the arrestee's ability to pay and the need for detention.

39. When a person is arrested on a VOP warrant, she typically learns the money bail amount required for release after she is served with the warrant.

40. If the person can access enough money to pay the money bail amount designated on her VOP warrant, or the premium required by a commercial bail bondsman, the Sheriff's department will release her immediately upon payment.

41. If the arrestee cannot access enough money to pay the money bail amount designated on the warrant, the Sheriff's department will detain her in jail until the Sheriff's deputies transport her to court for her revocation hearing.

F. The First Court Appearance

42. Individuals confined in Giles County Jail due to their inability to pay secured money bail are brought to court to adjudicate the allegations. People who are still detained at this hearing often plead guilty to the alleged misdemeanor probation violations.

43. If they are not sentenced at that appearance, they will be brought back to jail and detained until they pay the monetary amount required for release or the case is resolved.

9

44. Although a judge might consider a bond-reduction motion at a Thursday revocation hearing, he will not make an inquiry into ability to pay or findings concerning ability to pay or the need for detention. The bond hearing—like all proceedings in General Sessions Court—will not be on the record.

45. Secured money bail amounts that are required as conditions of release after arrest on misdemeanor VOP warrants operate to jail indigent individuals who cannot afford to pay the predetermined sum of money.

G. Crystal Webb's Experiences

46. Crystal Webb was arrested on April 23, 2018 pursuant to a violation-of-probation warrant issued by the Giles County General Sessions Court and requiring her to pay a $2,500 secured financial condition of release. At the time, Ms. Webb was unemployed and relied on limited government benefits. She also shared some income and expenses with her adult, disabled son. Ms. Webb's declaration states: "While on probation, I have been renting a room at a friend's house for about $350 per month. Sometimes he asks me to pitch in for utilities, and I have paid as much as $200 per month, though I often cannot afford to pay anything. At times, our water has been cut off because we couldn't afford to pay the water bill. Without much money, I have struggled to afford both food and a place to live. In the past year, I have sometimes had to go without food for up to four days because I had no money and have had to rely on friends to feed me. I often can't afford to buy shampoo, toothpaste, clothing, and other basic items I need for basic life." Because she could not afford $2,500 or the few hundred dollars a commercial bonding company would have charged her, she remained in jail for ten days after arrest and before she appeared in court for a revocation hearing.

H. Facts Relating to the Number of Misdemeanor VOP Warrants Issued Between January And August 2018

47. The Sheriff enforces secured money bail on well over one hundred misdemeanor violation-of-probation warrants every year.

48. For example, between January and August 2018, the sheriff executed approximately 281 warrants for alleged violations of probation.

49. The Sheriff enforced secured financial conditions of release on approximately 130 VOP arrest warrants.

50. Between January 1, 2018 and July 19, 2018, 13 people were detained in the Giles County jail for longer than 24 hours because they did not pay money bail required for release following arrest pursuant to a misdemeanor violation-of-probation warrant.

51. As of September 14, 2018, there were at least 14 outstanding violation-of-probation warrants with money bail on them.

III.  Analysis

In determining whether to issue a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g., Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

Plaintiffs argue they have shown a likelihood of success on the merits on their claim that detaining indigent misdemeanor probation arrestees based on a secured bail amount imposed in the absence of the arrestee, and without an inquiry into the ability to pay, consideration of

alternatives, and a finding that detention is necessary violates the equal protection and due process guarantees of the Fourteenth Amendment.

In a series of cases, the federal courts have addressed the equal protection and due process implications of the detention of indigent individuals based solely on their indigency. In *Williams v. Illinois*, 399 U.S. 235, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970), the Supreme Court held that a statute requiring a defendant to remain in jail to "work off" fines and court costs was unconstitutional under the Equal Protection Clause:

> We conclude that when the aggregate imprisonment exceeds the maximum period fixed by the statute and results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay . . .

> \* \* \*

> . . . [The State] may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency.

399 U.S. at 240-241, 242. Similarly, in *Tate v. Short*, 401 U.S. 395, 91 S. Ct. 668, 28 L. Ed. 2d 130 (1971), the Court relied on the *Williams* analysis under the Equal Protection Clause in striking down a state statute and municipal ordinance that permitted incarceration to "work off" traffic fines: "'[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'" 401 U.S. at 398 (quoting *Morris v. Schoonfield*, 399 U.S. 508, 509, 90 S. Ct. 2232, 26 L. Ed. 2d 773 (1970)). The Court pointed out that imprisonment did not further any penal objective of the State because the indigent defendant cannot pay the fines while in prison, and the State is saddled with the cost of feeding and housing the defendant for the period of imprisonment. *Id.* On the other hand, the Court explained, there are alternatives that serve the State's interest in enforcing payment of fines, such as collection of fines in installments. *Id. See*

*also Frazier v. Jordan,* 457 F.2d 726 (5th Cir. 1972) (holding that "default imprisonment" for those unable to pay fines for violation of noise ordinance created a suspect class defined by wealth that was not supported by a compelling state interest.)

In *Bearden v. Georgia*, 461 U.S. 660, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983), the Supreme Court addressed a challenge to the automatic revocation of an indigent defendant's probation for failure to pay a fine and restitution. Reviewing the analysis in *Williams, Tate,* and other cases, the Court explained that "[d]ue process and equal protection principles converge in the Court's analysis in these cases." 461 U.S. at 665. Noting the parties' vigorous arguments as to whether the strict scrutiny or rational basis standard applied to the equal protection question, the Court suggested the issue could not be divorced from due process analysis:

> There is no doubt that the State has treated the petitioner differently from a person who did not fail to pay the imposed fine and therefore did not violate probation. To determine whether this differential treatment violates the Equal Protection Clause, one must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation. This is substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine. Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . .' *Williams v. Illinois, supra,* 399 U.S., at 260, 90 S. Ct., at 2031 (Harlan, J., concurring).

461 U.S. at 666–67 (footnotes omitted).

In applying that analysis, the Court concluded it was fundamentally unfair to revoke probation automatically without inquiring into the reasons for the failure to pay:

> We hold, therefore, that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority. If the probationer could not pay despite sufficient bona fide efforts to

13

acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.* at 672-73 (footnote omitted).

The issue presented here, involving indigent defendants and the imposition of secured bail for pretrial release, has not been considered by the Supreme Court, but has been the subject of numerous lower court decisions. In *Pugh v. Rainwater,* 572 F.2d 1053 (5th Cir. 1978), the plaintiffs challenged, among other things, the pretrial detention of indigent defendants in Florida solely because they were unable to post bail as a condition of release. While the case was pending, the Supreme Court of Florida promulgated a new rule listing six forms of release, one of which contemplated the execution of a bail bond with sureties or the deposit of cash in lieu thereof. 572 F.2d at 1055. The plaintiffs argued the new rule was deficient in the case of indigents because it did not require a presumption against money bail and a presumption for the other enumerated forms of release. *Id.,* at 1056.

In rejecting the plaintiffs' argument, the Fifth Circuit acknowledged, based on *Williams* and *Tate*, that "imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056. Applying that principle to pretrial bail, the court explained, requires a balancing of the state's "compelling interest in assuring the presence at trial of persons charged with crime" and the understanding that the accused individuals "remain clothed with a presumption of innocence and with their constitutional rights intact." *Id.* Those considerations led the court to conclude that equal protection and due process prohibit the setting

of bail in excess of "what is necessary to reasonably assure defendant's presence at trial." *Id.,* at 1057.

In that regard, the court pointed out the difficulty with the use of a "master bond schedule," one that lists the amount of bail for each listed offense and automatically sets the bail amount based only on the offense charged:

> Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meetings [sic] its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.

*Id.,* at 1057. The court ultimately decided, however, that the revised rule on bail was not facially unconstitutional because it required judges to consider "all relevant factors" in determining "what form of release is necessary to assure the defendant's appearance." *Id.* at 1058.

A more recent challenge to the setting of bail was presented in *Jones v. City of Clanton*, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015). In *Jones*, the plaintiff challenged the practice of a municipal court in using a bail schedule for misdemeanor arrests. Those able to pay the bail amount obtained immediate release, while those unable to pay were jailed until the next weekly court date. *Id.,* at *1. After the lawsuit was filed, the municipal court changed its policy to allow misdemeanor arrestees to be released on an unsecured appearance bond unless they had an outstanding warrant for failure to appear or posed a danger to themselves or others. *Id.* Those who did not obtain immediate release were provided a hearing within 48 hours of arrest to make an individualized determination as to whether the person may be released, and if so, under what conditions. *Id.,* at *1-2.

The court reviewed the holdings of *Bearden* and *Pugh* and reasoned that "the use of a secured bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause

of the Fourteenth Amendment." *Id.* at *2. In concluding that the new policy facially complied with existing law, the court commended the defendants for revising its procedures:

> Bail schemes such as the one formerly enforced in the municipal court result in the unnecessary pretrial detention of people whom our system of justice presumes to be innocent. This period of detention 'has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness.' *Barker v. Wingo*, 407 U.S. 514, 532 (1972). It can also impede the preparation of one's defense, *see id.* at 533 (noting that pretrial detention hinders a defendant's 'ability to gather evidence, contact witnesses, or otherwise prepare his defense'); it can induce even the innocent to plead guilty so that they may secure a quicker release, *see* Andrew D. Leipold, 'How the Pretrial Process Contributes to Wrongful Convictions,' 42 Am.Crim. L.Rev. 1123, 1154 (2005); and it may result in a period of detention that exceeds the expected sentence, *see* Stephanos Bibas, 'Plea Bargaining Outside the Shadow of Trial,' 117 Harv. L.Rev. 2463, 2492 (2004). Moreover, unnecessary pretrial detention burdens States, localities, and taxpayers, and its use appears widespread: nationwide, about 60 % of jail inmates are pretrial detainees, and the majority of those people are charged with nonviolent offenses. *See* Todd D. Minton and Zhen Zeng, U.S. Dep't of Justice, Bureau of Justice Statistics, Jail Inmates at Midyear 2014, at 4, http://www.bjs.gov/content/pub/pdf/jim14.pdf (PDF replication in this litigation (doc. no. 75)); Richard Williams, Bail or Jail, State Legislatures, May 2012, http://www.ncsl.org/research/civil-and-criminaljustice/ bail-or-jail .aspx (PDF replication in this litigation (doc. no. 75)).

> Criminal defendants, presumed innocent, must not be confined in jail merely because they are poor. Justice that is blind to poverty and indiscriminately forces defendants to pay for their physical liberty is no justice at all. By enacting a new policy that takes account of the circumstances of those who come before its courts, the Clanton Municipal Court has made marked strides in improving the quality of the justice it delivers.

*Id.,* at *3.

In *Rodriguez v. Providence Community Corrections, Inc.,* 155 F. Supp. 3d 758 (M.D. Tenn. 2015), a former judge in this District granted a preliminary injunction in a case challenging, among other things, the practice by Rutherford County officials of detaining indigent individuals based on "preset" secured bonds. The plaintiffs, misdemeanor probationers, sought classwide relief on their claim that holding indigent defendants on secured money bonds violates the Fourteenth Amendment. *Id.,* at 761-62. The evidence at the preliminary injunction hearing showed that before

issuing arrest warrants for probationers accused of violating the conditions of their probation, Rutherford County General Sessions Court and Circuit Court judges set an amount for a secured bond on the warrant. *Id.,* at 762-63. These secured bonds required the probationer to make a monetary payment in order to obtain release pending his or her revocation hearing, but "[a]t no point in this process do Defendants inquire into probationers' indigency or consider whether another method of ensuring attendance at the revocation hearings might be equally effective." *Id.* at 763.

Those probationers who could not make bond payments were kept in jail pending their eventual hearings. *Id.* The court found some probationers received an informal hearing when the judges come to the jail on Mondays and Fridays as part of a "ten-day docket." *Id.* During these proceedings, probationers met with judges and prosecutors, and were given the option of immediately pleading guilty and receiving a sentence, or requesting representation and waiting for a formal revocation hearing. *Id.* The judges and prosecutors did not engage in any sort of inquiry into indigency during these hearings. *Id.* Probationers who did not plead guilty had to wait in jail for as long as 30 to 60 days before their actual court date. *Id.*

After reviewing *Pugh, Tate, Bearden*, and other cases, the court concluded the plaintiffs had shown a likelihood of success on the merits that the use of "preset secured money bonds" – secured money bonds assigned without an inquiry into ability to pay or alternative methods of ensuring attendance – violates both due process and equal protection guarantees. *Id.*, at 767-70. *See also Weatherspoon v. Oldham,* 2018 WL 1053548 (W.D. Tenn. Feb. 26, 2018) (summarizing the holdings of *Bearden* and *Pugh* as prohibiting the setting of money bail as a condition of release without inquiry into ability to pay and without meaningful consideration of other possible alternatives.)

More recently, in a series of district and circuit court cases, plaintiffs in Harris County, Texas brought a class action challenging the constitutionality of the County's system of setting bail for indigent misdemeanor arrestees. *O'Donnell v. Harris County,* 892 F.3d 147, 152 (5th Cir. 2018).  After eight days of hearings, the district court found that, although state law required bail to be set at a post-arrest hearing during which several factors were to be considered, the practice of the Harris County courts was much different. *Id.,* at 153-54. The court found the hearings were delayed, and when they were held, did not offer any opportunity for arrestees to submit evidence of inability to post bond. *Id.* Less than 10% of misdemeanor arrestees were assigned an unsecured personal bond; the rest were assigned secured bonds. *Id.* Officials imposed secured bonds even after becoming aware of the arrestee's indigence, and that by imposing the bond, the arrestee would remain detained. *Id.*

The district court rejected the County's argument that imposing secured bonds served its interest in ensuring the arrestee appeared at a future court date and committed no further crime. The court reviewed empirical data suggesting the opposite:  release on secured bond did not assure a greater rate of appearance or of law-abiding conduct before trial. *Id.* at 154. The data also suggested the expected outcomes for an arrestee who cannot afford bail are significantly worse than other arrestees – they were more likely to plead guilty, and their sentences were on average twice as long. *Id.* The court noted that pretrial detention can also lead to loss of job, family stress, and even an increase in likeliness to commit crime. *Id.,* at 155. Having concluded the plaintiffs had established a likelihood of success on the merits on their procedural due process and equal protection claims, the district court granted preliminary injunctive relief in the form of new procedures and ordered the release of numerous detainees who had been subjected to deficient procedures. *Id.* at 155.

On appeal, the Fifth Circuit agreed the County's bail system violated both due process and equal protection, but it did not accept the district court's definition of the liberty interest at stake for purposes of procedural due process. The appeals court framed the arrestee's liberty interest less broadly, describing it as "a right to bail that appropriately weighs the detainees' interest in pretrial release and the court's interest in securing the detainee's attendance." *Id.,* at 156-57. Even with that narrowed definition, however, the court easily found the County's procedures were inadequate to protect the arrestee's liberty interest. *Id.,* at 159.

Turning to the relief ordered by the district court, the Fifth Circuit agreed due process required the following procedures: (1) notice [to the arrestee] that the financial and other resource information collected by pretrial services is for the purpose of determining eligibility for release or detention; (2) a hearing at which the arrestee has an opportunity to be heard and to present evidence; and (3) an impartial decisionmaker. *Id.,* at 159-60. The court disagreed, however, with the district court's requirement that factfinders issue written statements supporting imposition of secured bail, and that bail hearings be held within 24 hours of arrest. *Id.,* at 160. The court modified those procedures to require judges "to specifically enunciate their individualized, case-specific reasons" for imposing secured bail, and to hold a bail hearing within 48 hours of arrest. *Id.*

In considering the defendants' challenge to the district court's equal protection analysis, the appeals court concluded that intermediate scrutiny was appropriate under applicable Supreme Court precedent because "indigent misdemeanor arrestees are unable to pay secured bail, and, as a result, sustain an absolute deprivation of their most basic liberty interests – freedom from incarceration." *Id.,* at 162. The court also found no error in the district court's conclusion that "although the County had a compelling interest in the assurance of a misdemeanor detainee's

future appearance and lawful behavior, its policy was not narrowly tailored to meet that interest."

*Id.* The court summed up its reasoning as follows:

> In sum, the essence of the district court's equal protection analysis can be boiled down to the following: take two misdemeanor arrestees who are identical in every way – same charge, same criminal backgrounds, same circumstances, etc. – except that one is wealthy and one is indigent. Applying the County's current custom and practice, with their lack of individualized assessment and mechanical application of the secured bail schedule, both arrestees would almost certainly receive identical secured bail amounts. One arrestee is able to post bond, and the other is not. As a result, the wealthy arrestee is less likely to plead guilty, more likely to receive a shorter sentence or be acquitted, and less likely to bear the social costs of incarceration. The poor arrestee, by contrast, must bear the brunt of all of these, simply because he has less money than his wealthy counterpart. The district court held that this state of affairs violates the equal protection clause, and we agree.

*Id.* at 163.

In a second appeal after remand, the Fifth Circuit granted a stay of the district court's revised injunction, in a split panel opinion. *O'Donnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) ("*O'Donnell II*"). The majority explained that in considering the plaintiffs' equal protection challenge, heightened scrutiny applies when an arrestee claims both an inability to afford bail and an absence of meaningful consideration of other possible alternatives to secured bail. *Id.,* at 226-27. The court concluded that rational basis review is appropriate, however, when an arrestee claims only an inability to afford bail. *Id. Cf. Buffin v. City and County of San Francisco*, 2018 WL 424362, at *10 (N.D. Cal. Jan. 16, 2018) (applying strict scrutiny analysis in evaluating the plaintiffs' equal protection and due process challenges to County's pretrial bail system).

In *Walker v. City of Calhoun,* 901 F.3d 1245 (11th Cir. 2018), the plaintiff brought a class action challenge to the City of Calhoun's policy of using a secured bail schedule to set bond amounts. Those who could not afford the bond amount were held in jail until the next weekly court session. *Id.* at 1252. After suit was filed, the City altered the policy to permit three forms of release: (1) arrestees charged with State offenses would be released immediately if they could pay the

secured bond amount; (2) arrestees charged with State offenses who did not post bail would be entitled to a bail hearing with court-appointed counsel within 48 hours from arrest (if they were able to prove at the hearing they were indigent, they would be released on a recognizance bond); and (3) all arrestees charged with violating a city ordinance would be released on unsecured bond (if they failed to appear, they would be assessed the bail-schedule amount). *Id.* at 1252-53. The district court held the revised policy was unconstitutional because indigent defendants were required to wait 48 hours for a hearing. *Id.* at 1253.

On appeal, the Eleventh Circuit agreed with the City that heightened scrutiny equal protection analysis did not apply because the revised bail policy did not result in the total deprivation of pretrial release, "[r]ather they must merely wait some appropriate amount of time to receive the same benefit as the more affluent." *Id.* at 1261-62. In reaching that conclusion, the court distinguished *O'Donnell*, which, it explained, involved some amount of upfront payment for release in most cases and no individualized assessment occurred in setting bail. Id. at 1261 n. 10; 1266 n. 12. The court observed, however, that "neither *Bearden* nor [*Pugh v.*] *Rainwater* is a model of clarity in setting out the standard of analysis to apply." *Id.* at 1265. In the court's view, "*Bearden* and *Rainwater* command that courts should apply something akin to a procedural due process mode of analysis to claims like Walker's . . ." *Id.* The court ultimately concluded that the 48-hour hearing requirement was presumptively constitutional. *Id.* at 1266-67.

In *Schultz v. State of Alabama,* 330 F. Supp. 3d 1344 (N.D. Ala. 2018), the plaintiffs filed suit challenging the bail system for pretrial arrestees in Cullman County, Alabama. Comparing the bail system at issue in *Walker* with the bail system that operated in Cullman County, the court found *Walker* to be distinguishable because those indigent arrestees were guaranteed release within 48 hours, while arrestees in Cullman County were not: "Cullman County affords that guaranty

only to criminal defendants who have the financial means to post a bond at the time of arrest in an amount set in the county's bail schedule." *Id.* at 1360. By contrast, in Cullman County:

> indigent defendants cannot secure their release merely by proving that they are indigent according to a uniform standard of indigency. Instead, within 72 hours of arrest, to obtain pretrial release in Cullman County, an indigent criminal defendant, without the assistance of counsel, must prove not only that he is indigent but also that he is not a flight risk or a threat to himself or the community. If a judge, applying no particular legal standard, decides that a defendant is indigent but that the defendant is a danger to himself or his community or a flight risk, then the judge may set bail at a level that the defendant cannot afford, creating a *de facto* detention order.
>
> * * *
>
> Under Cullman County's pretrial procedures, a dangerous arrestee who can post bond immediately returns to the community to which she is a threat, suffering only the inconvenience of detention of no more than two hours.

*Id.* at 1360.

The court ultimately determined the plaintiff was substantially likely to prove both her equal protection and due process claims. Reading *Walker* as requiring application of a rational basis analysis, the court easily concluded Cullman County's discriminatory bail practices deprived indigent criminal defendants of equal protection because the challenged distinction did not rationally further a legitimate state purpose. *Id.*, at 1361, 1365 n. 23. In reaching that decision, the court considered the three compelling interests identified by the defendants -- providing pretrial release as quickly as possible, ensuring defendants appear at trial, and protecting the community from dangerous criminal defendants -- and concluded the secured money bail procedures were not necessary to serve any of those interests. *Id.* at 1361-65. After reviewing expert evidence, the court pointed out that "secured bail is no more effective than other conditions to assure a criminal defendant's appearance at court proceedings, and secured bail is not necessary to secure a criminal defendant's appearance." *Id.* at 1363. Expert evidence also showed that there is "no statistically

significant difference between the rates at which criminal defendants released on secured and unsecured bail are charged with new crimes." *Id.*

The court went on to find that the plaintiff was also likely to be able to prove his substantive and procedural due process claims, finding the Cullman County bail system to be strikingly similar to the one considered by the Fifth Circuit in *O'Donnell, supra.* The court identified the following deficiencies in the Cullman County system: (1) absence of adequate notice to arrestees of what is at stake at an initial appearance (during which they are not afforded assistance of counsel, which exacerbates the other defects); (2) absence of an opportunity to be heard at the initial appearance; (3) absence of an evidentiary standard to be satisfied before ordering an unaffordable secured bond that serves as a *de facto* detention order; and (4) absence of factual oral or written findings (as opposed to checking boxes of factors "considered"). *Id.* at 1366-74.

Relying primarily on the *O'Donnell* cases, the court in *Davies v. Dallas County, Texas,* 341 F. Supp. 3d 688, 693-95 (N.D. Tex. 2018) determined the plaintiffs had shown a likelihood of success on the merits in establishing their equal protection and procedural due process claims in a case challenging the pretrial detention system in Dallas County, Texas. The court explained the injunctive relief it ordered was largely taken from the *O'Donnell* cases, and essentially includes "notice, an opportunity to be heard and submit evidence within 48 hours of arrest, and a reasoned decision by an impartial decision-maker." *Id.,* at 697; s*ee also Caliste v. Cantrell,* 329 F. Supp. 3d 296, 312 (E.D. La. 2018) (holding that due process requires notice to the individual of the importance of ability to pay in determining bond, an opportunity to be heard on the issue, findings on the record regarding ability to pay, and considerations of alternative conditions of release; court's inquiry into defendant's ability to pay must occur *prior to* pretrial detention).

As in the cases described above, Plaintiffs in this case claim the secured bail system in Giles County violates the equal protection and due process rights of indigent misdemeanor probation arrestees. Turning to the equal protection claim, the Court is persuaded heightened scrutiny is the appropriate standard to apply because Plaintiffs have demonstrated an inability to afford bail and an absence of meaningful consideration of other possible alternatives to secured bail. *O'Donnell,* 892 F.3d at 162. The evidence presented by the parties demonstrates the secured bail amounts written on the arrest warrants for misdemeanor probationers are determined prior to arrest, and without an opportunity for the arrestee to be heard or present evidence regarding ability to pay or alternative conditions of release. (Stipulated Facts, ¶ 20). In addition, the judges writing in the secured bail amounts do not make factual findings concerning the person's ability to pay, the necessity of detention, or the adequacy of alternative conditions of release. (*Id.* ¶ 21).

Individuals who are able to pay the secured bail amount written on the warrant are informed of a date to appear in court for an arraignment, and are released from custody by the Sheriff's deputies. (*Id.* ¶ 25). Those who cannot afford to pay the bail amount are kept in jail while they wait for a court date to be set by the General Sessions or Circuit Courts. (*Id.* ¶¶ 25, 46). For example, the evidence submitted by Plaintiffs shows that Mr. Clinnon Alexander was detained for 22 days before his first in-court appearance because he could not afford to pay either a $500 cash bond (requiring him to pay the full $500) or a $10,000 secured bond (meaning he could have paid a 10% nonrefundable premium to a commercial bonding agent) required for his release. (Plaintiffs' Exs. 21, 23, 24, 57, 58). Mr. James Matthew Allen was detained for over 21 days before his first in-court appearance because he could not afford to pay either a $210 cash bond or a $5,000 secured bond required for his release. (Plaintiffs' Exs. 21, 25, 26). Even the initial post-arrest hearings do

not provide an opportunity for indigent arrestees to obtain bail reductions[5] or to seek alternative conditions of release, nor are there any factual findings made about the necessity of detention. (*Id.* ¶¶ 27, 33). As in *O'Donnell,* "poor arrestees . . . are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond." *Id.* Thus, to survive an equal protection challenge, the distinction created by the current bail system in Giles County between indigent misdemeanor probation arrestees and other arrestees must be narrowly tailored to meet a compelling governmental interest. *Id.*[6]

The defense largely relies on procedural arguments in opposing Plaintiffs' request for a preliminary injunction, and has not made any significant arguments that the bail system described in the stipulated facts serves any compelling governmental interest.[7] Even if the Court assumes Defendants have a legitimate interest in ensuring arrestees appear at their revocation hearings and

---

[5] Teresa Mattox testified in a deposition that in the 12 years she has served as Jail Administrator, she has never seen the General Sessions Judge change a bond amount at arraignment. (Plaintiffs' Ex. 66, at 38).

[6] Unlike the indigent arrestees in *O'Donnell II,* where the Fifth Circuit applied rational basis review in considering a motion for stay, the indigent arrestees in this case are not assured of a hearing, within 48 hours after arrest, on the secured bail amount and possible alternatives to bail. 900 F.3d at 226-27.

[7] Defendants suggested at the hearing that Giles County judges were simply following state law when they put secured bail amounts on arrest warrants before issuance and without a hearing. At the Court's request, the parties filed supplemental briefs on the issue. (Doc. Nos. 221, 222). A review of the briefs leads the Court to conclude there is no state statute authorizing or requiring such a procedure. Indeed, the state statute listing factors for determining conditions of release appears to contemplate input from the arrestee. *See* Tenn. Code Ann. § 40-11-118(b) (listing factors court is to consider in setting bail include the defendant's "employment status," "family ties and relationships," "mental condition," "identity of responsible members of the community who will vouch for the defendant's reliability," and "ties to the community"); *see also Weatherspoon v. Oldham,* 2018 WL 1053548, at *3 (W.D. Tenn. Feb. 26, 2018) (discussing statutes governing pretrial release and detention in Tennessee). In any event, the requirements of the federal Constitution supersede conflicting state law under the Supremacy Clause. *See, e.g., Cooper v. Aaron,* 358 U.S. 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958); *Armstrong v. Exceptional Child Ctr., Inc.,* 135 S. Ct. 1378, 1384, 191 L. Ed. 2d 471 (2015).

in protecting the community from dangerous criminals, however, Defendants have presented no proof to suggest the current bail system furthers those interests. For example, Defendants have presented no statistical evidence of the court-appearance rates or new criminal activity rates of those released after arrest.

Indeed, the studies described by Plaintiffs' experts,[8] suggest that these governmental interests are not served by the current bail system. For example, Judge Morrison states in his Affidavit:

> In the District of Columbia, since 2014 we have released an average of more than 93% of all arrestees, a much higher percentage than all but a few court systems in the United States. In the 2017 [sic], 94% of arrestees were released and 98% of those who were released remained arrest-free from violent crimes during pretrial release. 86% of released defendants remained arrest-free from all crimes of any kind. Of those released pretrial, 88% made all scheduled court appearances during the pretrial period. . . . the District accomplishes these high rates of non-arrest and court appearances, again, without using money bonds.

(Plaintiffs' Ex. 63, ¶ 37). According to Dr. Jones:

> . . . the longer that lower-risk defendants are kept in pretrial detention beyond one day, the greater the likelihood that they will fail to appear in court after they are eventually released, again, when controlling for other relevant characteristics.

> * * *

> Detaining lower-risk defendants for longer than one day affects the likelihood of criminal activity up to two years later. Defendants who are released within 2 to 3 days are 17% more likely to engage in new criminal activity up to two years later compared to comparable defendants released within 24 hours. For those held 4 to 7 days, this longer-term recidivism worsens to 35%, and when release is delayed for 8 to 14 days, the recidivism rate further increases to 51%. This pattern of worsening recidivism as release is delayed is observed for moderate-risk defendants as well.

---

[8]    Plaintiffs have filed the Expert Report of Michael R. Jones, Ph.D (Plaintiffs' Exs. 60-63) and the Affidavit of Judge Truman Morrison (Plaintiffs' Exs. 63-64) in which these studies are described. The Court notes the testimony of these experts has been cited by other courts in addressing similar issues. *See Schultz,* 330 F. Supp. 3d at 1350, 1361-65 (Dr. Jones and Judge Morrison); *ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052, 1066 (S.D. Tex. 2017) (Judge Morrison).

(Plaintiffs' Ex. 60, ¶¶ 26, 28) (citation omitted). On the other hand, Defendants have not shown that arrestees who are able to pay the secured bail amount are more likely to appear for their revocation hearing and less likely to commit crime. As pointed out by the court in *Schultz,* "a dangerous arrestee who can post bond immediately returns to the community to which she is a threat, suffering only the inconvenience of detention of no more than two hours." 330 F. Supp. 3d at 1360.

Given the complete absence of evidence supporting the bail system in Giles County for indigent misdemeanor probation arrestees, the Court concludes that, even if it applied the rational basis standard, Defendants have failed to show the current bail system rationally furthers a legitimate governmental interest. *See Schultz*, 330 F. Supp. 3d at 1361-65.

As to Plaintiffs' due process claim, the Court is persuaded by the authority described above that the system of setting secured bail as described in the stipulated facts is constitutionally deficient in failing to provide notice and an opportunity for the arrestee to be heard, and for failing to provide oral or written findings regarding the arrestee's ability to pay, alternative conditions of release, and the need for pre-revocation detention. *See, e.g., Caliste*, 329 F. Supp. 3d at 312; *Schultz,* 330 F. Supp. 3d at 1466-74.

Defendants argue that, even if the Court concludes the secured bail system at issue here is constitutionally infirm, they are not the parties who should be enjoined. Defendant Helton contends that, as Sheriff, he is required to execute the arrest warrants issued by Giles County judges, and cannot second-guess the validity of those warrants. Relying on *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S. Ct. 2018, 2021, 56 L. Ed. 2d 611 (1978), Defendants argue that to demonstrate municipal liability, Plaintiffs must show the local government's policy or custom was the "moving force" behind the alleged constitutional violation. *See, e.g., Powers v.*

*Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). According to Defendants, the "moving force" underlying the constitutional claims at issue here is the issuance of arrest warrants with secured bail amounts, which is solely within the purview of the judges.

The custom or policy Plaintiffs challenge in Count 15, however, is the practice of the Sheriff in *detaining* misdemeanor probation arrestees who cannot satisfy the secured bail amount written on the arrest warrant. As the official in charge of the operation of the county jail, the Sheriff effectuates the detention of these indigent misdemeanor probation arrestees. *See, e.g., Wright v. Fentress Cnty., Tenn.,* 313 F. Supp. 3d 886, 891 (M.D. Tenn. 2018); *Doe #1 v. Cravens,* 2018 WL 1522401, at *4 (M.D. Tenn. Mar. 28, 2018); Tenn. Code Ann. § 8-8-201(a)(3) ("It is the sheriff's duty to . . . [t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein; receive those *lawfully* committed, and keep them personally, or by deputies or jailer, until discharged by law. . . ") (emphasis added); *see also Shorts v. Bartholomew*, 255 Fed. Appx. 47, 52 (6th Cir. 2007). Even if the Sheriff is not the "moving force" underlying the constitutional violations here, he is still an appropriate party to be enjoined under *Ex Parte Young*, 209 U.S. 123, 156, 28 S. Ct. 441, 452, 52 L. Ed. 714 (1908) because he has an independent duty to refrain from violating the federal Constitution. *See also Cooper v. Aaron*, 358 U.S. at 17; *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).

Despite Defendants' arguments to the contrary, the relief requested by Plaintiffs does not require the Sheriff or his deputies to refrain from *serving* arrest warrants, nor does it require they second-guess the validity of arrest warrants. As stated above, the injunctive relief requested focuses on the Sheriff's role as *jailer* in detaining misdemeanor probation arrestees *after* arrest based solely on the individual's inability to pay the secured bail amount written on the arrest warrant. Complying with such injunctive relief does not require the Sheriff, or his employees, to

engage in any kind of legal analysis to understand that detaining an arrestee based on such an arrest warrant with a secured bail amount *cannot* be the basis for constitutional detention under the system described in the stipulated facts.[9] The Fifth Circuit in *O'Donnell* approved similar injunctive relief regarding the sheriff in that case. 892 F.3d at 165 ("The Harris County Sheriff is therefore authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided.")

To the extent Defendants challenge the issuance of injunctive relief before the Court rules on Plaintiffs' pending motion for class certification, that challenge is without merit. The Court may grant preliminary injunctive relief protecting class members under Fed. R. Civ. P. 23(b)(2),[10] based upon its general equity powers. *See Rodriguez,* 155 F. Supp. 3d at 767 ("A district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general

---

[9]  The Court finds it unnecessary to determine whether a 48-hour detention period on a secured bail amount would be constitutionally acceptable as there is no evidence that a 48-hour "hearing or release" practice exists in Giles County. *See Walker,* 901 F.3d at 1266-67. Also, the Court notes that, for purposes of Count 15, Plaintiffs are not challenging the detention of arrestees pursuant to a "hold" arrest warrant.

[10]  Rule 23(b)(2) provides:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

* * *

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole;

equity powers."); *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148 (D. Kan.), *aff'd*, 691 F. App'x 900 (10th Cir. 2016), and *aff'd*, 840 F.3d 710 (10th Cir. 2016), and order enforced, 294 F. Supp. 3d 1154 (D. Kan. 2018) ("[C]ase law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding the class certification motion."); *O.B. v. Norwood,* 170 F. Supp. 3d 1186, 1200 (N.D. Ill.), aff'd, 838 F.3d 837 (7th Cir. 2016) ("[i]t is unnecessary to certify, or even conditionally certify, Plaintiffs' proposed class at this time. . . 'The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons.'"); *see also Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("The bar on one-way intervention does not prohibit preliminary injunctions that precede class certification, nor does it apply to mandatory classes."); *Wood v. Detroit Diesel Corp*., 213 Fed. Appx 463 (6th Cir. 2007) (concluding that harm outlined in declarations of putative class members was sufficient to justify preliminary injunctive relief even though named plaintiffs had not demonstrated such harm).[11]

For the reasons described above, the Court concludes Plaintiffs have established a strong likelihood of success on the merits of the constitutional claims raised in Count 15. As for the other Rule 65 considerations, the Court is persuaded Plaintiff Hilfort and other similarly-situated indigent misdemeanor probation arrestees will suffer irreparable harm, namely, the unconstitutional deprivation of their liberty, absent the injunction. Detention of these arrestees, who are otherwise deemed eligible for release, solely due to the inability to pay the secured bail amount on the arrest warrant can result in loss of work, separation from family, undue pressure to

---

[11]  The private defendants have also opposed injunctive relief based on the argument that Plaintiff Hilfort is not really indigent. That argument does not materially advance the analysis of the constitutional claims at issue here because one of the constitutional infirmities Plaintiffs complain of is the absence of an *opportunity* to demonstrate indigency before the setting of a secured bail amount.

plead guilty, and other negative consequences as outlined in Dr. Jones' Report. (Plaintiffs' Ex. 60, ¶¶ 23-36). This threatened harm outweighs any harm to Defendants or to the public interest. Defendants have presented no evidence demonstrating the injunctive relief requested will result in increased danger to the community given that these indigent arrestees are otherwise deemed eligible for release. Nor have Defendants demonstrated the release of these indigent arrestees will likely result in their failure to appear for court hearings. Finally, Defendants have not demonstrated the costs of alternatives to detention for these arrestees are greater than the costs of incarceration.

For these reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 51) is **GRANTED,** as follows. Pursuant to Rule 65, it is ORDERED that: Defendant Giles County, the Sheriff, and their officers, agents, employees, servants, attorneys, and all persons in active concert or participation with them are enjoined from detaining any person on misdemeanor probation in Giles County based on a secured financial condition of release (*i.e.,* secured bail amount) on a violation of probation warrant if the warrant is not accompanied by a record showing that the condition (*i.e.,* secured bail amount) was imposed after: (1) notice to the arrestee and an opportunity to be heard by an appropriate judicial officer; and (2) findings by that judicial officer concerning the arrestee's ability to pay, alternatives to secured bail, and whether pre-revocation detention is necessary to meet a compelling governmental interest.

As for the question of posting a bond, given that the members of the putative class are indigent, the Court exercises its discretion to waive the security required by Rule 65(c). *See, e.g., Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co*., 714 F.3d 424, 431 (6th Cir. 2013) (observing that the rule in Sixth Circuit has long been that the district court possesses discretion over whether to require the posting of security under Rule 65); *see also Schultz,* 330 F. Supp. 3d at 1376; *Daves,* 341 F. Supp. 3d at 697-98.

This Preliminary Injunction Order shall remain in effect pending further order of the Court.

The Court is of the opinion that the parties should participate in a judicial settlement conference within 90 days of entry of this Order. The Magistrate Judge shall issue any necessary orders, including the referral to another Magistrate Judge, regarding the judicial settlement conference.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE