UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE-COLUMBIA DIVISION

KAREN MCNEIL, et al. )
)
) Case No.: 1:18-cv-00033
Plaintiffs )
) JUDGE CAMPBELL/
v. ) JUDGE FRENSLEY
)
COMMUNITY PROBATION SERVICES, ) JURY DEMAND
LLC, et al. )
)
Defendants )

MEMORANDUM OF LAW IN SUPPORT
MOTION FOR SUMMARY JUDGMENT BY CPS AND MCNAIR

Defendants Community Probation Services, LLC, Patricia McNair, and additional

misnamed defendants, have been sued by Plaintiffs pursuant to 42 U.S.C. § 1983, the RICO Act,

18 U.S.C. §§ 1962(c) and (d), and Tennessee common law. The material facts are not in dispute,

and these Defendants are entitled to judgment as a matter of law on all claims.  The only factual

material essential to the resolution of these claims is set out in Defendants' Statement of

Undisputed Material Facts; the Declaration of Patricia McNair, and the State court judgments

and other documents attached thereto; the Declaration of Joel Colton; and the deposition excerpts

of Plaintiff Indya Hilfort, Judge Russell Parkes, and Judge Robert Richardson, filed

contemporaneously herewith. The Plaintiffs, and each of them, have pleaded guilty, and

particularly the constitutional issues they raise in this suit could have been, and (if they had

merit) should have been, raised in their underlying cases.[1]

---

[1] Notably, well-respected Circuit Judge Russell Parkes, who has not been sued in this case and
who is not affiliated with these Defendants  specifically testified that not only is there no factual
basis for many of Plaintiffs' claims, the Plaintiffs' attorneys lacked a good faith basis to even
make the allegations.  (Parkes Dep. at 97–100).

# I.     CPS is entitled to qualified immunity.

In the Sixth Circuit, a private entity sued in its individual capacity under § 1983 can assert the defense of qualified immunity. *See Bartell v. Lohiser*, 215 F.3d 550, 555–57 (6th Cir. 2000); *Cullinan v. Abramson*, 128 F.3d 301, 310–13 (6th Cir. 1997); *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 n. 3 (6th Cir. 2014). Because CPS did not violate Plaintiffs' constitutional rights in any respect, and even if it did, such rights were not clearly established, CPS and McNair are entitled to qualified immunity on all § 1983 claims, including Counts 5–6, 9–10, and 13–14 of the Amended Complaint.

## A.     CPS did not violate Plaintiffs' procedural due process rights. [Applicable to Counts 5 and 6][2]

Plaintiffs' procedural due process claim fails at the outset because they were never deprived of a cognizable liberty or property interest protected by the Fourteenth Amendment. Plaintiffs allege that conditions of probation and the possibility of incarceration amount to "restrictions on their liberty." (Am. Complaint at ¶ 489; 98 n. 14). But "[t]o succeed in establishing a protected liberty interest, a plaintiff must show that the [challenged action] deprived the individual of a right previously held[.]" *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (internal quote and citation omitted). Probationers do not possess the "absolute liberty to which every citizen is entitled," but only a "conditional liberty" interest, which is "properly dependent on observance of special . . . restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). "Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender

---

[2] Also with respect to Counts 5 and 6, the CPS defendants are entitled to immunity for reporting suspected violations of Plaintiffs' conditions of probation to the courts. *See Burns v. County of King*, 883 F.2d 819, 822–23 (9th Cir. 1989); *Holland v. O'Hair*, 145 F.3d 1331 (6th Cir. 1998); *Adams v. Hanson*, 635 F.3d 397, 402 (6th Cir. 2011).

2

of some freedoms enjoyed by law-abiding citizens." *U.S. v. Knights*, 534 U.S. 112, 119 (2001). Plaintiffs' liberty interest has already been extinguished because convicts sentenced to probation have no right whatsoever to be free from conditional restrictions on their freedom:

> Although probation is not a favor of the court bestowed upon defendant as a relief from imprisonment that may be conditioned in any manner the trial judge sees fit, neither does a probationer have a right to be free from conditions that severely restrain his freedom of action. The judge may, in fact is obliged to, view probation as a substitute for imprisonment and formulate conditions calculated to ensure that the probation furthers the purposes of the criminal law.

*United States v. Tonry*, 605 F.2d 144, 148 (5th Cir. 1979); *see also Knights*, 534 U.S. at 119; *Owens v. Kelley*, 681 F.2d 1362, 1368 (11th Cir. 1982) ("Because they have been convicted of crimes for which they could be incarcerated, probationers reasonably expect infringements on their privacy which law-abiding citizens neither expect nor receive."); *U.S. v. Peete*, 919 F.2d 1168, 1181 (6th Cir. 1990) ("probation restrictions may affect fundamental rights . . . if the conditions are primarily designed to meet the ends of rehabilitation and protect the public.") (citing *Tonry* favorably). Nor do convicts such as Plaintiffs have any right to be free from incarceration upon violating the conditions of their probation:

> There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. **But the conviction, with all its procedural safeguards, has extinguished that liberty right: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty."** *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

*Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *see also Peete*, 919 F.2d at 1181 ("We reject Peete's contention that his probation conditions were delivered without affording him due process of law. The sentencing proceedings afforded Peete his fundamental due process rights—notice and an opportunity to be heard.").

3

Moreover, even if Plaintiffs were deprived of a protected interest, they must prove causation to state a claim under § 1983. Plaintiffs cannot prove causation because CPS did not deprive them of anything. The State trial courts bore the sole and exclusive power and responsibility of determining whether Plaintiffs violated the terms of their probation and imposing sanctions for any such violation. Regardless of what CPS reported, only the State trial courts had the power to order Plaintiffs to serve jail time for failure to comply with the terms of their probation. The State courts, if anyone at all, caused Plaintiffs' alleged injuries, not CPS. *See Harper v. Professional Probation Services, Inc.*, 2018 WL 5976560, at *7–8 (N.D. Ala. 2018) (dismissing identical claim on causation); *McKenna v. Bowling Green State Univ.*, 568 Fed. App'x. 450, 460–61 (6th Cir. 2014). In addition to the Northern District of Alabama's dismissal in *Harper*, another court in the Southern District of Georgia likewise dismissed an identical claim against a private probation company on the issue of causation:

> [I]t is the court—and the court alone—that decides whether or not to place a misdemeanant on probation and whether or not she is able to pay probation supervision fees. The Statute "simply gives courts the authority to contract with private providers for the <u>administration of probation services</u>." As such, the Statute clearly delineates the decision-making function of the state-court judge and the administrative role of the private probation company. That a probation officer is able to use court process to collect fees for his employer, as Plaintiff emphasizes, does not in any way displace this division of authority or give the state-court judge any personal pecuniary interest in the outcome of the case. Because nothing in the Complaint or its attachments suggests that the state-court judge, as the sole decision maker, stands to incur a personal financial gain in sentencing misdemeanant defendants, there is no plausible conflict of interest implicating federal constitutional concerns.

*Brinson v. Providence Community Corrections*, 2016 WL 9651775, at *8 (S.D. Ga. 2016) (citations omitted), *vacated and remanded on jurisdictional grounds*, 703 Fed. App'x. 874 (11th Cir. 2017), and *aff'd*, 2018 WL 4059379 (S.D. Ga. 2018). This case is no different than *Harper* and *Brinson*. Here, it is likewise undisputed that the trial court retains the sole and final authority

and discretion to make findings of fact with respect to an alleged violation of probation, issue warrants, and impose sanctions for such violation. (Parkes Dep. at 92:7–14). Furthermore, Plaintiffs had every right and opportunity to contest the report's findings and cross-examine their probation officer at a revocation hearing. (Parkes Dep. at 64:22–25; 65:1–25). It is completely disingenuous now to suggest that CPS employees improperly reported their violations when they did not raise that issue in their revocation proceedings. (Parkes Dep. at 66:14–25; 67:1–13). Moreover, Plaintiffs do not allege, nor can they point to any evidence whatsoever that suggests, these state court judges had any pecuniary interest or stood to incur a personal financial gain in rendering their sentencing decisions. Because Plaintiffs cannot show causation, their procedural due process claim against CPS separately fails as a matter of law.

Finally, even if CPS did deprive these Plaintiffs of some cognizable liberty interest, which it did not, Plaintiffs received all the process they were due. Irrespective of an individual probation officer's motivations for reporting a suspected violation, if the report sets out plainly discernable and accurate factual matter from which the trial court is able to make a reasoned and unbiased decision, the neutrality requirement is met. *U.S. v. Espalin*, 350 F.3d 488, 496 (6th Cir. 2003) ("When the recommendation is based fairly on the facts and dispassionately traces its way through the law to a sensible conclusion, the requirement of neutrality has been met."); *see also Goldstein v. Delaware Bureau of Adult Corr.*, 931 F.Supp. 284, 298 (D. Del. 1996) (report, recommendation, and testimony of Receiver, who had direct financial interest in the outcome of revocation proceeding, did not violate probationer's due process right to a neutral decision maker, because reports "provided [judge] with the information that she needed to make an informed decision regarding Goldstein's compliance with the conditions of his probation"), *aff'd*, 127 F.3d 1095 (3d Cir. 1997). Plaintiffs can present no evidence that any report or

recommendation from CPS was false, misleading, or would otherwise bias the court so that it would be unable to sit as a neutral fact finder and render an impartial sentencing decision. (Parkes Dep. at 92:1–14; 98:18–25; 99:1–8). Moreover, importantly, CPS employees are paid hourly and Patricia McNair did not receive compensation or any other pecuniary benefit or burden for reporting or not reporting Plaintiffs' violations of their conditions of probation. (McNair Decl. at ¶ 24). No material facts are in dispute, and CPS is entitled to judgment as a matter of law on Counts 5 and 6.

**B.    CPS did not violate equal protection by treating Plaintiffs differently than private debtors. [Applicable to Counts 9 and 10]**

Plaintiffs allege that it violates equal protection to subject them to the possibility of jail for nonpayment of court-imposed fines, fees, and costs, when the only consequence for nonpayment of a private debt is the possibility of a civil judgment. Plaintiffs further allege that making court-imposed fines, fees, and costs a condition of probation violates equal protection because, essentially, private debtors do not have to report to a supervisor or take drug tests. Plaintiffs contrive these sweeping conclusions by piecing together dicta from *James v. Strange*, 407 U.S. 128 (1972). Plaintiffs' fabricated legal truisms find no support in *Strange* or elsewhere in the law. Rather, courts are clear that *de facto* economic distinctions such as these are subject only to rational basis review, and differential treatment will be unconstitutional only if it bears no rational relationship to any legitimate public purpose; a standard which, here, is clearly met. Enforcing court-ordered conditions of probation, and encouraging compliance with those conditions by informing probationers that they could be sent to jail for nonpayment is rationally related to the legitimate state interests of effective punishment and deterrence, maintaining supervised probation as an alternative to jail, and recouping supervision costs.

6

It is well-established law in the Sixth Circuit that equal protection claims based on economic distinctions are governed by the application of rational basis review unless they discriminate with respect to the exercise of a fundamental right. *See Thomas v. Haslam*, 329 F.Supp.3d 475, 482 (M.D. Tenn. 2018) (Trauger, J). There is no fundamental right at stake here. Nor are the indigent a suspect class entitled to heightened scrutiny. *See Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998) ("neither indigents nor prisoners are a suspect class"); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) ("And contrary to Plaintiffs' other contention, wealth-based classifications do not discriminate against a suspect class."). Therefore, the salient question is whether the challenged policy is rationally related to a legitimate state interest. *Thomas*, 329 F.Supp.3d at 482.

The State of Tennessee and its courts have a legitimate interest in collecting court-imposed fines, fees, and costs, "sharing the costs of incarceration," and "furthering offender accountability." *Sickles v. Campbell Cty. Ky.*, 501 F.3d 726, 731 (6th Cir. 2007); *Thomas*, 329 F.Supp.3d at 482 ("once the government lawfully imposes a debt that is itself supported by a legitimate purpose, then the government also has a legitimate purpose in encouraging payment of that debt."); *see also James v. Strange*, 407 U.S. 128, 141 (1972) (recognizing "important" state interests in discouraging "fraudulent concealment of assets and false assertions of indigency," and "recover[ing] some of the added costs" of "expanding criminal dockets," which have "heightened the burden on public revenues."). The challenged scheme encourages recoupment of supervision costs that would not otherwise be collected, and makes the system self-sustaining. *See* (McNair Decl. at ¶ 26). And although cheaper than incarceration, supervision imposes a cost burden on the State, and making repayment of those costs a condition of release, alongside other court-imposed monetary conditions, is rationally related to the State's interest in sustaining the

system that permits probationers to be conditionally free from incarceration. But the collection of a public debt is not the only legitimate state interest at play here. *Cf. Thomas*, 329 F.Supp.3d at 518 (examining only "the legitimate interest of collecting court debt"). Unlike the revocation statute in *Thomas*, which only served the purpose of augmenting State revenue, here the State's legitimate interests in effective punishment and deterrence, rehabilitation, and reentry also underlie the challenged policy.

The State of Tennessee has an interest in punishing people for their crimes and deterring future criminal conduct. *See Kuhlmann v. Wilson*, 477 U.S. 436, 452–53 (1986) (recognizing "the State's legitimate interest in deterring crime," and "the State's legitimate punitive interests."). The State also has an interest in overseeing the rehabilitation of its convicts and their successful reentry into society. *Id*. Supervised probation serves both of those interests by empowering convicts to serve out their sentences as members of the public rather than behind bars. Special conditions of release—both monetary and nonmonetary—have a punishment and deterrent effect. The restraint on the probationer's liberty acts as punishment for past criminal behavior, while the ever-present threat of incarceration for noncompliance discourages future criminality and incents accountability. Supervision is crucial to monitoring compliance, which is essential to the effectiveness of the rehabilitative scheme and meeting the State's penal interests in punishment and deterrence. *See Bearden v. Georgia*, 461 U.S. 600, 670 (1983) ("The decision to place the defendant on probation . . . reflects a determination by the sentencing court that the State's penal interests do not require imprisonment," but "[a] probationer's failure to make reasonable efforts to pay his debt to society may indicate that this original determination needs reevaluation, and imprisonment may now be required to satisfy the State's interests."). In other words, probationers are not supervised and subject to the possibility of imprisonment because

they owe a monetary debt to the government; they are subject to these conditions because they owe a debt to society for crimes they have committed. These debts cannot even remotely be compared to consumer credit because they involve the kind of fundamental penological interests that attach when someone is convicted of a crime. Compliance with the conditions of probation––even monetary conditions—is necessary to meeting the State's penal interests, and enforcing those conditions through supervision is rationally related to that legitimate public purpose. As the Supreme Court explicitly stated in *Williams v. Illinois*:

> **The State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction.**

399 U.S. 235, 244 (1970); *see also Id*. at 244 n. 20 ("What we have said regarding imprisonment for involuntary nonpayment of fines applies with equal force to . . . court costs. Although the actual amounts prescribed for fines and court costs reflect quite different considerations . . . the purpose of incarceration appears to be the same in both instances: ensuring compliance with a judgment."). There is simply no constitutional requirement that the indigent convict be relieved of any further obligation if the judgment remains unsatisfied upon expiration of his term of probation. Such a rule would be offensive to the State's penological interests, discourage accountability, incent fraudulent concealment of assets and false assertions of indigency, and make supervision less available to those who would otherwise benefit from it.

Nor does *Strange* support Plaintiffs' baseless contention that the State is "powerless to enforce judgments against those financially unable to pay a fine." *Williams*, 399 U.S. at 244. *Strange* involved a Kansas recoupment statute, which allowed the state to recover legal defense fees expended for the benefit of indigent criminal defendants. Under the Kansas statute, the

9

state's expenditures were automatically docketed as a civil judgment against the defendant. The judgment could be executed the same way as any other judgment lien under the Kansas Code of Civil Procedure—except that the defendant was not entitled to any of the myriad exemptions available to other judgment debtors other than the homestead exemption. The Supreme Court held that there was no rational basis for denying indigent criminal defendants the benefit of the same exemptions that other judgment debtors enjoyed under the same statutory scheme, especially because those exemptions were "designed primarily to benefit debtors of low and marginal incomes," and that the plaintiff was subject to the deprivation simply for exercising his Sixth Amendment right to appointed counsel. The plaintiff's debt in *Strange* was automatically governed by the same statutory scheme as every other judgment debtor, but arbitrarily denied the same statutory exemptions available to others under that scheme. That is completely different from how criminal judgments are executed in Tennessee.

Under Tennessee law, criminal fines, fees, and costs *may* be collected in the same manner as a judgment in a civil action, enforced by order of contempt, or discharged by service of imprisonment in default. Tenn. Code Ann. § 40-24-105(a). Tennessee law does not provide that fines and costs are to be collected as civil judgments and then deny probationers protections available to all other judgment debtors. To the contrary, probationers who have their court debts collected in the same manner as a civil judgment have the full panoply of protections available to all judgment debtors under that procedure. Plaintiffs have not pointed to the statutory denial of any exemption or other benefit that would otherwise be available to a judgment debtor, nor can they. Plaintiffs essentially allege that a judge's decision *not* to treat criminal fines as a civil judgment violates the constitution. That conclusion is unsupported by *Strange* or any other authority. Nothing in *Strange* establishes a blanket prohibition of differential treatment in the

10

collection of public and private debts as the Plaintiffs allege. Plaintiffs are not similarly situated to private debtors and their equal protection claims fail as a matter of law.

### C. CPS did not violate substantive due process or equal protection by keeping nonpaying probationers on supervised probation. [Applicable to Counts 13 and 14]

Plaintiffs allege that keeping them on supervised probation because they were unable to pay violates their substantive due process and equal protection rights. With respect to Plaintiffs' substantive due process claim, there is no "fundamental right" to unsupervised probation, and rational basis review applies. *Reno v. Flores*, 507 U.S. 292, 302–03, 306 (1993); *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). Likewise, for equal protection purposes, because Plaintiffs were not treated differently with respect to the exercise of any "fundamental right," and the indigent are not a suspect class, rational basis review applies. *Wilson*, 148 F.3d at 604; *Johnson*, 624 F.3d at 746; *Thomas*, 329 F.Supp.3d at 482. The universal question, therefore, is whether the challenged policy is rationally related to a legitimate state interest. Again, this standard is easily met.

As an initial matter, the Supreme Court has already spoken definitively on the topic of differential treatment of indigent and non-indigent convicts:

> **The mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense does not, of course, give rise to a violation of the Equal Protection Clause.**

*Williams*, 399 U.S. at 243; *see also Ross v. Moffitt*, 417 U.S. 600, 611–12 (1974) ("The Fourteenth Amendment does not require absolute equality or precisely equal advantages, nor does it require the State to equalize economic conditions.") (quoting *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 24 (1973) and *Griffin v. Illinois,* 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring)) (internal citations omitted). The same is surely true here, where

probationers are not even subject to physical confinement, merely an extended period of supervision. Supervised probation may be burdensome and inconvenient, but supervision is incident to conviction, and it is not constitutionally infirm to require reporting and other compliance measures while fines, fees, and costs remain outstanding.

The state has a legitimate interest in recoupment of supervision costs, *Sickles*, 501 F.3d at 731; *Thomas*, 329 F.Supp.3d at 482; *Strange*, 407 U.S. at 141, and continuing to supervise probationers who have not paid those costs is rationally related to the purpose of collecting them. For instance, in *U.S. v. Kras*, the Supreme Court upheld the requirement of a filing fee as a precondition to filing a bankruptcy petition, applying rational basis review, reasoning that Congress had "sought to make the system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large." 409 U.S. 434, 448 (1973); *see also Ortwein v. Schwab*, 410 U.S. 656, 660 (1973) (upholding filing fee requirement as rationally related to legitimate purpose of offsetting state court's operating costs). By contrast, in *Thomas*, while properly applying rational basis review, Judge Trauger reasoned that revocation of driving privileges was not rationally related to the legitimate purpose of collecting outstanding traffic fines because "the ability to drive is crucial to the debtor's ability to actually establish the economic self-sufficiency that is necessary to be able to pay the relevant debt." *Thomas*, 329 F.Supp.3d at 520. Likewise, in *Tate v. Short*, the Supreme Court held that imprisonment was not rationally related to the purpose of collecting speeding fines because "imprisonment, rather than aiding collection of the revenue, saddles the State with the cost of feeding and housing [the indigent defendant] for the period of his imprisonment." 401 U.S. 395, 399 (1971). This case is more analogous to *Kras* and *Ortwein*, and at odds with the reasoning in *Thomas* and *Tate*.

Unlike imprisonment or revocation of driving privileges, ongoing supervision is designed to ensure ongoing compliance with conditions of release, to ensure that probationers remain law-abiding, and separately and additionally, to aid the collection of court debts. It does not unduly burden the probationer's ability to actually establish the economic self-sufficiency necessary to be able to pay them. Rather, supervision empowers convicts to earn a living while encouraging compliance with conditions meant to promote economic self-sufficiency, such as abstaining from criminal activity, drugs and alcohol, and associating with known criminals. Monitoring compliance better ensures the avoidance of life choices pernicious to the timely repayment of court debts, and encourages successful restoration of useful and productive citizenship. (McNair Decl. at ¶ 27). Supervision is therefore rationally related to the State's legitimate interest in making probation self-sustaining and paid for by those who benefit from it, rather than by tax revenues drawn from the public at large. Supervision is also less expensive than incarceration, and extended periods of supervision in lieu of revocation and imprisonment are rationally related to the State's legitimate interest in reducing the cost burden on the State's prison system.

Further, because payment of these costs are conditions of probation imposed by the judgment of the sentencing court, the State's legitimate interests in punishment and deterrence would not be served by allowing indigent convicts to both escape confinement and repayment of fines and costs associated with their sentences. *See Williams*, 399 U.S. at 244 ("indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction.").

Pursuant to the foregoing, Plaintiffs' constitutional rights have not been violated, and CPS is entitled to qualified immunity. Furthermore, because all of Plaintiffs' constitutional claims fail as a matter of law, their § 1983 claims for equitable relief should also be dismissed.[3]

**D.      Even if Plaintiffs' constitutional rights were violated, such rights were not clearly established.**

A § 1983 plaintiff bears the burden of showing that a defendant is not entitled to the defense of qualified immunity. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. Jan. 3, 2019). In order to prevail, Plaintiffs must demonstrate that CPS violated their constitutional rights, and that those rights were "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). Plaintiffs cannot come close to satisfying this burden. As discussed above, Plaintiffs' constitutional rights were never violated, and even if they were, those rights were certainly not clearly established. *See Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 564 (6th Cir. 2018) ("There does not need to be 'a case directly on point, but **existing precedent must have placed the . . . constitutional question beyond debate**.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). There is absolutely no controlling precedent establishing that Plaintiffs' constitutional rights were violated. Thus, CPS is entitled to qualified immunity as no such right is clearly established.

**II.      Alternatively, CPS is entitled to Eleventh Amendment sovereign immunity.**

To the extent that Plaintiffs claim CPS is really sued in its official capacity, it is entitled to Eleventh Amendment sovereign immunity. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). CPS is not a municipal policymaker; it operates as an arm of the State of Tennessee,

---

[3] Plaintiffs' § 1983 claims against Giles County and the PSI Defendants fail for the same reason. Because the Plaintiffs' *Monell* claims against the County are inextricably intertwined with the resolution of the constitutional claims against CPS, Counts 5–6, 9–10, and 13–14 of the Amended Complaint should be dismissed in their entirety.

and suits against state officers acting in their official capacities are not cognizable under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).

In *McMillan v. Monroe County, Alabama*, the Supreme Court held that a county sheriff was a state policymaker in his law enforcement capacity, and was therefore entitled to Eleventh Amendment immunity. 520 U.S. 781 (1997). The same is true of CPS, despite having a contract with Giles County. In *McMillan*, the county sheriff acted as an arm of the state in his law enforcement capacity, even though he was elected locally, paid and equipped out of the county treasury, and had jurisdiction confined to the county. *Id*. Likewise, in *Pusey v. City of Youngstown*, the Sixth Circuit held that a city prosecutor, although a city employee, was entitled to Eleventh Amendment immunity because he was an officer of the municipal court, which is an arm of the state. 11 F.3d 652, 657–58 (6th Cir. 1993); *see also Ellis v. Bradley County, Tennessee*, 2007 WL 1830756 (E.D. Tenn. 2007). Similarly, CPS acts as officer of the State court system, and is endowed by the laws of the State of Tennessee to carry out "the judicial process of monitoring a convicted [person's] compliance with the Court's orders." *Haynie v. State*, 2010 WL 366689, at *3 (Tenn. Ct. App. 2010).

Whether a local government employee or contractor acts as an arm of the state for Eleventh Amendment purposes is a question of state law. *McMillan*, 520 U.S. at 786. In Tennessee, probation has traditionally been the prerogative of the State.[4] Private probation companies are authorized to exist by virtue of state law. Tenn. Code Ann. § 40-35-302(f). The legislature has established strict statutory requirements for private probation companies, including minimum education requirements for employees, mandatory recordkeeping, and

---

[4] *See e.g.*, (Am. Complaint at ¶ 488) ("The County has contracted with two private, for profit corporations to perform a traditional court function—probation"); (Am. Complaint at ¶ 490) (referring to "the longstanding, traditional role of the probation officer—such as the role performed by Tennessee State Probation Officers").

15

quarterly reporting to the State courts. Tenn. Code Ann. § 40-35-302(g)(1)(A), (B). State court judges, not county authorities, review and approve applications for the provision of misdemeanor probation services in each judicial district. Tenn. Code Ann. § 40-35-302(g)(1)(A)(ii). Moreover, the State legislature created an administrative agency known as the Private Probation Services Council to regulate private companies "rendering general misdemeanor probation supervision, counseling and collection services to the courts." Tenn. Code Ann. § 16-3-909. The Private Probation Services Council has promulgated extensive rules and regulations governing the operation of private probation services in the State of Tennessee. *See generally*, Tenn. Comp. R. & Regs. 1177-01-.01, *et seq*. Pursuant to State law, CPS is an arm of the State of Tennessee and not an agent of Giles County. CPS is entitled to Eleventh Amendment immunity from suit on all of Plaintiffs § 1983 damages claims to the extent that Plaintiffs claim it is really sued in its official capacity.

Moreover, Plaintiff Hilfort is not entitled to prospective injunctive relief because, as discussed above, she has not alleged any unconstitutional custom, policy, or practice capable of being enjoined. Counts 5–6, 9–10, and 13–14 of the Amended Complaint should be dismissed in their entirety.

### III. CPS and its Probation Officers are absolutely immune from liability under § 1983 as witnesses to judicial proceedings and quasi-judicial officers of the State courts.

To the extent that Plaintiffs' theory of liability under § 1983 is premised upon the presentation of testimony or other evidence against them, CPS and its employees are entitled to absolute witness immunity on those claims. *See Briscoe v. LaHue*, 460 U.S. 325 (1983) (witnesses are absolutely immune from § 1983 liability based on their trial testimony, and government officials who testify about the performance of their official duties are entitled to the same); *Rehberg v. Paulk*, 566 U.S. 356 (2012) (witness in a grand jury proceeding was entitled to

the same absolute immunity from suit under § 1983 as a witness who testifies at trial); *Swift v. Steffen*, 884 F.2d 580 (Table), 1989 WL 98474 (6th Cir. 1989) (defendant witnesses entitled to immunity) (citing *Briscoe*, 460 U.S. at 340–41). Separately and additionally, "the probation officers who supervised [Plaintiffs'] probation and reported [their] violations are entitled to quasi-judicial immunity." *Frazier v. Crump*, 2017 WL 5664900, at *2 (6th Cir. 2017).

## IV. Plaintiffs' § 1983 claims are an impermissible collateral attack on the valid judgments, convictions, and sentences of State court judges, and are not otherwise cognizable federal claims.

Plaintiffs' conditions of probation reflect the judgment of the sentencing court, which, in each case, made an explicit finding that Plaintiffs were able to satisfy the fines, fees, and costs imposed pursuant to the judgment. *See* (Parkes Dep. at 38:12–25; 39:1–18; 64:22–25; 65; 66:14–25; 67:1–13); (Richardson Dep. at 54:2–12). Plaintiffs may not raise a collateral attack on that finding in federal court. *See Tropf v. Fidelity Nat'l Title Ins. Co.*, 289 F.3d 929, 937–38 (6th Cir. 2002); *Kafele v. Lerner, Sampson & Rothfuss, L.P.A.*, 161 Fed. App'x 487, 490 (6th Cir. 2005); *Reguli v. Guffee*, 371 Fed. App'x 590, 595–97 (6th Cir. 2010); *McCormick v. Braverman*, 451 F.3d 382, 391–92 (6th Cir. 2006). The final judgments of the sentencing court that are attached to the Declaration of Patricia McNair are entitled to full faith and credit, and any attempt by these Plaintiffs to invalidate such judgments is barred by the doctrine of *res judicata* and further barred by the doctrine of collateral estoppel. *Dawson v. Lennon*, 797 F.2d 934, 936 (11th Cir. 1986) (indigency determination was *res judicata*); *Higgason v. Stephens*, 288 F.3d 868, 874–75 (6th Cir. 2002).

Under the *Rooker–Feldman* doctrine, "a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal

rights." *Johnson v. De Grandy,* 512 U.S. 997, 1005–06 (1994). "Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Tropf,* 289 F.3d at 937. Here, Plaintiffs were all found to be able to satisfy their fines, fees, and costs pursuant to the judgment of the sentencing court. Now, Plaintiffs attempt to challenge those findings by, essentially, arguing that they were wrong in the first instance, and unconstitutional as applied to them. This Court lacks subject matter jurisdiction over such claims. *Id.* ("the *Rooker–Feldman* doctrine precludes federal court jurisdiction where the claim is a specific grievance that the law was invalidly—even unconstitutionally—applied in the plaintiff's particular case."). Although the *Rooker–Feldman* doctrine does not bar a federal district court's jurisdiction where the claim is a general challenge to the constitutionality of the state law applied in the state action, Plaintiffs claim they are not challenging the Tennessee statute. Plaintiffs' § 1983 claims should be dismissed.

Likewise, the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), reinforces this principle. "[F]ederal and state courts are complementary systems for administering justice in our Nation. Cooperation and comity, not competition and conflict, are essential to the federal design." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586 (1999). The *Younger* doctrine prevents a state criminal defendant from asserting ancillary challenges to ongoing state criminal procedures in federal court. As previously discussed, Indya Hilfort, as well as other members of the putative class of plaintiffs, are subject to numerous ongoing criminal proceedings and have ample avenues to raise their constitutional challenges in those proceedings. There are no "extraordinary circumstances" requiring federal intervention. The Supreme Court recognized in *Kowalski v. Tesmer*, 543 U.S. 125, 133 (2004), that the Sixth Circuit correctly—and unanimously—applied

*Younger* to bar the indigent plaintiffs' § 1983 action in *Tesmer v. Granholm*, 295 F.3d 536 (6th Cir. 2002), and again on rehearing en banc in *Tesmer v. Granholm*, 333 F.3d 683 (6th Cir. 2003).

Moreover, as the Supreme Court has explicitly held, a convicted plaintiff may not bring a cognizable § 1983 action that would necessarily invalidate her conviction or sentence unless the underlying conviction or sentence has already been invalidated by the state courts or through a writ of *habeas corpus*:

> We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.
>
> **We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove** that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. **A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983**. Thus, when a state prisoner seeks damages in a § 1983 suit, **the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated**.
>
> &ast; &ast; &ast;
>
> In another respect, however, our holding sweeps more broadly than the approach respondents had urged. **We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action**.

*Heck v. Humphrey*, 512 U.S. 477, 486–87, 489 (1994). Plaintiffs challenge the constitutionality of the conditions of probation that they have been convicted of violating pursuant to the judgment of the State courts and their own guilty pleas. A judgment in favor of the Plaintiffs in federal district court would therefore necessarily render their convictions and sentences invalid.

19

Plaintiffs have made no attempt whatsoever to invalidate their convictions and sentences through the numerous avenues available to them. Instead, they have filed this § 1983 lawsuit in federal court. This is exactly the type of collateral attack the Supreme Court held impermissible in *Heck v. Humphrey*. Plaintiffs cannot prove that their underlying convictions and sentences have been invalidated, and their § 1983 claims fail as a matter of law.

**V.     Plaintiffs lack Article III standing.**

To have standing, a plaintiff must be able to show a concrete and particularized harm that is fairly traceable to the conduct of the defendant. Plaintiffs are not indigent, nor were they indigent while being supervised on probation by CPS. Both Indya Hilfort and Karen McNeil were found to be partially indigent and ordered to pay attorneys fees by the State courts. Lesley Johnson paid all her court costs in full and never violated the conditions of her probation. Patricia McNair never reported Karen McNeil or Indya Hilfort for violating the conditions of their probation solely for their failure to pay. Counts 5 and 6 of the Complaint essentially allege that the very nature of the private probation system in the State of Tennessee is unconstitutional, but have not sued the State and refused to serve the Attorney General as a party. If Plaintiffs' constitutional rights have been violated simply by virtue of being placed on supervised probation with a private company, that harm is fairly traceable to the State of Tennessee and the judicial officers who assigned them to supervision. A private company cannot be held liable for violating someone's constitutional rights for merely operating a business in accordance with state law. Because these non-indigent probationers' alleged harm is not fairly traceable to the conduct of any named Defendant, Plaintiffs lack Article III standing and their § 1983 claims should be dismissed in their entirety.

**VI.    Plaintiffs' RICO claims fail as a matter of law.**

Count 1 alleges that CPS and Patricia McNair violated the RICO Act, 18 U.S.C. §§ 1962(c) and (d), by engaging in predicate acts of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C. § 1952, and Tenn. Code Ann. § 39-14-112, by threatening convicts with probation violations, extensions of probation, and jail time in order to collect various probation fees. Plaintiffs' RICO claims necessarily fail because the use of threats to obtain the property to which one is legally entitled does not amount to extortion under any theory of law whatsoever. Because Plaintiffs cannot allege activity on the part of CPS that amounts to extortion, they have not alleged the predicate acts of racketeering activity required to state a plausible RICO claim, and Count 1 of the Complaint is due to be dismissed.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). A defendant "wrongfully" obtains property from another under the meaning of the Act when he uses wrongful means to achieve a wrongful objective. *United States v. Enmons*, 410 U.S. 396, 399–400, n. 3 (1973). In other words, under the Supreme Court's interpretation, the term "'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Enmons*, 410 U.S. at 400. The Sixth Circuit, among others, has expressly acknowledged this well-established rule:

> [C]onsider the Second Circuit's example of a country club manager who threatens to publish a list of members delinquent in their dues if the members do not promptly pay the manager their outstanding account balances. **In that instance, there is a nexus between the threat and a claim of right**: The duty of the members to pay the country club the outstanding dues exists independently of the threat and will continue to exist even if the club manager publishes the list as

threatened. **The law recognizes the club manager's threat as a lawful and valid exercise of his enforcement rights and, therefore, does not criminalize his conduct as extortion.**

*United States v. Coss*, 677 F.3d 278, 286 (6th Cir. 2012) (citing *United States v. Jackson*, 180 F.3d 55, 66 (2d Cir. 1999)) (emphasis added); *see also United States v. Collins*, 78 F.3d 1021, 1033 n. 7 (6th Cir. 1996); *United States v. Pendergraft*, 297 F.3d 1198, 1205 (11th Cir. 2002); *United States v. Nell*, 570 F.2d 1251, 1258 (5th Cir. 1978); *United States v. Didonna*, 866 F.3d 40, 47 (1st Cir. 2017); *United States v. Arambasich*, 597 F.2d 609, 611 (7th Cir. 1979); *United States v. Dischner*, 974 F.2d 1502, 1516 (9th Cir. 1992).

Furthermore, at least two Tennessee district courts have acknowledged that the applicability of the Hobbs Act depends on the wrongfulness of the underlying objective. *See HTC Sweden AB v. Innovatech Prod. & Equip. Co.*, 2008 WL 4510710, at *11 (E.D. Tenn. 2008) (dismissing RICO counterclaim, reasoning "a threat to terminate a contract is not extortion if the threatening party has a right to terminate the contract at any time."); *Overnite Transp. Co. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 168 F.Supp.2d 826, 840 (W.D. Tenn. 2001).

Here, the Complaint merely alleges that the supposed threats were "inherently wrongful because they were motivated out of a desire to extort, . . . premised on deception concerning the facts . . . and . . . demanded pursuant to an unlawful contract." (Complaint, ¶ 376). It contains no allegation whatsoever that CPS had no lawful claim to the money it sought to collect from the Plaintiffs. And, as the Eastern District recognized in *HTC Sweden*, it is well established in the Sixth Circuit that threats to initiate legal proceedings—even those made pursuant to an illegal contract—do not constitute extortion under the Hobbs Act. 2008 WL 4510710, at *11 (citing *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994)). CPS has a legal right to collect

fees from the convicts it supervises on probation, including the Plaintiffs, and there is no

allegation in the Complaint to the contrary because no good faith basis exists to say otherwise.

Because CPS had a lawful claim to the payments sought from Plaintiffs and others, threats to

collect them are not indictable under the Hobbs Act, and Plaintiffs' claims under the Travel Act

fail for the same reason.

Furthermore, Plaintiffs' State law claims are facially deficient to allege a predicate act of

extortion for the purposes of RICO. As the Supreme Court made clear in a similar case:

> Even assuming that defendants' conduct would be "chargeable under State law
> and punishable by imprisonment for more than one year," 18 U.S.C. §
> 1961(1)(A), **it cannot qualify as a predicate offense for a RICO suit unless it
> is "capable of being generically classified as extortionate**," [citations omitted].
> For the reasons just given, the conduct alleged does not fit the traditional
> definition of extortion, so Robbins's RICO claim does not survive on a theory of
> state-law derivation.

*Wilkie v. Robbins*, 551 U.S. 537, 567 (2007) (emphasis added). Because CPS's conduct cannot

be classified as extortionate under any theory of law whatsoever, Plaintiffs' conclusory state-law

allegations cannot sustain a plausible RICO claim.

Moreover, this Court would be in good company dismissing the RICO Claims, and Count

1, as three district courts in Alabama have recently disposed of nearly identical claims. In

*Carden v. Town of Harpersville*, Judge Proctor granted the defendant private probation

company's motion to dismiss all claims, holding in relevant part:

> Here, Plaintiff's RICO claims fail from the start because Plaintiff has failed to
> plead that JCS or Harpersville committed wrongful conduct indictable under the
> Hobbs Act. The court is convinced by a recent analysis of similar civil RICO
> claims against JCS and a municipality premised on extortion.
> * * *
> JCS's alleged failure to fulfill their contract, or even their
> coordination with City officials as part of a broader scheme to
> increase municipal revenue, **does not amount to extortion
> however, as neither the objective nor means were inherently
> wrongful—collecting fees and costs from defendants on parole**

**and notifying such defendants a warrant may be issued if they do not comply is both commonplace and does not appear to be challenged.**

*McCullough v. City of Montgomery*, 2017 WL 956362, at *14 (M.D. Ala. Mar. 10, 2017). The court agrees with and adopts this analysis. Plaintiff's Amended Complaint fails to demonstrate that JCS's threats constituted indictable extortion under the Hobbs Act [footnote omitted].

Likewise, Plaintiff has failed to plead that JCS or Harpersville committed racketeering activity by violating the Travel Act. . . . First, Plaintiff has not alleged that any specific employee or agent of JCS or Harpersville travelled across state lines with the intent of promoting unlawful activity. Second, Plaintiff's Amended Complaint fails to allege that JCS or Harpersville used the mail to promote or facilitate an unlawful activity—namely, extortion—because the demands for payment in the letters sent by JCS sought fees imposed by Municipal Court orders. **Because the letters sought payments for which JCS had a lawful claim (based upon orders of the Municipal Court), the letters did not seek to extort money from probationers under JCS supervision, and a travel Act violation cannot be premised upon them**.

* * *

Plaintiff's allegation that Defendants committed predicate acts of indictable state-law extortion is wholly conclusory and fails to state the predicate act element of her RICO claims.

2017 WL 4180858, at *8, n. 5 (N.D. Ala. 2017) (Proctor, J.) (citations to the record omitted) (emphasis added).  And more recently, in *Malone v. City of Decatur, Alabama*, Judge Haikala likewise held that the Plaintiff failed to state a plausible RICO claim against the defendant probation company under any theory of law:

Here, PPS had a lawful claim to fines and fees. *See* Ala. Code §§ 12-14-13(d)(7); 12-14-13(i). Though the plaintiffs may succeed in proving that under *Bearden* and *Tate*, the defendants violated the Constitution if they incarcerated indigent defendants who could not afford to pay fines or fees, the plaintiffs have not alleged facts that would allow them to establish that PPS did not have a lawful claim to the fines and fees.

* * *

Because the plaintiffs have not adequately alleged predicate acts of extortion, the plaintiffs' RICO claims fail as a matter of law. The Court will dismiss the plaintiffs' RICO claims against PPS.

24

2018 WL 4901212, at *9–10 (N.D. Ala. Oct. 9, 2018) (Haikala, J.). The Plaintiffs here present a virtually indistinguishable RICO claim from those dismissed in *McCullough*, *Carden*, and *Malone*. Defendants' research has uncovered no case where a similar RICO claim has survived a dispositive motion. Plaintiffs have failed to allege any predicate acts of racketeering activity sufficient to state a plausible RICO claim against CPS. Plaintiffs' allegations of extortion under the Hobbs Act, the Travel Act, and Tennessee State law are facially deficient because threats made for the purpose of collecting fees to which CPS has a lawful claim of right is not conduct that can be classified as "wrongful" or extortionate under any theory of law. Plaintiffs' RICO claims are frivolous and should be dismissed.

**VII.    CPS is entitled to Eleventh Amendment immunity on Plaintiffs' state law tort claims. [Applicable to Counts 17, 20, 21, and 25]**

As an initial matter, because all of Plaintiffs' federal claims fail as a matter of law, this Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law tort claims. Pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims," even when federal claims remain against other defendants. *See Medlin v. City of Algood*, 2019 WL 215854, at *8 (M.D. Tenn. Jan. 16, 2019) (citing *Martinez v. City of Cleveland*, 700 Fed. App'x. 521, 523 (6th Cir. 2017)).

But even if the Court were inclined to exercise supplemental jurisdiction, CPS is entitled to Eleventh Amendment immunity for the same reasons discussed above with respect to Plaintiffs' § 1983 claims. *See Oshop v. Tennessee Dept. of Children's Services*, 2009 WL 1651479, at *3–4 (Trauger, J) (holding that plaintiffs' contention that the State of Tennessee has waived its sovereign immunity under the Tennessee Governmental Tort Liability Act (GTLA) was "plainly incorrect."); *see also Tenn. Dept. of Mental Health & Mental Retardation v.*

*Hughes*, 531 S.W.2d 299, 300 (Tenn. 1975) (the GTLA waives "governmental immunity only at the county, municipal or other local level, and not the state level."); *Chapman v. Sullivan County*, 608 S.W.2d 580, 582 (Tenn. 1980); *Freeman Indus. LLC v. Eastman Chem. Co.*, 227 S.W.3d 561, 567 (Tenn. Ct. App. 2006). Therefore, Counts 17, 20, 21, and 25 of the Amended Complaint should be dismissed.

## VIII. Patricia McNair is entitled to quasi-judicial immunity on Plaintiffs' state law tort claims. [Applicable to Counts 20 and 21]

In Tennessee, probation officers performing discretionary tasks as officers of the court, such as reporting probation violations or seeking the issuance of violation warrants, are entitled to absolute quasi-judicial immunity from suit. *Jackson v. Metropolitan Government of Nashville*, 2010 WL 2287639, at *4–6 (Tenn. Ct. App. 2010); *Haynie v. State*, 2010 WL 366689, at *3 (Tenn. Ct. App. 2010); *see also Davis v. Knox County*, 2015 WL 7709427, at *4–6 (Tenn. Ct. App. 2015) (holding that counties are entitled to quasi-judicial immunity under the GTLA with respect to actions taken by county employees, to the extent that such employees are entitled to quasi-judicial immunity). Therefore, Patricia McNair is entitled to absolute immunity from suit on Plaintiffs' state law tort claims, and Counts 20 and 21 of the Amended Complaint should be dismissed in their entirety.

## IX. Even on the merits, Plaintiffs' state law tort claims fail.

Under Tennessee law, an abuse of process claim is not cognizable unless the process instituted "compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do." *Givens v. Mullikin*, 75 S.W.3d 383, 401 (Tenn. 2002). As previously discussed, Plaintiffs have not alleged that they were not legally obligated to pay their court-imposed fines and costs, or that CPS had no legal authority to collect supervision fees, nor can they. Further, "no claim of abuse will be heard if process is used for its lawful

26

purpose, even though it is accompanied with an incidental spiteful motive or awareness that the use of process will result in increased burdens and expenses to the other party." *Id*. Patricia McNair had no ulterior motive, pecuniary or otherwise, to report Plaintiffs for violating their probation other than it was her job to do so, and Plaintiffs have introduced no evidence to the contrary. (McNair Decl. at ¶ 25).

Plaintiffs' unjust enrichment claim likewise fails because they cannot prove that the circumstances of any benefit conferred upon CPS were unjust, as required by Tennessee law. *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). CPS has a legal right to collect fees from the probationers they supervise pursuant to the lawful orders of the State courts. Tenn. Code Ann. § 40-35-303(i)(1). Collecting those payments is not unconstitutional, and therefore cannot be considered "unjust" in any respect.

Finally, Plaintiffs have not stated a claim of civil conspiracy. The elements of civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury to the plaintiff. *Rock Ivy Holding, LLC v. RC Properties, LLC*, 464 S.W. 3d 623, 643 (Tenn. Ct. App. 2014). Civil conspiracy "must be pled with some degree of specificity." *Kincaid v. SouthTrust Bank*, 221 S.W. 3d 32, 38 (Tenn. Ct. App. 2006). Furthermore, civil conspiracy requires an actionable "underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W. 3d 169, 180 (Tenn. Ct. App. 2007). Plaintiffs have not alleged a common design between CPS and any other person, because the alternative entities listed in Count 25 of the Complaint do not exist, nor have they ever existed in Giles County. (Colton Decl.). And as discussed at length above, nor is the purpose of collecting the fines, fees, and costs imposed

pursuant to the judgment of the sentencing court an unlawful purpose or accomplished in any way by unlawful means. Finally, because Plaintiffs have not alleged any unconstitutional practice, RICO violation, or stated a claim for abuse of process or unjust enrichment, there is no underlying predicate tort committed pursuant to the conspiracy. Plaintiffs' civil conspiracy claim likewise fails and should be dismissed.

### Conclusion

For the foregoing reasons, the material facts are not in dispute, and these Defendants, and each of them, are entitled to judgment as a matter of law.  This case should be dismissed.

Respectfully submitted,

MOORE, RADER,
FITZPATRICK AND YORK, P. C.

By /s/ Daniel H. Rader IV, BPR 025998
      DANIEL H. RADER IV
      Attorneys for Defendants,
      Community Probation Services,
      LLC; Community Probation
      Services, L.L.C.; Community
      Probation Services; and
      Patricia McNair,
      P. O. Box 3347
      Cookeville, TN  38502
      (931-526-3311)
      B.P.R.No. 025998

By /s/ André S. Greppin, BPR 036706
      ANDRÉ S. GREPPIN
      Attorneys for Defendants,
      Community Probation Services,
      LLC; Community Probation
      Services, L.L.C.; Community
      Probation Services; and
      Patricia McNair,
      P. O. Box 3347
      Cookeville, TN  38502
      (931-526-3311)
      B.P.R.No. 036706

<u>CERTIFICATE OF SERVICE</u>

     The undersigned attorney herby certifies that on April 18th, 2019, a true and exact copy of the foregoing pleading was filed electronically.  Notice of this filing was sent by operation of the Courts electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties my access the filing through the Court's electronic filing system.

Mr. Chirag Badlani
Ms. Kate E. Schwartz
Mr. Matthew J. Piers
Hughes, Socol, Piers, Resnick & Dym Ltd.
70 W Madison Street
Suite 4000
Chicago, IL 60602

David W. Garrison
Scott P. Tift
BARRETT JOHNSTON MARTIN & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900 Nashville, TN 37219

Ms. Elizabeth Anne Rossi
Mr. Eric Halperin
Mr. Jonas Wang
Civil Rights Corps
910 17th Street NW
Suite 500
Washington, DC 20006

Mr. Kyle F. Mothershead
The Law office of Kyle Mothershead
414  Union Street
Suite 900
Nashville, TN 37219

Mr. Brandt M. McMillan
Tune, Entrekin & White, P.C.
315 Deadrick Street
Suite 1700
Nashville, TN 37238

Ms. Cassandra M. Crane
Ms. Robyn Beale Williams
Farrar & Bates
211 Seventh Avenue, North

Suite 500
Nashville, TN 37219

Mr. John Christopher Williams
Williams Law and Mediation Group
101 S 1st Street
Pulaski, TN 38478

Timothy N. O'Connor
Tune, Entrekin, & White, P.C.
315 Deaderick St., Ste. 1700
Nashville, TN 37238-1700
p: (615) 244-2770

Heather Ross
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207 (615) 532-2559

Joseph Ahillen
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207 (615) 532-2559

D. Andrew Saulters
330 Commerce St., Ste 110
Nashville, TN 37201
(615) 256-9999

    This the 18th day of April, 2019.

                    MOORE, RADER,
                    FITZPATRICK AND YORK, P. C.

                    By /s/ Daniel H. Rader IV, BPR 025998
                        DANIEL H. RADER IV
                        Attorneys for Defendants,
                        Community Probation Services,
                        LLC; Community Probation
                        Services, L.L.C.; Community
                        Probation Services; and
                        Patricia McNair, by special
                        and limited appearance only,
                        P. O. Box 3347
                        Cookeville, TN  38502
                        (931-526-3311)
                        B.P.R.No. 025998