IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION


| | | |
|---|---|---|
| **KAREN MCNEIL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:18-cv-00033** |
| | ) | |
| **COMMUNITY PROBATION** | ) | **JUDGE CAMPBELL** |
| **SERVICES, LLC, et al.,** | ) | **MAGISTRATE JUDGE FRENSLEY** |
| | ) | |
| **Defendants.** | ) | |


## MEMORANDUM

## I.  INTRODUCTION

Pending before the Court are the CPS Defendants' Motion to Dismiss (Doc. No. 369), Plaintiffs' Response (Doc. No. 387), and the CPS Defendants' Reply (Doc. No. 393). Also pending before the Court are the CPS Defendants' Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction (Doc. No. 374), Plaintiffs' Response (Doc. No. 389), and the CPS Defendants' Reply (Doc. No. 394).

The PSI Defendants have filed a Notice (Doc. No. 384), requesting they be allowed to join the Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. No. 374) with regards to Plaintiff Tanya Mitchell's claims for injunctive relief. The request to join is **GRANTED.**

For the reasons set forth herein, the Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction (Doc. No. 374) is **DENIED,** and the Motion to Dismiss (Doc. No. 369) is **GRANTED** in part, and **DENIED** in part. Accordingly, Count 1 (the RICO claim); Count 5 (the due process claim for damages); Count 9 (the equal protection claim for damages);

Count 10 (the equal protection claim for equitable relief); and Count 13 (the equal protection and due process claim for damages) are dismissed. Count 6 (the due process claim for equitable relief); Count 14 (the equal protection and due process claim for equitable relief); Count 16 (the unjust enrichment claim); Counts 19 and 20 (the abuse of process claims); and Count 24 (the civil conspiracy claim) remain for trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Karen McNeil, Lesley Johnson, Tanya Mitchell,[1] Indya Hilfort, and Lucinda Brandon allege they are indigent individuals who have been placed on probation for misdemeanor offenses by the Giles County courts, and that their probation is supervised by one of the two named private probation companies. (Doc. Nos. 41, 256). Plaintiffs McNeil, Johnson, and Hilfort allege they have been supervised by the "CPS Defendants" or "CPS" (Community Probation Services, LLC, Community Probation Services, L.L.C., Community Probation Services, and Patricia McNair). Plaintiffs Mitchell and Brandon allege they have been supervised by "the PSI Defendants" or "PSI" (Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., Tennessee Correctional Services, LLC, Timothy Cook, Markeyta Bledsoe, and Harriet Thompson). Plaintiffs assert constitutional claims, claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state law claims against the CPS Defendants and the PSI Defendants. Plaintiffs assert constitutional and state law claims against Giles County and Sheriff Kyle Helton. The named Plaintiffs seek to represent a class to obtain damages and injunctive relief on their claims.

---

[1] During the pendency of this litigation, Plaintiff Tanya Mitchell passed away, and Plaintiffs have filed a pending motion to substitute her estate as a party for purposes of Counts 7, 11, 21, and 23. (Doc. No. 410). The Court's resolution of the arguments herein does not address the effect of Ms. Mitchell's death on this litigation, as that issue has not been addressed by the parties.

2

As an overview to their claims, Plaintiffs allege as follows:

1. This class action lawsuit challenges systemic constitutional and statutory violations and an illegal extortion scheme in Giles County, Tennessee, which has allowed two for-profit companies – Community Probation Services, LLC and PSI Probation, LLC – to transform the County's misdemeanor probation system into a machine for generating their own profit on the backs of Giles County's most impoverished residents. The named plaintiffs and the members of the putative plaintiff classes (collectively 'Plaintiffs') in this case live in poverty and were assigned to supervised probation with one of the Defendant companies. They are victims of the Defendants' conspiracy to extract as much money as possible from impoverished misdemeanor probationers through a pattern of illegal racketeering activity, including threats of arrest and jailing, physical confinement, and extended periods of supervised probation due to nonpayment of debts owed to the court and to the private companies.

2. The goal of CPS and PSI (collectively, the 'private companies' or the 'companies') is to maximize their own profits by acting as probation officers for the purpose of collecting fines, costs, fees, and litigation taxes (these legal financial obligations will be referred to collectively as 'court debts') owed to the court following convictions for minor misdemeanor offenses. Pursuant to their respective contracts with the County (the 'Contracts'), the companies add their own fees and surcharges on top of those court debts and continue to supervise the collection of even greater amounts of money from probationers who cannot afford to pay their debts. These fees and surcharges – which probationers pay directly to the companies – are the companies' only sources of revenue under their Contracts.

3. The supervision the companies provide, however, consists almost exclusively of continuous and repeated threats of jailing, humiliating abuses of power such as invasive drug screens during which employees of the companies observe probationers urinating (and the companies, in their discretion, then charge fees for each drug test that they decide to administer), and repeated revocations and extensions of probation for not making payments that the companies and their employees ('private probation officers' or 'for-profit probation officers'; collectively, the companies and their employees are referred to as 'Private Defendants') know the probationers cannot afford. All of this occurs while the companies continue to impose additional monthly fees and surcharges, and the probationers' debts mount.

4. In addition to providing substantial revenue to the County, the contractual arrangements give Giles County's private probation officers, who should be neutral officers of the court, a direct financial stake in every aspect of misdemeanor probation supervision. This financial conflict of interest, baked into the companies' contracts with the County and the companies' written and

3

unwritten policies, causes a cycle of debt; arrest and jailing for inability to pay that debt; additional fees for those arrests; repeated revocation and extension of supervised probation for nonpayment; and crushing, inescapable poverty.

5. As a result of these extortionate enterprises, individuals who are supervised by the companies, including the named plaintiffs, have lost homes, jobs, and personal belongings; suffered severe medical problems, sold their blood plasma, and gone without food, clothing, and medicine for themselves and their children; taken out high-interest loans and borrowed money from friends and family members who are themselves struggling to afford the basic necessities of life; and diverted public benefits – including social security disability checks, or whatever minimal income they have – to instead pay the escalating supervision fees that the companies demand under threat of arrest and jailing. These policies and practices have trapped Plaintiffs and hundreds of people like them in Giles County in a web of fear and panic for years.

6. The companies' user-funded model of probation – in which the probation officer's only sources of income and profit under the Contracts are the payments made by the impoverished probationers the County assigns to them for probation supervision – violates the Constitution and has no place in our legal system. This lawsuit seeks to recover damages from the alleged wrongdoers here, disgorge their ill-gotten profits, and to end the practice of for-profit misdemeanor probation in Giles County administered by private companies with financial incentives to place and keep persons on probation.

(Doc. No. 256 ¶¶ 1-6) (footnotes omitted).

Plaintiffs' claims are summarized below:

| Count | Claim | Plaintiffs | Defendants | Relief |
|---|---|---|---|---|
| 1 | RICO | Karen McNeil & Lesley Johnson | CPS corporate defendants & Patricia McNair | Damages |
| 2 | RICO | Tanya Mitchell | PSI corporate defendants & Markeyta Bledsoe | Damages |
| 3 | RICO | Lucinda Brandon | PSI corporate defendants & Harriet Thompson | Damages |
| 4 | RICO | Tanya Mitchell | PSI corporate defendants & Markeyta Bledsoe | Equitable Relief |
| 5 | 42 U.S.C § 1983 | Karen McNeil, Lesley | CPS corporate defendants & Giles | Damages |

4

| | | | | |
|---|---|---|---|---|
| | (Due Process) | Johnson, & Indya Hilfort | County | |
| 6 | 42 U.S.C. § 1983 (Due Process) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 7 | 42 U.S.C. § 1983 (Due Process) | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Giles County | Damages |
| 8 | 42 U.S.C. § 1983 (Due Process) | Tanya Mitchell | PSI corporate defendants & Giles County | Equitable Relief |
| 9 | 42 U.S.C. § 1983 (Equal Protection) | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants | Damages |
| 10 | 42 U.S.C. § 1983 (Equal Protection) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 11 | 42 U.S.C. § 1983 (Equal Protection) | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Giles County | Damages |
| 12 | 42 U.S.C. § 1983 (Equal Protection) | Tanya Mitchell | PSI corporate defendants & Giles County | Equitable Relief |
| 13 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants & Giles County | Damages |
| 14 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 15 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Indya Hilfort | Giles County & Sheriff Kyle Helton | Equitable Relief |
| 16 | Unjust Enrichment | Karen McNeil & Lesley Johnson | CPS corporate defendants | Damages |
| 17 | Unjust Enrichment | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants | Damages |
| 18 | Unjust Enrichment | Tanya Mitchell | PSI corporate defendants | Equitable Relief |

| 19 | Abuse of Process | Karen McNeil, Lesley Johnson, & Indya Hilfort | Giles County, CPS corporate defendants, & Patricia McNair | Damages |
| 20 | Abuse of Process | Indya Hilfort | Giles County, CPS defendants, & Patricia McNair | Equitable Relief |
| 21 | Abuse of Process | Lucinda Brandon & Tanya Mitchell | Giles County, PSI corporate defendants, Markeyta Bledsoe, & Harriet Thompson | Damages |
| 22 | Abuse of Process | Tanya Mitchell | Giles County, PSI corporate defendants, & Markeyta Bledsoe | Equitable Relief |
| 23 | Civil Conspiracy | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Timothy Cook | Damages |
| 24 | Civil Conspiracy | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants | Damages |

(Doc. No. 256).

# III. ANALYSIS

## A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

### 1. Standard of Review

The Sixth Circuit has recognized that challenges to subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure "'come in two varieties: a facial attack or a factual attack.'" *Wayside Church v. Van Buren Co.,* 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 440 (6th Cir. 2012)). A facial attack questions merely the sufficiency of the pleadings. *Id.* A factual attack, however, requires the court to "'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Wayside Church,* 673 F.3d at 817 (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007)).

6

Defendants argue subject matter jurisdiction is lacking as to Plaintiffs' claims for equitable relief because they are moot, and because Plaintiffs lack standing to pursue the claims. To support their argument, the CPS Defendants have filed the Declaration of Giles County Circuit Court Clerk Natalie Oakley (Doc. No. 376), stating that Plaintiff Hilfort's probation was terminated on October 28, 2019.[2] The PSI Defendants make the same argument regarding Plaintiff Mitchell, pointing out that Ms. Mitchell's probation was terminated on November 27, 2018, and the "money owed" was converted to a civil judgment. (Doc. Nos. 301-23; 384).

The CPS Defendants have also filed the Declaration of Joel Colton, the Chief Executive Officer of Community Probation Services, LLC, stating that he terminated the company's contract with Giles County on August 6, 2019 (apparently to be effective 90 days later). (Doc. No. 377). Mr. Colton also states that Defendant McNair has left her employment with the company, though no date is given. (*Id.*) Ms. Oakley's Declaration also states that CPS is not providing probation officers in any active cases in Giles County. (Doc. No. 376 ¶ 5).

2. Standing

Under Article III's case-or-controversy requirement, federal courts have authority to adjudicate only where the plaintiff has standing, and the parties' dispute has not become moot. *See e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 180, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000). Unlike mootness, standing is to be measured as of the time the complaint was filed:

> Although the case-or-controversy requirement of Article III, § 2 of the Constitution 'underpins both our standing and our mootness jurisprudence,' *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*

---

[2]  The Declaration also states that Plaintiffs McNeil and Johnson are no longer on probation, but neither of these plaintiffs have brought equitable claims against the CPS Defendants. In any event, the Court's decision would extend to these plaintiffs as well.

7

528 U.S. 167, 180, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000), standing and mootness inquiries diverge in several important respects, one of which is timing. Whether a plaintiff has standing to sue is 'determined as of the time the complaint is filed.' *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 524. If a plaintiff overcomes the standing hurdle at the time of filing, the doctrine of mootness then 'requires that there be a live case or controversy at the time that a federal court decides the case.' *Burke v. Barnes*, 479 U.S. 361, 363, 107 S. Ct. 734, 93 L.Ed.2d 732 (1987).

*Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571, 112 S. Ct. 2130, 2142, 119 L. Ed. 2d 351 (1992); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S. Ct. 1202, 1209, 63 L. Ed. 2d 479 (1980).

To establish standing, a plaintiff must show: (1) she has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth,* 528 U.S. at 180; *Mosley v. Kohl's Department Stores, Inc.,* 942 F.3d 752, 756 (6th Cir. 2019). A plaintiff requesting injunctive relief must show both "'past injury and a real immediate threat of future injury.'" *Id.* (quoting *Houston v. Marod Supermarkets, Inc.,* 733 F.3d 1323, 1329 (11th Cir. 2013)).

Plaintiff Hilfort alleged in the Second Amended Complaint, filed on April 23, 2019, that she was being supervised on probation by CPS; that the CPS Defendants had violated, and were violating, her rights under federal and state law; that she was suffering harm as a result of the defendants' conduct; and that the proposed relief would redress that harm. (Doc. No. 256). The Declaration filed by the CPS defendants in support of the pending motion does not address Plaintiff Hilfort's status as of the time the Second Amended Complaint was filed. Indeed, the Declaration supports the allegation that Plaintiff Hilfort was being supervised on probation before October 28, 2019. The CPS Defendants have not provided any supplemental evidence on

8

the standing issue. Thus, they have failed to establish that Plaintiff Hilfort lacks standing to pursue her claims for equitable relief.

Similarly, Plaintiff Mitchell alleged in the Second Amended Complaint that she was being supervised on probation by PSI; that the PSI Defendants had violated, and were violating, her rights under federal and state law; that she was suffering harm as a result of the defendants' conduct; and that the proposed relief would redress that harm. (Doc. No. 256). The PSI Defendants have not provided any supplemental evidence on the standing issue. Thus, they have failed to establish that Plaintiff Mitchell lacks standing to pursue her claims for equitable relief.

3.   Mootness

As noted above, the court has an obligation under Article III to adjudicate only actual and concrete disputes that have not become moot. A case becomes moot when the issues presented are no longer live, or the parties lack a legally cognizable interest in the outcome. *See, e.g., Wilson v. Gordon,* 822 F.3d 934, 941-42 (6th Cir. 2016). "'[T]he heavy burden of demonstrating mootness rests on the party claiming mootness.'" *Columbia MHC E., LLC v. Stewart*, 815 Fed. Appx. 887, 891 (6th Cir. 2020) (quoting *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 531 (6th Cir. 2001)).

In class actions, the mootness doctrine is "flexible." *Wilson,* 822 F.3d at 942.  A class representative has two legally cognizable interests: One is the claim on the merits; and the other is the claim that he or she is entitled to represent a class. *Wilson,* 822 F.3d at 942. Once a class is certified, the mooting of the named plaintiff's claims does not moot the action; jurisdiction exists as long as a controversy exists between any class member and the defendant. *Wilson,* 822 F.3d at 942. "'Where, on the other hand, the named plaintiff's claim becomes moot *before* certification,' the ordinary rule is that 'dismissal of the action is required.'" *Wilson,* 822 F.3d at 942 (quoting

9

*Brunet v. City of Columbus,* 1 F.3d 390, 399 (6th Cir. 1993)). The Court has not certified a class in this case.

The general rule is subject to exceptions, and Plaintiffs argue two of those exceptions are relevant here. With respect to the CPS Defendants' argument that the equitable claims are moot because CPS and Defendant McNair no longer supervise probationers in Giles County, Plaintiffs rely on the "voluntary cessation" exception. As to the defendants' argument that the claims of the putative class are moot because Plaintiffs Hilfort and Mitchell are no longer on probation, Plaintiffs argue the "inherently transitory" exception applies.

The "voluntary cessation" exception to mootness is well-established: "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth,* 528 U.S. at 190 (citing *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982)). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* To demonstrate mootness in such a case, "subsequent events [must make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S. Ct. 361, 21 L. Ed. 2d 344 (1968)).

"The 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.*; *see also Already, LLC v. Nike, Inc.,* 568 U.S. 85, 92, 133 S. Ct. 721, 727, 184 L. Ed. 2d 553 (2013). The burden is heavy because the courts want to "protect a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior." *Youngstown Publishing Co., v. McKelvey,* 189 Fed. Appx. 402, 405 (6th Cir. 2006). The bar is higher for a private party to

10

demonstrate mootness based on voluntary cessation than for a government entity. *Speech First, Inc. v. Schlissel,* 939 F.3d 756, 767 (6th Cir. 2019).[3] In addition, where the defendant continues to defend the legality of the conduct it has voluntarily ceased, it is more difficult for the defendant to demonstrate it would not engage in the challenged conduct in the future. *See Knox v. Service Employees Intern. Union, Local 1000,* 567 U.S. 298, 307, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012).

In this case, the CPS Defendants base their mootness argument on a change in their contractual relationship with Defendant Giles County. In that regard, this case is similar to *United States v. Dairy Farmers of America, Inc.,* 426 F.3d 851, 856-57 (6th Cir. 2005), where the Sixth Circuit reversed the district court's suggestion that the case was moot because the agreement challenged by the government plaintiff, which was executed by two of the defendants, was replaced after suit was filed by a revised agreement that omitted the challenged provisions:

> DFA argues that because the original agreement was replaced by a revised agreement, the district court did not need to examine the legality of the original agreement. According to DFA, no relief could have been afforded even if the original agreement was illegal, because the government did not seek money damages and, in the absence of any evidence that DFA intends to reinstate the terms of the original agreement, an injunction to prohibit such reinstatement is unnecessary.

> This argument is unsuccessful because it misstates the burden in establishing that a claim is moot. The Supreme Court has repeatedly explained that '[a] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' unless 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.,* 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (quoting *City of*

---

[3]  The CPS Defendants have not demonstrated they are entitled to the presumption of good faith the courts afford to government actors. Therefore, their citation to *Irwin v. Tennessee Valley Auth.*, 2013 WL 3968553, at *2 (E.D. Tenn. July 31, 2013), where that presumption was discussed, is inapposite.

*Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1983) and *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S. Ct. 361, 21 L. Ed. 2d 344 (1968)). The party asserting mootness bears a 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to stand up again.' *Id.* Otherwise, 'the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.' *Id.* (quoting *Mesquite,* 455 U.S. at 289 n. 10, 102 S. Ct. 1070).

Thus, it is DFA's burden to show that the government's claim with respect to the original agreement is moot; the government is not required, as DFA suggests, to present evidence that the terms of the original agreement might be resorted to. As the government notes, DFA has made no effort to meet its 'heavy burden' of persuading the court that it will not revert to the original agreement. The government's claim with respect to the original agreement was not mooted by the adoption of the revised agreement, and the district court should have considered it.

426 F.3d at 857.

Mr. Colton's Declaration states only that, approximately a year or so after this litigation began, CPS terminated its agreement with Giles County, and it does not have a plan to resume providing probation services there. No reason is given for the termination. For example, Mr. Colton does not suggest that CPS has discontinued its operations in other counties, or has otherwise gone out of business. In addition, there are no declarations from Giles County officials stating that the County no longer uses for-profit probation companies, and indeed, the PSI Defendants apparently continue to operate in Giles County. The timing of the contract termination and the lack of explanation suggest the contract was terminated because of this litigation. And Mr. Colton's statements regarding CPS' future plans carry little weight in light of the defendants' continued vigorous defense of its conduct under the contract. *See, e.g.,* Doc. No. 371. In short, Mr. Colton's Declaration fails to describe any impediment to these defendants – CPS and Giles County – resuming their contractual relationship once this litigation has ended. *See United States v. Government of Virgin Islands,* 363 F.3d 276, 285 (3rd Cir. 2004) (holding

12

that contract termination does not moot the plaintiff's claims where timing of contract termination, lack of sufficient explanation for termination, and continued defense of the validity of the contract provide little assurance that a similar contract would not be entered into again).

As for Defendant McNair, Mr. Colton's Declaration states only that she voluntarily left her employment with the company, and that she does not plan to resume probation supervision services in Giles County. Mr. Colton does not explain the basis for his knowledge of Ms. McNair's future plans. Most importantly, Defendant McNair has not filed a declaration stating the reasons for her departure, the nature of her present employment, and any basis for believing she is unlikely to return to her position as a probation supervisor when this litigation ends. Defendants' submissions fall far short of satisfying the "heavy burden" of demonstrating they will not revert to the conduct challenged by Plaintiffs.

The Court is not persuaded the CPS Defendants' citation to *Rodriguez v. Providence Community Corrections, Inc.,* 191 F.Supp.3d 758, 770 (M.D. Tenn. 2016), requires a different result. In *Rodriguez,* the court held the plaintiffs' request for the court to void a contract between the county and a private probation company had become moot because the contract had expired:

> With respect to at least Count III, the cause of action to void the contract, the Court agrees with Defendants that the expiration of the contract moots the claim. Whether the contract's expiration also moots Plaintiffs' other claims for equitable relief against the Private Defendants is a closer question. Although the Court is hesitant to find that merely pointing to an expired contract is enough to support the 'heavy burden' a defendant is required to shoulder when claiming mootness in a voluntary cessation case, *Appalachian* seems to mandate that result for the Private Defendants. The contract's expiration means that the Private Defendants no longer play any part in the provision of probation services in Rutherford County. Plaintiffs have presented no evidence that would indicate that the same party (PCC) is likely to return to engage in the same conduct. In this Circuit, that is enough for a finding of mootness.

191 F. Supp. 3d at 771–72.

13

The facts at issue in *Rodriguez* are distinguishable. First, unlike this case, the contract in *Rodriguez* expired by its own terms on a date selected *before* the initiation of litigation; it was not voluntarily terminated after the initiation of litigation by the party requesting dismissal based on mootness. In addition, the court suggested it was required to reach its conclusion by *Appalachian Regional Healthcare, Inc. v. Coventry Health and Life Ins. Co.,* 714 F.3d 424, 430 (6th Cir. 2013) – a case that does not address the "voluntary cessation" exception at issue here. In *Appalachian,* the court held the case was moot because the preliminary injunction challenged by the defendant expired by its terms while the case was on appeal. *Id.* In arguing that the "capable of repetition, yet evading review" exception to mootness applied, the defendant suggested the injunction encouraged *other dissatisfied providers* "to consider similar legal tactics to gain negotiating leverage against [it]." *Id.* The court explained, however, that in order for the exception to apply, the defendant was required to show that *the plaintiff* would subject it to the same objectionable conduct. *Id.* The defendant could not make that showing because it was no longer in a contractual relationship with the plaintiff. *Id.* Neither *Rodriguez* nor *Appalachian* are factually or legally applicable here.

For the reasons described above, the Court concludes Plaintiffs have established the "voluntary cessation" exception applies to the withdrawal of CPS and Ms. McNair from their activities in Giles County.

Plaintiffs argue the "inherently transitory" exception applies to the defendants' mootness arguments based on the termination of the named plaintiffs' probation terms. The Sixth Circuit has explained the purpose for the exception as follows: "We recognize that '[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires. In such cases,

14

the relation back doctrine is properly invoked to preserve the merits of the case for judicial resolution.'" *Gawry v. Countrywide Home Loans, Inc.,* 395 Fed. Appx. 152, 158-59 (6th Cir. 2010) (quoting *Riverside v. McLaughlin,* 500 U.S. 44, 52, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991)). Where the class claims are inherently transitory, the termination of a class representative's claim does not moot the claims of the unnamed members of the class. *Gerstein v. Pugh,* 420 U.S. 103, 110 n.11, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).

In order for the "inherently transitory" exception to apply, two requirements must be shown: (1) the injury must be so transitory that it would likely evade review by becoming moot before the district court can rule on class certification; and (2) it must be clear other class members are suffering the same injury. *Wilson,* 822 F.3d at 945 (citing *Gerstein v. Pugh,* 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)). In analyzing the first requirement, the court is to consider whether the claim is of short duration or whether there is uncertainty about the length of time the claim may remain alive. *Id.,* at 946; *see also Unan v. Lyon,* 853 F.3d 279, 287 (6th Cir. 2017); *Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 76, 133 S. Ct. 1523, 1531, 185 L. Ed. 2d 636 (2013) (explaining that the inherently transitory exception "was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course.") As to the second requirement, the plaintiff need not show they will personally be subject to the same practices again; they need only find that other class members would suffer the same injury. *Wilson,* 822 F.3d at 944.

Plaintiffs argue the lack of certainty that Plaintiffs' claims could survive long enough to be adjudicated is present in this case. Plaintiffs state that probation terms typically last six months or 11 months and 29 days in Giles County, and in a complex case, a class is unlikely to

15

be certified in such a short time. Plaintiffs point out that their class certification motion was filed before the probation terms ended for Ms. Mitchell and Ms. Hilfort.

The Court concludes Plaintiffs' claims are so transitory and of such short duration that they are likely to (and have) become moot before litigation on the class certification issue has an opportunity to run its course. The Second Amended Complaint alleges that determinate terms of probation for misdemeanor convictions in Giles County typically last six months or 11 months and 29 days. (Doc. No. 256 ¶¶ 74, 282).[4] Probation periods of a year or less are of such a short duration that probationary status is likely to end before a court has an opportunity to rule on class certification. Consequently, the injury alleged by Plaintiffs would likely evade review before becoming moot.

Indeed, that likelihood is borne out by the circumstances of this case. Plaintiffs filed their first motion for class certification (Doc. No. 5) when they filed the initial complaint on April 23, 2018. At that time, both Ms. Hilfort and Ms. Mitchell were still serving a probationary sentence. (Doc. No. 1 ¶¶ 281-294; 265-74). The defendants subsequently moved to hold the motion in abeyance pending the initial case management conference (Doc. Nos. 28, 31). Plaintiffs opposed the motion, and requested a schedule that would result in full briefing of the class certification motion by October 5, 2018 (Doc. No. 33). On July 13, 2018, Plaintiffs filed an amended motion for class certification (Doc. No. 36). The Court subsequently entered an Order (Doc. No. 54) referring to the Magistrate Judge the task of setting a schedule for discovery and briefing relating to the class certification motion. Some time later, the Magistrate Judge granted Plaintiffs' request to substitute a class representative for Sandra Beard as she was no longer available to serve due

---

[4] Defendants cite no proof contradicting these general time frames.

16

to medical reasons. (Doc. No. 229). On March 5, 2019, this Court denied the pending motion for class certification without prejudice to refiling after the identity of the class representatives had been finalized. (Doc. No. 234).

On April 18, 2019, the CPS Defendants moved for summary judgment on qualified immunity grounds and, at some point, took the position that they were no longer required to participate in discovery. (Doc. Nos. 245, 292-1, 294-1). On April 19, 2019, the Magistrate Judge granted Plaintiffs' request to substitute Lucinda Brandon for Sonya Beard as a named plaintiff, and Plaintiffs filed the Second Amended Complaint shortly thereafter. (Doc. Nos. 253, 256). After the Court denied their summary judgment motion in order to allow Plaintiffs additional discovery before responding (Doc. No. 283), the CPS Defendants filed a Notice of Appeal (Doc. No. 286), and a motion to stay discovery (Doc. No. 289). The Court granted the motion and stayed discovery from July 29, 2019 to June 2, 2020 (upon resolution of the appeal). (Doc. Nos. 296, 367). Within days and over two years after this case began, the CPS Defendants filed the pending motions to dismiss, and a second motion to stay discovery. (Doc. Nos. 369, 370. 374). The Court granted the defendants' second request for stay on June 23, 2020, and that stay remains in effect. (Doc. No. 382).

Defendants argue Plaintiffs have been dilatory in failing to refile their motion for class certification after finalizing their class representatives in April 2019. Defendants rely on *Gawry v. Countrywide Home Loans, Inc, supra,* to support their argument. In *Gawry,* the court held the "inherently transitory" exception did not apply to the plaintiff's claims because she knew the contractual provision challenged in the lawsuit expired in three years, and she did not move for class certification until nearly five years after executing the contract. 395 Fed. Appx. at 158-59. The facts in *Gawry* are distinguishable. Here, Plaintiffs moved for class certification when they

17

filed suit, but case management issues and the defendants' requests to stay discovery have delayed adjudication of the issue.[5] Defendants' argument that *Plaintiffs'* actions have prolonged this litigation and delayed the advancement of the class certification motion is not borne out by the record in this case.

As for the second requirement, Plaintiffs allege the class for injunctive relief includes over 200 members at any given time. (Doc. No. 256 ¶¶ 344-48). As for PSI, Plaintiffs allege the company is currently supervising probationers in Giles County who are suffering the same injury as that alleged by Ms. Mitchell. According to documents filed by the CPS Defendants, PSI took over supervision of the CPS probationers when CPS voluntarily ceased operating in Giles County (Doc. No. 377-1), and Plaintiffs allege the class includes those individuals as well. Given these allegations, which have not been refuted by the defendants, it is likely other purported class members were suffering the same injury as alleged by Plaintiffs Mitchell and Hilfort when these plaintiffs initially moved for class certification, and it is likely they are still doing so.

Thus, the Court concludes Plaintiffs have established the "inherently transitory" exception to mootness applies here. The Court takes no position at this stage of the proceedings, however, as to what effect CPS' voluntary termination of its contract with Giles County will have on whether Ms. Hilfort should serve as a class representative, or as to whether equitable relief will ultimately be appropriate with regard to the CPS Defendants. The Court also takes no position at this time on the merits of any subsequently-filed request for class certification or request for injunctive relief.

---

[5]   Courts commonly deny motions for class certification as premature when filed before discovery begins. *See Beaudry v. Telecheck Servs., Inc.*, 2010 WL 2901781, at *2 (M.D. Tenn. July 20, 2010).

**B. Motion to Dismiss (based on Rule 12(b)(6))**

1. Standard of Review

In considering a motion to dismiss, a court must determine whether the plaintiff has sufficiently alleged "a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Well-pleaded factual allegations are accepted as true and are construed in the light most favorable to the nonmoving party. 129 U.S. at 1950; *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017).[6]

2. The RICO Claim (Count 1)

As discussed above, Plaintiffs McNeil and Johnson have asserted a RICO claim against the CPS Defendants in Count 1. The CPS Defendants argue they are entitled to qualified immunity on the RICO claim, or alternatively, that the claim should be dismissed for failure to state a claim. Because the Court concludes Plaintiffs' RICO claim should be dismissed, it is unnecessary to consider the qualified immunity argument.

Plaintiffs allege the CPS corporate defendants, Defendant McNair, Defendant Giles County, and other unnamed co-conspirators, formed an "association-in-fact," and therefore, a "RICO Enterprise," for the purpose of maximizing the collection of court fines, costs, and fees by CPS without consideration of the probationer's ability to pay. (*Id.* ¶ 365). Plaintiffs allege the

_____

[6] Plaintiffs argue the CPS Defendants' motion to dismiss is untimely because it was filed after the defendants filed a responsive pleading, and request that the Court exercise its discretion to deny the motion. Given the complicated procedural history of this case and Plaintiffs' failure to identify any prejudice from the alleged "untimeliness," the Court declines to deny the motion to dismiss on that basis.

"CPS RICO Enterprise" was engaged in interstate commerce because federal dollars disbursed through federal programs, such as Supplemental Security Income Disability and Supplemental Nutrition Assistance Program, constituted a portion of the profits collected through threats of violations and jailing. (*Id.* ¶ 366). Plaintiffs also allege this "extortion" occurred on a mass scale from victims who would have otherwise spent the money on goods and services in interstate commerce. (*Id.*) Plaintiffs allege the defendants used electronic communications and the United States mail to extort payment. (*Id.*)

Plaintiffs further allege the CPS RICO Enterprise engaged in the following predicate acts of "racketeering activity:" (1) extortion under the Hobbs Act, 18 U.S.C. § 1951; (2) extortion under Tennessee Code Annotated § 39-14-112; and (3) extortion under the Travel Act, 18 U.S.C. § 1952. (*Id.* ¶ 370).

The RICO statute, 18 U.S.C. § 1962, provides, in pertinent part, as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

To establish a violation of the RICO statute, the plaintiff must prove: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

"Racketeering activity" consists of acts that are indictable under state or federal law, as listed in 18 U.S.C. § 1961(1). As noted above, Plaintiffs allege, as predicate acts of racketeering

20

activity, extortion under the Hobbs Act, the Travel Act, and under a Tennessee statute. Plaintiffs argue the CPS Defendants committed extortion by threatening probationers with arrest and jailing if they failed to make their required payments even though the defendants knew the failure to pay was due to their indigency.

A plaintiff claiming a Hobbs Act violation based on extortion as a predicate act in a civil RICO claim must show the defendant "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by . . . extortion or attempt[ed] or conspir[ed] so to do, or committ[ed] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951(a); *Heinrich,* 668 F.3d at 406-07. Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion can occur either through (1) the threat of force, violence, or fear; or (2) "the color of official right." *United States v. Watson,* 778 Fed. Appx. 340, 345 (6th Cir. 2019).

To establish extortion on an "under color of official right" theory, the plaintiff must show the defendant obtained a "payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (quoting *Evans v. United States,* 504 U.S. 255, 268, 112 S. Ct. 1881, 1889, 119 L. Ed. 2d 57 (1992)). This type of extortion by a public official requires some *quid pro quo:* "This means that the victim gives up her property to the public official in exchange for something else." *Watson,* 778 Fed. Appx. at 345. To establish extortion based on a "threat of force, violence, or fear" theory, the plaintiff must show: "(1) that the defendants obtained the plaintiffs' property (2)

through the wrongful use of (3) threats or fear of physical or economic harm." *Heinrich,* 668 F.3d at 407; *Watson,* 778 Fed. Appx. at 346-47.

The CPS Defendants argue Plaintiffs cannot establish extortion under either theory because they had a lawful right to claim the money obtained from the probationers, based on the "claim-of-right" defense established in *United States v. Enmons,* 410 U.S. 396, 93 S. Ct. 1007, 35 L. Ed. 2d 379 (1973). In *Emmons,* the Supreme Court addressed whether the defendant union members were guilty of extortion under the Hobbs Act based on acts of violence occurring during a legal strike called to seek higher wages for union members. The Court concluded the conduct was not within the reach of Hobbs Act extortion because the defendants sought to achieve legitimate collective-bargaining demands:

> The term 'wrongful,' which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of 'wrongful violence' or 'wrongful force' since, as the Government acknowledges, any violence or force to obtain property is 'wrongful.' Rather, 'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property.

410 U.S. at 399-400 (footnotes omitted).

The holding in *Enmons* created what has come to be called the "claim of right" defense to charges of extortion under the Hobbs Act. *United States v. Sturm,* 870 F.2d 769, 772 (1st Cir. 1989). Notwithstanding creation of the defense by the Supreme Court, subsequent decisions by federal appellate courts have largely restricted the claim of right defense to the labor context in cases alleging the wrongful use of force or violence. *Id.,* at 772-73; *see also United States v. Castor,* 937 F.2d 293, 299 (7th Cir. 1991); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 522-23 (3rd Cir. 1998); *United States v. Daane,* 475 F.3d 1114, 1120 (9th Cir. 2007);

*United Brotherhood of Carpenters and Joiners of America v. Building and Construction Trades Dep't,* 770 F.3d 834, 838 (9th Cir. 2014). The claim of right defense is still viable, however, in cases where the threat produces economic fear, because "there is nothing inherently wrongful about the use of economic fear to obtain property." *Id.,* at 773; *see also Brokerage Concepts,* 140 F.3d at 523. In such cases, "the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." *Id.* (footnotes omitted); *Brokerage Concepts,* 140 F.3d at 523 (In cases involving the use of economic fear, "a defendant is not guilty of extortion if he has a lawful claim to the property obtained."); *United States v. Coss,* 677 F.3d 278, 284-88 (6th Cir. 2012) (discussing "claim of right" and inherent wrongfulness under 18 U.S.C. § 875(d) (prohibiting communication of threat to injure the property or reputation of another with intent to extort)).

Use of economic fear is "wrongful," however, "when employed to achieve a wrongful purpose." *Brotherhood of Carpenters,* 770 F.3d at 838. "Thus, following *Enmons,* using fear of economic loss to obtain personal payoffs or payments for 'imposed, unwanted, superfluous and fictitious services' may well be extortionate." *Id.* (quoting *Enmons,* 410 U.S. at 400).

Plaintiffs argue the CPS Defendants do not have a legitimate claim to supervision fees. Their claim to the property is not legitimate, according to Plaintiffs, because their actions violate the due process and equal protection rights of probationers. The CPS Defendants' claim to supervision fees arises by virtue of its contract with Giles County and the court orders providing for the payment of such fees. Plaintiffs have not alleged the fees are illegitimate because they are "personal payoffs" or because they are for "fictitious services," as the *Enmons* Court described what it considered to be illegitimate claims to property. 410 U.S. at 400. Plaintiffs have not explained why CPS's allegedly unconstitutional conduct affects the legitimacy of its claim to

23

supervision fees for purposes of the claim of right defense. Thus, Plaintiffs have not established CPS has "no lawful claim" to the property at issue. *See Malone v. City of Decatur, Alabama,* 2018 WL 4901212, at 9-10 (N.D. Ala. Oct. 9, 2018) (holding that a private probation company had a lawful claim to fines and fees for purposes of the "claim of right" defense to Hobbs Act extortion, even if the company's conduct were considered to be unconstitutional).[7]

Plaintiffs also argue the defense does not apply because the threats of arrest and/or imprisonment are "threats of force (because they are threats to force an individual out of her community, forcibly confine her in a jail cell, strip her of her liberty, and severely limit her movements, even if such force is state-sanctioned)." (Doc. No. 387, at 20). Plaintiffs do not cite any authority defining "force" or "violence" for purposes of Hobbs Act extortion. In defining those terms for purposes of Hobbs Act robbery, the Sixth Circuit has held they require the use, attempted use, or threatened use of "physical force" or "violent force," *United States v. Gooch,* 850 F.3d 285, 291-92 (6th Cir. 2017), and such force must be "capable of causing physical pain or injury to another person." *United States v. Thomas,* 849 F.3d 906, 909 (10th Cir. 2017) (quoting *Johnson v. United States,* 559 U.S. 133, 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010)). Although the arrest of a person involves a loss of liberty, Plaintiffs have not cited any authority suggesting that a facially lawful arrest and/or detention carried out by duly authorized law enforcement officers, presumably at the behest of the defendants, falls within the definition of

---

[7]   Plaintiffs' citation of *United States v. Cuya,* 724 Fed. Appx. 720, 723-24 (11th Cir. 2018), does not persuade the Court otherwise. In *Cuya,* the court held that a defendant's "threats of bogus lawsuits, detentions, and seizures of property were plainly wrongful and extortionate." *Id.,* at 724. Unlike the supervision fees at issue here, however, the payments demanded in connection with the threats in *Cuya* were for "fabricated" product orders to which the defendant had no legitimate claim. *Id.,* at 723.

24

"force or violence" for purposes of Hobbs Act extortion.[8] Thus, the Court is not persuaded the threatened conduct alleged by Plaintiffs constitutes threats of force or violence.[9]

The CPS Defendants' legitimate claim to supervision fees also undermines Plaintiffs' "under color of official right" extortion argument. As discussed above, to establish this type of extortion, the plaintiff must show the defendant obtained a "payment *to which he was not entitled*, knowing that the payment was made in return for official acts." *United States v. Kelley*, 461 F.3d at 826 (emphasis added). For the reasons discussed in connection with the "claim of right" defense, Plaintiffs cannot establish this element of the offense.

As the Court concludes that the claim of right defense applies under both theories of Hobbs Act extortion alleged by Plaintiffs, that aspect of Plaintiffs' RICO claim is subject to dismissal.

---

[8]  Plaintiffs' citation of *United States v. Valenzeno*, 123 F.3d 365, 369 (6th Cir. 1997) does not persuade the Court otherwise. The defendant in *Valenzeno* argued his conduct was more in the nature of bribery than Hobbs Act extortion because his victims' fear was similar to fear of losing a business opportunity. *Id.* The court rejected the argument, pointing out that the fears of the defendant's victims went beyond a lost business opportunity to "fears of economic loss or potential imprisonment." *Id.* The *Valenzeno* Court did not discuss the meaning of "force or violence," nor did it discuss the "claim of right" defense. Thus, the court's reasoning does not advance the analysis here.

[9]  The Court notes that bringing or threatening to bring wrongful litigation in order to extract money from the target of the litigation is not considered by most courts to constitute Hobbs Act extortion. *See, e.g., Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir. 1994); *Edelson PC v. The Bandas Law Firm PC,* 2018 WL 723287 (Feb. 6, 2018 N.D. Ill.) (collecting cases). Those courts reason that "it is up to 'the courts, and their time-tested procedures' to reliably resolve the matter, 'separating validity from invalidity, honesty from dishonesty.'" *Edelson,* 2108 WL 723287, at *6 (quoting *United States v. Pendergraft,* 297 F.3d 1198, 1206 (11th Cir. 2002)). Although the allegations of this case do not fit squarely into this line of cases involving threats of wrongful litigation, the CPS Defendants are alleged to be "court-affiliated actors," and their conduct is arguably more appropriately governed by constitutional standards of due process and equal protection, as discussed below, as opposed to the provisions of the RICO statute.

Plaintiffs also fail to establish extortion under Tennessee Code Annotated Section 39-14-112 because they are entitled to rely on an affirmative defense under Subsection (b)(2). Section 39-14-112 provides, in pertinent part:

(a) A person commits extortion who uses coercion[10] upon another person with the intent to:

(1) Obtain property, services, any advantage or immunity;

* * *

(3)(A) Impair any entity, from the free exercise or enjoyment of any right or privilege secured by the Constitution of Tennessee, the United States Constitution or the laws of the state, in an effort to obtain something of value for any entity;

(b) It is an affirmative defense to prosecution for extortion that the person reasonably claimed:

* * *

(2) Appropriate compensation for property or lawful services.

The affirmative defense applies here because, as discussed above, the CPS Defendants "reasonably claim" supervision fees, which are "[a]ppropriate compensation for . . . lawful services."[11] As the affirmative defense applies here, the aspect of the RICO claim based on state law "extortion" is subject to dismissal.

_____

[10]   "Coercion" is defined in Tennessee Code Annotated Section 39-11-106(4) as including threats to: "(B) Wrongfully accuse any person of any offense;" or "(E) Take or withhold action as a public servant or cause a public servant to take or withhold action. . ." *See State v. Parris,* 236 S.W.3d 173, 181 (Tenn. Crim. App. 2007) (applying this definition of "coercion" to offense of extortion in Section 29-14-112).

[11]   Even if the Court ignores Section 39-14-112 altogether, and instead relies on the "generic" definition of extortion for purposes of the state law crime, the courts have recognized a "claim of right" defense to generic extortion. *See United Brotherhood,* 770 F.3d at 843 (rejecting the plaintiffs' argument that the

26

Finally, Plaintiffs cannot show a violation of the Travel Act, 18 U.S.C. § 1952, for the same reasons they have not shown a violation of the Hobbs Act, or a violation of Tennessee Code Annotated § 39-14-112. To establish a violation of the Travel Act, Plaintiffs must prove the use of interstate travel or the use of an interstate facility, with the intent to promote unlawful activity. *See Brokerage Concepts,* 140 F.3d at 529. "Unlawful activity" is defined as "extortion, bribery, or arson in violation of the laws of the State in which committed or the United States." 18 U.S.C. § 1952(b)(2). The unlawful activity alleged by Plaintiffs is extortion. Extortion under the Travel Act is governed by the case law discussed above in connection with the Hobbs Act. *Brokerage Concepts,* 140 F.3d at 529. Because the CPS Defendants are entitled to rely on the "claim of right" defense to Hobbs Act extortion, they are entitled to rely on the same defense to extortion under the Travel Act. Accordingly, the aspect of the RICO claim based on the Travel Act is subject to dismissal.

For the reasons set forth above, the Court concludes Plaintiffs have not stated a valid claim that the CPS Defendants engaged in predicate acts of racketeering activity. Accordingly, the RICO claim brought by Plaintiffs McNeil and Johnson (Count 1) is dismissed.

3. The Section 1983 Claims

a. Nature of the Claims and Defenses

Through Counts 5, 6, 9, 10, 13, and 14, Plaintiffs have brought claims against the CPS Defendants and Giles County under 42 U.S.C. § 1983. In order to establish a claim for relief under Section 1983, a plaintiff must show: (1) he or she was deprived of a right secured by the

---

generic definition of extortion does not include a claim of right defense). And for the reasons discussed above, the Court concludes the PSI defendants are entitled to rely on such a defense to generic extortion.

Constitution or federal law; and (2) the deprivation was committed by a person acting under color of state law. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999); *Toth v. City of Toledo*, 480 Fed. Appx. 827, 831-32 (6th Cir. 2012).

Through Count 5, Plaintiffs allege the CPS corporate defendants and Giles County violated the Due Process Clause by using a private actor with a personal financial stake in the outcome of judicial proceedings and probation case decisions. (Doc. No. 256 ¶¶ 482-91). The heading for Count 5 states that it is brought by Plaintiffs McNeil, Johnson, and Hilfort for money damages. (*Id.*). Count 6 appears to be identical to Count 5, except the heading for the Count states that it is brought by Plaintiff Hilfort and seeks equitable relief. (*Id.* ¶¶ 492-501).

Count 9 alleges the CPS corporate defendants violated the Equal Protection Clause by using jail, the threat of jail, and an onerous probation system to collect debts owed to the County because it imposes unduly harsh and punitive restrictions on debtors whose creditor is the government as compared to those who owe money to private creditors. (*Id.* ¶¶ 522-27). The heading for Count 9 states that it is brought by Plaintiffs McNeil, Johnson, and Hilfort and seeks damages. (*Id.*) Count 10 appears to be identical to Count 9, except the heading states that it is brought by Plaintiff Hilfort against the CPS corporate defendants and Giles County, and seeks equitable relief. (*Id.* ¶¶ 528-33).

Count 13 alleges the CPS corporate defendants and Giles County violated the Equal Protection and Due Process clauses by placing and keeping people on supervised probation solely because they cannot afford to pay court debts and probation supervision fees. (*Id.* ¶¶ 546-50). The heading for Count 13 states that it is brought by Plaintiffs McNeil, Johnson, and Hilfort

28

and seeks damages. (*Id.*) Count 14 appears to be identical to Count 13, except that it is brought by Plaintiff Hilfort, and seeks equitable relief. (*Id.* ¶¶ 551-55).

The CPS Defendants argue Plaintiffs are judicially estopped from seeking damages for any of their Section 1983 claims by the Sixth Circuit's opinion in this case issued on February 28, 2020. *McNeil v. Cmty. Prob. Servs., LLC,* 2020 WL 973120, at *2 (6th Cir. Feb. 28, 2020); Doc. No. 364). The defendants are presumably referring to Counts 5, 9, and 13. Through the appeal, the court addressed the CPS Defendants' claims to various immunities. In considering their assertion of qualified immunity, the court determined that Plaintiffs had not sought damages for their Section 1983 claims:

> *Qualified immunity.* Qualified immunity partially, though not completely, protects government employees from personal liability for their official actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). In invoking this defense, the company and McNair trip over the reality that they face no prospect of damages liability.

> Start with the company. The complaint does not contain an individual-capacity claim against the company. Nor does any feature of the 'course of proceedings,' *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001) (en banc), suggest a different conclusion about the company's potential exposure to damages. On top of that, the plaintiffs have represented repeatedly and expressly that they do not seek to hold the company individually liable for damages.

> This case looks like *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003), except it is easier. There, the plaintiff sought compensatory and punitive damages, but the complaint stated that the defendant was being sued in his official capacity. *Id.* at 594. The plaintiff amended the complaint and did not change anything relevant to the capacity in which it sued the defendant. *Id.* We concluded that the lawsuit targeted the defendant in his official capacity and thus did not expose him to individual liability. *Id.* at 595. The same is more true here because the plaintiffs have repeatedly assured the company that it has no risk of individual liability.

> What should we make of the reality, the company counters, that the plaintiffs seek punitive damages? It's true that punitive damages are not available against counties. And it's true that in some instances courts have treated a request for punitive damages as an indication that a suit seeks individual liability. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140, 145–46 (1st Cir. 2003). But none of this

alters the equation, given the plaintiffs' express representations that the company faces no liability.

Even so, the company adds, what should we make of a second reality – that the plaintiffs have amended their complaint twice and have yet to clarify that the company does not face money damages? That is true. But it does not alter what they have clarified – that in four separate filings they have insisted that they do not seek damages from the company. *Judicial estoppel would prohibit any change of heart now.*

Now consider McNair. She seeks 'qualified immunity on all § 1983 damages claims brought against [her].' Appellant Br. 13. In response, the plaintiffs represent that they have not asserted any § 1983 claims against McNair. There is good reason to take their word for it. A review of the complaint confirms as much. Not a single § 1983 claim against McNair appears in it.

McNair worries that two features of the complaint cast doubt on this conclusion. She points out that the complaint says she is being sued in her individual and official capacities. But that language alone does not create a § 1983 claim, especially in the face of the plaintiffs' disavowal of such a claim. On top of that, she points out that § 1983 could be the underlying cause of action in Counts 19 and 20, which assert 'abuse of process' claims against McNair (and others) and say that McNair acted 'under color of state law as defined by 42 U.S.C. § 1983.' R. 256 at 122–23. But abuse of process is 'a tort for which [Tennessee] ha[s] long recognized a remedy,' *Givens v. Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002), and we accept plaintiffs' representation that they have pursued McNair under state, not federal, law.

All in all, the plaintiffs have not filed individual-capacity § 1983 claims against the company or McNair. No qualified-immunity defense thus applies to them for such claims.

803 Fed. Appx. at 847-48.

After the court issued its opinion, Plaintiffs filed a petition for rehearing, seeking to make clear that they do seek damages against CPS under Section 1983. *McNeil, et al. v. Community Probation Services, et al.,* Sixth Circuit Case No. 19-5660 (Doc. No. 34). The court denied the petition. (*Id.,* at Doc. No. 37-1).

The CPS Defendants argue Plaintiffs are bound by the "law of the case" doctrine and the "mandate" rule with regard to the Section 1983 damages claims. "The law-of-the-case doctrine

provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' *Moore v. WesBanco Bank, Inc.*, 612 Fed. Appx. 816, 819-20 (quoting *Westside Mothers v. Olszewski,* 454 F.3d 532, 538 (6th Cir. 2006)). "The complementary 'mandate' rule requires the lower court to follow the orders of an appellate court following a remand." *Id.; United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir.1994). "[U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" *Moore,* 38 F.3d at 1421 (quoting *United States v. Kikumura,* 947 F.2d 72, 76 (3rd Cir.1991)).

Plaintiffs concede this point (Doc. No. 387, at 42), and state their understanding that they must recover damages for their constitutional claims from the County for all the defendants' joint conduct. But Plaintiffs argue the Court has the discretion to keep CPS in this case as to those counts because the company is most likely to have the most relevant evidence as to the amount of damages suffered by Plaintiffs and class members. Given the large number of claims and parties in this case, the Court is of the view that Counts 5, 9, and 13 should be dismissed against the CPS Defendants to avoid confusion. *See M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014) (". . . [C]onsidering the large number of Counts and Defendants named in the complaint, the Court is persuaded that retention of redundant official capacity claims would cause confusion and would unnecessarily clutter the docket.") Any unwarranted refusal by CPS to provide relevant discovery, either as a party or as a non-party, should be directed to the attention of the Magistrate Judge.

The CPS Defendants also argue Plaintiffs' constitutional claims are barred by *Heck v.*

31

*Humphrey,* 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), because they have not alleged the local court's probation revocation decisions have been invalidated. *Heck* bars a plaintiff's claim under Section 1983 if a ruling in favor of the plaintiff would "necessarily imply the invalidity of his conviction or sentence," unless the plaintiff can demonstrate the conviction or sentence has already been invalidated. 512 U.S. at 487; *see also Wilkinson v. Dotson,* 544 U.S. 74, 81-82, 125 S. Ct. 1242, 161 L. Ed. 2d 253 (2005) (explaining the rule as follows: "a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – if success in that action would necessarily demonstrate the invalidity of confinement or its duration.")

Plaintiffs' constitutional claims here, however, do not challenge specific probation revocation decisions. Rather, Plaintiffs challenge the neutrality of the misdemeanor probation system in Giles County; the collection practices of the defendants; and the practice of threatening indigent defendants with revocation and jail and/or extension of their probation term for failure to make payments. A ruling in favor of Plaintiffs on their constitutional claims in this case would not necessarily imply the invalidity of particular revocation decisions. Therefore, their claims are not barred by *Heck v.Humphrey. See Powers v. Hamilton County Public Defender Com'n,* 501 F.3d 592, 604-05 (6th Cir. 2007) (holding *Heck* does not bar challenge to procedure whereby the plaintiff was committed to jail without an indigency hearing); *Carter v. City of Montgomery,* 473 F. Supp. 3d 1273, 1295 (N. D. Ala. 2020) (holding *Heck* does not bar challenge to *procedures* used to impose probation and imprisonment as the plaintiff does not challenge his underlying conviction).

32

b. Due process claim (Count 6)

Through Count 6, Plaintiffs claim the contractual relationship between Giles County and CPS violates procedural due process because the arrangement permits "non-neutral actors with direct pecuniary interests in the outcome of probationers' cases to dictate the outcomes of those cases." (Doc. No. 256 ¶ 494). The contract permits CPS "to perform a traditional court function – probation – and, critically, made the resolution of Plaintiff's case contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of these private entities." (*Id.* ¶ 495). Through the arrangement, "CPS and its employees can both influence what conditions are imposed for people assigned to them for supervision, determine whether and when those conditions have been violated, and decide whether and when to initiate revocation proceedings." (*Id.* ¶ 496). They can "make rules and determine whether and when to petition for revocation based on technical or perceived violations of those rules or other conditions." (*Id.*) The companies then "serve as the main witness at the violation proceedings, and often the allegations of employees of the companies are treated as evidence." (*Id.*) The companies also "meet privately with the district attorney and the judge and recommend a resolution or sanction in the case," which include "whether the person should be placed back on supervised probation for an extended period of time (and charged additional fees) and/or jailed." (*Id.*)

Unlike the "longstanding, traditional role of the probation officer – such as the role performed by Tennessee State Probation Officers and United States Probation Officers – the companies and their employees have a direct financial stake in every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation." (*Id.* ¶ 497). The companies "have a personal financial interest in conducting their functions as

33

probation officers in a way that maximizes their personal profit and not as neutral public court officers." (*Id.*) Because they "profit significantly from the decisions about whether to place and keep people on supervised probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide before and during revocation hearings, and what sanction to recommend – including extending the person's term on supervised probation, there is a clear risk that those financial interests will affect its judgment when it participates in those decisions." (*Id.* ¶ 498).

To support this claim, Plaintiffs rely on a line of cases addressing the due process implications of permitting judges and quasi-judicial actors, as well as enforcement actors, to operate under a conflict of interest in carrying out their duties. This line of cases traces back to *Tumey v. Ohio,* 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), where the Supreme Court held that a defendant was deprived of due process when the official presiding over his case operated under a conflict of interest. The Court found a conflict existed because the defendant was convicted and fined by a village mayor, and a portion of the fine imposed was paid to the mayor and a portion was paid to the village:

> [I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.
>
> * * *
>
> No matter what the evidence was against [the defendant], he had the right to have an impartial judge. He seasonably raised the objection, and was entitled to halt the trial because of the disqualification of the judge, which existed both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village.

273 U.S. at 523, 535.

34

The next year, the Court addressed the neutrality issue again in *Dugan v. Ohio,* 277 U.S. 61, 48 S. Ct. 439, 72 L. Ed. 784 (1928). The defendant in *Dugan* had also been convicted and fined by a mayor, and the fines imposed by the mayor provided a major part of the city's income. Unlike *Tumey,* however, the mayor did not receive a salary that was dependent on convictions. The Court ultimately determined that the defendant's due process rights were not violated because the mayor's relationship to the executive or financial policy of the city was too remote to warrant a presumption of bias. 277 U.S. at 64.

The Supreme Court returned to the neutrality issue in *Ward v. Village of Monroeville, Ohio,* 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), where it determined that the relationship between the decisionmaker and the fines produced by convictions created an unconstitutional conflict. The plaintiff in *Ward* had beens convicted of traffic offenses and fined by a mayor who had responsibilities for revenue production, and the fines imposed by the mayor provided a substantial portion of the village funds:

> Although 'the mere union of the executive power and the judicial power in him cannot be said to violate due process of law,' *id.*, at 534, 47 S. Ct., at 445 the test is whether the mayor's situation is one '*which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused . . .' Id.*, at 532, 47 S. Ct., at 444. Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.' *Id.*, at 534, 47 S. Ct., at 445.

409 U.S. at 60 (emphasis added). In reaching its decision, the Court rejected the village's argument that any unfairness created by the conflict could simply be corrected on appeal of the defendant's conviction. Such a procedure, the Court explained, "does not guarantee a fair trial in

35

the mayor's court; there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal." 409 U.S. at 61. In addition, such a delayed impartial adjudication does not make the procedure constitutionally acceptable: "Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62.

The Court applied *Tumey* to a state optometry board in *Gibson v. Berryhill,* 411 U.S. 564, 578-79, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973). The *Gibson* Court determined that the board, whose members were all employed in private practice, violated due process by adjudicating hearings to determine whether to revoke the licenses of optometrists employed by corporations. Disqualification of all optometrists employed by corporations, who accounted for nearly half of all optometrists practicing in the state, the Court pointed out, would likely redound to the personal benefit of optometrists employed in private practice. *Id.*

In *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986), the Court held that a state supreme court judge (Judge Embry), who authored an opinion resulting in his receipt of a recovery in his own pending litigation, violated the due process neutrality requirement. In reaching its decision, the Court made clear that the due process violation was not based on a finding that the judge was "in fact" influenced by his personal interest in the outcome of the opinion, but only that his role in issuing the opinion "'would offer a possible temptation to the average . . . judge to . . . lead him to not hold the balance nice, clear and true.'" 475 U.S. at 825 (quoting *Ward,* 409 U.S. at 60). The Court found any slight pecuniary interests of the other supreme court judges as class members in Judge Embry's case were "too remote and insubstantial" to violate constitutional constraints. 475 U.S. at 825-26.

In *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009), the Court held that due process required recusal of a state supreme court judge in a

36

case in which the judge's largest campaign contributor (donating $3 million) sought to overturn a $50 million verdict against the corporation for which he served as board chairman and principal officer. The Court emphasized that the judge's subjective assessment of his own actual bias was not the determinative factor in considering due process violations: "Due process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" 556 U.S. at 886 (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955)).

More recently, the Fifth Circuit held the due process neutrality requirement was violated when state criminal court judges required defendants to obtain surety bonds as a pretrial release condition, and a percentage of the value of the bond was deposited into the court's judicial expense fund. *Caliste v. Cantrell,* 937 F.3d 525 (5th Cir. 2019). The fund was administered by the judges and used to pay for court staff and other expenses. *See also Cain v. White,* 937 F.3d 446, 454 (5th Cir. 2019) (holding that judges' imposition and collection of fines and fees used to pay the salaries of their staff and other expenses presented too great a "temptation," and violated the Due Process Clause).

The Eleventh Circuit recently applied the neutrality requirement to a private probation company ("PPS") that was compensated for its services by the individual probationers it supervised. In *Harper v. Professional Probation Services, Inc.,* 976 F.3d 1236, 1238-39 (11th Cir. 2020), the plaintiff probationers alleged the judges imposing their probation sentences left certain portions of their orders blank, and that PPS filled in the blanks to extend the duration of probation, increase the fines, and impose additional conditions. The plaintiffs alleged PPS had a financial interest in keeping them on probation so as to continue receiving the monthly supervision fees they were required to pay. *Id.*, at 1239-40. The district court dismissed the

37

plaintiffs' due process claim, holding that they failed to show the probation officers owed a duty of neutrality to probationers because they did not perform adjudicatory functions. *Id.,* at 1240.

The appeals court reversed, concluding that the plaintiffs had sufficiently alleged PPS engaged in quasi-judicial functions, and therefore, owed a duty of neutrality to the probationers it supervised. *Id.,* at 1241-43. In reaching its decision, the court pointed out prior decisions holding that probation officers perform a "judicial function" when they set terms of probation, such as determining whether a probationary sentence should include mandatory mental health treatment, or establishing a schedule for restitution payments. *Id.* The court concluded that PPS was carrying out a judicial function when it imposed binding sentence enhancements. *Id.,* at 1244.

The court also determined the funding arrangement implicated the company's impartiality: "We further hold that PPS was not impartial because its revenue depended directly and materially on whether and how it made sentencing decisions." *Id.*; *see also United States v. Espalin,* 350 F.3d 488, 490-96 (6th Cir. 2003) (Lawson, J. concurring) (discussing various functions of federal probation officers, and observing that the requirement of neutrality has been met when the probation officer's recommendation is based "fairly on the facts and dispassionately traces its way through the law to a sensible conclusion.")

The due process neutrality requirement has also been applied to officials who perform prosecutorial/enforcement functions, based on language from the Supreme Court's opinion in *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). In *Marshall*, a restaurant owner challenged civil penalties assessed by the Employment Standards Administration (ESA) of the Department of Labor. The owner argued that the funding mechanism whereby the civil penalties are returned to the ESA in reimbursement for its costs

38

created an impermissible risk of bias in violation of the Due Process Clause. The Court rejected

the argument, reasoning that the role of the ESA was not that of a decisionmaker:

> The rigid requirements of *Tumey* and *Ward,* designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, see *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S. Ct. 1146, 35 L.Ed.2d 793 (1973), and similar considerations have been found applicable to administrative prosecutors as well, see *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 414, 78 S. Ct. 377, 380, 2 L.Ed.2d 370 (1958); *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S. Ct. 903, 912, 17 L.Ed.2d 842, (1967). Prosecutors need not be entirely 'neutral and detached,' *cf. Ward v. Village of Monroeville,* 409 U.S., at 62, 93 S. Ct., at 84. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties.

446 U.S. at 248-49.

The Court made clear, however, that administrative prosecutors were not free of any

limitations imposed by the Due Process Clause:

> Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935). In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law. See *Dunlop v. Bachowski,* 421 U.S. 560, 567, n. 7, 568–574, 95 S. Ct. 1851, 1858, n. 7, 1858–1861, 44 L. Ed. 2d 377 (1975); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S. Ct. 754, 83 L. Ed. 1147 (1939). Moreover, the decision to enforce—or not to enforce— may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. *Cf.* 2 K. Davis Administrative Law Treatise 215–256 (2d ed. 1979). *A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions. See Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S. Ct. 663, 669, 54 L.Ed.2d 604 (1978); *cf.* 28 U.S.C. § 528 (1976 ed., Supp. III) (disqualifying federal prosecutor from participating in litigation in which he has a personal interest). But the strict requirements of neutrality cannot be the same for administrative prosecutors as

39

for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.

446 U.S. at 249-50 (footnote omitted) (emphasis added). The Court ultimately determined that "the influence alleged to impose bias is exceptionally remote," given that no governmental official stood to profit economically from vigorous enforcement of the child labor provisions, and the civil penalties collected represented substantially less than 1% of the budget of the ESA. 446 U.S. at 250.

The Court found the improper influence to be more direct in *Young v. United States ex rel. Vuitton,* 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), in which counsel for a party who was the beneficiary of a court order was appointed to undertake contempt prosecutions for alleged violations of the order. The Court pointed out that appointment of counsel for the interested party to bring the contempt prosecution "at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." 481 U.S. at 806 (footnote omitted). That the judge made the ultimate decision did not allay those concerns:

> As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

481 U.S. at 807. The danger, the Court explained, was that injecting "'a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision.'" 481 U.S. at 808 (quoting *Marshall v. Jerrico, Inc.,* 446

U.S. at 249-250). The Court distinguished the situation in *Marshall,* however, by explaining that the financial benefits to the prosecuting agency in that case presented a potential conflict that was too remote to be of concern. 482 U.S. at 807.

The lower courts have also applied the neutrality requirement to enforcement officials. In *Flora v. Southwest Iowa Narcotics Enforcement Task Force,* 292 F. Supp. 3d 875, 903-05 (S.D. Iowa 2018), the court denied summary judgment on the plaintiff's claim that the defendants – a narcotics task force, law enforcement officers, and county attorneys – violated due process by stopping motorists and seizing their assets for forfeiture because the forfeited assets partially funded the defendants' departments. In reaching its decision, the court explained that under state law, the defendants' forfeiture share agreement was such that "with successful prosecutions of forfeitures not deemed excessive, [the task force and the county attorney's office] are guaranteed to profit economically as penalties will flow to their offices." 292 F. Supp. 3d at 904. The forfeiture funds were not limited to expenses accrued in pursuing the forfeiture, and the fund's balance "which can exceed $1 million" was used to pay for a wide range of expenses. *Id.* The court recognized that state courts had the final say on whether forfeiture was proper in a given case, but a factual dispute remained as to whether the defendants "were so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment." *Id.* For purposes of summary judgment, the court found the defendants had failed to establish that "forfeitures comprise an insignificant percentage" of the defendants' budgets, and that the defendants were not "financially dependent on maintaining a large and continuing stream of forfeiture penalties." *Id.,* at 904-05.

The court rejected the plaintiff's facial challenge to the state forfeiture statute that permitted seizing agencies the authority to enter into forfeiture share agreements because the statute left the terms of such agreements to the discretion of the seizing agencies:

> Under this provision, law enforcement and county attorneys can structure agreements that do not offend due process. For example, officers and county attorneys could draw up a share agreement entitling seizing agents to retain only that portion of forfeited assets reflecting expenses accrued, similar to how the penalties were distributed to the ESA regional administrators in *Marshall.* 446 U.S. 238, 251, 100 S. Ct. 1610.

292 F. Supp. 3d at 905.

In *Harjo v. City of Albuquerque,* 326 F. Supp. 3d 1145 (D.N.M. 2018), the court held the plaintiff was entitled to judgment on her claim that the City's forfeiture program violated the Due Process Clause under *Marshall* because it created an institutional incentive to prosecute forfeiture cases. Under the program, officials were able to set their own budget and spend the funds raised from forfeiture revenues without meaningful oversight. 326 F. Supp. 3d at 1193-98. Consequently, the court reasoned: "there is a realistic possibility that the forfeiture program prosecutors' judgment will be distorted, because in effect, the more revenues the prosecutor raises, the more money the forfeiture program can spend." *Id.,* at 1195. The court reached a contrary conclusion regarding the individual attorneys and investigators who brought forfeiture actions, finding the connection between the personal incentives to them "too attenuated" to violate due process. *Id.,* at 1199-1200, 1204-07. *See also Brucker v. City of Doraville,* 391 F. Supp. 3d 1207, 1217 (N.D. Ga. 2019) (denying motion to dismiss the plaintiffs' due process claim where city's law enforcement personnel were subject to partisan influence by city council that depended heavily on revenues from fines, fees, and forfeitures); *but see Merck Sharp & Dohme Corp. v. Conway,* 861 F. Supp. 2d 802 (E.D. Ky. 2012) (holding the use of private

attorneys acting for the attorney general pursuant to a contingency fee arrangement in a case seeking civil penalties did not violate the due process neutrality requirement where the attorney general retained the authority to direct the course of the action).

Based on this line of cases, therefore, the neutrality requirement applies to officials performing quasi-judicial functions and those performing enforcement functions. Probation or parole officers traditionally perform both types of functions. *See Swift v. California*, 384 F.3d 1184 (9th Cir. 2004) (in discussing immunity, the court explains that state parole board members perform quasi-judicial functions when they decide to grant, deny, or revoke parole, while parole officers perform enforcement functions when they investigate parole violations, exercise their power to have a parolee arrested, and in recommending revocation of parole to the parole board). And Plaintiffs have alleged that CPS probation officers perform both quasi-judicial and enforcement functions.

As for quasi-judicial functions, as set forth above, Plaintiffs allege CPS probation officers confer with the district attorney and judges regarding probationers' cases, act as witnesses, and make recommendations as to the disposition of cases, including whether an individual should be jailed or have their supervised probation extended. In addition, Plaintiffs allege CPS exercises its authority to convert a person's supervised probation to unsupervised probation, without the approval of a judge. (Doc. No. 256 ¶¶ 191-92; 65). A person on unsupervised probation is no longer required to report to the company, pay additional fees to the company, submit to drug tests, or comply with the other conditions of probation. (*Id.*)

Plaintiffs also allege CPS retains considerable discretion in carrying out its supervisory functions, much like the enforcement functions described in *Marshall, Young, Flora,* and *Harjo*. For example, Plaintiffs allege CPS probation officers exercise discretion as to how frequently to

43

drug test a probationer, whether to seek an arrest warrant for an alleged violation of probation, and what information to provide when seeking a warrant. (*Id.* ¶¶ 9-10, 15, 51, 63-64, 104, 114, 183, 498). In addition, CPS decides "how much money a probationer owes to them each week to avoid violating their probation and how frequently the probationer must report and make payments." (*Id.* ¶ 70).

CPS's discretion to decide whether to recommend arrest, and to make other recommendations affecting probationers, implicates due process neutrality concerns. That the courts ultimately make revocation decisions does not allay neutrality concerns, as the Supreme Court explained in *Young:* "As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives." 481 U.S. at 807.

Having determined that the CPS Defendants perform functions implicating the neutrality requirement, the Court considers whether Plaintiffs have alleged its financial arrangement with Giles County "may bring irrelevant or impermissible factors" into its decisions. *Marshall,* 446 U.S. at 249-50. If so, the Court must determine if the potential conflict is "too remote" to be of concern. *Young,* 481 U.S. at 807.

Plaintiffs allege the 100% "user-funded" probation system established by the CPS contract with Giles County presents a substantial conflict of interest because it creates a financial incentive for CPS to exercise its power over probationers in ways that result in longer periods of probation, and in ways that maximize the collection of supervision fees from probationers. For example, Plaintiffs allege that, in order to generate and collect more fees, CPS threatens probationers with arrest, jailing, and extension of supervised probation, resulting in more fees owing to the company. (Doc. No. 256 ¶¶ 10, 70, 120, 123). In addition, Plaintiffs allege that CPS

44

conducts more frequent drug tests near the end of a probationer's supervision term because it can earn significantly more profit if a positive drug screen creates a basis for revocation and extension of the person's supervised probation. (*Id.* 104). Plaintiffs also allege that, during revocation proceedings, CPS probation officers routinely withhold relevant evidence concerning a probationer's inability to pay. (*Id.* ¶ 183). The fees and surcharges paid to the company by probationers is its only source of revenue under the contract. (*Id.* ¶¶ 2, 8). This "direct financial stake" permeates "every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation." (*Id.* ¶ 497).

The Court concludes that Plaintiffs' allegations are more than sufficient to state a valid claim that CPS's 100% funding arrangement with Giles County creates an impermissible conflict of interest, and that this conflict is not "too remote" to be of concern under the case law discussed above.[12]

The CPS Defendants argue they cannot be the proximate cause of Plaintiffs' injury because the sentencing court makes the final revocation decision. The due process afforded to a probationer at the revocation hearing, however, occurs independently of the deprivation alleged here. As such, it does not "cure" the alleged deprivation, or suggest that proximate cause is lacking. This conclusion is supported by *Ward*, where the Supreme Court rejected the village's argument that any unfairness created by the mayor's conflict of interest could simply be corrected on appeal of the defendant's conviction. 409 U.S. at 61. As discussed above, the Court held that a delayed impartial adjudication does not cure the deprivation: "Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62; *see also Tumey,* 47 U.S. at

---

[12]   Although Plaintiffs cite to additional allegations in the record supporting their due process neutrality claim, the Court does not include an exhaustive list here. The examples cited above are sufficient to demonstrate that dismissal is inappropriate.

535 ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge."); *Marshall*, 446 U.S. at 249 ("Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication."); *Flora*, 292 F.Supp.3d at 904 (explaining that, although the state courts had the final say on forfeiture, a factual dispute remained as to whether the defendants "were so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment.")[13]

Furthermore, the defendants' suggestion that "convicts" (Doc. No. 371, at 12-13) no longer have due process neutrality rights is not borne out by case law. *See, e.g., Harper,* 976 F.3d at 1238-43.[14] The Court is similarly unpersuaded by their argument that Plaintiffs' neutrality claim is undermined by a Tennessee statute they claim requires probation officers to report nonpayment to the courts. *See* Tenn. Code Ann. § 40-35-303(i)(3) ("Willful failure to pay the supervision fee . . . shall be grounds for revocation of probation and the supervising entity shall report all instances of non payment to the sentencing court.")  Plaintiffs' allegations relating to

---

[13]    To the extent the CPS Defendants argue the due process neutrality requirement only applies to judges, they are in error as *Marshall* and its progeny demonstrate. In addition, the defendants' citation to *Harper v. Professional Probation Services, Inc.,* 2019 WL 3555068 (N.D. Ala. Aug. 5, 2019) is unpersuasive. As discussed above, the district court's decision was reversed on appeal by the Eleventh Circuit, which held that the plaintiffs had sufficiently alleged that a private probation company owed a duty of neutrality to the probationers it supervised. *Harper v. Professional Probation Services, Inc.,* 975 F.3d at 1238-43.

[14]    The defendants' reliance on *Brinson v. Providence Comm. Corr.,* 2016 WL 9651775, at * 8 (S.D. Ga. March 31, 2016), *vacated and remanded on jurisdictional grounds,* 703 Fed. Appx. 874 (11th Cir. 2017), does not suggest otherwise. In *Brinson,* the plaintiffs brought a facial challenge to a state statute authorizing the state courts to contract for private probation services. Plaintiffs do not bring any facial challenges here. In addition, although Tennessee law permits private probation companies to operate, and permits them to collect fees from non-indigent probationers as "part payment of expenses incurred" by the supervising agency, *see* Tenn. Code Ann. §§ 40-35-302, 40-35-303; *McNeil v. Cmty. Prob. Servs., LLC,* 803 Fed. Appx. 846, 849 (6th Cir. 2020), it does not *require* the 100% user-funded arrangement at issue here. *See Flora,* 292 F. Supp. 3d at 905 ("Under [forfeiture statute], law enforcement and county attorneys can structure agreements that do not offend due process.")

46

the conduct of CPS probation officers goes far beyond merely reporting instances of nonpayment to the courts.

For the reasons set forth above, the CPS Defendants have not established they are entitled to dismissal of Plaintiffs' due process claim (Count 6).

    c.   Equal protection claim – *James v. Strange* (Count 10)

Through Count 10, Plaintiffs bring an equal protection claim, based on *James v. Strange,* 407 U.S. 128, 92 S. Ct. 2027, 32 L. Ed. 2d 600 (1972), through which they allege that CPS and Giles County "take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor." (Doc. No. 256 ¶ 531). Plaintiffs further allege this deprivation occurs "even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments." (*Id.*)

In *James v. Strange,* the Supreme Court held that a Kansas recoupment statute requiring indigent defendants to repay legal defense fees violated the Equal Protection Clause because it deprived those individuals of the protective exemptions (such as a limit on earnings subject to garnishment) available to other civil judgment debtors. 407 U.S. at 2031-32. Recognizing that state recoupment statutes may be supported by legitimate state interests, the Court, nevertheless, concluded that such interests "are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors to whom the statute itself repeatedly makes reference." *Id.,* at 2035. "The statute before us," the Court explained, "embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." *Id.*

In *Johnson v. Bredesen,* 624 F.3d 742, 746-50 (6th Cir. 2010), the Sixth Circuit discussed *James v. Strange* in addressing a challenge to a Tennessee statute conditioning restoration of felons' voting rights on payment of court-ordered victim restitution and child support obligations. The court initially determined that rational basis review was appropriate because the statute did not involve a fundamental right, and ". . . contrary to Plaintiffs' other contention, wealth-based classifications do not discriminate against a suspect class." *Id.*, at 746. In distinguishing *Strange* as concerning "fundamental interests subject to heightened scrutiny," the court explained:

> . . . [T]hough *Strange's* text appeared to apply rational basis review, the Court, concerned about discriminatory garnishment of the wages with which a debtor 'supports himself and his family,' found that the admittedly 'legitimate' interests of the state paled in comparison to 'the hopes of indigents for self-sufficiency and self-respect.' *Strange*, 407 U.S. at 135, 141–42, 92 S. Ct. 2027; *see also Olson v. James*, 603 F.2d 150, 154 (10th Cir.1979) ('[I]t was the failure of the statute to protect the wages and the intimate personal property of the defendant from seizure and its consequent discouraging of independence and self-sufficiency . . . that brought the Court to the conclusion that the provisions constituted a violation of the equal protection clause.'). Plaintiffs here assert no comparable interest triggering a heightened standard of review, but, instead, the mere 'statutory benefit' of re-enfranchisement. *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010).

624 F.3d at 749.

In two more recent cases, the Sixth Circuit presents a narrower view of *Strange* claims. In *Fowler v. Benson,* 924 F.3d 247, 260-263 (6th Cir. 2019), the court held that indigent drivers were not likely to succeed on their equal protection challenge to a Michigan statute suspending the driver's licenses of those with unpaid court debt. In considering the plaintiffs' "extraordinary debt collection claim" based on *Strange,* the court appeared to limit the case to its facts:

> Plaintiffs cite *Strange* for the proposition that Secretary Benson may not, consistent with the Equal Protection Clause, 'subject[ ] [Plaintiffs] to a

48

significantly harsher collection method than people who owe other types of debt.' Michigan law violates this principle, according to Plaintiffs, because their licenses are suspended due to their court debt, while 'people with unpaid private debt do not face license suspension.'

The district court correctly rejected this argument under *Fuller v. Oregon*, 417 U.S. 40, 94 S. Ct. 2116, 40 L.Ed.2d 642 (1974). The problem that *Strange* identified, according to the *Fuller* Court, was 'the elimination of exemptions normally available to judgment debtors.' *Id.* at 47, 94 S. Ct. 2116. Here, there is no dispute that the challenged Michigan statutes do not eliminate any such exemptions. Moreover, the State is uniquely empowered to grant, suspend, or reinstate driver's licenses. Supreme Court precedent does not require anything like exact parity between the State and private creditors in this regard. The Court in *Strange* said: '[w]e recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not be identical.' 407 U.S. at 138, 92 S. Ct. 2027. It would be passing strange indeed to interpret *Strange* as putting Michigan to the choice of either giving up its right to suspend the licenses of those with unpaid court debt or empowering private creditors to suspend the driver's licenses of those indebted to them.

In any event, laws challenged under *Strange* are subject to rational basis review. *Johnson*, 624 F.3d at 746. As established above, Michigan's statutory scheme is rationally related to legitimate government interests.

924 F.3d at 263.

In a similar case decided less than a year ago, the Sixth Circuit continued to apply its narrow interpretation of *Strange.* In *Robinson v. Long,* 814 Fed. Appx. 991 (6th Cir. 2020), the court rejected a challenge by indigent drivers to a Tennessee statute that was "nearly identical" to the Michigan statute considered in *Fowler.* Relying on its analysis in *Fowler,* the court held the plaintiffs were unlikely to succeed on their claim that the Tennessee statute constitutes "impermissible wealth discrimination" or their claim that the statute "runs afoul of the Supreme Court's prohibition against extraordinary debt collection as articulated in *James v. Strange." Id.,* at 994. The court also rejected the plaintiffs' argument that wealth-based distinctions should be analyzed with heightened scrutiny outside the criminal-justice context. *Id.,* at 995. Explaining

49

that such classifications are to be reviewed under a rational basis standard, the court concluded that the license-suspension policy was rationally related to the State's goal of encouraging payment of court debt by heightening the incentive to pay. *Id.*

The Court is not persuaded that Plaintiffs' equal protection challenge "fits the mold" of a *Strange* claim, as construed by the Sixth Circuit. Plaintiffs allege that CPS and Giles County collected funds from indigent probationers without applying the exemptions enjoyed by civil judgment debtors. (Doc. No. 256 ¶ 531). But Plaintiffs further allege the County is subject to the same laws on debt collection – presumably, including the required exemptions – as are other civil judgment creditors. (*Id.*); *See* Tenn. Code Ann. § 40-35-303(i)(1) (providing that misdemeanor probationers must pay a fee to be used as part payment of expenses by supervising agency "*unless the defendant is found to be indigent and without anticipated future funds with which to make the payment*.") (emphasis added). Any unequal treatment, therefore, apparently occurs because the defendants do not *advise* indigent probationers that they may qualify for a waiver or reduction of their payments. (Doc. No. 256 ¶¶ 129-34, 231, 256, 289). Plaintiffs have not cited a case in which the courts have relied on *Strange* to impose a duty to inform a government debtor of available exemptions. Heeding the admonition of the Sixth Circuit to apply *Strange* narrowly, therefore, the Court concludes Plaintiffs have not stated a viable equal protection claim based on *Strange.* Accordingly, Count 10 is dismissed.[15]

C.  Equal protection/Due Process Claim – *Bearden v. Georgia* (Count 14)

Through Count 14, Plaintiffs allege CPS and Giles County have violated their equal protection/due process rights under *Bearden v. Georgia, supra.* Plaintiffs allege the defendants

---

[15] As Giles County has not filed a dispositive motion, the Court does not address its liability on the equal protection claims.

have a policy and practice of "placing and keeping individuals on supervised probation with the CPS Defendants solely because they cannot afford to pay their court debts and probation fees, without an inquiry to determine whether their failure to pay was willful." (Doc. No. 256 ¶ 553). Plaintiffs refer to this as "pay-only probation." (*Id.* ¶ 10 n.4). Probationers who can afford to pay their court debts in full, however, "will not be subjected to supervised probation by the private companies (sometimes, Defendants permit a probationer to purchase her way off of supervised probation only after a minimum period of time, typically four months, on supervised probation has passed)." (*Id.* ¶ 553)

"If the person is too poor to pay, the County and the Private Defendants have a policy and practice of keeping that person on supervised probation, including forcing the person to abide by conditions agreed upon by the companies and the County that seriously restrict the person's liberty and that subject the person to arrest and jailing if those conditions, as interpreted by the For-Profit Probation Defendants (including payment of extra fees to the company) are violated." (*Id.*) In addition to additional supervision fees, probationers also incur drug testing fees payable to CPS. (*Id.* ¶¶ 10, 293). Also, while on "pay-only probation," a probationer can be arrested and jailed for violation of any conditions imposed. (*Id.* ¶¶ 86-96, 99-100, 103).

Plaintiffs further allege the CPS Defendants have the authority to convert supervised probation to unsupervised probation without an order from a judge, and that they refuse to do so until they obtain as much money as possible from the person. (*Id.* ¶¶ 60, 190-93). Also, Plaintiffs allege the County has the ability, as an alternative, "to collect outstanding debts directly from the Plaintiff by allowing her to make payments directly to the court or by using other debt-collection practices that are legal under Tennessee law." (*Id.* ¶ 554).

In *Bearden*, the Supreme Court addressed a challenge to the automatic revocation of an indigent defendant's probation for failure to pay a fine and restitution. Reviewing precedent, Court explained that "[d]ue process and equal protection principles converge in the Court's analysis in these cases." 461 U.S. at 665. Noting the parties' vigorous arguments as to whether the strict scrutiny or rational basis standard applied to the equal protection question, the Court suggested the issue could not be divorced from due process analysis:

> There is no doubt that the State has treated the petitioner differently from a person who did not fail to pay the imposed fine and therefore did not violate probation. To determine whether this differential treatment violates the Equal Protection Clause, one must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation. This is substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine. Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . .' *Williams v. Illinois*, supra, 399 U.S., at 260, 90 S. Ct., at 2031 (Harlan, J., concurring).

461 U.S. at 666–67 (footnotes omitted). In applying that analysis, the Court concluded it was fundamentally unfair to revoke probation automatically without inquiring into the reasons for the failure to pay:

> We hold, therefore, that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority. If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation

52

would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.*, at 672-73 (footnote omitted).

Even though *Bearden* involved physical confinement by those who could not afford to pay a fine or restitution, Plaintiffs argue *Bearden* applies here because probation supervision imposes extensive restrictions on the indigent person's liberty, which are not imposed on those who can afford to pay off their debt.

*Bearden* involved a distinction between physical confinement and the conditional liberty interest of supervised probationers, based on wealth. *See Morrissey v. Brewer,* 408 U.S. 471, 483, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972) (recognizing that parolees have a conditional liberty interest in remaining on parole, and imposing certain procedural and substantive limits on revocation of parole); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973) (extending *Morrissey* to probation revocation proceedings). In this case, Plaintiffs allege a distinction between the conditional liberty interest of supervised probationers, and the greater liberty interest enjoyed by those on unsupervised probation, or those terminated from probation altogether because they were able to pay all financial costs and fees at the end of the original term. In the Court's view, *Bearden* applies to the restrictions on the liberty interests identified by Plaintiffs for those on supervised probation, including the requirement that they report regularly to CPS, submit to drug tests (for which they are charged), refrain from traveling or moving freely, and the risk they will be arrested and/or jailed for alleged violations of conditions. This loss of liberty allegedly is not imposed (at least to the same extent) on those who are moved to unsupervised probation because they have the means to pay off the amounts owed.

53

Plaintiffs also adequately allege CPS is responsible for the deprivation by extending supervised probation for those who cannot pay off their court debt and supervision fees. This extension allegedly comes about by CPS either refusing to change an individual's probation from supervised to unsupervised on its own, or by CPS's initiation of probation revocation proceedings with the court (often based only on the indigent probationer's failure to pay), which can result in imprisonment or an extension of the probation term. (*Id.* ¶¶ 190-93, 293-98, 301).[16]

Having determined that *Bearden* applies to the liberty interests alleged here, and that defendants' alleged conduct is responsible for the deprivation, the Court will consider the following factors, as set forth in *Bearden,* in analyzing this claim: (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose. 461 U.S. at 666-67.

With regard to the first two factors, as discussed above, Plaintiffs allege that supervised probation restricts their liberty by imposing the requirement that they report regularly to CPS, submit to drug tests (for which they are charged), and refrain from traveling or moving freely, and subjects them to possible arrest and/or jail for alleged violations of conditions. Plaintiffs allege these restrictions implicate their right to privacy and their right to freedom of movement, among others. The Court concludes that these individual interests are significant, and that they are alleged to be substantially affected by the defendants' alleged conduct.

---

[16]  It is interesting to note that Tennessee law appears to prohibit the extension of the original probation term or the imposition of more onerous probation terms without compliance with certain due process requirements, including a hearing before a trial court. *See State v. Hicks,* 2003 WL 21663678 (Tenn. Crim. App. Jul. 14, 2003) (explaining that extending the length of a defendant's probation imposes a condition more onerous than originally imposed, and may only be made at the conclusion of a probation revocation hearing); *State v. Merriweather,* 34 S.W.3d 881 (Tenn. Crim. App. 2000) (finding extension of probation for "indefinite" period until costs and restitution were paid in full to be illegal under state law).

As to the third factor, the Court is persuaded that Plaintiffs have adequately alleged a lack of rational connection between the purpose of the policies and the means of achieving that purpose. CPS argues their alleged actions are aimed at achieving the following purposes: (1) encouraging the payment of court debt; (2) ensuring the probation system is "user-funded" and results in no cost to the County; (3) encouraging probationers to seek and maintain employment; (4) ensuring the sentence of the court is satisfied; and (5) encouraging law-abiding behavior.

As for the first two purposes, the CPS Defendants appear to argue the State of Tennessee and Giles County have an interest in ensuring court debt is paid, regardless of ability to pay, and in ensuring the County does not incur any costs for its probation system. Neither alleged interest is supported by state law. As discussed above, Tennessee law exempts indigent individuals, in many instances, from the payment of costs and fees associated with probation. *See* Tenn. Code Ann. §§ 40-35-303(i) (indigent individuals excepted from payment of probation supervision fees; other costs of supervision subject to defendant's ability to pay; only "*willful* failure to pay" supervision fee is grounds for revocation);[17] 40-35-303(d)(1)(B) (excepting indigent persons from payment for drug assessments and treatment); 40-35-303(f) ("The trial judge shall *not* have the authority to require that the defendant either secure or pay the costs accrued in the case at the instance of the state as a condition of conducting a hearing on the defendant's request for suspension of sentence and probation."); Tenn. Code Ann. §§ 40-28-201, 202 (probationers and parolees who satisfy criteria for "hardship" (due to poverty and other reasons) exempted from payment of fees to department of correction); *see also State v. Merriweather,* 34 S.W.3d at 886

---

[17]   Defendants argue this provision supports their actions because it requires the probation supervisor to "report" all instances of nonpayment to the sentencing court. Contrary to their suggestion, however, the statute does not require the supervisor to make the report by initiating revocation proceedings. *See Rodriguez,* 191 F. Supp. 3d. at 778 (explaining that the statute does not require the private probation company to report nonpayment in the form of an Arrest Affidavit).

(finding extension of probation for "indefinite" period until costs and restitution were paid in full to be illegal under state law). The defendants do not cite any authority suggesting the State of Tennessee would consider their alleged zeal to collect fees from indigent probationers a legitimate goal.

As for the third interest identified by the CPS Defendants – encouraging probationers to seek and maintain employment – Plaintiffs allege the defendants' conduct actually results in the opposite. (Doc. No. 256 ¶¶ 5, 310). Even if the Court disregards those allegations, however, the defendants have not explained why a condition of *unsupervised* probation requiring that a person maintain employment is not sufficient to accomplish this goal, without the imposition of monthly supervision fees and an ever-increasing debt load on those who are indigent. (*Id.* ¶ 117 (those on unsupervised probation are also allegedly required to maintain employment)). Nor do the defendants explain why the time an indigent probationer must devote to reporting (and taking drug tests) to CPS, at a frequency determined by CPS, increases the likelihood that a probationer will be able to obtain and keep employment. (*Id.* ¶¶ 89-96).

Next, CPS argues its conduct satisfies the sentencing court's original determination that the offender did not require imprisonment. (Doc. No. 371, at 20). It is true that extending a person's probation rather than ordering the person to serve a sentence upon revocation is consistent with the court's determination that imprisonment is unnecessary. But the distinction at the heart of Plaintiffs' claim is not between imprisonment and the extension of supervised probation. The distinction at issue here is between supervised probation and unsupervised probation (or the termination of probation) based on the probationer's ability to pay. In that regard, the defendants have not explained why supervised probation is consistent with the court's

56

determination that imprisonment is unnecessary, while unsupervised probation is somehow inconsistent with that determination.

Finally, as to the fifth purpose the CPS Defendants identify – encouraging law-abiding behavior – the defendants do not explain why this goal only applies to indigent probationers. (Doc. No. 393, at 12-13 (arguing their conduct ensures "indigent convicts" do not "escape confinement and repayment of fines and costs.") Their suggestion that only indigent individuals are at risk of breaking the law is not factually or legally supported.

Assuming any of the purposes identified by the defendants may be legitimately claimed by the CPS Defendants, and rationally connected to the means of achieving the purpose, the Court considers whether the defendants have an "alternative means" of achieving the purpose. In that regard, Plaintiffs have alleged that their outstanding debts may be converted to civil debts and collected thorough any mechanism available in Tennessee civil law. (Doc. No. 256 ¶¶ 72, 554 n.12); Tenn. Code Ann. § 40-24-105(a) ("Costs and litigation taxes due may be collected in the same manner as a judgment in a civil action, but shall not be deemed part of the penalty, and no person shall be imprisoned under this section in default of payment of costs or litigation taxes.") Thus, the defendants may pursue collection of the money owed to them without imposition of "pay-only" probation, and the resulting restrictions it imposes on Plaintiffs' liberties.

For these reasons, the Court concludes Plaintiffs' allegations are sufficient to state a valid *Bearden* claim. The Court's conclusion is supported, in that regard, by the analysis of a similar claim in *Rodriguez v. Providence Community Corrections, Inc.*, *supra*. In *Rodriguez,* a former judge of this court concluded that allegations about the practices of a user-funded private probation company were sufficient to withstand a motion to dismiss:

57

Count V asserts that it violates equal protection and due process to relegate indigent individuals to the onerous conditions of supervised probation while those who have the ability to pay their fines do not receive supervised probation sentences. Specifically, Plaintiffs allege:

> The Defendants' policy and practice is to use supervised probation for those people who cannot afford to pay the court judgment in full. If the person can pay, the person pays and they are not supervised by PCC, Inc. If the person is too poor to pay, the County has a policy and practice of placing that person on "probation," ... This policy and practice of altering punishment based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

(Docket No. 1 at ¶ 296). To be clear, Plaintiffs' argument is not that indigent defendants receive steeper fines than those misdemeanor offenders who pay upfront. Rather, they argue that their inability to immediately pay court fines and fees channels them into PCC-supervised probation, which brings with it a set of 'significant consequences' and a 'host of liberty restrictions.' (Docket No. 75 at 36). Those who can pay their debts are still put on probation, but theirs is unsupervised. As General Sessions Court Judge Benjamin Hall McFarlin said 'you can pay everything and not be on supervised probation.' (Docket No. 70, Nov. 6, 2015 Hr'g Tr. at 86:11-86:12). Probationers who are not subject to supervision are not subject to the terms and conditions of PCC probation and do not constantly face the threat of arrest and detention. Thus, Plaintiffs argue that indigent probationers will suffer a materially harsher punishment, PCC-supervised probation, which is 'imposed solely because [the probationers] could not afford to pay [their] court costs on the day of conviction.' *Id.*

Crucial to this claim is the fact that the County has the ability to collect outstanding debts directly from probationers, meaning that one does not have to be on supervised probation in order to pay one's fines and costs. As Plaintiffs allege, probationers may apply to be put on unsupervised payment plans and pay any outstanding fines and costs directly to the courts. Indeed, several of the Named Plaintiffs were ultimately able to obtain access to such plans and avoid future contact with PCC. (Docket No. 1 at ¶¶ 108, 177, 197). These payment plans 'contemplate[ ] the payment in full of [probationers'] court costs,' but without 'incurring the additional debts, burdens, or threats associated with participation in PCC, Inc.'s illegal private probation scheme.' (*Id.* at ¶ 108). Supervised probation is therefore not necessary to collecting monetary debts owed by misdemeanor offenders.

Plaintiffs' allegations plausibly allege a Fourteenth Amendment violation. Plaintiffs are similarly situated to those offenders who escape PCC's clutches in all respects but one: wealth. They have pleaded or been found guilty of the same offenses and sentenced to the same fines. Because Plaintiffs, who are indigent,

cannot afford to pay their fines and costs immediately, they are subject to supervised probation and its attendant terms, conditions, and consequences while those who can pay receive only unsupervised probation. The rationality of this wealth-based distinction is called into question by the fact that the County has alternative mechanisms for collecting outstanding fines and costs, namely, court-administered payment plans.

The Private Defendants do not dispute these allegations. Rather, they seek dismissal of Count V because it is the County, not PCC, which technically places misdemeanor offenders on probation. According to the Private Defendants, 'Plaintiffs have made no showing that they can state a claim premised entirely on placing individuals on probation against an entity that cannot place individuals on probation.' (Docket No. 90 at 13). Plaintiffs respond by noting that PCC is responsible for this violation insofar as the Company conspired with the County and because PCC keeps Plaintiffs on supervised probation rather than referring them to the County for a payment plan. The allegations in the Complaint indicate PCC's involvement in perpetuating supervised probation for the indigent. For example, Plaintiffs allege that PCC has a policy and practice of declining to inform and/or providing misinformation about indigency waivers, thereby preventing Plaintiffs from obtaining a direct payment plan from the County. (Docket No. 1 at ¶¶ 36-37, 167-171). For now, these allegations are sufficient to impute liability under the Fourteenth Amendment to PCC. Count V will survive.

191 F. Supp. 3d at 775-76 (footnotes omitted); *see also Briggs v. Montgomery,* 2019 WL 2515950 (D. Ariz. Jun. 18, 2019) (holding the plaintiffs sufficiently stated a *Bearden*-type claim that "pay-only" pretrial diversion violates equal protection and due process).

For the reasons set forth above, the CPS Defendants have not established they are entitled to dismissal of Plaintiffs' equal protection/due process claim (Count 14).

4. The State law claims

On one page of their brief, the CPS Defendants argue Plaintiffs' state law claims for unjust enrichment (Count 16), abuse of process (Counts 19 and 20), and civil conspiracy (Count 24) should be dismissed for failure to state a claim. (Doc. No. 371, at 25). Defendants do not attempt to identify the elements of each cause of action, and explain why the allegations of the

59

lengthy complaint fail to adequately implicate those elements. Plaintiffs argue the defendants'
arguments should be deemed waived due to insufficient development.

In the Sixth Circuit, "it is well-settled that '[i]ssues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived." *Pryor v.
Holder*, 436 Fed. Appx. 471, 479 (6th Cir. 2011) (quoting *McPherson v. Kelsey,* 125 F.3d 989,
995-96 (6th Cir.1997)). "'It is not sufficient for a party to mention a possible argument in the
most skeletal way, leaving the court to . . . put flesh on its bones.'" *Id.* The Court concludes that
the CPS Defendants' failure to adequately present their arguments about the state law claims
results in a waiver of those arguments. Even if the Court considers the arguments, however, they
are without merit.

a. <u>Unjust Enrichment (Count 16)</u>

The elements of an unjust enrichment claim in Tennessee are: (1) a benefit conferred
upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3)
acceptance of such benefit under such circumstances that it would be inequitable for him to
retain the benefit without payment of the value thereof. *Freeman Indus., LLC v. Eastman Chem.
Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). "The most significant requirement of an unjust
enrichment claim is that the benefit to the defendant be unjust." *Id.* "A plaintiff need not be in
privity with a defendant to recover," but must demonstrate "that he or she has exhausted all
remedies against the person with whom the plaintiff enjoyed privity of contract." *Id.* A plaintiff
need not show the defendant received a direct benefit in order to recover; "a plaintiff may
recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if
the defendant's retention of the benefit would be unjust." *Id.*

In Count 16, Plaintiffs allege:

562. CPS Defendants took and converted to their own use monetary payments from Plaintiffs and proposed Class Members. Defendants extracted those funds in violation of Plaintiffs' federal and state constitutional rights to due process of law and equal protection of the laws. Defendants had no legal right to Plaintiffs' money and took these funds in violation of state law as related above. Under the circumstances presented here, Defendants' retention of Plaintiffs' money would result in unjust enrichment.

(Doc. No. 256 ¶ 562).

The CPS Defendants argue Plaintiffs have not shown their collection of fees was "unjust" because they collected the fees based on court orders. Although the defendants may have had a right to collect supervision fees, Plaintiffs allege the method of collection resulted in violations of their constitutional rights and violations of state law. Thus, Plaintiffs have adequately alleged the defendants' collection of fees was "unjust" for purposes of Count 16.

    b.   Abuse of process (Counts 19 and 20)

In Tennessee, to adequately state an abuse of process claim, the plaintiff must allege: "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 400-01 (Tenn. 2002).

In Counts 19 and 20, Plaintiffs allege:

571. Defendants abused the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional 'supervision' and 'drug testing' fees. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

572. When probationers are unable to pay what CPS demands, the company files revocation petitions and secures arrest warrants. Moreover, CPS participates through written documents, testimony, and informal ex parte conversations with Giles County prosecutors and judges to secure violation-of-probation judgments. The company refuses to convert a person's supervised probation to unsupervised probation unless she has paid all of her debts.

573. The company seeks violation-of-probation citation or arrest warrants for nonpayment even when it knows that the person did not pay because they were too poor to pay. The company and the County use these warrants as a way to extort additional money from impoverished probationers who are scared of being arrested and jailed.

574. The company and the County engage in all of these activities, and threaten probationers with arrest, jailing, and revocation if they do not make payments, with the ulterior motive of securing the additional court costs and fees that come as a matter of County policy and practice with each revocation violation.

575. The company also engages in an abuse of process throughout its probation supervision by using the order of probation not to do justice and assist probationers, but for the ulterior motive of making profit by setting fees, performing drug tests, and threatening to seek violation-of-probation warrants to extort money.

(Doc. No. 256 ¶¶ 569-75; 576-82).

The CPS Defendants argue Plaintiffs' claims are subject to dismissal because the defendants "were acting pursuant to their lawful enforcement right, and the Complaint fails to establish otherwise." (Doc. No. 371, at 25). The Court disagrees. Plaintiffs allege the defendants used the legal process with an ulterior motive to maximize profits. The tort of abuse of process contemplates the use of *legal* process in a way that is not "proper in the regular prosecution of the charge." *Givens,* 75 S.W.3d at 402. Thus, Plaintiffs have sufficiently alleged the elements of abuse of process for purposes of Counts 19 and 20.

c. Civil Conspiracy (Count 24)

To establish a civil conspiracy, a plaintiff must show: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006); *Pagliara v. Moses*, 2020 WL 838482, at *6 (Tenn. Ct. App. Feb. 20, 2020). A claim for civil conspiracy

"requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007); *Pagliara* 2020 WL 838482, at *6. A claim of conspiracy, standing alone, is not actionable where the underlying tort is not actionable. *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

In Count 24, Plaintiffs allege:

607. Defendants Community Probation Services, LLC, Community Probation Services, L.L.C., and Community Probation services acted in concert to accomplish the common and unlawful purposes of:

a. Acting under color of state law to deprive Plaintiffs and other probationers of the rights, privileges, and immunities secured by the United States Constitution and the laws of the United States without due process of law by:

i. Placing private, non-neutral actors with direct pecuniary interests in the outcome of probationers' cases in a position to dictate the outcome of those cases;

ii. Using imprisonment, threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses, intrusive drug tests, extra fees, and other restrictions on probationers' liberty to collect debts owed to the County;

iii. Placing and keeping individuals on supervised probation solely because they cannot afford to pay their court debts and probation fees, without determining whether the failure to pay was willful;

iv. Permitting non-neutral actors with direct pecuniary interests in the drug testing of probationers to determine how many drug tests a probationer must endure and pay for, and when the probationer must take those drug tests;

v. Taking and converting to their own use monetary payments from Plaintiffs and proposed class members to which Defendants had no legal right; and

63

vi. Abusing the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional 'supervision' and 'drug testing' fees.

608. Defendants accomplished their common design via the unlawful means of contracting with the County to allow non-neutral, financially-interested individuals to serve a traditional government function, and extorting payments of court fines, costs, and various fees from Plaintiffs and proposed Class Members using, *inter alia* imprisonment and threats of imprisonment in violation of Tennessee and federal law.

609. The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

610. Defendants knew or should have known that Tennessee and federal law require individual consideration of each Plaintiff or proposed Class Member's ability to pay such court fines, costs, and fees, that placing and keeping a person on supervised probation solely for nonpayment of such civil debts violates Tennessee and federal law, and that Tennessee and federal law provide Plaintiffs and proposed class members with the right to have their probation supervised by a neutral officer of the court.

611. Defendants knew of each other's common intent to contract with the County and subject Plaintiffs and proposed Class Members to onerous conditions of probation in violation of Tennessee and federal law. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs Tanya Mitchell and Lucinda Brandon.

612. The conspiracy among Defendants was a proximate and legal cause of harm to Plaintiffs and proposed class members. If Defendants had abided by the laws requiring probation officers to be free of financial conflicts of interest and prohibiting the use of supervised probation, arrest, and jailing to coerce payment from indigent individuals, Plaintiffs and proposed class members would not have suffered the unlawful deprivations of liberty and property described herein. Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

(Doc. No. 256 ¶¶ 605-612).

The CPS Defendants argue this claim is subject to dismissal because Plaintiffs have failed to allege a viable predicate tort. The defendants assume all other claims have been dismissed. Through Count 24, Plaintiffs allege the defendants conspired to violate their

64

constitutional rights, extort money from them, and to commit abuse of process and unjust enrichment. As Plaintiffs' other state law claims have not been dismissed, Plaintiffs' civil conspiracy claim remains a viable claim.

## IV. CONCLUSION

For the reasons set forth above, the Motion to Dismiss Certain Claims for Lack of Subject Matter Jurisdiction (Doc. No. 374) is **DENIED,** and the Motion to Dismiss (Doc. No. 369) is **GRANTED** in part, and **DENIED** in part. Accordingly, Count 1 (the RICO claim); Count 5 (the due process claim for damages); Count 9 (the equal protection claim for damages); Count 10 (the equal protection claim for equitable relief); and Count 13 (the equal protection and due process claim for damages) are dismissed. Count 6 (the due process claim); Count 14 (the equal protection and due process claim for equitable relief); Count 16 (the unjust enrichment claim); Counts 19 and 20 (the abuse of process claims); and Count 24 (the civil conspiracy claim) remain for trial.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE