# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

KAREN MCNEIL, et al.,       )
                                 )

    Plaintiffs,             )
                                 )

v.                           )       NO. 1:18-cv-00033
                                 )

COMMUNITY PROBATION     )       JUDGE CAMPBELL
SERVICES, LLC, et al.,        )       MAGISTRATE JUDGE FRENSLEY
                                 )

    Defendants.          )

## MEMORANDUM

## I.  INTRODUCTION

Pending before the Court are the PSI Defendants' (Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., Tennessee Correctional Services, LLC, Timothy Cook, Markeyta Bledsoe, and Harriet Thompson) Renewed Motion for Summary Judgment (Doc. No. 363);[1] Plaintiffs' Amended Response (Doc. No. 388); and the PSI Defendants' Reply (Doc. No. 392).[2]

For the reasons set forth below, the PSI Defendants' Renewed Motion (Doc. No. 363) is **GRANTED** in part, and **DENIED** in part. The Court grants summary judgment to the PSI Defendants on the following claims: Counts 2, 3, and 4 (the RICO claims); Counts 11 and 12 (the equal protection claims); and Count 21 (an abuse of process claim, as to Defendants Bledsoe and

---

[1]   Through the Renewed Motion, the PSI Defendants incorporate by reference the additional briefs and pleadings filed as Docket Nos. 300, 301, 301-1 to 301-26, 343, and 344.

[2]   The CPS Defendants have not joined in the Renewed Motion for Summary Judgment. (Doc. No. 383). Giles County and Kyle Helton have not moved for summary judgment either. Consequently, the Court does not address the validity of the claims against these defendants herein.

Thompson only). The other claims against the PSI Defendants – Counts 7 and 8 (the due process claims); Counts 17 and 18 (the unjust enrichment claims); Count 21 (an abuse of process claim, as to the remaining defendants); Count 22 (an abuse of process claim); and Count 23 (a civil conspiracy claim) – remain for trial.

The Joint Motion to Set Oral Argument (Doc. No. 395) is **DENIED,** as the Court finds oral argument unnecessary, given the thoroughness of the written legal and factual material filed by the parties to support their arguments.

The PSI Defendants' Motion to Ascertain Status of Case (Doc. No. 411) is **DENIED,** as moot, given the Court's resolution of their pending motion herein.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Karen McNeil, Lesley Johnson, Tanya Mitchell,[3] Indya Hilfort, and Lucinda Brandon allege they are indigent individuals who have been placed on probation for misdemeanor offenses by the Giles County courts, and that their probation is supervised by one of the two named private probation companies. (Doc. Nos. 41, 256). Plaintiffs McNeil, Johnson, and Hilfort allege they have been supervised by the "CPS Defendants" or "CPS" (Community Probation Services, LLC, Community Probation Services, L.L.C., Community Probation Services, and Patricia McNair). Plaintiffs Mitchell and Brandon allege they have been supervised by "the PSI Defendants" or "PSI" (Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., Tennessee Correctional Services, LLC, Timothy Cook, Markeyta Bledsoe, and Harriet Thompson).  Plaintiffs assert constitutional claims, claims brought under the Racketeer Influenced

---

[3]  During the pendency of this litigation, Plaintiff Tanya Mitchell passed away, and Plaintiffs have filed a pending motion to substitute her estate as a party. (Doc. No. 410). The Court's resolution of the claims herein does not address the effect of Ms. Mitchell's death on this litigation, as that issue has not been addressed by the parties.

2

and Corrupt Organizations Act ("RICO"), and state law claims against the CPS Defendants and the PSI Defendants. Plaintiffs assert constitutional and state law claims against Giles County and Sheriff Kyle Helton. The named Plaintiffs seek to represent a class to obtain damages and injunctive relief on their claims. The claims are summarized below:

| Count | Claim | Plaintiffs | Defendants | Relief |
|-------|-------|-----------|-----------|--------|
| 1 | RICO | Karen McNeil & Lesley Johnson | CPS corporate defendants & Patricia McNair | Damages |
| 2 | RICO | Tanya Mitchell | PSI corporate defendants & Markeyta Bledsoe | Damages |
| 3 | RICO | Lucinda Brandon | PSI corporate defendants & Harriet Thompson | Damages |
| 4 | RICO | Tanya Mitchell | PSI corporate defendants & Markeyta Bledsoe | Equitable Relief |
| 5 | 42 U.S.C § 1983 (Due Process) | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants & Giles County | Damages |
| 6 | 42 U.S.C. § 1983 (Due Process) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 7 | 42 U.S.C. § 1983 (Due Process) | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Giles County | Damages |
| 8 | 42 U.S.C. § 1983 (Due Process) | Tanya Mitchell | PSI corporate defendants & Giles County | Equitable Relief |

3

| | | | | |
|---|---|---|---|---|
| 9 | 42 U.S.C. § 1983 (Equal Protection) | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants | Damages |
| 10 | 42 U.S.C. § 1983 (Equal Protection) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 11 | 42 U.S.C. § 1983 (Equal Protection) | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Giles County | Damages |
| 12 | 42 U.S.C. § 1983 (Equal Protection) | Tanya Mitchell | PSI corporate defendants & Giles County | Equitable Relief |
| 13 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants & Giles County | Damages |
| 14 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Indya Hilfort | CPS corporate defendants & Giles County | Equitable Relief |
| 15 | 42 U.S.C. § 1983 (Equal Protection and Due Process) | Indya Hilfort | Giles County & Sheriff Kyle Helton | Equitable Relief |
| 16 | Unjust Enrichment | Karen McNeil & Lesley Johnson | CPS corporate defendants | Damages |
| 17 | Unjust Enrichment | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants | Damages |
| 18 | Unjust Enrichment | Tanya Mitchell | PSI corporate defendants | Equitable Relief |
| 19 | Abuse of Process | Karen McNeil, Lesley Johnson, & Indya Hilfort | Giles County, CPS corporate defendants, & Patricia McNair | Damages |
| 20 | Abuse of Process | Indya Hilfort | Giles County, CPS defendants, & Patricia McNair | Equitable Relief |

| | | | | |
|---|---|---|---|---|
| 21 | Abuse of Process | Lucinda Brandon & Tanya Mitchell | Giles County, PSI corporate defendants, Markeyta Bledsoe, & Harriet Thompson | Damages |
| 22 | Abuse of Process | Tanya Mitchell | Giles County, PSI corporate defendants, & Markeyta Bledsoe | Equitable Relief |
| 23 | Civil Conspiracy | Lucinda Brandon & Tanya Mitchell | PSI corporate defendants & Timothy Cook | Damages |
| 24 | Civil Conspiracy | Karen McNeil, Lesley Johnson, & Indya Hilfort | CPS corporate defendants | Damages |

(Doc. No. 256).

On December 15, 2011, Giles County and PSI entered into an agreement through which PSI provides probation supervision services to the County for individuals convicted of misdemeanors. (PSI Defendants' Response to Plaintiffs' Counter-Statement of Undisputed Material Facts ¶ 2 (hereinafter "PSI's Response to Facts) (Doc. No. 344); (Doc. No. 329-2)). The one-page document does not state explicitly how PSI is to be paid, but the parties agree the County pays PSI nothing for its services. (PSI's Response to Facts ¶ 3). The County has entered into a similar arrangement with CPS. (*Id.* ¶¶ 1, 4). Through the agreements, any misdemeanor offender who is sentenced to probation in Giles County must be assigned to supervision with CPS or PSI. (*Id.*) The PSI agreement authorizes the company to "[m]onitor all scheduled time payments for fines, courts costs and restitution." (Doc. No. 329-2). The agreement also provides that PSI "shall not attempt to profit from any fines, restitution or court costs collected from the Clients." (*Id.*)

In addition to fines, restitution and court costs, the courts in Giles County also impose, as a condition of probation, "supervision fees," which are paid to PSI. (*Id.* ¶¶ 6-8). These fees and

5

costs are reflected in the Order of Probation (Doc. No. 301-4) for Plaintiff Brandon, dated September 24, 2015, which requires her to pay $25 per week for "court costs/fines/restitution and/or administrative and attorney fees for court appointed attorney in addition to probation and lawful administrative fees associated with probation." The Order also imposes a fee of $45 per month "as a probation supervision fee as allowed by law (TCA 40-35-303 and 40-35-313);" a $35 "administrative fee;" and a $15 fee for "missed appointments without calling to reschedule." (*Id.*) The Order, which appears to be a form, also states that "The Defendant . . . stated in open court that he/she is financially capable of paying [the fees and costs associated with probation]." (*Id.*) Probationers are also required to abide by twelve "PSI Probation Rules," including the requirement that they "[p]ay all fines and costs in a timely manner." (PSI's Response to Facts ¶ 24; Doc. No. 329-5, at 2).

Individuals charged with misdemeanors may be sentenced to serve up to 11 months and 29 days in jail if they are not placed on probation. (PSI's Response to Facts, at ¶ 12). Typically, probation terms for misdemeanor defendants in Giles County are for 6 months or for 11 months and 29 days. (*Id.* ¶¶ 12, 13). Also, typically, defendants are sentenced to a minimum period of supervised probation, after which – so long as the person has paid everything he or she owes to the County and the probation company – the company can convert the person's supervised probation to unsupervised probation, or probation can be terminated altogether. (*Id.* ¶ 14). In other cases, there is no required minimum period of supervised probation at all, and the person need not be supervised during probation if the probationer can afford to pay his or her entire debt after conviction. (*Id.* ¶ 15).

Plaintiffs contend that PSI is solely responsible for determining whether and when to convert a person's supervised probation to unsupervised, once the minimum period of supervision,

if any, has elapsed. Although the PSI Defendants deny that contention (*Id.* ¶¶ 16-19), Plaintiffs have filed four "Orders" for four separate probationers converting them from supervised probation to unsupervised probation with the signature of only the defendant and the probation officer. (Doc. No. 388-6). The Orders are not signed by a judge. (*Id.*) Aside from reporting a change of address or a new arrest, probationers on unsupervised probation are no longer required to report to the company or pay additional fees. (*Id.*) Plaintiffs have submitted evidence indicating that probationers who have not paid all costs and fees in full are not moved by PSI to unsupervised probation. (Doc. Nos. 330-6, at 7; 330-7, at 11).

In supervising probationers, PSI typically has discretion to determine how frequently a person must report, whether the person must report in person, and when the person must submit to a drug test. (PSI's Response to Facts, ¶¶ 29-31). Plaintiffs have submitted evidence that probationers who are behind in paying fees are required to report more often. (Doc. Nos. 331-5, at 3; 331-6, at 6; 331-7, at 15; 331-8, at 25). In addition, Plaintiffs have submitted evidence that PSI probation officers have initiated violation-of-probation proceedings solely for non-payment of costs and fees. (Doc. No. 333-3, at 3-18) (proceedings initiated solely for non-payment of probation supervision fee payable to PSI). When a probationer is reported to the court for a probation violation, evidence in the record suggests that the judge is likely to revoke and extend probation, resulting the probationer owing more fees to PSI for supervision. (Doc. No. 335-7, at 17; Doc. No. 336-4, at 3; Doc. No. 334-3; PSI's Response to Facts ¶ 118).

## III. ANALYSIS

### A. <u>The Standards Governing Motions for Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B. **The RICO Claims (Counts 2, 3, and 4)**

Through their pending motion, the PSI Defendants argue they are entitled to summary judgment on Plaintiffs' RICO claims set forth in Counts 2, 3, and 4. In response to the Motion, Plaintiff Mitchell indicated her intention to voluntarily dismiss her RICO claims in Counts 2 and 4 for strategic reasons. (Doc. No. 388, at 40 n. 53). Thus, the only remaining RICO claim against the PSI Defendants is the one alleged by Plaintiff Brandon in Count 3.

8

Through Count 3, Plaintiff Brandon asserts a RICO claim for damages against the PSI corporate defendants and Defendant Thompson. (Doc. No. 256 ¶ 420). Plaintiffs allege the PSI corporate defendants, Defendant Cook, Defendant Thompson, Defendant Giles County, and other unnamed co-conspirators, formed an "association-in-fact," and therefore, a "RICO Enterprise," for the purpose of maximizing the collection of court fines, costs, and fees by PSI without consideration of the probationer's ability to pay. (*Id.* ¶ 424). Plaintiffs allege the "PSI RICO Enterprise" was engaged in interstate commerce because federal dollars disbursed through federal programs, such as Supplemental Security Income Disability and Supplemental Nutrition Assistance Program, constituted a portion of the profits collected through threats of violations and jailing. (*Id.* ¶ 426). Plaintiffs also allege this "extortion" occurred on a mass scale from victims who would have otherwise spent the money on goods and services in interstate commerce. (*Id.*) Plaintiffs allege the defendants used electronic communications and the United States mail to extort payment. (*Id.*)

Plaintiffs further allege the PSI RICO Enterprise engaged in the following predicate acts of "racketeering activity:" (1) extortion under the Hobbs Act, 18 U.S.C. § 1951; (2) extortion under Tennessee Code Annotated § 39-14-112; and (3) extortion under the Travel Act, 18 U.S.C. § 1952. (*Id.* ¶¶ 430-433).

The RICO statute, 18 U.S.C. § 1962, provides, in pertinent part, as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

9

To establish a violation of the RICO statute, the plaintiff must prove: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

"Racketeering activity" consists of acts that are indictable under state or federal law, as listed in 18 U.S.C. § 1961(1). As noted above, Plaintiffs allege, as predicate acts of racketeering activity, extortion under the Hobbs Act, the Travel Act, and under a Tennessee statute. Plaintiffs argue the PSI Defendants committed extortion by threatening probationers with arrest and jailing if they failed to make their required payments even though the defendants knew the failure to pay was due to their indigency.

A plaintiff claiming a Hobbs Act violation based on extortion as a predicate act in a civil RICO claim must show the defendant "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by . . . extortion or attempt[ed] or conspir[ed] so to do, or committ[ed] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951(a); *Heinrich,* 668 F.3d at 406-07. Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion can occur either through (1) the threat of force, violence, or fear; or (2) "the color of official right." *United States v. Watson,* 778 Fed. Appx. 340, 345 (6th Cir. 2019).

To establish extortion on an "under color of official right" theory, the plaintiff must show the defendant obtained a "payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (quoting *Evans v. United States,* 504 U.S. 255, 268, 112 S. Ct. 1881, 1889, 119 L. Ed. 2d 57 (1992)). This

10

type of extortion by a public official requires some *quid pro quo:* "This means that the victim gives up her property to the public official in exchange for something else." *Watson,* 778 Fed. Appx. at 345. To establish extortion based on a "threat of force, violence, or fear" theory, the plaintiff must show: "(1) that the defendants obtained the plaintiffs' property (2) through the wrongful use of (3) threats or fear of physical or economic harm." *Heinrich,* 668 F.3d at 407; *Watson,* 778 Fed. Appx. at 346-47.

The PSI Defendants argue Plaintiffs cannot establish extortion under either theory because: (1) Plaintiffs cannot establish the alleged extortion had a substantial effect on interstate commerce as required by the Hobbs Act; and (2) Plaintiffs cannot establish extortion as the defendants had a lawful "claim of right" to the property allegedly taken. Because the Court grants summary judgment on this claim based on the second ground, it is unnecessary to address the interstate commerce argument.

The PSI Defendants argue they cannot be liable for extortion because they had a lawful right to claim the money obtained from probationers, based on the "claim-of-right" defense established in *United States v. Emmons,* 410 U.S. 396, 93 S. Ct. 1007, 35 L. Ed. 2d 379 (1973). In *Emmons,* the Supreme Court addressed whether the defendant union members were guilty of extortion under the Hobbs Act based on acts of violence occurring during a legal strike called to seek higher wages for union members. The Court concluded the conduct was not within the reach of Hobbs Act extortion because the defendants sought to achieve legitimate collective-bargaining demands:

> The term 'wrongful,' which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of 'wrongful violence' or 'wrongful force' since, as the Government acknowledges, any violence or force to obtain property is

11

'wrongful.' Rather, 'wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property.

410 U.S. at 399-400 (footnotes omitted).

The holding in *Enmons* created what has come to be called the "claim of right" defense to charges of extortion under the Hobbs Act. *United States v. Sturm,* 870 F.2d 769, 772 (1st Cir. 1989). Notwithstanding creation of the defense by the Supreme Court, subsequent decisions by federal appellate courts have largely restricted the claim of right defense to the labor context in cases alleging the wrongful use of force or violence. *Id.,* at 772-73; *see also United States v. Castor,* 937 F.2d 293, 299 (7th Cir. 1991); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 522-23 (3rd Cir. 1998); *United States v. Daane,* 475 F.3d 1114, 1120 (9th Cir. 2007); *United Brotherhood of Carpenters and Joiners of America v. Building and Construction Trades Dep't,* 770 F.3d 834, 838 (9th Cir. 2014). The claim of right defense is still viable, however, in cases where the threat produces economic fear, because "there is nothing inherently wrongful about the use of economic fear to obtain property." *Id.,* at 773; *see also Brokerage Concepts,* 140 F.3d at 523. In such cases, "the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." *Id.* (footnotes omitted); *Brokerage Concepts,* 140 F.3d at 523 (In cases involving the use of economic fear, "a defendant is not guilty of extortion if he has a lawful claim to the property obtained.")

Use of economic fear is "wrongful," however, "when employed to achieve a wrongful purpose." *Brotherhood of Carpenters,* 770 F.3d at 838. "Thus, following *Enmons,* using fear of economic loss to obtain personal payoffs or payments for 'imposed, unwanted, superfluous and fictitious services' may well be extortionate." *Id.* (quoting *Enmons,* 410 U.S. at 400).

12

Plaintiffs argue that even if the PSI defendants had a lawful claim to the property at issue, they cannot claim the defense because they threatened to engage in "unlawful" behavior, and therefore, their threats were "inherently wrongful." The threatened action, according to Plaintiffs, was solicitation of payments from indigent probationers "who are struggling to pay for basic necessities and who may be living off of means-tested government benefits despite the federal and state exemptions that protect such assets." (Doc. No. 388, at 43). Such solicitation is made unlawful, Plaintiffs contend, by (1) equal protection jurisprudence; (2) the Supreme Court's decision in *Bearden v. Georgia,* 461 U.S. 660, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983) (holding that revoking probation for failure to pay a fine or restitution without inquiring into the reasons for the failure to pay violates due process and equal protection); and (3) Tennessee Code Annotated Section 40-35-303(i)(3) ("*Willful* failure to pay the supervision fee . . . shall be grounds for revocation of probation and the supervising entity shall report all instances of non payment to the sentencing court.") (emphasis added). Assuming the alleged solicitation is "unlawful," however, Plaintiffs have not cited any authority addressing whether threats to engage in "unlawful" behavior, that is not otherwise forceful or violent, are "inherently wrongful" for purposes of the Hobbs Act.

A review of applicable case law reveals few cases in which courts have determined threats to be "inherently wrongful" when they did not involve force and/or violence. In one case, *United States v. Villalobos,* 748 F.3d 953, 957-58 (9th Cir. 2014), the Ninth Circuit held a nonviolent threat to be "inherently wrongful" where it involved obstruction of justice, *i.e.,* an offer to impede an ongoing investigation by lying to a federal grand jury. *Id.* Because the threat to engage in such criminal behavior was "inherently wrongful," the court held that the claim of right defense was unavailable. *Id.,* at 958.

In a subsequent decision, however, the Ninth Circuit appeared to give a narrow construction to its holding in *Villalobos*:

> We recently held [in *Villalobos*] that a lawyer's threat to a engage potential witness to 'do "whatever it is we need her to do," including impeding the investigation, lying to [an] investigating Assistant U.S. Attorney . . . , and repeating those lies to the grand jury' was 'unlawful, and therefore clearly wrongful under the circumstances.' *Villalobos* did not, however, hold that conduct must be characterized as wrongful if it involves a breach of duty derived from contract or tort law in the course of pursuing a legitimate transaction. The proper remedy for such a breach is a claim under state law.

*United Brotherhood,* 770 F.3d at 841. Having concluded that a breach of duty imposed by contract or tort law was not "inherently wrongful," the court explained that the plaintiffs were required to show the defendants threatened force or violence. *Id.*

The conduct Plaintiffs allege is "inherently wrongful" here is not alleged to rise to the level of a crime, like obstruction of justice. At worst, assuming Plaintiffs' allegations are true, the threatened conduct violates certain constitutional rights of the probationers, or otherwise violates a duty imposed by state law. In the Court's view, such conduct is more in the nature of a breach of duty imposed by law, as in *United Brotherhood,* than it is the commission of a crime like obstruction of justice, as in *Villalobos. See Malone v. City of Decatur, Alabama,* 2018 WL 4901212, at 9-10 (N.D. Ala. Oct. 9, 2018) (holding that private probation company had a lawful claim to fines and fees for purposes of Hobbs Act extortion "claim of right defense," even if the plaintiffs succeeded in proving the company's conduct in incarcerating indigent defendants violated the constitution). Thus, the Court concludes that Plaintiffs have failed to sufficiently establish PSI's threats were "inherently wrongful."[4]

---

[4] The Court notes that bringing or threatening to bring wrongful litigation in order to extract money from the target of the litigation is not considered by most courts to constitute Hobbs Act extortion. *See, e.g., Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir. 1994); *Edelson PC v. The Bandas Law Firm PC,*

Plaintiffs alternatively argue the threats of arrest and/or imprisonment are "threats of force (because they are threats to force an individual out of her community, strip her of her liberty, and severely limit her movements, even if such force is state-sanctioned)." (Doc. No. 388, at 43 n.56). Plaintiffs do not cite any authority defining "force" or "violence" for purposes of Hobbs Act extortion. In defining those terms for purposes of Hobbs Act robbery, the Sixth Circuit has held they require the use, attempted use, or threatened use of "physical force" or "violent force," *United States v. Gooch,* 850 F.3d 285, 291-92 (6th Cir. 2017), and such force must be "capable of causing physical pain or injury to another person." *United States v. Thomas,* 849 F.3d 906, 909 (10th Cir. 2017) (quoting *Johnson v. United States,* 559 U.S. 133, 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010)). Although the arrest of a person involves a loss of liberty, Plaintiffs have not cited any authority suggesting that a facially valid arrest and/or detention carried out by duly authorized law enforcement officers, presumably at the behest of the defendants, falls within the definition of "force or violence" for purposes of Hobbs Act extortion. Thus, the Court is not persuaded the threatened conduct alleged by Plaintiffs constitutes threats of force or violence.

Finally, Plaintiffs argue that even if the threats are not considered "inherently wrongful," the PSI Defendants do not have a legitimate claim to the supervision fees. Their claim to the property is not legitimate, according to Plaintiffs, because state law does not permit them to threaten probationers with revocation of probation unless the failure to pay is willful, citing the same Tennessee statute section discussed above. But PSI's claim to supervision fees arises by

---

2018 WL 723287 (Feb. 6, 2018 N.D. Ill.) (collecting cases). Those courts reason that "it is up to 'the courts, and their time-tested procedures' to reliably resolve the matter, 'separating validity from invalidity, honesty from dishonesty.'" *Edelson,* 2108 WL 723287, at *6 (quoting *United States v. Pendergraft,* 297 F.3d 1198, 1206 (11th Cir. 2002)). Although the allegations of this case do not fit squarely into this line of cases involving threats of wrongful litigation, the PSI Defendants are alleged to be "court-affiliated actors," and their conduct is arguably more appropriately governed by constitutional standards of due process, as discussed below, as opposed to the provisions of the RICO statute.

15

virtue of its contract with Giles County and the court orders providing for the payment of such fees. Plaintiffs have not alleged the fees are illegitimate because they are "personal payoffs" or because they are for "fictitious services," as the *Enmons* Court described what it considered to be illegitimate claims to property. 410 U.S. at 400. Plaintiffs have not explained why PSI's compliance with state law in reporting alleged violations affects the legitimacy of its claim to supervision fees for purposes of the claim of right defense. Thus, Plaintiffs have not established PSI has "no lawful claim" to the property at issue.

As the Court concludes that the claim of right defense applies under both theories of Hobbs Act extortion alleged by Plaintiffs, the PSI Defendants are entitled to summary judgment on that aspect of Plaintiffs' RICO claim.

The PSI Defendants argue Plaintiffs cannot establish extortion under Tennessee Code Annotated Section 39-14-112 because they are entitled to rely on an affirmative defense under Subsection (b)(2). Section 39-14-112 provides, in pertinent part:

(a) A person commits extortion who uses coercion[5] upon another person with the intent to:

(1) Obtain property, services, any advantage or immunity;

\* \* \*

(3)(A) Impair any entity, from the free exercise or enjoyment of any right or privilege secured by the Constitution of Tennessee, the United States Constitution or the laws of the state, in an effort to obtain something of value for any entity;

---

[5]    "Coercion" is defined in Tennessee Code Annotated Section 39-11-106(4) as including threats to: "(B) Wrongfully accuse any person of any offense;" or "(E) Take or withhold action as a public servant or cause a public servant to take or withhold action. . ." *See State v. Parris,* 236 S.W.3d 173, 181 (Tenn. Crim. App. 2007) (applying this definition of "coercion" to offense of extortion in Section 29-14-112).

(b) It is an affirmative defense to prosecution for extortion that the person reasonably claimed:

* * *

(2) Appropriate compensation for property or lawful services.

Defendants argue the affirmative defense applies here because, as discussed above, they "reasonably claim" supervision fees, which are "[a]ppropriate compensation for . . . lawful services."

Plaintiffs argue the PSI Defendants are not entitled to invoke the affirmative defense because they waived the argument by failing to raise it in their Answers (Doc. Nos. 60, 268), citing Federal Rule of Civil Procedure 8(c). In responding to a pleading, Rule 8(c) requires a party to "affirmatively state any avoidance or affirmative defense. . ."  In their most-recently filed Answer (Doc. No. 268), the PSI Defendants incorporated, as an affirmative defense, the RICO arguments made in a summary judgment memorandum (Doc. No. 251) filed by the CPS Defendants. A review of that memorandum reveals that the CPS defendants argued their alleged conduct was not extortionate under state law because they had a lawful claim to the payments sought from probationers. (Doc. No. 251, at 21-25). The record indicates, therefore, that the PSI Defendants adequately pled the affirmative defense, and Plaintiffs have failed to establish the defendants waived reliance on the affirmative defense by failing to raise it in their Answer.

Plaintiffs alternatively argue that the PSI Defendants may not rely on an affirmative defense set forth in a state statute as a defense in a civil RICO action, citing a footnote in a concurring opinion from the First Circuit, *Roma Const. Co. v. aRusso,* 96 F.3d 566, 580 n.12 (1st Cir. 1996). In *Roma Construction,* a majority of the court held that, assuming without deciding

17

that RICO plaintiffs were required to be "innocent parties" in order to bring federal RICO claims, the plaintiffs had sufficiently alleged they were innocent parties coerced to provide bribes. The "innocent parties" requirement was imposed by the district court as a standing requirement. 96 F.3d at 568. In the section of the opinion referenced by Plaintiffs, a concurring judge opined that the "innocent parties" standing requirement found in some state laws should not be incorporated into the federal RICO statute. 96 F.3d at 579-80. Neither the court nor the concurrence, however, addressed the issue here: whether an affirmative defense included in a state statute defining one of the crimes alleged to be a predicate offense for purposes of the RICO claim should be available to a defendant. The reasoning in *Roma Construction* does not persuade the Court that the PSI Defendants should be barred from relying on the affirmative defense.[6]

Finally, Plaintiffs argue the PSI defendants are not entitled to rely on the affirmative defense because, by threatening to report probationers for non-willful nonpayment, their actions were unlawful. For the reasons described above, however, the Court is not persuaded the PSI Defendants' alleged failure to comply with a duty imposed by state law or their alleged violation of certain constitutional rights of the probationers precludes their reliance on the state law affirmative defense. As the affirmative defense applies here, the PSI Defendants are entitled to summary judgment on that aspect of the RICO claim based on state law "extortion."

The PSI Defendants argue Plaintiffs cannot show a violation of the Travel Act, 18 U.S.C. § 1952, for the same reasons they have not shown a violation of the Hobbs Act, or a violation of

---

[6] Even if the Court ignores Section 39-14-112 altogether, and instead relies on the "generic" definition of extortion for purposes of the state law crime, the courts have recognized a "claim of right" defense to generic extortion. *See United Brotherhood,* 770 F.3d at 843 (rejecting the plaintiffs' argument that the generic definition of extortion does not include a claim of right defense). And for the reasons discussed above, the Court concludes the PSI defendants are entitled to rely on such a defense to generic extortion.

Tennessee Code Annotated § 39-14-112. To establish a violation of the Travel Act, Plaintiffs must prove the use of interstate travel or the use of an interstate facility, with the intent to promote unlawful activity. *See Brokerage Concepts,* 140 F.3d at 529. "Unlawful activity" is defined as "extortion, bribery, or arson in violation of the laws of the State in which committed or the United States." 18 U.S.C. § 1952(b)(2). The unlawful activity alleged by Plaintiffs is extortion. Extortion under the Travel Act is governed by the case law discussed above in connection with the Hobbs Act. *Brokerage Concepts,* 140 F.3d at 529. Because the PSI Defendants are entitled to rely on the "claim of right" defense to Hobbs Act extortion, they are entitled to rely on the same defense to extortion under the Travel Act. Accordingly, the PSI Defendants are entitled to summary judgment on that aspect of the RICO claim based on the Travel Act.

For the reasons set forth above, the Court concludes Plaintiffs have not created a genuine issue of material fact (as the Court assumes the truth of their factual allegations) that the PSI Defendants engaged in predicate acts of racketeering activity. Accordingly, the PSI Defendants are entitled to summary judgment on Plaintiff Brandon's RICO claim (Count 3).

## C.  Section 1983 Claims – Due Process and Equal Protection

### 1.  Section 1983

Through Counts 7, 8, 11, and 12, Plaintiffs have brought claims against the PSI Defendants and Giles County under 42 U.S.C. § 1983. In order to establish a claim for relief under Section 1983, a plaintiff must show: (1) he or she was deprived of a right secured by the Constitution or federal law; and (2) the deprivation was committed by a person acting under color of state law. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999); *Toth v. City of Toledo*, 480 Fed. Appx. 827, 831-32 (6th Cir. 2012).

19

Through Count 7, Plaintiffs allege the PSI corporate defendants and Giles County violated the Due Process Clause by using a private actor with a personal financial stake in the outcome of judicial proceedings and probation case decisions. (Doc. No. 256 ¶¶ 502 – 511). The heading for Count 7 states that it is brought by Plaintiffs Brandon and Mitchell and seeks damages. (*Id.*) The allegations of Count 8 appear to be identical to Count 7, except the heading for the Count states that it is brought by Plaintiff Mitchell and seeks equitable relief. (*Id.* ¶¶ 512-521).

Through Count 11, Plaintiffs allege the PSI corporate defendants and Giles County violated the Equal Protection Clause by using jail, threats of jail, and an onerous probation system to collect debts owed to the County because the system imposes unduly harsh and punitive restrictions on debtors whose creditor is the government as compared to those who owe money to private creditors. (*Id.* ¶¶ 534-539). The heading for Count 11 states that it is brought by Plaintiffs Brandon and Mitchell and seeks damages. (*Id.*) The allegations of Count 12 appear to be identical to Count 11, except the heading for the Count states that it is brought by Plaintiff Mitchell and seeks equitable relief. (*Id.* ¶¶ 540-545).

2. Due process claims (Counts 7 and 8)

Plaintiffs claim the contractual relationship between Giles County and PSI (and CPS) violates procedural due process because the arrangement "vest[s] each company with vast discretion over probationers' fundamental liberty interests, while also requiring each company to generate 100% of its revenue from the people it supervises." (Doc. No. 388, at 10). Plaintiffs also allege the evidence they have gathered shows the defendants actually carry out their duties under the contract in a manner that allows them to maximize profits as they supervise probationers.

To support this claim, Plaintiffs rely on a line of cases addressing the due process implications of permitting judges and quasi-judicial actors, as well as enforcement actors, to

operate under a conflict of interest in carrying out their duties. This line of cases traces back to *Tumey v. Ohio,* 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), where the Supreme Court held that a defendant was deprived of due process when the official presiding over his case operated under a conflict of interest. The Court found a conflict existed because the defendant was convicted and fined by a village mayor, and a portion of the fine imposed was paid to the mayor and a portion was paid to the village:

> [I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.
>
> * * *
>
> No matter what the evidence was against [the defendant], he had the right to have an impartial judge. He seasonably raised the objection, and was entitled to halt the trial because of the disqualification of the judge, which existed both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village.

273 U.S. at 523, 535.

The next year, the Court addressed the neutrality issue again in *Dugan v. Ohio,* 277 U.S. 61, 48 S. Ct. 439, 72 L. Ed. 784 (1928). The defendant in *Dugan* had also been convicted and fined by a mayor, and the fines imposed by the mayor provided a major part of the city's income. Unlike *Tumey,* however, the mayor did not receive a salary that was dependent on convictions. The Court ultimately determined that the defendant's due process rights were not violated because the mayor's relationship to the executive or financial policy of the city was too remote to warrant a presumption of bias. 277 U.S. at 64.

The Supreme Court returned to the neutrality issue in *Ward v. Village of Monroeville, Ohio,* 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), where it determined that the relationship

between the decisionmaker and the fines produced by convictions created an unconstitutional conflict. The plaintiff in *Ward* had been convicted of traffic offenses and fined by a mayor who had responsibilities for revenue production, and the fines imposed by the mayor provided a substantial portion of the village funds:

> Although 'the mere union of the executive power and the judicial power in him cannot be said to violate due process of law,' *id.*, at 534, 47 S. Ct., at 445, the test is whether the mayor's situation is one '*which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused . . .*' *Id.*, at 532, 47 S. Ct., at 444. Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.' *Id.*, at 534, 47 S. Ct., at 445.

409 U.S. at 60 (emphasis added). In reaching its decision, the Court rejected the village's argument that any unfairness created by the conflict could simply be corrected on appeal of the defendant's conviction. Such a procedure, the Court explained, "does not guarantee a fair trial in the mayor's court; there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal." 409 U.S. at 61. In addition, such a delayed impartial adjudication does not make the procedure constitutionally acceptable: "Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62.

The Court applied *Tumey* to a state optometry board in *Gibson v. Berryhill,* 411 U.S. 564, 578-79, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973). The *Gibson* Court determined that the board, whose members were all employed in private practice, violated due process by adjudicating hearings to determine whether to revoke the licenses of optometrists employed by corporations. Disqualification of all optometrists employed by corporations, who accounted for nearly half of

22

all optometrists practicing in the state, the Court pointed out, would likely redound to the personal benefit of optometrists employed in private practice. *Id.*

In *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986), the Court held that a state supreme court judge (Judge Embry), who authored an opinion resulting in his receipt of a recovery in his own pending litigation, violated the due process neutrality requirement. In reaching its decision, the Court made clear that the due process violation was not based on a finding that the judge was "in fact" influenced by his personal interest in the outcome of the opinion, but only that his role in issuing the opinion "'would offer a possible temptation to the average . . . judge to . . . lead him to not hold the balance nice, clear and true.'" 475 U.S. at 825 (quoting *Ward,* 409 U.S. at 60). The Court found any slight pecuniary interests of the other supreme court judges as class members in Judge Embry's case were "too remote and insubstantial" to violate constitutional constraints. 475 U.S. at 825-26.

In *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009), the Court held that due process required recusal of a state supreme court judge in a case in which the judge's largest campaign contributor (donating $3 million) sought to overturn a $50 million verdict against the corporation for which he served as board chairman and principal officer. The Court emphasized that the judge's subjective assessment of his own actual bias was not the determinative factor in considering due process violations: "Due process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" 556 U.S. at 886 (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955)).

More recently, the Fifth Circuit held the due process neutrality requirement was violated when state criminal court judges required defendants to obtain surety bonds as a pretrial release

condition, and a percentage of the value of the bond was deposited into the court's judicial expense fund. *Caliste v. Cantrell,* 937 F.3d 525 (5th Cir. 2019). The fund was administered by the judges and used to pay for court staff and other expenses. *See also Cain v. White,* 937 F.3d 446, 454 (5th Cir. 2019) (holding that judges' imposition and collection of fines and fees used to pay the salaries of their staff and other expenses presented too great a "temptation," and violated the Due Process Clause).

The Eleventh Circuit recently applied the neutrality requirement to a private probation company ("PPS") that was compensated for its services by the individual probationers it supervised. In *Harper v. Professional Probation Services, Inc.,* 976 F.3d 1236, 1238-39 (11th Cir. 2020), the plaintiff probationers alleged the judges imposing their probation sentences left certain portions of their orders blank, and that PPS filled in the blanks to extend the duration of probation, increase the fines, and impose additional conditions. The plaintiffs alleged PPS had a financial interest in keeping them on probation so as to continue receiving the monthly supervision fees they were required to pay. *Id.*, at 1239-40. The district court dismissed the plaintiffs' due process claim, holding that they failed to show the probation officers owed a duty of neutrality to probationers because they did not perform adjudicatory functions. *Id.,* at 1240.

The appeals court reversed, concluding that the plaintiffs had sufficiently alleged PPS engaged in quasi-judicial functions, and therefore, owed a duty of neutrality to the probationers it supervised. *Id.,* at 1241-43. In reaching its decision, the court pointed out prior decisions holding that probation officers perform a "judicial function" when they set terms of probation, such as determining whether a probationary sentence should include mandatory mental health treatment, or establishing a schedule for restitution payments. *Id.* The court concluded that PPS was carrying out a judicial function when it imposed binding sentence enhancements. *Id.,* at 1244.

24

The court also determined the funding arrangement implicated the company's impartiality: "We further hold that PPS was not impartial because its revenue depended directly and materially on whether and how it made sentencing decisions." *Id.*; *see also United States v. Espalin,* 350 F.3d 488, 490-96 (6th Cir. 2003) (Lawson, J. concurring) (discussing various functions of federal probation officers, and observing the requirement of neutrality has been met when the probation officer's recommendation is based "fairly on the facts and dispassionately traces its way through the law to a sensible conclusion.")

The due process neutrality requirement has also been applied to officials who perform prosecutorial/enforcement functions, based on language from the Supreme Court's opinion in *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). In *Marshall*, a restaurant owner challenged civil penalties assessed by the Employment Standards Administration (ESA) of the Department of Labor. The owner argued that the funding mechanism whereby the civil penalties are returned to the ESA in reimbursement for its costs created an impermissible risk of bias in violation of the Due Process Clause. The Court rejected the argument, reasoning that the role of the ESA was not that of a decisionmaker:

> The rigid requirements of *Tumey* and *Ward,* designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, see *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S. Ct. 1146, 35 L.Ed.2d 793 (1973), and similar considerations have been found applicable to administrative prosecutors as well, see *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 414, 78 S. Ct. 377, 380, 2 L. Ed. 2d 370 (1958); *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S. Ct. 903, 912, 17 L.Ed.2d 842, (1967). Prosecutors need not be entirely 'neutral and detached,' *cf. Ward v. Village of Monroeville,* 409 U.S., at 62, 93 S. Ct., at 84. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties.

25

446 U.S. at 248-49.

The Court made clear, however, that administrative prosecutors were not free of any limitations imposed by the Due Process Clause:

> Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935). In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law. See *Dunlop v. Bachowski,* 421 U.S. 560, 567, n. 7, 568–574, 95 S. Ct. 1851, 1858, n. 7, 1858–1861, 44 L. Ed. 2d 377 (1975); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S. Ct. 754, 83 L. Ed. 1147 (1939). Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. *Cf.* 2 K. Davis Administrative Law Treatise 215–256 (2d ed. 1979). *A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions. See Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S. Ct. 663, 669, 54 L.Ed.2d 604 (1978); *cf.* 28 U.S.C. § 528 (1976 ed., Supp. III) (disqualifying federal prosecutor from participating in litigation in which he has a personal interest). But the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.

446 U.S. at 249-50 (footnote omitted) (emphasis added). The Court ultimately determined that "the influence alleged to impose bias is exceptionally remote," given that no governmental official stood to profit economically from vigorous enforcement of the child labor provisions, and the civil penalties collected represented substantially less than 1% of the budget of the ESA. 446 U.S. at 250.

The Court found the improper influence to be more direct in *Young v. United States ex rel. Vuitton,* 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), in which counsel for a party who was the beneficiary of a court order was appointed to undertake contempt prosecutions for alleged

violations of the order. The Court pointed out that appointment of counsel for the interested party to bring the contempt prosecution "at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." 481 U.S. at 806 (footnote omitted). That the judge made the ultimate decision did not allay those concerns:

> As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives. A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court.

481 U.S. at 807. The danger, the Court explained, was that injecting "'a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision.'" 481 U.S. at 808 (quoting *Marshall v. Jerrico, Inc.,* 446 U.S. at 249-250). The Court distinguished the situation in *Marshall,* however, by explaining that the financial benefits to the prosecuting agency in that case presented a potential conflict that was too remote to be of concern. 482 U.S. at 807.

The lower courts have also applied the neutrality requirement to enforcement officials. In *Flora v. Southwest Iowa Narcotics Enforcement Task Force,* 292 F. Supp. 3d 875, 903-05 (S.D. Iowa 2018), the court denied summary judgment on the plaintiff's claim that the defendants – a narcotics task force, law enforcement officers, and county attorneys – violated due process by stopping motorists and seizing their assets for forfeiture because the forfeited assets partially funded the defendants' departments. In reaching its decision, the court explained that under state law, the defendants' forfeiture share agreement was such that "with successful prosecutions of

27

forfeitures not deemed excessive, [the task force and the county attorney's office] are guaranteed to profit economically as penalties will flow to their offices." 292 F. Supp. 3d at 904. The forfeiture funds were not limited to expenses accrued in pursuing the forfeiture, and the fund's balance "which can exceed $1 million" was used to pay for a wide range of expenses. *Id.* The court recognized that state courts had the final say on whether forfeiture was proper in a given case, but a factual dispute remained as to whether the defendants "were so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment." *Id.* For purposes of summary judgment, the court found the defendants had failed to establish that "forfeitures comprise an insignificant percentage" of the defendants' budgets, and that the defendants were not "financially dependent on maintaining a large and continuing stream of forfeiture penalties." *Id.,* at 904-05.

The court rejected the plaintiff's facial challenge to the state forfeiture statute that permitted seizing agencies the authority to enter into forfeiture share agreements because the statute left the terms of such agreements to the discretion of the seizing agencies:

> Under this provision, law enforcement and county attorneys can structure agreements that do not offend due process. For example, officers and county attorneys could draw up a share agreement entitling seizing agents to retain only that portion of forfeited assets reflecting expenses accrued, similar to how the penalties were distributed to the ESA regional administrators in *Marshall.* 446 U.S. 238, 251, 100 S. Ct. 1610.

292 F. Supp. 3d at 905.

In *Harjo v. City of Albuquerque,* 326 F. Supp. 3d 1145 (D.N.M. 2018), the court held the plaintiff was entitled to judgment on her claim that the City's forfeiture program violated the Due Process Clause under *Marshall* because it created an institutional incentive to prosecute forfeiture cases. Under the program, officials were able to set their own budget and spend the funds raised from forfeiture revenues without meaningful oversight. 326 F. Supp. 3d at 1193-98. Consequently,

the court reasoned: "there is a realistic possibility that the forfeiture program prosecutors' judgment will be distorted, because in effect, the more revenues the prosecutor raises, the more money the forfeiture program can spend." *Id.,* at 1195. The court reached a contrary conclusion regarding the individual attorneys and investigators who brought forfeiture actions, finding the connection between the personal incentives to them "too attenuated" to violate due process. *Id.,* at 1199-1200, 1204-07; *see also Brucker v. City of Doraville,* 391 F. Supp. 3d 1207, 1217 (N.D. Ga. 2019) (denying motion to dismiss the plaintiffs' due process claim where city's law enforcement personnel were subject to partisan influence by city council that depended heavily on revenues from fines, fees, and forfeitures); *but see Merck Sharp & Dohme Corp. v. Conway,* 861 F. Supp. 2d 802 (E.D. Ky. 2012) (holding the use of private attorneys acting for the attorney general pursuant to a contingency fee arrangement in a case seeking civil penalties did not violate the due process neutrality requirement where the attorney general retained the authority to direct the course of the action).

Based on this line of cases, therefore, the neutrality requirement applies to officials performing quasi-judicial functions and those performing enforcement functions. Probation or parole officers traditionally perform both types of functions. *See Swift v. California*, 384 F.3d 1184 (9th Cir. 2004) (in discussing immunity, the court explains that state parole board members perform quasi-judicial functions when they decide to grant, deny, or revoke parole, while parole officers perform enforcement functions when they investigate parole violations, exercise their power to have a parolee arrested, and in recommending revocation of parole to the parole board). And Plaintiffs have cited to evidence in the record suggesting PSI probation officers also perform both quasi-judicial and enforcement functions.

As for quasi-judicial functions, for example, Plaintiffs have filed four "orders" with the style of a probationer's criminal case, converting an individual's supervised probation to unsupervised probation. (Doc. No. 388-6). The orders are signed only by the probationer and the probation officer, not by a judge. (*Id.*) Unsupervised probation results in greater freedom and less financial burdens for probationers, and PSI's ability to decide whether to convert a probationer from supervised to unsupervised probation is the performance of a quasi-judicial function. PSI also typically has discretion to determine how frequently a person must report to his or her probation officer, whether the person must report in person, and when the person must submit to a drug test. (PSI's Response to Facts, ¶¶ 29-31). These are also examples of PSI's exercise of quasi-judicial functions in supervising probationers.

Even if PSI did not engage in quasi-judicial functions, it retains considerable discretion in carrying out its supervisory functions, much like the enforcement functions described in *Marshall, Young, Flora*, and *Harjo*. For example, Plaintiffs have produced evidence indicating PSI probation officers swear to the affidavits used to support arrest warrants for probationers alleged to have violated their probation, including affidavits based solely on a probationer's failure to pay court costs and/or probation supervision fees. (Doc. Nos. 177-1 to 177-45; 333-3). The evidence also indicates PSI probation officers make recommendations to the courts as to the disposition of cases involving probationers. (Doc. Nos. 388-25; 335-8, at 23). Those recommendations relate to the need for jail time, extension of probation, or other disposition. (Doc. No. 336-3, at 1) (Regarding Christy Alexander: "Did not pay as instructed – was violated for running out of time to pay this – does not hold employment – does pay $10.00 each week but this is just not enough – *will need extension* – 1st VOP – *jail time is not necessarily needed . . .*"); (Regarding Layla Gowder: "Did not pay as instructed – no payments – was violated for running out of time to pay this – does not

30

hold employment – *will need extension or offer flattening sentence* – no restitution – all other conditions have been satisfactory – 2nd VOP – served 60d on 1st – *jail time is not necessarily needed unless you offer her a sweet deal to be off probation . . .*"). There is also evidence in the record to suggest PSI probation officers have recommended bond amounts on arrest warrants subsequently signed by a judge. (Doc. No. 388-11) (PSI internal email about "pre-printing" a bond amount on a violation of probation warrant: "I have used a rough formula that each Violation Rule is about $1500 worth of bond amount, with less for technical violations and more for NOT REPORTING or if they have a CAPIAS already.") PSI's discretion to decide whether to recommend arrest, and to make other recommendations affecting probationers, implicates due process neutrality concerns. That the courts ultimately make revocation decisions does not allay neutrality concerns, as the Supreme Court explained in *Young:* "As should be apparent, the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives." 481 U.S. at 807.

Having determined that the PSI Defendants perform functions implicating the neutrality requirement, the Court considers whether its financial arrangement with Giles County "may bring irrelevant or impermissible factors" into its decisions. *Marshall,* 446 U.S. at 249-50. If so, the Court must determine if the potential conflict is "too remote" to be of concern. *Young,* 481 U.S. at 807.

Plaintiffs contend the 100% "user-funded" probation system established by PSI's contract with Giles County presents a substantial conflict of interest because it creates a financial incentive for PSI to exercise its power over probationers in ways that result in longer periods of probation, and in ways that maximize the collection of supervision fees from probationers. Plaintiffs cite to

31

evidence in the record suggesting this funding arrangement, not only has the potential to influence PSI's decisions in supervising probationers, but actually *does* influence those decisions. For example, Plaintiffs have filed a set of PSI PowerPoint training slides in which the importance of "collection rates" is emphasized, with one slide stating:

Collection Rates Matter

The goal of our company is to serve TN
courts, be we also must be concerned
about paying our bills.

Although making money shouldn't be our only focus, it
is important. *If your officers don't collect, they won't
have jobs and we won't be able (sic) keep offices open.* It is
my hope that taking time every two weeks to turn in
collection rates it (sic) will help you as a manager do (sic) *stay on
top of your officers* more efficiently - Charles

(Doc. No. 336-5, at 7) (emphasis added). Other slides indicate the "Collection Rate Goal" is 70%, and that a "Scoreboard Feature" will compare collection rates for a list of PSI employees. (*Id.*, at 5, 6); (Doc. No. 336-8, at 87) (explaining charts comparing performance in meeting 70% monthly collection goal).

Internal emails indicate PSI employees understand the importance of collection rates and conduct themselves accordingly. In one email, Defendant Thompson tells another PSI employee: "I signed a violation warrant for her but a citation was placed on bond . . . we are treating it like all our other nonpayers – *cite them to court or if the warrant is enough to scare them into paying quickly* before they are served with a court date, I will dismiss . . . DA and Judge both said *get our money.*" (Doc. No. 335-8, at 23) (emphasis added); *see also* (Doc. No. 336-6) (Internal email tying collection rate to monthly bonus). In another internal email, Defendant Thompson writes: "Honestly, we did think of the bonus (I gotta cut Tiff a portion of it because she is doing an

32

awesome job at collecting on them), but we just incorporated *a new way of getting the moola out of them* . . . we tried it and it worked on some and others it didnt (sic) . . . we will try it again this time . . . however, *I did file 44 warrants this month so we will see how my numbers do for August. . .*") (Doc. No. 336-7); *see also* (Doc. No. 336-9) (In another internal email, Defendant Thompson writes: ". . . I really did my best to get some of these old balances paid up . . . *I really want my [collection] percentage to reflect what we are trying to accomplish here*."); Doc. No. 388-14 (In internal email, PSI probation officer writes: "*sometimes the sound of handcuffs inspire people to pay*. . . even though we know he will not get jail time out of it."); (Doc. No. 334-5, at 14) (notes indicate probation officer told probationer that "paying her rent is important but when she does not pay, *the courts will pay her rent for her at the jail*.")

In addition to exercising its supervision duties in ways that maximize the collection of fees already owed, PSI also profits when courts extend a probationer's term as a result of revocation proceedings initiated by its probation officers. Evidence in the record suggests that when probationers are reported to the court for a probation violation, the judge is likely to revoke and extend probation, resulting in more fees being owed to PSI for supervision. For example, Plaintiff Brandon's probation was revoked for non-payment, and extended for another 11 months and 29 days, or until her "financial obligation to court is met." (PSI's Response to Facts ¶ 118). As a result, her court debt increased from $512.50 to $618.50, and she continued to incur additional supervision fees. (*Id.* ¶¶ 119, 120); *see also* (Doc. No. 335-7, at 17) (notes indicate probation was revoked for Eliza Leigh Bass, then extended 11 months and 29 days, or until conditions are met); (Doc. No. 336-4, at 3) (notes indicate probation was revoked for Marcus D'Wayne Marsh, then extended 11 months and 29 days); (Doc. No. 334-3) (original sentence and extensions result in John Lewis Johnson serving five years of probation for a misdemeanor offense).

The Court concludes Plaintiffs have come forward with substantial evidence creating a genuine issue of material fact that PSI's 100% funding arrangement with Giles County creates an impermissible conflict of interest, and that this conflict is not "too remote" to be of concern under the case law discussed above.[7]

For their part, the PSI Defendants argue they are entitled to summary judgment on Plaintiffs' due process claims for any of the following four reasons: (1) Plaintiffs failed to plead the process provided by Tennessee law is inadequate; (2) Tennessee's procedural process for probation revocations exceeds the United States Supreme Court's specific requirements; (3) undisputed facts show the plaintiffs received all process that was due; and (4) Defendant Bledsoe did not cause a deprivation pursuant to a custom or policy of PSI. (Doc. No. 301, at 42).

With regard to the first and second arguments, the defendants contend Plaintiffs are required to plead and prove the following elements to establish their procedural due process claim: "(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir. 1999). Defendants argue Plaintiffs have not pled or proved the third element – "that the state's procedural process is in any way inadequate as it relates to PSI's probation officers' alleged lack of neutrality." (Doc. No. 301, at 43). According to

---

[7] Although Plaintiffs cite to additional evidence in the record supporting their due process neutrality claims, the Court does not include an exhaustive list here. The examples cited above are sufficient to demonstrate that summary judgment is inappropriate.

34

Defendants, the probation revocation procedures for misdemeanor probationers in Giles County "is perfectly adequate." (Doc. No. 301, at 43).

The Sixth Circuit has explained that the third element the PSI Defendants cite applies only to procedural due process claims involving random and unauthorized deprivations, or those for which pre-deprivation process is impractical. *See, e.g., Daily Services, LLC v. Valentino,* 756 F.3d 893, 904-10 (6th Cir. 2014). The third element does not apply to claims "involving a direct challenge to an established state procedure." *Id.,* at 907; *see also Cahoo v. SAS Analytics, Inc.,* 912 F.3d 887, 903 (6th Cir. 2019) ("While claimants had the opportunity to appeal a fraud determination, 'postdeprivation remedies alone will not satisfy due process if the deprivation resulted from conduct pursuant to an "established state procedure," rather than random and unauthorized conduct.'") Plaintiffs' due process claims challenge the established process by which PSI carries out its supervision duties while operating under a financial conflict of interest. Therefore, Plaintiffs need not allege or prove the inadequacy of post-deprivation remedies in order to sustain their claims.

This conclusion is supported by *Ward*, where the Supreme Court rejected the village's argument that any unfairness created by the mayor's conflict of interest could simply be corrected on appeal of the defendant's conviction. 409 U.S. at 61. As discussed above, the Court held that a delayed impartial adjudication does not cure the deprivation: "Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62; *see also Tumey,* 47 U.S. at 535 ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge."); *Marshall,* 446 U.S. at 249 ("Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication."); *Flora,* 292 F. Supp. 3d at 904 (explaining that, although the state

35

courts had the final say on forfeiture, a factual dispute remained as to whether the defendants "were so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment.")

Similarly, the PSI Defendants argue that Plaintiffs Mitchell and Brandon each received "all process due" as part of their probation revocation hearings before the local court. As explained above, however, the courts' revocation process for these individuals does not "correct" the due process deprivation at issue here.

As to the PSI Defendants' fourth argument – that Defendant Bledsoe did not cause a due process deprivation for purposes of Section 1983 – Plaintiffs point out that they have not asserted a Section 1983 claim against Ms. Bledsoe. And the Court notes that, elsewhere in the defendants' brief, they acknowledge the Section 1983 claims "are not pled against any individual defendants. . ." (Doc. No. 301, at 38). Defendants do not address the issue in their reply briefs. (Doc. Nos. 343, 392). This argument is meritless.[8]

Finally, to the extent the PSI Defendants suggest any challenge to their contractual arrangement with Giles County is, in effect, a challenge to Tennessee law, the Court is unpersuaded. Although Tennessee law permits private probation companies to operate, and permits them to collect fees from non-indigent probationers as "part payment of expenses incurred" by the supervising agency, *see* Tenn. Code Ann. §§ 40-35-302, 40-35-303; *McNeil v. Cmty. Prob. Servs., LLC,* 803 Fed. Appx. 846, 849 (6th Cir. 2020), it does not *require* the 100% user-funded arrangement at issue here. *See Flora,* 292 F. Supp. 3d at 905 ("Under [forfeiture statute], law enforcement and county attorneys can structure agreements that do not offend due

---

[8]   For this same reason, Defendants' statute of limitations argument based on the employment dates of Defendants Bledsoe and Thompson is also without merit. (Doc. No. 301, at 40).

process."); *Rodriguez v. Providence Community Corrections, Inc.,* 191 F.Supp.3d 758, 769-70 (M.D. Tenn. 2016) (constitutional allegations against user-funded private probation company "stem not from Tennessee law *qua* Tennessee law but from Defendants' failure to abide by the Constitution when effectuating state law."); *cf. Brinson v. Providence Comm. Corr.,* 2016 WL 9651775 (S.D. Ga. March 31, 2016), *vacated and remanded on jurisdictional grounds,* 703 Fed. Appx. 874 (11th Cir. 2017) (plaintiffs bring a facial challenge to a state statute authorizing state courts to contract for private probation services).

For the reasons set forth above, the PSI Defendants are not entitled to summary judgment on Plaintiffs' due process claims (Counts 7 and 8).

3. Equal protection claims (Counts 11 and 12)

Through their equal protection claims – based on *James v. Strange,* 407 U.S. 128, 92 S. Ct. 2027, 32 L. Ed. 2d 600 (1972) – Plaintiffs allege that PSI and Giles County "take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor." (Doc. No. 256 ¶¶ 537, 543). Plaintiffs further allege this deprivation occurs "even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments." (*Id.*)

In *James v. Strange,* the Supreme Court held that a Kansas recoupment statute requiring indigent defendants to repay legal defense fees violated the Equal Protection Clause because it deprived those individuals of the protective exemptions (such as a limit on earnings subject to garnishment) available to other civil judgment debtors. 407 U.S. at 2031-32. Recognizing that state recoupment statutes may be supported by legitimate state interests, the Court, nevertheless, concluded that such interests "are not thwarted by requiring more even treatment of indigent

37

criminal defendants with other classes of debtors to whom the statute itself repeatedly makes reference." *Id.,* at 2035. "The statute before us," the Court explained, "embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law." *Id.*

In *Johnson v. Bredesen,* 624 F.3d 742, 746-50 (6th Cir. 2010), the Sixth Circuit discussed *James v. Strange* in addressing a challenge to a Tennessee statute conditioning restoration of felons' voting rights on payment of court-ordered victim restitution and child support obligations. The court initially determined that rational basis review was appropriate because the statute did not involve a fundamental right, and ". . . contrary to Plaintiffs' other contention, wealth-based classifications do not discriminate against a suspect class." *Id.*, at 746. In distinguishing *Strange* as concerning "fundamental interests subject to heightened scrutiny," the court explained:

> . . . [T]hough *Strange's* text appeared to apply rational basis review, the Court, concerned about discriminatory garnishment of the wages with which a debtor 'supports himself and his family,' found that the admittedly 'legitimate' interests of the state paled in comparison to 'the hopes of indigents for self-sufficiency and self-respect.' *Strange*, 407 U.S. at 135, 141–42, 92 S. Ct. 2027; *see also Olson v. James*, 603 F.2d 150, 154 (10th Cir.1979) ('[I]t was the failure of the statute to protect the wages and the intimate personal property of the defendant from seizure and its consequent discouraging of independence and self-sufficiency . . . that brought the Court to the conclusion that the provisions constituted a violation of the equal protection clause.'). Plaintiffs here assert no comparable interest triggering a heightened standard of review, but, instead, the mere 'statutory benefit' of re-enfranchisement. *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010).

624 F.3d at 749.

In two more recent cases, the Sixth Circuit presents a narrower view of *Strange* claims. In *Fowler v. Benson,* 924 F.3d 247, 260-263 (6th Cir. 2019), the court held that indigent drivers were not likely to succeed on their equal protection challenge to a Michigan statute suspending the

38

driver's licenses of those with unpaid court debt. In considering the plaintiffs' "extraordinary debt collection claim" based on *Strange,* the court appeared to limit the case to its facts:

> Plaintiffs cite *Strange* for the proposition that Secretary Benson may not, consistent with the Equal Protection Clause, 'subject[ ] [Plaintiffs] to a significantly harsher collection method than people who owe other types of debt.' Michigan law violates this principle, according to Plaintiffs, because their licenses are suspended due to their court debt, while 'people with unpaid private debt do not face license suspension.'
>
> The district court correctly rejected this argument under *Fuller v. Oregon*, 417 U.S. 40, 94 S. Ct. 2116, 40 L.Ed.2d 642 (1974). The problem that *Strange* identified, according to the *Fuller* Court, was 'the elimination of exemptions normally available to judgment debtors.' *Id*. at 47, 94 S. Ct. 2116. Here, there is no dispute that the challenged Michigan statutes do not eliminate any such exemptions. Moreover, the State is uniquely empowered to grant, suspend, or reinstate driver's licenses. Supreme Court precedent does not require anything like exact parity between the State and private creditors in this regard. The Court in *Strange* said: '[w]e recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not be identical.' 407 U.S. at 138, 92 S. Ct. 2027. It would be passing strange indeed to interpret *Strange* as putting Michigan to the choice of either giving up its right to suspend the licenses of those with unpaid court debt or empowering private creditors to suspend the driver's licenses of those indebted to them.
>
> In any event, laws challenged under *Strange* are subject to rational basis review. *Johnson*, 624 F.3d at 746. As established above, Michigan's statutory scheme is rationally related to legitimate government interests.

924 F.3d at 263.

In a similar case decided less than a year ago, the Sixth Circuit continued to apply its narrow interpretation of *Strange*. In *Robinson v. Long,* 814 Fed. Appx. 991 (6th Cir. 2020), the court rejected a challenge by indigent drivers to a Tennessee statute that was "nearly identical" to the Michigan statute considered in *Fowler*. Relying on its analysis in *Fowler,* the court held the plaintiffs were unlikely to succeed on their claim that the Tennessee statute constitutes "impermissible wealth discrimination" or their claim that the statute "runs afoul of the Supreme

39

Court's prohibition against extraordinary debt collection as articulated in *James v. Strange*." *Id.,* at 994. The court also rejected the plaintiffs' argument that wealth-based distinctions should be analyzed with heightened scrutiny outside the criminal-justice context. *Id.,* at 995. Explaining that such classifications are to be reviewed under a rational basis standard, the court concluded the license-suspension policy was rationally related to the State's goal of encouraging payment of court debt by heightening the incentive to pay. *Id.*

The Court is not persuaded that Plaintiffs' equal protection challenge "fits the mold" of a *Strange* claim, as construed by the Sixth Circuit. Plaintiffs allege that PSI and Giles County collected funds from indigent probationers without applying the exemptions enjoyed by civil judgment debtors. (Doc. No. 256 ¶¶ 537, 543). But Plaintiffs further allege the County is subject to the same laws on debt collection – presumably, including the required exemptions – as are other civil judgment creditors. (*Id.*); *see* Tenn. Code Ann. § 40-35-303(i)(1) (providing that misdemeanor probationers must pay a fee to be used as part payment of expenses by supervising agency "*unless the defendant is found to be indigent and without anticipated future funds with which to make the payment*.") (emphasis added). Any unequal treatment, therefore, apparently occurs because the defendants do not *advise* indigent probationers that they may qualify for a waiver or reduction of their payments. (Doc. No. 256 ¶¶ 129-34, 231, 256, 289). Plaintiffs have not cited a case in which the courts have relied on *Strange* to impose a duty to inform a government debtor of available exemptions. Heeding the admonition of the Sixth Circuit to apply *Strange* narrowly, therefore, the Court concludes Plaintiffs have not stated a viable equal protection claim based on *Strange*. Accordingly, the PSI Defendants are entitled to summary judgment on Counts 11 and 12.

40

**D. State law claims (Counts 17, 18, 21, 22, 23)**

PSI argues the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims because, it assumes, all federal claims are dismissed. As the Court has not dismissed all of Plaintiffs' federal claims, this argument is without merit.

In their response brief, Plaintiffs voluntarily dismiss the abuse of process claim against Defendants Bledsoe and Thompson for damages (Count 21). (Doc. No. 326, at 42 n.55). Accordingly, Count 21, as to Defendants Bledsoe and Thompson only, is dismissed. The other state law claims remain for trial.

**E. Official Capacity Claims for Defendants Bledsoe and Thompson**

PSI argues Plaintiffs' claims against Defendants Bledsoe and Thompson in their "official capacity" should be dismissed. The defendants do not reference any particular claim, but rather cite to the paragraphs of the Second Amended Complaint describing Defendants Bledsoe and Thompson. Paragraphs 49 and 50 each state that the defendant "is sued in her personal and official capacities." (Doc. No. 256 ¶¶ 49, 50). As noted above, Defendants Bledsoe and Thompson have not been named in any Section 1983 claims, and the Court has granted summary judgment on the RICO claims. The only remaining claim, against Defendant Bledsoe, is the abuse of process claim (Count 22). The PSI Defendants have not addressed whether Plaintiffs may seek relief against Defendant Bledsoe "in her official capacity" with regard to the abuse of process claim. In the absence of adequate briefing, the Court declines to address the argument.

**IV. CONCLUSION**

For the reasons set forth above, the PSI Defendants' Renewed Motion for Summary Judgment (Doc. No. 363) is **GRANTED** in part, and **DENIED** in part. The Court grants summary judgment to the PSI Defendants on the following claims: Counts 2, 3, and 4 (the RICO claims);

Counts 11 and 12 (the equal protection claims); and Count 21 (an abuse of process claim as to Defendants Bledsoe and Thompson only). The other claims against the PSI Defendants – Counts 7 and 8 (the due process claims); Counts 17 and 18 (the unjust enrichment claims); Count 21 (an abuse of process claim as to the remaining defendants); Count 22 (an abuse of process claim); and Count 23 (a civil conspiracy claim) – remain for trial.

      An appropriate Order shall enter.

 

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE