UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE — COLUMBIA DIVISION

| | |
|---|---|
| KAREN MCNEIL, | Case No. 1:18-cv-00033 |
| LESLEY JOHNSON, | Judge Campbell |
| TANYA MITCHELL (through her Estate), | Magistrate Judge Frensley |
| INDYA HILFORT, | |
| LUCINDA BRANDON, | |
| and VICTOR GRAY, | **THIRD[1] AMENDED COMPLAINT— CLASS ACTION** |
| On behalf of themselves and all others similarly situated, | JURY DEMAND |
| Plaintiffs, | |
| v. | |
| COMMUNITY PROBATION SERVICES, LLC; | |
| COMMUNITY PROBATION SERVICES, L.L.C.; | |
| COMMUNITY PROBATION SERVICES; | |
| PROGRESSIVE SENTENCING, INC.; | |
| PSI-PROBATION II, LLC; | |
| PSI-PROBATION, L.L.C.; | |
| TENNESSEE CORRECTIONAL SERVICES, LLC; | |
| TIMOTHY COOK; | |
| GILES COUNTY, TENNESSEE; | |
| PATRICIA MCNAIR; | |
| MARKEYTA BLEDSOE; | |

---

[1] Plaintiffs previously submitted a proposed Third Amended Complaint to address Defendants' concerns about the capacity in which they had been sued. Dkt. No. 298. The Court denied that Motion as moot because that issue was pending appeal in the Sixth Circuit. Dkt. No. 314. Thus, that Complaint never became operative.

KYLE HELTON,

Defendants.

# Table of Contents

UNITED STATES DISTRICT COURT ................................................................................ I

I.     INTRODUCTION ................................................................................................. 6

II.    NATURE OF THE ACTION ................................................................................ 8

III.   JURISDICTION AND VENUE .......................................................................... 14

IV.    THE PARTIES..................................................................................................... 14

       A.     Plaintiffs .................................................................................................. 14

       B.     Defendants .............................................................................................. 16

       C.     Alter Ego Allegations ............................................................................. 19

V.     DEFENDANTS' CONSPIRACY TO OPERATE AN UNCONSTITUTIONAL
       FOR-PROFIT PROBATION SYSTEM BY EXTORTION.................................. 20

       A.     The Contracts .......................................................................................... 21

       B.     The Companies' Practices Are Materially Indistinguishable ............... 22

       C.     The System of Private Probation in Giles County ................................ 23

       D.     The Process for Notifying the Court of Alleged Non-Compliance ....... 37

       E.     Revocation Proceedings.......................................................................... 42

       F.     When a Person Pays Her Debts in Full.................................................. 44

VI.    PLAINTIFFS ARE SUBJECTED TO DEFENDANTS' UNCONSTITUTIONAL
       FOR-PROFIT PROBATION SYSTEM ............................................................... 46

       A.     Plaintiff Karen McNeil ........................................................................... 46

       B.     Plaintiff Lesley Johnson.......................................................................... 53

       C.     Plaintiff Tanya Mitchell (through her Estate)....................................... 57

       D.     Plaintiff Indya Hilfort ............................................................................ 59

       E.     Plaintiff Lucinda Brandon....................................................................... 64

       F.     Plaintiff Victor Gray ............................................................................... 70

VII.   CLASS ACTION ALLEGATIONS ...................................................................... 72

       B.     Class Definitions..................................................................................... 73

       C.     The Prerequisites of Rule 23(a) Are Satisfied ..................................... 73

COMMON QUESTIONS ................................................................................................ 74

       D.     The Prerequisites of Rule 23(b)(2) and (b)(3) Are Satisfied .............. 77

VIII.  CLAIMS .............................................................................................................. 79

COUNT 1: DISMISSED.................................................................................................. 79

-i-

COUNT 2: DISMISSED.........................................................................................79

COUNT 3: DISMISSED.........................................................................................79

COUNT 4: DISMISSED.........................................................................................79

COUNT 5: THE USE OF A PRIVATE ACTOR WITH A PERSONAL FINANCIAL
    STAKE IN THE OUTCOME OF JUDICIAL PROCEEDINGS AND
    PROBATION CASE DECISIONS VIOLATES PLAINTIFFS' RIGHT TO A
    NEUTRAL PROBATION OFFICER UNDER THE DUE PROCESS CLAUSE
    OF THE FOURTEENTH AMENDMENT. BROUGHT UNDER 42 U.S.C. §
    1983 BY NAMED PLAINTIFFS KAREN MCNEIL, LESLEY JOHNSON, AND
    INDYA HILFORT ON BEHALF OF THEMSELVES AND ALL OTHERS
    SIMILARLY SITUATED AGAINST GILES COUNTY FOR DAMAGES. ................79

COUNT 6: THE USE OF A PRIVATE ACTOR WITH A PERSONAL FINANCIAL
    STAKE IN THE OUTCOME OF JUDICIAL PROCEEDINGS AND
    PROBATION CASE DECISIONS VIOLATES PLAINTIFF'S RIGHT TO A
    NEUTRAL PROBATION OFFICER UNDER THE DUE PROCESS CLAUSE
    OF THE FOURTEENTH AMENDMENT. BROUGHT UNDER 42 U.S.C. §
    1983 BY NAMED PLAINTIFF INDYA HILFORT ON BEHALF OF HERSELF
    AND ALL OTHERS SIMILARLY SITUATED AGAINST CPS AND GILES
    COUNTY FOR EQUITABLE RELIEF. .........................................................82

COUNT 7: THE USE OF A PRIVATE ACTOR WITH A PERSONAL FINANCIAL
    STAKE IN THE OUTCOME OF JUDICIAL PROCEEDINGS AND
    PROBATION CASE DECISIONS VIOLATES PLAINTIFFS' RIGHT TO A
    NEUTRAL PROBATION OFFICER UNDER THE DUE PROCESS CLAUSE
    OF THE FOURTEENTH AMENDMENT. BROUGHT UNDER 42 U.S.C. §
    1983 BY NAMED PLAINTIFFS LUCINDA BRANDON, VICTOR GRAY,
    AND TANYA MITCHELL (THROUGH HER ESTATE) ON BEHALF OF
    THEMSELVES AND ALL OTHERS SIMILARLY SITUATED AGAINST PSI
    AND GILES COUNTY FOR DAMAGES. .......................................................85

COUNT 8: THE USE OF A PRIVATE ACTOR WITH A PERSONAL FINANCIAL
    STAKE IN THE OUTCOME OF JUDICIAL PROCEEDINGS AND
    PROBATION CASE DECISIONS VIOLATES PLAINTIFF'S RIGHT TO A
    NEUTRAL PROBATION OFFICER UNDER THE DUE PROCESS CLAUSE
    OF THE FOURTEENTH AMENDMENT. BROUGHT UNDER 42 U.S.C. §
    1983 BY NAMED PLAINTIFF VICTOR GRAY ON BEHALF OF HIMSELF
    AND ALL OTHERS SIMILARLY SITUATED AGAINST PSI AND GILES
    COUNTY FOR EQUITABLE RELIEF. .........................................................87

COUNT 9:  DEFENDANTS' USE OF JAIL, THREATS OF JAIL, AND AN
ONEROUS PROBATION SYSTEM TO COLLECT DEBTS OWED TO THE
COUNTY VIOLATES EQUAL PROTECTION AND DUE PROCESS
BECAUSE IT IMPOSES UNDULY HARSH AND PUNITIVE RESTRICTIONS
ON DEBTORS WHOSE CREDITOR IS THE GOVERNMENT AS
COMPARED TO THOSE WHO OWE MONEY TO PRIVATE CREDITORS
BROUGHT UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFFS KAREN
MCNEIL, LESLEY JOHNSON, AND INDYA HILFORT ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED AGAINST
GILES COUNTY FOR DAMAGES. ............................................................................. 90

COUNT 10:  DEFENDANTS' USE OF JAIL, THREATS OF JAIL, AND AN
ONEROUS PROBATION SYSTEM TO COLLECT DEBTS OWED TO THE
COUNTY VIOLATES EQUAL PROTECTION AND DUE PROCESS
BECAUSE IT IMPOSES UNDULY HARSH AND PUNITIVE RESTRICTIONS
ON DEBTORS WHOSE CREDITOR IS THE GOVERNMENT AS
COMPARED TO THOSE WHO OWE MONEY TO PRIVATE CREDITORS
BROUGHT UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFF INDYA
HILFORT ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY
SITUATED AGAINST GILES COUNTY FOR EQUITABLE RELIEF....................... 91

COUNT 11:  DEFENDANTS' USE OF JAIL, THREATS OF JAIL, AND AN
ONEROUS PROBATION SYSTEM TO COLLECT DEBTS OWED TO THE
COUNTY VIOLATES EQUAL PROTECTION AND DUE PROCESS
BECAUSE IT IMPOSES UNDULY HARSH AND PUNITIVE RESTRICTIONS
ON DEBTORS WHOSE CREDITOR IS THE GOVERNMENT AS
COMPARED TO THOSE WHO OWE MONEY TO PRIVATE CREDITORS
BROUGHT UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFF LUCINDA
BRANDON, VICTOR GRAY, AND TANYA MITCHELL (THROUGH HER
ESTATE) ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED AGAINST GILES COUNTY FOR DAMAGES....................................... 93

COUNT 12:  DEFENDANTS' USE OF JAIL, THREATS OF JAIL, AND AN
ONEROUS PROBATION SYSTEM TO COLLECT DEBTS OWED TO THE
COUNTY VIOLATES EQUAL PROTECTION AND DUE PROCESS
BECAUSE IT IMPOSES UNDULY HARSH AND PUNITIVE RESTRICTIONS
ON DEBTORS WHOSE CREDITOR IS THE GOVERNMENT AS
COMPARED TO THOSE WHO OWE MONEY TO PRIVATE CREDITORS
BROUGHT UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFF VICTOR
GRAY ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED AGAINST GILES COUNTY FOR EQUITABLE RELIEF....................... 95

COUNT 13: DEFENDANTS VIOLATE EQUAL PROTECTION AND DUE
PROCESS BY PLACING AND KEEPING PEOPLE ON SUPERVISED
PROBATION SOLELY BECAUSE THEY CANNOT AFFORD TO PAY
COURT DEBTS AND PROBATION SUPERVISION FEES  BROUGHT
UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFFS KAREN MCNEIL,
LESLEY JOHNSON, AND INDYA HILFORT ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED AGAINST
GILES COUNTY FOR DAMAGES ............................................................................... 96

COUNT 14: DEFENDANTS VIOLATE EQUAL PROTECTION AND DUE
PROCESS BY PLACING AND KEEPING PEOPLE ON SUPERVISED
PROBATION SOLELY BECAUSE THEY CANNOT AFFORD TO PAY
COURT DEBTS AND PROBATION SUPERVISION FEES  BROUGHT
UNDER 42 U.S.C. § 1983 BY NAMED PLAINTIFF INDYA HILFORT ON
BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED
AGAINST CPS AND GILES COUNTY FOR EQUITABLE RELIEF ......................... 97

COUNT 15: DEFENDANTS VIOLATE PLAINTIFFS' EQUAL PROTECTION AND
DUE PROCESS RIGHTS BY JAILING THEM SOLELY BECAUSE THEY
CANNOT AFFORD A MONETARY PAYMENT  BROUGHT BY NAMED
PLAINTIFF INDYA HILFORT ON BEHALF OF HERSELF AND ALL
OTHERS SIMILARLY SITUATED UNDER 42 U.S.C. § 1983 AGAINST THE
COUNTY AND THE SHERIFF  FOR EQUITABLE RELIEF..................................... 98

COUNT 16: UNJUST ENRICHMENT  BROUGHT BY NAMED PLAINTIFFS
KAREN MCNEIL AND LESLEY JOHNSON ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED AGAINST CPS FOR
DAMAGES................................................................................................................... 99

COUNT 17: UNJUST ENRICHMENT  BROUGHT BY NAMED PLAINTIFFS
LUCINDA BRANDON, VICTOR GRAY, AND TANYA MITCHELL
(THROUGH HER ESTATE) ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED AGAINST PSI FOR DAMAGES..................... 100

COUNT 18: UNJUST ENRICHMENT  BROUGHT BY NAMED PLAINTIFF
VICTOR GRAY ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED AGAINST PSI FOR EQUITABLE RELIEF .................... 101

COUNT 19: ABUSE OF PROCESS  BROUGHT BY NAMED PLAINTIFFS KAREN
MCNEIL, LESLEY JOHNSON, AND INDYA HILFORT ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED AGAINST
GILES COUNTY, AND CPS, FOR DAMAGES ........................................................ 101

COUNT 20: ABUSE OF PROCESS  BROUGHT BY NAMED PLAINTIFF INDYA
HILFORT ON BEHALF OF HERSELF AND ALL OTHERS SIMILAR
SITUATED AGAINST GILES, CPS, AND DEFENDANT MCNAIR FOR
EQUITABLE RELIEF................................................................................................. 103

COUNT 21:  ABUSE OF PROCESS  BROUGHT BY NAMED PLAINTIFFS
LUCINDA BRANDON, VICTOR GRAY, AND TANYA MITCHELL
(THROUGH HER ESTATE) ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED AGAINST GILES COUNTY, PSI, AND
DEFENDANTS BLEDSOE AND THOMPSON FOR DAMAGES ........................... 104

COUNT 22:  ABUSE OF PROCESS  BROUGHT BY NAMED PLAINTIFF VICTOR
GRAY ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED AGAINST GILES COUNTY, PSI, AND DEFENDANT BLEDSOE,
FOR EQUITABLE RELIEF ........................................................................... 105

COUNT 23:  CIVIL CONSPIRACY   BROUGHT BY NAMED PLAINTIFFS
LUCINDA BRANDON, VICTOR GRAY, AND TANYA MITCHELL
(THROUGH HER ESTATE) ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED AGAINST DEFENDANTS
PROGRESSIVE SENTENCING, INC., PSI-PROBATION II, LLC, PSI-
PROBATION, L.L.C., TENNESSEE CORRECTIONAL SERVICES, LLC, AND
TIMOTHY COOK FOR DAMAGES .......................................................... 107

COUNT 24:  CIVIL CONSPIRACY  BROUGHT BY NAMED PLAINTIFFS KAREN
MCNEIL, LESLEY JOHNSON, AND INDYA HILFORT ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED AGAINST
DEFENDANTS COMMUNITY PROBATION SERVICES, LLC,
COMMUNITY PROBATION SERVICES, L.L.C., AND COMMUNITY
PROBATION SERVICES ........................................................................... 109

PRAYER FOR RELIEF ...................................................................................... 111

JURY TRIAL DEMANDED ............................................................................... 112

# I.   **INTRODUCTION**[2]

1.      This class action lawsuit challenges systemic constitutional and statutory violations and an illegal extortion scheme in Giles County, Tennessee, which has allowed two for-profit companies—Community Probation Services, LLC and PSI Probation, LLC—to transform the County's misdemeanor probation system into a machine for generating their own profit on the backs of Giles County's most impoverished residents.[3] The named plaintiffs and the members of the putative plaintiff classes (collectively "Plaintiffs") in this case live in poverty and were assigned to supervised probation with one of the Defendant companies.  They are victims of the Defendants' conspiracy to extract as much money as possible from impoverished misdemeanor probationers through a pattern of illegal racketeering activity, including threats of arrest and jailing, physical confinement, and extended periods of supervised probation due to nonpayment of debts owed to the court and to the private companies.

2.      The goal of CPS and PSI (collectively, the "private companies" or the "companies") is to maximize their own profits by acting as probation officers for the purpose of collecting fines,

---

[2] The facts alleged in the Third Amended Complaint reflect the facts known to Plaintiffs on information and belief at the time the First Amended Complaint was filed on July 13, 2018. Since that Complaint was filed, named Plaintiff Tanya Mitchell's supervised probation was terminated. Named Plaintiff Indya Hilfort moved for and was granted a Temporary Restraining Order on Count 15, Dkt. Nos. 42, 45, 50. Ms. Hilfort also moved for and was granted classwide preliminary injunctive relief on Count 15. Dkt. Nos. 51, 52, 224, 225. On Sept. 14, 2020, Ms. Mitchell sadly passed away, and her estate was substituted to continue the claims for damages that survive her death, Dkt. No. 432. In addition, this Court and the Sixth Circuit have issued rulings related to Plaintiffs' claims. This Complaint has been updated to reflect the remaining parties and claims. *See* Dkt. Nos. 414-17. Plaintiffs' injunctive claims, except for Count 15, relate back to the date the Complaint was filed; Count 15 relates back to the date the First Amended Complaint was filed. Plaintiffs are unaware at this time of other significant, material changes to facts alleged in the First or Second Amended Complaint.

[3] As alleged herein, PSI Probation operates through at least one individual and four legal entities—including Defendants Timothy Cook, Progressive Sentencing, Inc., Tennessee Correctional Service, LLC, PSI-Probation L.L.C., and PSI-Probation II, LLC—all of which are alter egos of each other for purposes of Tennessee law.  CPS Probation operates through at least three legal entities—including Defendants Community Probation Services, LLC, Community Probation Services, L.L.C., and Community Probation Services—which are alter egos of each other for purposes of Tennessee law.

costs, fees, and litigation taxes[4] (these legal financial obligations will be referred to collectively as "court debts") owed to the court following convictions for minor misdemeanor offenses. Pursuant to their respective contracts with the County (the "Contracts"), the companies add their own fees and surcharges on top of those court debts and continue to supervise the collection of even greater amounts of money from probationers who cannot afford to pay their debts. These fees and surcharges—which probationers pay directly to the companies—are the companies' only sources of revenue under their Contracts.

3.      The supervision the companies provide, however, consists almost exclusively of continuous and repeated threats of jailing, humiliating abuses of power such as invasive drug screens during which employees of the companies observe probationers urinating (and the companies, in their discretion, then charge fees for each drug test that they decide to administer), and repeated revocations and extensions of probation for not making payments that the companies and their employees ("private probation officers" or "for-profit probation officers"; collectively, the companies and their employees are referred to as "Private Defendants") know the probationers cannot afford. All of this occurs while the companies continue to impose additional monthly fees and surcharges, and the probationers' debts mount.

4.      In addition to providing substantial revenue to the County, the contractual arrangements give Giles County's private probation officers, who should be neutral officers of the court, a direct financial stake in every aspect of misdemeanor probation supervision. This financial conflict of interest, baked into the companies' contracts with the County and the companies' written and unwritten policies, causes a cycle of debt; arrest and jailing for inability to pay that

---

[4] Tenn. Code Ann. § 67-4-602(a) ("There is levied a privilege tax on litigation instituted in this state, of twenty-nine dollars and fifty cents ($29.50) on all criminal charges, upon conviction or by order.").

debt; additional fees for those arrests; repeated revocation and extension of supervised probation for nonpayment; and crushing, inescapable poverty.

5.    As a result of these extortionate enterprises, individuals who are supervised by the companies, including the named plaintiffs, have lost homes, jobs, and personal belongings; suffered severe medical problems, sold their blood plasma, and gone without food, clothing, and medicine for themselves and their children; taken out high-interest loans and borrowed money from friends and family members who are themselves struggling to afford the basic necessities of life; and diverted public benefits—including social security disability checks, or whatever minimal income they have—to instead pay the escalating supervision fees that the companies demand under threat of arrest and jailing.  These policies and practices have trapped Plaintiffs and hundreds of people like them in Giles County in a web of fear and panic for years.

6.    The companies' user-funded model of probation—in which the probation officer's only sources of income and profit under the Contracts are the payments made by the impoverished probationers the County assigns to them for probation supervision—violates the Constitution and has no place in our legal system. This lawsuit seeks to recover damages from the alleged wrongdoers here, disgorge their ill-gotten profits, and to end the practice of for-profit misdemeanor probation in Giles County administered by private companies with financial incentives to place and keep persons on probation.

## II.    **NATURE OF THE ACTION**

7.    Giles County contracted to give control of its misdemeanor probation system to two private, for-profit companies—CPS and PSI—by entering into separate contracts with each company.  *See* Ex. 1 (contract between Giles County and CPS); Ex. 2 (contract between Giles County and PSI).

8.     The Contracts provide for a user-funded model of probation, in which probationers must pay—under threat of arrest, jailing, and repeated revocation and extension of their probation—a variety of fees and surcharges to the company in addition to their court debts. The Contracts specify that CPS and PSI must earn their revenue and profit solely and directly from payments by the people they supervise.

9.     CPS and PSI repeatedly threaten misdemeanor and traffic probationers with arrest and physical confinement if they do not make payments. The Private Defendants tell probationers that nonpayment will result in the company "violating" them—i.e., alleging to the court in a sworn statement that the probationer has violated a condition of probation and asking the court to issue an arrest warrant or a citation warrant.

10.     The Private Defendants further tell probationers that "violations" for nonpayment will result in extended periods of "pay-only" probation,[5] during which periods[6] probationers accrue more fees owed to the companies, including monthly supervision fees and discretionary drug testing fees, and that non-compliance with other conditions of probation—and sometimes nonpayment—will result in jail time in addition to revocation and extension of pay-only probation.

---

[5] "Pay-only probation" refers to a period of supervised probation during which the person is supervised only because she has not paid all of the court debt. Pay-only probation ends only when a person has paid court debts in full. *See* Human Rights Watch, *Profiting From Probation: America's 'Offender Funded' Probation Industry* (2015), available at https://www.hrw.org/report/2014/02/05/profiting-probation/americas-offender-funded-probation-industry ("Pay only probation is an extremely muscular form of debt collection masquerading as probation supervision, with all costs billed to the debtor."); Sarah Stillman, *Get Out of Jail, Inc.*, New Yorker (June 23, 2014), available at https://www.newyorker.com/magazine/2014/06/23/get-out-of-jail-inc.

[6] Terms of probation in Giles County are usually the maximum allowable under Tennessee law: 11 months and 29 days, referred to locally as "11/29." The most common sentence includes jail time of 11 months and 29 days, suspended for 11 months and 29 days. When Defendants revoke and extend a person's probation, they typically require the person to also serve some amount of their jail sentence, and then extend the probationary period for an additional 11/29. Therefore, following revocation and extension, the possibility of extensive jail time, albeit shortened by the amount of time the person served for the violation, looms for the probationer who cannot pay or violates any of the company's other rules or conditions.

11.     In fact—and Defendants never disclose this to Plaintiffs—under federal and Tennessee law, only *willful* nonpayment can constitute a violation of probation.[7]  As a matter of policy and practice, the companies train their employees not to inform probationers of this law and their basic rights.  Defendants routinely threaten to seek violation-of-probation warrants for probationers who are too poor to make a payment, or whose payments fall short of what the probation officer demanded, without verifying that the nonpayment was willful.

12.     A person may be assigned to supervised misdemeanor probation by either the General Sessions Court or the Circuit Court in Giles County. The General Sessions Court issues citation warrants when the allegation is solely nonpayment. These warrants do not authorize arrests.  The Circuit Court, however, issues arrest warrants solely for nonpayment. Those warrants authorize arrest and typically state that a secured money bail amount is required for release after arrest.

13.     Although the citation warrants that probation officers seek alleging solely non-payment for General-Sessions probationers do not authorize arrest, most probationers do not know that and believe—based on the threats of the Private Defendants—that if they do not to pay the company, they will be arrested and taken to jail.

14.     Moreover, warrants for multiple alleged violations including nonpayment do authorize arrest.  Such warrants typically have either a pre-set money bond in an amount determined without individualized consideration of the arrestee's ability to pay, or a requirement

---

[7] *See, e.g.*, Tenn. Code Ann. § 40-35-303(i)(3) (2017) (nonpayment of supervision fees must be willful to be grounds for probation revocation); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 770 n.13 (M.D. Tenn. 2015), *appeal dismissed* (Mar. 15, 2016) ("Defendants' probation scheme is the functional equivalent of what *Bearden* prohibits: probation revocation due to nonpayment without an indigency inquiry."); Tenn. Code Ann. § 40-24-105(a) (2017) (nonpayment of court fines must be willful to be grounds for criminal contempt); *State v. Dye*, 715 S.W.2d 36, 41 (Tenn. 1986) (reversing revocation of probation because lower court did not determine that nonpayment of restitution was willful).

to "hold" the arrestee in jail until her probation-revocation hearing, which does not take place until up to ten days after arrest.

15.     The Contracts give the companies enormous discretion, including authorizing them to notify the court of alleged non-compliance with conditions of probation, seek and prepare probation revocation warrants, act as the main witness and present evidence at revocation proceedings, confer with judges and prosecutors on bond amounts for violation-of-probation warrants and whether a person arrested for an alleged violation of probation should be detained until the revocation hearing, and recommend sentences and sanctions. The Contracts give the companies discretion to determine how much a probationer must pay on each reporting day, how frequently the probationer must report, and (in the case of CPS) how much of each payment the company will keep for itself before paying the court. All of these discretionary decisions are communicated by the Private Defendants under threat of arrest for noncompliance.

16.     The Contracts permit CPS and PSI to petition for revocation of probation solely for nonpayment, and to seek the arrest and jailing of probationers and petition for extension of probation for people who have not paid all of the accumulated fees and costs, but have already paid enough money to cover the entirety of their original court debts.

17.     In their efforts to generate greater revenue, the individual probation officer defendants regularly make sworn statements of fact that they know are false and knowingly omit material facts when seeking warrants solely for nonpayment of court costs and probation fees. As a matter of policy and practice, the Private Defendants consistently omit critical facts—such as that a person who did not make payments survives on disability income. They seek warrants that are facially insufficient to justify a revocation of probation as a matter of law because the Private

Defendants never allege that probationers willfully refused to pay, i.e., that they have refused to pay even though they are able to do so.

18.     Defendants know that the vast majority of CPS and PSI probationers are only on supervised for-profit probation because they are indigent and cannot afford to pay their court debts and probation fees in one lump sum.  Nonetheless, they regularly participate in probation-revocation hearings that result in the revocation and extension of supervised probation due solely to nonpayment, without conducting an inquiry into the probationer's ability to pay, and without findings that the nonpayment was willful. Revocations for nonpayment typically result in an extension of probation for another period of 11 months and 29 days, and result in saddling the probationer with additional court debts and company fees and surcharges, continuing the cycle of debt, arrest, for-profit probation supervision, jail, and more debt.

19.     Each Contract creates an actor within the Giles County legal system that is fundamentally incompatible with constitutional law: a probation officer who is supposed to be neutral, but instead has a direct financial stake in every decision and outcome in every individual's probation case.  This arrangement violates basic notions of due process, neutrality, and fairness.

20.     Defendants' extortion scheme constitutes a systematic violation of constitutional rights calculated to generate significant profits every year for the companies and to provide substantial revenue to the County.

21.     The Plaintiffs seek declaratory, injunctive, compensatory, and punitive relief for themselves and all others similarly situated.

22.     The allegations in this case are materially indistinguishable from those in *Rodriguez v. Providence Community Corrections, Inc.*, 3:15-cv-01048 (M.D. Tenn. 2015), a class-action lawsuit that raised identical constitutional claims against nearby Rutherford County, Tennessee

and a now-defunct private probation company, PCC, Inc.[8]  Soon after *Rodriguez* was filed, PCC, Inc. ended its operations in Giles County, in Tennessee, and throughout the entire country.[9]

23.     When PCC, Inc. left Giles County, one of the Defendant probation companies in this case—CPS—began operating in Giles County in its place.  CPS moved into the old PCC, Inc. offices, assumed the accounts for probationers whom PCC, Inc. had previously supervised, hired PCC, Inc.'s former employees—including Defendant Patricia McNair—and implemented identical debt-collection practices.  PSI, which has been operating in Giles County for more than four years, engages in materially the same extortionate and unconstitutional conduct.

24.     Defendants' policies and practices in this case are materially identical to those at issue in *Rodriguez*, and a court in this District has already issued two detailed memorandum opinions concluding that such policies and practices violate the United States Constitution.[10]  Giles County has been on notice that its private probation practices violate Tennessee law, federal statutes, and the United States Constitution since at least July 5, 2016—when Giles County

---

[8] PCC, Inc. was also operating in Giles County at the time the company's conduct in Rutherford County was challenged by Plaintiffs in *Rodriguez*.

[9] The federal court recently granted Plaintiffs' motion for preliminary approval of a settlement agreement, through which PCC, Inc. agreed to pay $14 million and Rutherford County agreed to pay $300,000 to the people who were on supervised probation.  *See Rodriguez v. Providence Cmty. Corr., Inc.*, Case 3:15-cv-01048, Dkt. 197, Order Granting Second Unopposed Motion to Approve Notice of Class Action Settlement Agreement, Set Hearing Date, and Authorize Notice to Class Members (Jan. 2, 2018).  Rutherford County also agreed to make significant changes to its probation system, including never again contracting with a for-profit, private probation company, waiving fees for indigent probationers, and ending pay-only probation.

[10] *See Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758 (M.D. Tenn. 2015) (holding that it violates the Equal Protection Clause to treat government debtors more harshly than debtors who owe debts to private companies; holding that it violates the Equal Protection and Due Process Clauses to keep impoverished probationers on supervised probation solely because of their inability to make monetary payments; holding that it violates the Fourth and Fourteenth Amendments to arrest misdemeanor probationers solely for nonpayment; holding that it violates the Equal Protection and Due Process Clauses to jail probationers solely because they cannot afford to pay secured money bail); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015) (granting Plaintiffs' motion for preliminary injunction enjoining Rutherford County from detaining misdemeanor arrestees who cannot afford the predetermined money bail amount required for release following an arrest for allegedly violating probation; holding that it violates equal protection and due process to keep an impoverished misdemeanor probationer in jail after arrest and prior to a probation-revocation hearing due to her inability to pay a pre-determined secured money bail amount).  Plaintiffs in this case raise many of the same federal constitutional claims that were litigated in *Rodriguez*.

Executive, Janet Vanzant, received a letter summarizing the *Rodriguez* allegations and the two federal court rulings, *see* Ex. 3.

25.     Like *Rodriguez*, this civil rights action is brought under the United States Constitution and Tennessee law to stop the Defendants from continuing to operate racketeering enterprises that extort money from some of the most impoverished people in Giles County, and to prevent the Defendants from continuing to misuse the probation system for profit.

26.     Plaintiffs bring this civil rights action on behalf of themselves and all others similarly situated seeking the vindication of their fundamental rights, compensation for the violations that they suffered, punitive damages to punish the private probation company Defendants and to deter all Defendants from similar misconduct in the future, and injunctive and declaratory relief to protect them against future violations.

## III.     JURISDICTION AND VENUE

27.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, et seq., and the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a) (over the state law claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution).

28.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## IV.     THE PARTIES

### A.     Plaintiffs

29.     Plaintiff Karen McNeil is 53 years old and lives in Giles County with a friend in a mobile home outside of Pulaski.  She has four adult children.  Ms. McNeil was subjected to supervised probation with Defendant CPS from March 2016 until October 2017.  She was previously supervised on probation by PCC, Inc. from November 2015 until March 2016.  For the

entire period of supervised probation with both CPS and PCC, Inc., Defendant McNair was the probation officer to whom Ms. McNeil primarily reported.

30.     Plaintiff Lesley Johnson is a 35-year-old single mother of two children who lives in Mississippi.  She previously lived in Baldwin County, Alabama, where she resided during the period she was on CPS probation.  Ms. Johnson was subjected to supervised probation with Defendant CPS from February 2017 to August 2017.  During her period of supervised probation with CPS, Defendant McNair was the probation officer to whom Ms. Johnson primarily reported.

31.     Plaintiff Tanya Mitchell[11] is 53 years old and lives in Giles County, in a mobile home with her daughter, Plaintiff Indya Hilfort, and her four grandchildren (Ms. Hilfort's children).  Ms. Mitchell has been subjected to supervised probation with Defendant PSI since September 2017.  For the entire period of supervised probation with PSI, Defendant Bledsoe has been the probation officer to whom Ms. Mitchell reports.

32.     Plaintiff Indya Hilfort is a 27-year-old single mother of four children under the age of 10.  She lives with them and her mother, Plaintiff Tanya Mitchell, in a mobile home in Giles County.  Ms. Hilfort has been subjected to supervised probation with Defendant CPS since September 2017.  She was previously supervised on probation by PCC, Inc. in 2015.  For the entire period of supervised probation with CPS, Defendant McNair is the probation officer to whom Ms. Hilfort primarily reports.

33.     Plaintiff Lucinda Brandon is a 31-year-old single mother of three children under the age of 10 who lives in Lawrence County, adjacent to Giles County.  Ms. Brandon was subjected to supervised probation with Defendant PSI between September 2015 and May 2017.  During her

---

[11] *See* n.2 (noting that Ms. Mitchell died in September 2020 but her estate has been substituted to continue the litigation of her claims as previously alleged).

period of supervised probation with PSI, Ms. Brandon reported primarily to Defendant Thompson. She also reported to Defendant Bledsoe.

34.    Plaintiff Victor Gray is 54 years old and lives in Lawrence County, Tennessee. Mr. Gray has been subjected to supervised probation with Defendant PSI since November 2019. For the entire period of supervised probation with PSI, Defendant Bledsoe has been the probation officer to whom Mr. Gray primarily reported.

### B.    **Defendants**

35.    Defendant Community Probation Services, LLC is a for-profit limited liability corporation organized and registered to do business in Tennessee. Community Probation Services, LLC is headquartered in Crossville, Tennessee, and has operated in the State of Tennessee since 2015 when it formed via conversion of Defendant Community Probation Services.

36.    Defendant Community Probation Services is a for-profit general partnership organized in Tennessee on January 1, 2014, and headquartered in Crossville. On October 15, 2015, Community Probation Services filed a Certificate of Conversion with the Tennessee Secretary of State, converting itself into Defendant Community Probation Services, LLC.

37.    Defendant Community Probation Services, L.L.C. was a for-profit limited liability corporation organized and registered to do business in Tennessee.[12] Community Probation Services, L.L.C. was headquartered in Crossville, Tennessee. The company was known as "PSI-Probation, L.L.C." until it changed its name to Community Probation Services, L.L.C. effective January 1, 2008. Community Probation Services, L.L.C. was terminated on April 25, 2014.

38.    Defendants Community Probation Services, LLC, Community Probation Services, and Community Probation Services, L.L.C. are collectively referred to herein as "CPS."

---

[12] "Community Probation Services, LLC" and "Community Probation Services L.L.C." are distinct entities. The use or absence of periods in "LLC" are intentional throughout the complaint.

39.    Defendant Progressive Sentencing, Inc. is a for-profit corporation incorporated and registered to do business in Tennessee.  Progressive Sentencing, Inc. is headquartered in Cookeville and has operated in the State of Tennessee since 1991.

40.    Defendant PSI-Probation, L.L.C. was a for-profit limited liability corporation organized and registered to do business in Tennessee.  PSI-Probation, L.L.C. was headquartered in Cookeville and has operated in the State of Tennessee since 1999.  Effective January 1, 2008, PSI-Probation, L.L.C. changed its name to "Community Probation Services, L.L.C."  Community Probation Services, L.L.C. was terminated on April 25, 2014.

41.    Defendant PSI-Probation II, LLC was a for-profit limited liability corporation organized and registered to do business in Tennessee.  PSI-Probation II, LLC was headquartered in Cookeville, and operated in the State of Tennessee since 2005.  PSI-Probation II, LLC was administratively dissolved on August 6. 2017.

42.    Defendant Tennessee Correctional Services, LLC is a for-profit limited liability corporation organized and registered to do business in Tennessee.  Tennessee Correctional Services, LLC is headquartered in Cookeville, and has operated in the State of Tennessee since 2002.

43.    Defendant Timothy Cook is a citizen and resident of Cookeville, Tennessee. Defendant Cook is or was the owner, member, organizer, partner, and/or president of Defendants Progressive Sentencing, Inc., PSI-Probation, L.L.C., PSI-Probation II, LLC, and Tennessee Correctional Services, LLC.

44.    Defendants Progressive Sentencing, Inc., PSI-Probation, L.L.C., PSI-Probation II, LLC, and Tennessee Correctional Services, LLC are collectively referred to herein as "PSI," the name that local probationers and court staff use to refer to the company in Giles.

45.     Both CPS and PSI generate their income from supervision fees and surcharges that Defendants require misdemeanor probationers to pay to the companies, pursuant to contracts signed by the Giles County Executive on behalf of the County.  *See* Exs. 2, 3.

46.     Pursuant to the Contracts, the County pays nothing for the companies' services. Ex. 1 at 4; Ex. 2 at 3.

47.     Instead, the Contracts require the County to refer misdemeanor probation supervision to the companies, which provide probation supervision services at no charge to the County, extracting their revenue exclusively through various fees charged to probationers.  Ex. 1 at 4, Ex. 2 at 3.

48.     Defendant Giles County is a local government entity organized under the laws of the State of Tennessee.  Its officials are responsible for, among other things, operating the County jail, prosecuting misdemeanor and traffic offenses, providing for a lawful probation supervision system, and supplying adequate indigent defense services.

49.     Defendant Patricia McNair is a probation officer employed by CPS.  Defendant McNair supervises Named Plaintiff Indya Hilfort.  She previously supervised Named Plaintiffs Karen McNeil and Lesley Johnson.  She is sued in her personal and official capacities.

50.     Defendant Markeyta Bledsoe is a probation officer employed by PSI.  She supervises Named Plaintiff Victor Gray.  She previously supervised Named Plaintiff Lucinda Brandon and Named Plaintiff Tanya Mitchell.  She is sued in her personal and official capacities.

51.     Harriet Thompson was a probation officer employed by PSI.  She previously supervised Named Plaintiff Lucinda Brandon.[13]

---

[13] The only claims brought against Harriet Thompson, Counts 3 and 21 for damages, have now either been dismissed by the Court or voluntarily dismissed by Plaintiffs. Mem. Op. at 41 (Dkt. No. 416).

52. Defendants McNair, Thompson, and Bledsoe have used their discretion as probation officers to determine how frequently probationers have to report, the means by which probationers must report (e.g., in person or by phone), whether and when to seek an arrest warrant based on a purported violation of probation and on what basis or bases, what disposition to recommend to the court following a revocation proceeding, how frequently to subject probationers to drug tests, and every other discretionary probationary decision discussed in this Complaint. Defendant McNair uses her discretion as a CPS probation officer to allocate payments from probationers to pay the company first and court debts second and whether and when to convert individuals' probation from supervised to unsupervised.

53. Defendants CPS, PSI, McNair, Thompson, and Bledsoe perform a traditional government function and were acting under color of state law at all times relevant to this case.

54. Defendants McNair, Thompson, and Bledsoe acted as agents of their employers at all times relevant to this case.

C. **Alter Ego Allegations**

1. **CPS Defendants**

55. Defendants Community Probation Services, LLC, Community Probation Services, L.L.C., and Community Probation Services constitute alter egos of each other. These Defendant entities have been used in contravention of public policy—namely contracting with the County to allow non-neutral, financially-interested companies to serve a traditional government function, which Defendants abused to extort payments of court fines, costs, and various fees from Plaintiffs and proposed Class Members using, *inter alia* imprisonment and threats of imprisonment in violation of Tennessee and federal law. These Defendant entities also use the same office or business location, employ the same employees, and do not maintain arms-length relationships. Unless otherwise specified, all references to "CPS" herein refer to all current and former legal

entities through which CPS operates and has operated in the State of Tennessee during the Class periods.

### 2. PSI Defendants

56.     Defendants Progressive Sentencing, Inc., PSI-Probation L.L.C., PSI-Probation II, LLC, and Tennessee Correctional Services, LLC constitute alter egos of each other. These Defendant entities have been used in contravention of public policy—namely contracting with the County to allow non-neutral, financially-interested companies to serve a traditional government function, which Defendants abused to extort payments of court fines, costs, and various fees from Plaintiffs and proposed Class Members using, *inter alia* imprisonment and threats of imprisonment in violation of Tennessee and federal law. These Defendant entities also use the same office or business location, employ the same employees, and do not maintain arms-length relationships. Unless otherwise specified, all references to "PSI" herein refer to all current and former legal entities through which PSI operates and has operated in the State of Tennessee during the Class periods.

### V. DEFENDANTS' CONSPIRACY TO OPERATE AN UNCONSTITUTIONAL FOR-PROFIT PROBATION SYSTEM BY EXTORTION

57.     Giles County and the Private Defendants, operating pursuant to the Contracts between the companies and the County, conspired to use the County's probation system to collect court debts owed to the County by misdemeanor offenders, as well as to collect fees owed solely to the private companies, using unlawful extortion, threats of arrest and jailing, physical confinement, and improper and fraudulent legal process.

58.     By establishing a purely user-funded probation system, Defendants created financial incentives for the companies to use their access and perceived access to the County's courts, law enforcement officers, and jail to engage in extortionate and unconstitutional policies

and practices, described in detail below. All Defendants, including County officials, are aware of and complicit in each of these policies and practices.

59.     Pursuant to the County's contracts with the companies, for-profit supervised probation thus serves almost exclusively as a mechanism for collecting post-judgment court debts from individuals who are poor, and as a mechanism to generate and extort additional income for the companies through coercive and unlawful means not available to any private creditor under state or federal law. These policies and practices devastate the lives of hundreds of misdemeanor probationers in Giles County every year, and have done so for more than a decade.

60.     Probation need not be a cash-collection tool. For example, Defendants have at their disposal the option to convert misdemeanor court and probation debts into civil judgments, which would allow the County to collect debts while observing constitutional and statutory safeguards.

61.     Defendants know these options exist: they occasionally terminate the probation of a person who has been on pay-only supervised probation for several years and permit the person's debts to be treated as civil judgments in accordance with Tennessee law. However, Defendants rarely use this option, choosing instead, as a matter of policy, to use threats, arrest, jailing, and endless cycles of supervised probation to extort payments from impoverished people.

### A.     The Contracts

#### 1.     CPS

62.     CPS signed its contract with Giles County on March 16, 2016, after PCC, Inc.— which operated in Giles for more than a decade until it was sued for materially the same policies challenged in this Complaint—left the private probation business.

63.     After PCC, Inc. left Giles, CPS moved into the former PCC, Inc. offices, began supervising PCC, Inc.'s former probationers, and hired PCC, Inc.'s former employees, including defendant Patricia McNair.

64.     The Contract between CPS and Giles County empowers the company to determine how much money a probationer must pay in supervision fees, surcharges, and court costs and on what dates in order to avoid a violation-of-probation arrest warrant or citation warrant being issued.

65.     The Contract requires the company to collect court debts and fees generated for the company and to decide how much of the money collected should be remitted to the court, and how much should be used to pay itself.  Ex. 1.

66.     CPS is also required by the Contract to prepare arrest warrants for violations of probation, confer with the judge and prosecutor about cases, provide testimony and evidence at revocation hearings, and decide whether and when to report non-compliance to the Court.

## 2.     PSI

67.     PSI has been providing private probation services in Giles County since at least December 14, 2011, when the County and PSI signed the operative Contract.  *See* Ex. 2.

68.     The Contract gives PSI the power to monitor, collect, and levy its own additional payments, enforce compliance with conditions, report non-compliance (including through sworn affidavits for arrest warrants and citation warrants), and confer privately with the prosecutor and judges on cases.

69.     In exchange, the County agreed to assign cases to private for-profit supervised probation with PSI.

## B.     The Companies' Practices Are Materially Indistinguishable

70.     The companies operate in the same way in all material respects.  The only apparent difference is that probationers with PSI make payments on their court debt directly to the court and pay only their probation fees to the company, while probationers with CPS typically pay their court debts to the company in addition to the probation fees.  CPS then remits some portion of those payments to the court.

71.     In pursuit of generating revenue for themselves and the County, all of the Private Defendants decide how much money a probationer owes to them each week to avoid violating their probation and how frequently the probationer must report and make payments; both companies monitor probationers' payments of court debts and probation fees, and both companies consider mere nonpayment of either court debts or probation fees to be a violation of probation that justifies revocation; both companies engage in a pattern and practice of threatening indigent probationers with arrest, jailing, and extension of supervised probation if they do not pay probation fees or court debts, refuse to submit to costly and invasive drug tests at the discretion of the companies, or do not comply with any of the companies' other vague and onerous conditions; and both companies file sworn affidavits with the court seeking warrants, informing the court that the person did not make payments as required, without first determining that the person willfully refused to pay, and even when they know the person did not pay only because she was too poor to pay.

C.     **The System of Private Probation in Giles County**

1.     **The Process for Assigning Misdemeanor Offenders to Private Probation**

72.     In Giles County, misdemeanor and traffic cases are typically handled in General Sessions Court. A person may plead guilty to a misdemeanor offense in the Circuit Court if the charge was originally filed as a felony.

73.     Individuals sentenced to probation are assessed a variety of fines (as punishment for the offense) and fees (which are used to pay for municipal services), court costs, and litigation taxes[14] without regard for the person's ability to pay.[15]

74.     A misdemeanor defendant is never told at the time of pleading guilty how much he or she will owe.  During one recent docket, a person who was pleading guilty asked the judge, "What are my costs and fines?"  The judge responded, "I don't know."

75.     A misdemeanor defendant is typically sentenced to either 11 months and 29 days in jail suspended for 11 months and 29 days of probation, or to six months in jail, suspended for six months of probation.  Sometimes the sentence includes several days or a month in jail in addition to the suspended sentence and probation.

76.     As a matter of policy, every person convicted of a misdemeanor offense in General Sessions Court is required to pay at least $25 every week toward their court debts as a condition of probation, regardless of ability to pay.  People convicted of misdemeanors in Circuit Court are required to pay at least $50 every month.

77.     In every General Sessions case, a pre-printed "Order" is entered at the sentencing hearing, purporting to find that every single misdemeanor probationer "stated in open court that he/she is financially capable of paying $25 per week."  But, the statements are coerced since people charged with misdemeanor offenses believe that they must agree to make payments, or else they risk being sentenced to jail instead of probation.

78.     Many misdemeanor defendants who state on the record that they are able to pay $25 each week are extremely poor.  Many of them survive only on social security disability

---

[14] Restitution—which is a payment made to a victim of an offense in compensation for the harm caused—is also sometimes required.

[15] Under Tennessee law, court debt may be collected in the same manner as a civil judgment.  *See* Tenn. Code Ann. § 40-24-105(a).

payments or other means-tested government benefits, and struggle to meet the basic necessities of life. They cannot in fact make the weekly payments without foregoing basic necessities or falling even deeper into debt.

79. Everyone involved in the process of assessing and collecting court debts, including the County and the Private Defendants, knows that the "Orders" purporting to find every person charged with a misdemeanor financially able to pay $25 per week are based, in many cases, on coerced statements: Defendants possess information about the probationers' finances, and are present in the courtroom when fees are assessed and the purported colloquy occurs, and many probationers were found indigent for purposes of appointing counsel.

80. In some rare cases, a person will ask for a lower weekly payment during sentencing, but these requests are routinely denied.

81. The sole General Sessions judge routinely threatens people he sentences to probation that if they do not pay, their probation could be revoked and extended, saying words to the effect of, "I don't want to see you back here on a violation, much less a violation for nonpayment."

82. In many cases, people owe so much money that they will be unable to pay it all off at a rate of $25 per week within the probation period.

83. Under Tennessee law, community service can be an alternative to a requirement to pay court costs. The County could suspend court debts upon the successful completion of community service, but community service is typically not affirmatively offered to impoverished probationers as an alternative to payment.

84.     Additional rehabilitative conditions of probation are rarely required. But when people are required to complete such classes as a condition of probation, the probationers must travel to and pay for them.

85.     Pursuant to the companies' contracts with the County, any misdemeanor offender who is sentenced to probation must be assigned to be supervised by either CPS or PSI.

86.     According to policy and practice, and by agreement or acquiescence of all Defendants, assignments to supervised probation alternate between each company so that each company is assigned approximately the same number of new probationers.

87.     In many cases, people are sentenced to a minimum period of supervised probation, during which time the person must report to the company, submit to drug tests any and every time the company decides to conduct them, and make regular payments of court costs and probation fees under threat of arrest and revocation. After the minimum period of supervision, the probation can be converted to unsupervised if all court costs and probation fees have been paid.

88.     In some cases, there is no required minimum period of supervised probation, and probationers are informed that they will be "supervised until paid in full." People who can afford to pay in full are permitted to pay their court costs at their first probation meeting, along with a $45 probation fee for the single visit, and then, if the person was assigned to CPS, the company will notify the court to convert the person's supervised probation to unsupervised probation. If the person was assigned to PSI, the Court Clerk's office is responsible for closing the probationer's account.

89.     Those who are sentenced to "supervised probation until paid in full" and cannot afford the full court debt must continuously report to the Private Defendants, submit to invasive drug tests, and pay supervision fees to the companies. They face arrest warrants, revocation,

additional fees, and extension of their for-profit supervised probation, and thus additional supervision fees, if they have not paid all of their court costs and probation fees by the end of their probationary period.

### 2. Conditions of Probation

90. Upon assignment to supervised probation, probationers are required to have an initial meeting with a CPS or PSI representative present in the courtroom.

91. In General Sessions Court, Defendants Bledsoe and McNair sit at desks to the right of the judge's bench while the court is in session. On their desks are stacks of documents entitled "Misdemeanor Sentence." These forms are pre-signed by the General Sessions judge. On the day of conviction, the probation officer will check off applicable conditions of probation, including the amount of money the person must pay each week in court costs, and the amount she must pay each month as a supervision fee to the company, and any "special conditions," such as classes provided by third party contractors who charge a fee.

92. If a probationer cannot afford to pay the fee required for the class, then she cannot take the class. If a person does not take the class, she cannot satisfy the conditions of her probation, and her probation will be revoked and extended. As a matter of policy, the County and the companies do not provide any mechanism for waiving the fee.

93. The forms also indicate how frequently the probationer must report, and whether she must report in person or by phone. One of the individual Defendant probation officers fills out the portion of the forms relating to the probationer's reporting requirements at her own discretion.

94. Probationers are also required by Defendants McNair and Bledsoe, and previously by Defendant Thompson, to sign a company-specific, standard document agreeing to abide by general "Rules" of probation.

95. A set of these Rules were designed by each company and agreed to by the County.

96. CPS requires probationers to agree to each of the following conditions on penalty of arrest and revocation of probation for failure to obey:

     a. To pay all court debts and probation fees.

     b. To "[p]ay probation fees, and drug screen fee as instructed";

     c. To submit to random drug tests and pay for them;

     d. To "make a full and truthful report to my probation officer . . . as directed by the officer . . .";

     e. To avoid consuming any "intoxicants"; and

     f. To notify the private probation company "BEFORE changing my address or employment."

97. The document distributed to people assigned to CPS supervision listing the Rules is entitled "Probation Order," which gives it the imprimatur of the court. However, it is signed only by the private probation officer and the probationer. It states that "[v]iolation of any of the terms of Probation may be sufficient cause for revocation of Probation."

98. PSI's rules are similar. They require probationers to agree to abide by each of the following conditions on penalty of arrest and revocation of probation for failure to obey:

     a. To pay probation fees "in a timely manner";

     b. To submit to random drug tests "as required by the probation officer" and to pay for those tests;

     c. To permit any for-profit probation officer and any law enforcement officer to search their bodies, homes, cars, and personal belongings at any time, in any place, and without a search warrant;

d.    To "not keep late or unusual hours";

e.    To "not associate with any person who is known to be involved in criminal activity";

f.    To not leave the State of Tennessee without the for-profit probation officer's permission;

g.    To "not use any alcoholic beverage to the point that you may be arrested or charged with a criminal offense"; and

h.    To notify the private probation company "before changing address or employment."

99.    The County and the companies require probationers to agree to submit to and pay for suspicionless drug tests at any time, even when their underlying charge has nothing to do with drugs or alcohol, and even when the person has no history of substance abuse.  Refusing to take a drug test constitutes a violation of probation.

100.    The companies charge for the drug tests, and the cost gets added to the probationer's debts to the company.  The company charges orders of magnitude more for each portable drug test than the company spends, making drug testing one of the most profitable aspects of the companies' business.

101.    Although CPS writes in its rules that it charges $45 every six months for drug tests, many probationers are charged for every single drug test, which occur much more frequently than once every six months.  The cost of each drug test varies.  Probation officers typically charge $35 or $45 per test, but sometimes they will accept $20, and sometimes they will require the probationer to pay as much as $90.

102.     PSI also exercises its discretion to charge varying amounts for drug tests, typically ranging from $20 to $45.  The company sometimes charges for every drug test, and other times charges a lump sum for some period of time, regardless of the number of drug tests actually conducted during that time period.

103.     The companies use drug-testing kits, which they administer in the office, that purport to provide immediate results without laboratory analysis.

104.     If probationers wish to have the results of the in-office test verified by a lab, as a matter of each company's policy, the probationer must make another payment to the private company, which sends the sample to a lab for the confirmatory test.  In at least one case, CPS charged a probationer $120 for the confirmatory testing.

105.     The Private Defendants drug test probationers more frequently near the end of their supervised probation periods because they can earn significantly more profit if there is a reason to revoke and extend the person's supervised probation: by increasing drug tests—and charging the associated fees—just as someone's probation is about to end, the companies make it more likely that the person will violate a condition of probation by testing positive for drugs, refusing to submit to the drug test, or being unable to pay for the drug test, and their probation will be revoked and extended, resulting in more fees for the company.

106.     If a probationer who is being supervised by PSI tests positive in a drug test for the first time, then Defendant Bledsoe (and previously Defendant Thompson), in her discretion may permit the probationer to pay for and participate in a 12-hour drug education class—which costs $75—to avoid a violation-of-probation warrant.  The amount is not waivable.

107. If the person cannot afford to pay for the class, then she cannot take it, and Defendant Bledsoe (and previously Defendant Thompson) will seek an arrest warrant for violation of probation.

### 3. **Reporting**

108. Both companies run their Giles County probation operations out of offices located within a block of the Giles County Courthouse in Pulaski.

109. CPS has one primary reporting day for adult probationers each week, and most CPS supervised adult probationers are required to report to their probation officer on that day.

110. Probationers assigned to PSI report throughout the week, except Thursday, when Defendant Bledsoe is in court for the misdemeanor docket.

111. The companies decide how frequently a person must report and whether they must report in person or by phone. The companies typically require probationers to report every week, every other week, or every month.

112. The probation officers routinely allow a person to report less frequently if she has been making regular payments.

113. But if a probationer cannot make payments, or the probation officer decides in her discretion that the payments are too small, the private probation officer routinely requires the person to report more frequently.

114. The main purpose of each probation meeting is for probationers to make payments to the probation officer.

115. Non-reporting is deemed to be a violation of probation, and the company employee, in her discretion, can seek an arrest warrant, which she knows will have either a predetermined secured monetary bail amount or an instruction to "hold" the arrestee, i.e., to detain the arrestee in jail until her court date, or otherwise notify the court of non-reporting.

116.	Pursuant to policy and practice, during the meetings, the probationer reports the amount she paid to the company that day, and is asked to report any contacts with law enforcement. As a matter of policy, Defendants Bledsoe and McNair—and previously Defendant Thompson— make no investigation or inquiry into the reasons that a person does not report and, when probationers offer reasons, Defendants ignore them.

117.	The supervision meetings typically last only five minutes, or sometimes ten if the private probation officer decides to require a drug test.

118.	For those who report to CPS by phone, the company's written rules instruct individuals to simply "LEAVE VOICE MAIL" that covers four things: (1) the probationer's name; (2) contact information and employment status; (3) whether the probationer has had contact with law enforcement (if yes, then "when and where"); and (4) whether the probationer has sent in a payment to CPS and if not, then when the person intends to pay.  There is no option to speak with a probation officer instead of leaving a message.

119.	PSI tells probationers it supervises by phone that they must fax in a form every week or every other week and must call at the same interval on Wednesdays or Fridays to speak with an employee.  The form requires the probationer to state her name, address, place of employment (if employed), and whether she has been arrested or "questioned" by police since her last reporting date.  The form also requires the probationer to state when she will pay the court and how much, and to state when she will pay PSI the supervision fee.  The probationer must state whether she is "familiar with all conditions/rules of my probation" and attest as to whether "except where noted above, and [sic] have fully obeyed them."

### 4. Defendants Threaten Probationers with Arrest and Jailing for Nonpayment

120.    The for-profit probation officers tell the probationers they supervise that they must make regular payments of probation fees and surcharges to the company supervising them and must also make regular payments on their court costs.

121.    If the probationer is behind on her payments, the probation officer will threaten her with arrest, jailing, revocation, and/or extension of supervised probation, telling her that she will be "violated" if she does not bring enough money the next time, or the probation officer may inform the probationer that a citation warrant or an arrest warrant has already been issued or will be issued for nonpayment.

122.    As a matter of policy and practice, the Private Defendants tell probationers that, if they violate their probation, they could be sent to jail for the entire suspended sentence of 11/29 following even a first or second violation.

123.    Sometimes, the probation officer's threats are subtler or implicit.  Defendants Bledsoe and McNair, and previously Defendant Thompson, sometimes inform probationers simply that they "must pay" a certain amount of money at their next meeting, or they inform them of the total amount due before the end of the 11/29 term of probation, meaning that if the probationers do not pay the amount required, they will be arrested and their probation will be revoked and extended.

124.    The private probation officers have discretion to seek warrants for nonpayment when a person does not pay whatever amount the probation officer demands.  They tell probationers that they will be "violated" if they do not pay.

33

125.   The Private Defendants often tell probationers that they will extend the probationers' probation to allow more time to pay, instead of requiring the probationer to serve her entire suspended sentence in jail.

126.   Probationers must also pay for the drug tests the companies require them to submit to, and the company employee can require probationers to be tested for drugs any and every time they report.

127.   Under federal and Tennessee law, only willful nonpayment can constitute a violation of probation.[16]  As a matter of policy and practice, the companies train their employees not to inform probationers of this law and their basic rights.  Defendants routinely threaten to seek violation-of-probation warrants for probationers who are too poor to make a payment, or whose payments fall short of what the probation officer demanded, without verifying that the nonpayment was willful.

128.   The Private Defendants know that the probationers they supervise are impoverished because the companies require probationers to state their source of income on company intake forms.  Many probationers report that they are unemployed, have no income, rely on friends or family for housing and financial support, or have income only from public benefits such as unemployment, veteran's benefits, disability, or food stamps.

129.   Many probationers divert their food stamps and disability checks to pay their court debts and probation fees.  Many miss rent payments and go without heat or electricity for their homes, gas for their cars, and food for themselves and their families in order to pay their court debts and probation fees.

---

[16] *See supra* note 5.

### 5. Defendants Refuse to Waive Fees and Costs

#### a. CPS waiver process

130.    The CPS Probation Rules state, "Please DO NOT ask the Probation Officer to change the amount of your payments or the date the Judge ordered you to pay your cost by, because only the Judge can make those type of changes."

131.    Notwithstanding this written admonition, CPS does have a "Supervision Fee Exemption Form" that probationers can complete—although the company, as a matter of policy and practice, never affirmatively offers the form. Sometimes, Defendant McNair, at her discretion, provides the form when a probationer specifically asks for it. Other times, Defendant McNair or another CPS employee tells the probationer that no such form exists, or that the company has no power to waive costs and fees.

132.    The form requires the probationer to provide amounts paid per month toward various "Bills." The form asks for the probationer's income per month, but not whether the probationer receives government benefits, is employed, unable to work, or whether she must support children or other family members.

133.    The form also asks for the probationer's spouse's income, as well as "Other Forms of Income (boyfriend, girlfriend, child support, food stamps, etc…)." The form then requires that these sources of income be added together to reach a "Total Average Income Per Month" from which the probationer's "Total Average Bills Per Month" will be deducted to determine the "Average Balance Left Per Month."

134.    Although they are under no legal obligation to do so, in practice, friends and family of probationers, who are often themselves living in poverty, frequently contribute whatever money they have to help pay the companies so that the probationer can avoid being arrested and jailed for not paying. The "fee exemption" form allows an individual probation officer to recommend

various outcomes to the "Probation Manager," including that the waiver be disapproved, that the person's fees be reduced, that some of the person's fees be waived, or that the "balance owed" be waived (presumably the person would incur additional probation fees going forward).

135.    Over the course of an 18-month investigation, including interviews with more than one hundred people supervised by CPS, undersigned counsel has not encountered any CPS probationer whose court debt or probation fees were reduced or waived by the company.

### b.    PSI Waiver Process

136.    PSI similarly fails and refuses, as a matter of policy, to inform probationers about the option of seeking a fee waiver or reduction.

137.    If a probationer who is being supervised by PSI requests a fee waiver or reduction form, Defendant Bledsoe, and previously Defendant Thompson, sometimes provide, in her discretion a lengthy, 10-page "Application for Indigency."

138.    The form requires that the probationers provide detailed information about their income and assets, and the income and assets of any other members of their household, and that the probationer provide various documents including an identity card, proof of housing costs, proof of immigration status ("not required if you were born in the US"), and proof of earned income. The Application further requests proof of "Unearned Income," such as award letters showing proof of social security, veteran's, unemployment, or retirement benefits.  Probationers may also be required to produce "proof of pregnancy and due date if someone in your household is pregnant." The company's General Manager determines whether to waive fees.

139.    The onerous documentation requirements function as a deterrent for probationers, many of whom do not have stable housing or filing systems for the paperwork the company demands.  Additionally, the time and expense (e.g. gas money) required for gathering the documents can function as a further deterrent.

140.    The probationer then submits the form and supporting documentation to her probation officer, who sends it to the PSI Headquarters in Cookeville for review.  Defendant Bledsoe, and previously Defendant Thompson, state that they have no authority to waive the fees themselves.

141.    It can take weeks or months for a waiver decision to be made.  In the meantime, the probationer is required to continue reporting and making payments.

142.    Before any fees will be waived, the probationer must pay for and pass a drug screen according to PSI policy.

### c.    The County Refuses to Waive Costs and Fees

143.    According to the clerk's office, there is no mechanism to ask the General Sessions judge to reduce or waive fees.  One clerk explained, "Otherwise, everyone would do that."  Instead, when someone gets to the end of their probation and has not paid everything they owe to the court and the company, the person's probation is extended, and additional costs are assessed against the probationer.

### D.    The Process for Notifying the Court of Alleged Non-Compliance

144.    The companies have a financial stake in using alleged rule violations to extract more payments from probationers.  They have an incentive to use the reporting and revocation process to maximize their revenues.

145.    They also have a financial stake in advising the judge to issue violation-of-probation warrants and to revoke and extend the person's probation.

146.    The Private Defendants have the power to manufacture "probation violations" by setting rules and then claiming that a probationer broke those rules, or by interpreting vague standard rules and conditions in a way that generates a violation.

37

147. The companies rely on the vagueness of the rules and conditions to threaten probationers and create a culture of fear in which probationers believe that the company can find a way to "violate" their probation whenever it wants if the company wants more money.

148. The companies use their control over the process of notifying the court of alleged violations to overlook certain violations—i.e., a positive drug screen—if a person is making payments to the company, and to threaten other people that, if they do not pay, the company will use its discretion to petition the Court for revocation for a technical violation if they do not come up with money.

149. Company employees are also authorized to recommend that the court issue an arrest warrant with a secured financial condition on it or with a "hold" on it (requiring the Sheriff to detain the arrestee prior to a probation-revocation hearing), or to request that the person be released without an up-front payment prior to a revocation hearing.

1. **When the Alleged Violation Is Solely Non-Payment**

150. Probationers placed on PSI and CPS supervised probation are told from the moment they are placed on probation that payment is a required condition of probation.

151. Probation orders for CPS explicitly state that "[f]ailure to pay court cost as instructed at any time by the Probation Officer or the Court can result in a violation of probation."

152. The private probation officers have discretion to violate a person for nonpayment the first time she does not pay the amount the company demands, and to seek a citation or arrest warrant.

153. They also have discretion to accept a partial payment of the amount required or give the person time to come up with the money instead of seeking a warrant.

154.     The Private Defendants regularly threaten probationers in person that they will inform the court of their nonpayment and ask the court to issue a warrant if the probationer does not make a payment, or if the payment is not big enough.

155.     The companies have a policy of not informing probationers that, under Tennessee and federal law, their probation cannot be revoked unless nonpayment is willful.

156.     Perversely, the Private Defendants view probationers who receive monthly public benefits as a steady stream of income and frequently tell probationers that they will delay "violating" those probationers until after their disability checks arrive, giving the probationers an opportunity—by using money from their means-tested public benefits payments—to make a payment to the company and avoid arrest.  (Federal law prohibits the Defendants from explicitly garnishing such federal benefits.)

157.     Defendant private probation officers frequently tell probationers that revocation and extension for another term of "user-funded" supervised probation is the common penalty for nonpayment of court debt and probation fees.

158.     To report a violation for nonpayment, the companies seek warrants from the courts.

159.     General Sessions Court issues citation warrants which do not authorize arrest. Instead of being arrested, the person will be told to report to court the following Thursday for the misdemeanor violation-of-probation docket.

160.     Circuit Court warrants for nonpayment authorize arrest, and employees of the Giles County Sheriff's Office routinely arrest and jail people who are alleged by the private companies to have violated their probation solely by not making payments while on supervised probation out of Circuit Court.  These arrest warrants include a preset money bail amount, printed on the arrest warrant.

39

161.     Company employees often seek arrest or citation warrants for nonpayment as a means of coercing additional payments from probationers: probation officers inform probationers that a warrant has issued, but tell the probationer that they will have the warrant recalled if the probationer makes the payment in full.

162.     When a probation officer asks the court to recall a warrant because a probationer has paid whatever amount the company demanded, the court always recalls the warrant.

163.     The Private Defendants have a pattern and practice of threatening to seek probation-violation warrants based solely on nonpayment.

164.     Defendants use the Circuit Court arrest warrants for nonpayment to "send a message" to other probationers that they must pay or the same thing (arrest and jailing) will happen to them.

165.     When probationers are arrested—even just for nonpayment—their mugshots typically appear in the local paper, Hard Times, which is sold at gas stations.  Friends, family members, neighbors, and coworkers of probationers often find out about arrests and probation violations this way.

### 2.     When the Alleged Violation is Non-Compliance with a Substantive Condition of Probation

166.     Arrest warrants for alleged violations other than nonpayment typically have a monetary amount preprinted on them that must be paid before the probationer can be released following arrest.

167.     The companies and their employees know that arrest warrants for alleged violations of probation are typically issued with a secured financial condition of release pre-printed on the warrant and determined without an individualized inquiry into the arrestee's ability to pay.  The companies and their employees also know that the County has a policy of detaining arrestees who

cannot afford the money bail amount for up to ten days before bringing them to court for a probation-revocation hearing and that, as a result, arrests for alleged violations of probation routinely result in the person's lengthy confinement before any opportunity to contest the for-profit probation officer's allegations of a violation of probation.

168. Because the vast majority of probationers are impoverished and struggle to pay for basic necessities, many remain in jail following an arrest for an alleged violation of probation.

169. After a warrant issues, the Private Defendants routinely instruct probationers to avoid the town of Pulaski—except for when they have to come to the probation office to make payments—as a way of evading arrest by law enforcement officers. The companies also instruct probationers, however, to continue to make payments on their probation fees. In this way, the companies continue making money while the person waits to be arrested or prepares to surrender to the jail.

170. When the alleged violation is anything other than nonpayment, probation officers make sworn statements to the court alleging that a violation occurred and petitioning the Court to issue an arrest warrant—which the court always does. These violation-of-probation arrest warrants usually have monetary bail amounts on them. Sometimes they say "Hold," meaning that the person will be detained after arrest until she is taken to court.

171. If a probationer-arrestee is permitted to pay a monetary bail amount to secure release and can afford it, she will be released and ordered to return to the court on a Tuesday for a "first appearance." If she cannot afford the bail amount, or if she is being detained, the probationer-arrestee will be taken to court on a Thursday, typically within 10 days of her arrest. On Thursdays, the General Sessions judge conducts violation-of-probation "hearings": typically, the prosecutor

confers with the public defender or with the probationer herself (if she elected to proceed *pro se*), the parties complete plea paperwork, and the judge accepts the guilty plea.

172.    As a result of these policies and practices, if a person is arrested on a Thursday afternoon and she cannot afford to pay the money bail amount predetermined on her warrant, or if she is ordered detained, she will be kept in jail until Thursday morning without access to a lawyer, without an opportunity to seek less restrictive non-financial conditions of release, and without an opportunity to contest the allegations made by the private company that has a financial stake in the person's arrest, detention, and revocation.

173.    Probationers have good reason to fear detention in the Giles County Jail.  The jail is an abusive, dangerous, and unhealthy place. Guards have referred to women inmates as "dogs," and inmates routinely receive only two, nutritionally inadequate meals each day.  The jail is so overcrowded that people often sleep on the floor.  At least one probationer was recently confined with four other women to a jail cell meant for two.

174.    Jail officials often withhold medication from inmates, even when the medicine is prescribed and the inmate herself has provided the medication to the jail to dispense.

**E.    Revocation Proceedings**

175.    Probationers who are arrested for allegedly violating their probation and who were unable to pay money bail to secure release are transported from the jail to the Giles County courthouse in orange jumpsuits and shackles.  Arrestees who were able to pay the money bail required for release also appear on that docket.

176.    In the General Sessions court, probationers who are in County custody are seated in the courtroom behind a one-way panel that enables them to see the courtroom, while no one in the courtroom can see them.

177.     Probationers accused of violating their probation will be given a few minutes to consult with a public defender if they wish.

178.     Often a person can get out of jail that day if she agrees to revocation and extension of her supervised for-profit probation term.

179.     The individual private probation officer defendants sit in the courtroom at tables next to the judge during court proceedings, including probation-revocation proceedings.

180.     The contracts explicitly permit the companies to confer with judges, court staff, and the County prosecutors on individual cases.

181.     Company employees engage in *ex parte* conversations about probationers with judges and prosecutors before, during, and after revocation-of-probation hearings, including recommending revocation, recommending a particular sentence, and offering evidence, which routinely consists solely of the probation officer's allegations.

182.     The for-profit probation officers provide testimony and make recommendations about the appropriate disposition of a revocation hearing, including urging the judge to sentence the person to jail and extend the person's term of for-profit supervised probation.

183.     The companies' allegations are routinely the only basis provided to support revocation.

184.     During revocation proceedings, company employees routinely withhold the true reasons for the violations the company has alleged.  In particular, they routinely withhold relevant material information and evidence concerning ability to pay.  For example, as they do with applications for arrest warrants, company employees withhold from the judge the fact that the person did not pay because the person could not afford to pay.

185.     The Private Defendants typically recommend some time in jail in addition to extension of supervised probation for every violation of misdemeanor probation. These penalties help the companies ensure that their threats to jail probationers who do not pay enough money are credible and help to convey to probationers that the company is correct when it describes the influence that it wields over the local probation system.

186.     Arrests and revocation lead to additional court debts being added to the probationers' existing debts.

187.     As a result of Defendants' policies and practices, probationers end up on supervised probation with a private company for years because they cannot afford to make payments.

188.     It is the policy, pattern, and practice of the Private Defendants and Giles County not to inform probationers that their ability to pay is a critical issue at any revocation proceeding concerning their nonpayment. As a result, their probation is revoked and extended without anyone ever determining that nonpayment was willful.

**F.     When a Person Pays Her Debts in Full**

189.     Desperate to get off of supervised probation, probationers will sometimes use their tax refunds, an entire social security check, payday loans, money from selling blood plasma, proceeds from selling personal items, or money loaned from family and friends to pay off their debts to the company and the court.

190.     PSI and CPS have different policies and practices that apply when someone has paid her court debts in full.

191.     The supervised probation of a person who is being supervised by CPS will not end unless and until the company itself decides to convert the person's supervised probation to unsupervised.

192.     When a person pays off her debt in full, CPS issues an "Order" informing the probationer that her supervised probation is over and that she is now on unsupervised probation. These "Orders" are signed only by the individual CPS employee. No judge reviews the decision to convert a person's supervised probation to unsupervised. And the judge does not sign the "Order."

193.     When CPS converts an individual's probation from supervised to unsupervised, the probationer is no longer required to report to the company, pay additional fees to the company, submit to costly drug tests, or suffer additional restraints on her liberty imposed by the company.

194.     The final decision to make this conversion rests entirely with CPS, which has a direct financial stake in delaying conversion.

195.     Because people who are supervised by PSI make payments on their court debts directly to the court clerk, the clerk's office knows before PSI does when a person is eligible for unsupervised probation. When that happens, the clerk's office notifies PSI, and PSI puts a "hold" on collection of the supervision fees. The person is no longer required to report to PSI or to submit to the company's conditions of probation.

196.     Giles County's contractual agreements with the Defendant companies have turned the Giles County misdemeanor probation system into a mechanism for generating profit for private benefit and coercing collection of court debts for the County in a way that violates Tennessee and federal law governing debt collection.

197.     Pursuant to the Contracts, financial incentives permeate every decision made before and during the probation period, leading to systemic violations of Plaintiffs' fundamental rights.

198.     The Private Defendants earn hundreds of thousands of dollars from this extortion scheme each year. The County collects hundreds of thousands in court debts each year.

## VI.   PLAINTIFFS ARE SUBJECTED TO DEFENDANTS' UNCONSTITUTIONAL FOR-PROFIT PROBATION SYSTEM

### A.   Plaintiff Karen McNeil

199.   Karen McNeil is 53 years old and lives in Giles County with a friend in a mobile home outside of Pulaski.  She has four adult children.

200.   Ms. McNeil was subjected to supervised probation with CPS from March 2016 until October 2017.  She was previously supervised on probation by PCC, Inc. from November 2015 until March 2016.  For the entire period of supervised probation with both CPS and PCC, Inc., Defendant McNair was the probation officer to whom Ms. McNeil primarily reported.

201.   Ms. McNeil has an eighth grade education.  She cannot read or write at an adult level and is functionally illiterate.

202.   Ms. McNeil lives in poverty and struggles to meet the basic necessities of life.  She has no bank account, real estate interest, or other assets.  She depends on Supplemental Security Income ("SSI") and food stamps to survive.

203.   Ms. McNeil is not employed.  She last worked about twenty years ago, as a traffic flagger.  While on the job, she was hit by a truck and sustained severe back injuries that have prevented her from working regularly ever since.  Due to her medical conditions and the accident, Ms. McNeil suffers from serious chronic pain.

204.   Ms. McNeil faces additional health challenges that impede her day-to-day life, including chronic obstructive pulmonary disorder ("COPD"), cancer, and fibromyalgia.  She has had multiple major surgeries.  At times, she must use an oxygen tank and a cane for walking.

205.   Ms. McNeil pled guilty on November 19, 2015 to driving on a revoked license, a misdemeanor offense, and was sentenced to probation for 11 months and 29 days, with a minimum of four months' supervised probation.  The Court assessed $426 in fines and fees and ordered her

to pay $25 each week in court costs and fines, $45 a month in supervision fees, and $45 for each drug test.  After four months, Ms. McNeil's supervised probation could have been converted to unsupervised probation, but only if her court costs and probation fees were paid in full.

206.     At no point was Ms. McNeil ever able to afford these payments without sacrificing the basic necessities of life.

207.     Throughout Ms. McNeil's probation—whether the company supervising Ms. McNeil was PCC, Inc. or CPS—she endured Defendant McNair's perpetual threats of arrest and jailing for nonpayment.  Ms. McNeil lived in constant terror that she would be arrested and, given her serious medical issues, she reasonably feared she would die if sent to jail.

208.     Defendant McNair repeatedly forced Ms. McNeil to undergo invasive and humiliating drug tests throughout her probation with CPS.  Pursuant to company policy, during each drug screen, Defendant McNair forced Ms. McNeil to leave the bathroom door open while Defendant McNair observed Ms. McNeil urinating into a cup to produce a sample to be tested. Anyone walking down the hallway could see Ms. McNeil urinating.  On one occasion, Defendant McNair invited a male CPS employee to watch Ms. McNeil urinate.

209.     CPS required Ms. McNeil to pay $45 for each drug test.  Because she could not afford that amount up-front, it was added to the total debt owed to CPS.

210.     On April 19, 2016, while on supervised probation solely because Ms. McNeil had been unable to pay her court costs and fines in full, Ms. McNeil was arrested for a misdemeanor offense.

211.     The following day, in accordance with CPS company policy, Defendant McNair filed an affidavit, swearing to the court that Ms. McNeil violated a condition of probation because she was "charged and arrested" for a new misdemeanor offense.  A violation-of-probation arrest

warrant was issued, stating that a $1,000 money bail amount, predetermined without an inquiry into or findings concerning her ability to pay, would be required for Ms. McNeil's release following arrest.

212.    While Ms. McNeil was in jail, Sheriff's deputies served the violation-of-probation warrant. On April 23, a friend signed a contract with a commercial bonding agent to secure Ms. McNeil's release.

213.    On April 28, 2016, Ms. McNeil pled guilty to the new misdemeanor offense and to the alleged violation of probation. Ms. McNeil was sentenced to 45 days in jail for violating probation, and a concurrent 30 days in jail for the new offense. She was informed that her probation would be reinstated after she completed 45 days in jail.

214.    While Ms. McNeil was in jail serving the sentence, jail employees refused to administer Ms. McNeil's prescription pain medication. They told her that her only option would be to purchase two ibuprofen pills for two dollars at the commissary. She could not afford the medicine. Ms. McNeil attempted to seek help from a nurse, but the guards required her to fill out a "nurse request" form, which Ms. McNeil could not do on her own given her limited reading and writing abilities. The guards refused to help her complete the form, made fun of her, and called her "stupid" because she could not read or write.

215.    Due to overcrowding, Ms. McNeil had to sleep on the floor of her jail cell, which aggravated her chronic back pain.

216.    When she was released from jail, her for-profit supervised probation was reinstated, and she incurred additional court costs and fees.

217.    Because she was so afraid of being arrested and jailed for nonpayment, throughout her entire term of supervised probation, Ms. McNeil often chose to pay the company rather than

purchase the medication she needs to treat chronic pain, pay her electricity bill, or pay rent. Ms. McNeil's electricity was shut off because she made payments to CPS instead of paying her utility bill. She became homeless in significant part because she paid the company instead of her rent. Ms. McNeil slept in a tent by a creek in July 2016.

218.    During a probation meeting after losing her home, Ms. McNeil told Defendant McNair that she was sleeping by the creek. Defendant McNair demanded money anyway, saying, "We still gotta have payment."

219.    After about three months of homelessness, Ms. McNeil found a place to live.

220.    Throughout all of this, Ms. McNeil continued to report to CPS. But because Ms. McNeil's driver's license is suspended due solely to her inability to pay court costs, she cannot lawfully drive. She therefore sometimes walked over a mile with her oxygen tank, including on hot summer days, to the CPS office.

221.    Ms. McNeil missed some appointments around that time because she could not find a ride and was unable to walk all the way to the probation office because of her disability. When she was unable to report in person, she called the office, but no one answered the phone or returned her messages.

222.    In October 2016, Defendant McNair again sought a violation-of-probation arrest warrant, alleging that Ms. McNeil did not report on four occasions and did not "pay all required supervision fees, court fines and court cost." Defendant McNair did so even though she knew that Ms. McNeil was living in desperate poverty, could not afford the costs and fees, and was physically unable to walk to the probation office or to find someone to drive her.

223.    The violation-of-probation arrest warrant stated that Ms. McNeil would be required to pay a predetermined secured financial condition of $1,500 to secure release.

49

224.	After the warrant issued, Defendant McNair told Ms. McNeil that there was an active warrant for her arrest, and instructed Ms. McNeil to "stay low" to avoid law enforcement, but also insisted that Ms. McNeil continue to make payments to CPS by mail.

225.	Defendant McNair told Ms. McNeil that she would "get the judge to dismiss the charges" if Ms. McNeil paid all of her fees and debts to CPS.

226.	On November 15, 2016, Ms. McNeil was arrested on the violation-of-probation arrest warrant and kept in jail for one day before a friend loaned her the money to pay the bond amount.

227.	On December 22, 2016, Ms. McNeil appeared in General Sessions court for a probation-revocation hearing and pled guilty to the alleged violations, including nonpayment of fees and costs. Ms. McNeil's probation was revoked without any inquiry into the reasons for nonpayment or her ability to make payments. She was sentenced to another 45 days in jail for nonpayment and non-reporting, followed by an extension of probation for six months, until June 22, 2017, including supervision by the private company "until costs/fines paid in full," and the addition of more costs and fees.

228.	Ms. McNeil continued to report to probation, and the company continued threatening her with arrest and jailing if she did not make payments. Because she was scared of being sent to jail again for nonpayment, Ms. McNeil paid the company instead of her rent.

229.	In March 2017, because she made payments to CPS, she could no longer afford the rent where she had been living and moved into a one-room mobile home with a friend and another roommate. After a few months, Ms. McNeil moved in with another friend, who lives in a different mobile home.

230. Throughout her probation, Ms. McNeil repeatedly told Defendant McNair that she was struggling to pay for food, housing, utilities, and other basic necessities and could not afford the payments required. In response, Defendant McNair told Ms. McNeil to "go pick up cans" to pay her court debt and fees.

231. During an April 2017 reporting date, Defendant McNair threatened Ms. McNeil with "ninety days in jail" if she did not pay, warning Ms. McNeil that she might seek an arrest warrant before Ms. McNeil's probation ended, since "it looks like you won't have it paid."

232. Neither Defendant McNair nor anyone else at CPS ever informed Ms. McNeil that she could seek a waiver or reduction of her payments or that it violates the law to seek revocation of probation solely for nonpayment. In fact, when Ms. McNeil asked Defendant McNair to waive her supervision fees because she could not both pay the company and also pay for basic necessities, Defendant McNair told her that she had no power to waive or reduce the fees. Ms. McNeil asked Defendant McNair if the court could waive or reduce her payments, and Defendant McNair told her that was not possible.

233. Throughout her probation, Ms. McNeil was terrified that she would be arrested and jailed. Every time a car pulled up to her trailer, she would startle, fearing that the police had arrived to arrest her for nonpayment.

234. On May 2, 2017, Ms. McNeil made a $120 payment to CPS, which she scraped together from her social security disability benefits and money from friends. Defendant McNair, in her discretion, allocated $60 of the payment to supervision fees and $60 to court debts (with a remaining balance of $265). Defendant McNair wrote on Ms. McNeil's payment receipt that Ms. McNeil would owe more than $500 the next time she reported, and told Ms. McNeil that she would

seek an arrest warrant if Ms. McNeil did not pay the full amount by the end of her probation period in June.

235.     On June 6, 2017, Ms. McNeil reported to CPS.  When she arrived at the company's office, Defendant McNair told Ms. McNeil to submit to a drug test and instructed a male CPS employee to accompany Ms. McNeil to the bathroom to observe Ms. McNeil urinate.  After Ms. McNeil submitted to the drug screen, Defendant McNair told Ms. McNeil that she had tested positive for a controlled substance.

236.     On June 30, 2017, Ms. McNeil attended her son's graduation from a G.E.D. program.  He was incarcerated at the time, so she went to the jail for the ceremony.  When Ms. McNeil arrived at the jail, Giles County Sheriff Helton told her that a warrant had been issued for her arrest.  The violation-of-probation warrant was based on CPS's allegations that Ms. McNeil tested positive for drugs and did not pay $215 in court costs.  (It is unclear how the company calculated that Ms. McNeil owed $215 in court costs given that a receipt from June 6, 2017 states that Ms. McNeil paid $60 and had a "balance" of $265.)  He told Ms. McNeil to return to the jail the following day, which she did.

237.     On July 1, Ms. McNeil was booked into the jail because she could not afford to pay the $2,500 secured financial condition of release that was pre-printed on the violation-of-probation arrest warrant.

238.     Ms. McNeil was released later that day after a friend paid a $300 nonrefundable fee to a commercial bonding agent who then posted her bond.  Ms. McNeil used about half of her next disability check to repay her friend.  As a result, Ms. McNeil could not afford some of her medications or any of her probation fees that month.

239.    A jail employee told Ms. McNeal to appear in court for the alleged violations of probation on July 27, 2017.  At that court date, she was told to come back on August 17, 2017.  Defendant McNair told Ms. McNeil to continue reporting and paying probation fees in the meantime.

240.    On August 17, 2017, Ms. McNeil appeared in court for a violation-of-probation hearing.  Her probation was revoked, and she was sentenced to 65 days in jail.

241.    Upon her release from jail, the County and CPS finally released her from probation.

242.    CPS, McNair, and the County knew at all times that Ms. McNeil was impoverished and that her only income came from social security benefits: Ms. McNeil provided her financial information to CPS repeatedly on forms and during meetings, and to the court when she sought appointed counsel.

### B.    Plaintiff Lesley Johnson

243.    Lesley Johnson is a 35-year-old single mother of two children, ages 11 and 13.  She lives in Mississippi, and previously lived in Baldwin County, Alabama, where she resided during the period she was on CPS probation.

244.    Ms. Johnson performed manual labor for a Mercedes-Benz factory in Giles County.  She lives paycheck to paycheck and struggles to provide basic necessities for herself and her children.

245.    In 2015, Ms. Johnson received a traffic ticket in Baldwin County, Alabama.  She was unable to pay the ticket, and her driver's license was suspended as a result.

246.    On September 6, 2016, Ms. Johnson was charged in Giles County with driving on a suspended license, a misdemeanor offense.  She was found indigent and legal counsel was appointed.  Ms. Johnson was assessed a $100 "public defender fee" and a $50 fee for the "attorney indigent admin fee."

247.    On February 9, 2017, Ms. Johnson pled guilty.  She was sentenced to six months of probation, assessed $331 in court debt, and assigned to CPS for supervision "until paid in full," meaning that as soon as she paid her court costs in full, her supervised probation would be converted to unsupervised probation.  Because she could not afford the payments, she was subject to all of the conditions of supervised probation throughout her entire probation term.

248.    On the day she was sentenced, Ms. Johnson was told to speak with Defendant McNair, who was seated in the courtroom at a desk labeled "CPS, LLC" to the right of the judge. Defendant McNair instructed Ms. Johnson to bring $45 for a supervision fee, $35 for a drug screen, and $25 for court costs to her first probation reporting date, "or it will be a violation."  Ms. Johnson believed that a "violation" would mean jail time.

249.    Ms. Johnson began reporting as required every two weeks and made whatever payments she was able to make whenever she could.  Her probation meetings lasted less than ten minutes.   At each meeting, she completed paperwork about her employment, and Defendant McNair asked her for a payment.

250.    On April 11, 2017, Ms. Johnson paid CPS $55.  Defendant McNair exercised her discretion to allocate $22 to pay for drug testing and $23 to court debts.  On April 25, 2017, Ms. Johnson paid $60.  Defendant McNair allocated $30 to probation supervision fees and $30 to court costs.

251.    While on supervised probation, Ms. Johnson routinely had to choose between paying the private company—so she could avoid being arrested and jailed, and her probation revoked and extended—and meeting the basic necessities of life, such as buying food and clothes for her children.  Sometimes, she could not afford her rent because she instead paid CPS.

252.    Paying the company made it even more difficult for Ms. Johnson to make ends meet.  To survive, Ms. Johnson used an application on her cell phone to "borrow" from her next paycheck so she could purchase basic necessities.  To feed her children, she relied on donated food from her church.

253.    Ms. Johnson was terrified she would lose her children if she was jailed for nonpayment.

254.    Fearing that her probation would be revoked if she fell behind on payments, Ms. Johnson repeatedly told Defendant McNair that she could not afford the payments.  The first time Ms. Johnson told Defendant McNair that she could not pay, Defendant McNair replied by threatening Ms. Johnson with a "violation" and "120 days in jail" if she did not pay the full amount owed by the end of her probation term.

255.    At another probation meeting, Defendant McNair told Ms. Johnson that nonpayment would lead to an extension of her term on supervised probation.  When Ms. Johnson asked if an extension meant that she would continue to have to pay $45 per month in supervision fees, Defendant McNair confirmed that it did.

256.    Sometimes, Defendant McNair required Ms. Johnson to submit to a drug test—each of which generated more profit for the private company—even though Ms. Johnson's offense of conviction had nothing to do with drugs.

257.    CPS, McNair, and the County were at all times aware of Ms. Johnson's indigency—because Ms. Johnson repeatedly told Defendant McNair that she could not afford the payments—but did not reduce or waive any of her fees.  The company never informed Ms. Johnson of a process for seeking a waiver or reduction of her costs and fees, or that it was illegal to jail her solely for nonpayment.

258.     On July 11, 2017, Defendant McNair informed Ms. Johnson that her probation term, which was scheduled to end on August 8, 2017, would end only if she paid her remaining court debts and probation fees by that date. When Ms. Johnson asked what would happen if she did not have the money to pay, Defendant McNair said the judge would extend her supervised probation for another six months.

259.     Also on July 11, Defendant McNair demanded that Ms. Johnson to submit to a drug test and insisted that she watch, humiliating Ms. Johnson while she urinated.

260.     Ms. Johnson told CPS that she believed it was unfair to keep her on probation only because she could not afford to pay. Defendant McNair responded that if Ms. Johnson had simply paid up-front, she would have been placed on unsupervised probation.

261.     Because she was so afraid of being arrested and jailed for nonpayment, and of remaining on supervised probation, Ms. Johnson sold her television and laptop—which her children need to do homework—so that she could make a lump sum payment to CPS and terminate her probation.

262.     On August 8, 2017, Ms. Johnson paid CPS $331 to satisfy all remaining CPS fees and court debt. In total, she had paid $340 in probation fees to CPS which is more than she owed and paid in court debts.

263.     When her probation was terminated, Ms. Johnson told a CPS employee that she had to sell her belongings to make the final payment. The probation officer chuckled in response.

264.     The only reason Ms. Johnson spent any time on supervised probation was because she was too poor to afford her court costs and probation fees when she was sentenced. But for her poverty, she could have avoided the entire six months of supervision, including threats of arrest and jailing, onerous conditions, and invasive and humiliating drug tests.

C.    **Plaintiff Tanya Mitchell (through her Estate)[17]**

265.    Tanya Mitchell is 53 years old and lives in Giles County, in a mobile home with her daughter, Plaintiff Indya Hilfort, and four grandchildren (Ms. Hilfort's children).

266.    Ms. Mitchell is currently unemployed, and her sole income is from food stamps. She has not worked since 2012, when she was employed as a home healthcare worker, and relies on family and friends for financial support.

267.    Ms. Mitchell has multiple serious medical conditions, including fibromyalgia and gout, that prevent her from working.    As a result, Ms. Mitchell struggles to provide basic necessities for herself and her household.

268.    The electricity in her trailer home has been disconnected for several days in the past few months because she could not afford to pay the bill.

269.    On September 25, 2017, Ms. Mitchell pled guilty in Giles County Circuit Court to a misdemeanor charge.  She was sentenced to probation for 11 months and 29 days, assessed $750 in court fines and fees, and ordered to pay at least $50 per month in supervision fees.

270.    Ms. Mitchell was assigned to PSI for probation "supervision," and met with Defendant Markeyta Bledsoe immediately after being sentenced to probation.  Defendant Bledsoe told Ms. Mitchell that the terms of her probation included bi-weekly, in-person reporting, drug tests that would be administered whenever the probation company wanted, and payment of a $45 per month probation supervision fee.

271.    Defendant Bledsoe told Ms. Mitchell that she was required to make a payment of $83.75 the first time she reported for probation.

---

[17] These facts are identical to those found in the Second Amended Complaint and do not reflect Ms. Mitchell's passing on September 14, 2020.

272.     Ms. Mitchell reported to probation for the first time on October 9, 2017, as instructed by Defendants PSI and Bledsoe.  Ms. Mitchell's family and friends gave her money so she could pay the $83.75 the company demanded.

273.     Ms. Mitchell has made every reporting date required.  She asks family and friends to give her money, including friends from out of state who frequently send her money, so she can make partial payments when she reports to probation because she is afraid she will be arrested and jailed, and her probation revoked and extended, if she does not pay the company.  She has not made any payments to the court so she still owes the full amount of court debt she owed when she was initially placed on probation.

274.     To pay PSI, Ms. Mitchell has forgone medicine for her many conditions because she cannot afford to pay both PSI and purchase her prescriptions.

275.     Defendant Bledsoe has, in her discretion, allowed Ms. Mitchell to report monthly instead of every two weeks because Ms. Mitchell typically makes a payment to PSI toward her supervision fee.  But Defendant Bledsoe conveyed to Ms. Mitchell that if she stops making payments to PSI, Defendant Bledsoe will require her to report more frequently.

276.     To avoid having to report in-person more frequently—which is difficult for Ms. Mitchell because she does not have money to pay for gas—Ms. Mitchell pays the company's fees, and has been unable to make any payments toward her court debt.

277.     Defendant Bledsoe has drug tested Ms. Mitchell, and watched Ms. Mitchell through an open door while Ms. Mitchell urinated.

278.     Defendant Bledsoe has repeatedly told Ms. Mitchell that she must make a payment every month, even if Ms. Mitchell is unable to pay the full amount due.

D.    **Plaintiff Indya Hilfort**

279.    Indya Hilfort is a 27-year-old single mother of four children under the age of 10. She lives with them and her mother, Named Plaintiff Tanya Mitchell, in a mobile home in Giles County.  She is the only member of the household who is able to work.

280.    Ms. Hilfort lost her job at a factory in December 2017, after being hospitalized for the flu.  After a stretch of unemployment, Ms. Hilfort obtained a job in mid-June 2018 taking home $350 a week, which is below the federal poverty line to care for herself and four young children.

281.    Ms. Hilfort struggles to meet the basic necessities of life, including providing food, clothing, and shelter for herself and her children.  Prior to moving in with her mother, Ms. Hilfort was homeless.

282.    On December 8, 2016, Ms. Hilfort pled guilty in General Sessions Court to a misdemeanor charge.

283.    Ms. Hilfort was sentenced to a jail term of 11 months and 29 days, to be suspended for a probationary term of 11 months and 19 days after serving ten days in jail.  Ms. Hilfort was assessed $565.50 in court costs, fines, and taxes.  She was assigned to supervised probation for a minimum of four months, after which time she would be eligible for unsupervised probation, but only if she had paid her court costs and probation fees in full.

284.    Due to a clerical error, Ms. Hilfort was not initially assigned to supervision with either company, and so she did not report to either company for the first eight months of her probationary period.

285.    The clerical error was resolved in August 2017.  Ms. Hilfort began reporting to CPS in September.

286.     On September 25, 2017, Ms. Hilfort pled guilty to a misdemeanor charge in Circuit Court.  She was assessed $1,487.50 in court costs, fines, taxes, and restitution.  Ms. Hilfort was sentenced to 11 months and 29 days on supervised probation and assigned to CPS.

287.     CPS therefore supervises Ms. Hilfort on two concurrent probation cases.

288.     Ms. Hilfort met with Defendant McNair immediately after being sentenced in the second case.  Defendant McNair told Ms. Hilfort that the conditions of her probation included in-person reporting every two weeks, drug tests to be administered in the discretion of the for-profit probation officer (even though neither charge involved drugs), and monthly payments of $45 for a probation supervision fee.  Defendant McNair also informed Ms. Hilfort that if she paid off her court and probation fees and did not violate her probation in the first four months, CPS would place her on unsupervised probation for her Circuit Court probation case, as with her General Sessions probation case.

289.     Ms. Hilfort cannot afford to pay the supervision fees or court debt.  To make ends meet, Ms. Hilfort relies on money from family members.

290.     Ms. Hilfort asked Defendant McNair for a supervision fee waiver form on March 5, 2018.  Defendant McNair did not provide one.  Instead, she suggested that Ms. Hilfort pay probation fees from a tax refund or that Ms. Hilfort request an extension of probation (to avoid arrest, jailing, and formal revocation of probation), which, of course, would result in additional fees and prolonged supervision requirements.

291.     Defendant McNair previously supervised Ms. Hilfort for a period of 11 months and 29 days, from June 2015 (while Defendant McNair was employed by PCC, Inc.), to June 2016 (Defendant McNair was hired by CPS, LLC in March 2016).  During this period of supervision, Defendant McNair threatened Ms. Hilfort with jail if she did not pay her supervision fees.  Shortly

before the supervision period was supposed to end, Defendant McNair told Ms. Hilfort to pay her CPS supervision fees in full by noon the next day or go to jail. Fearing jail, Ms. Hilfort sold car tires and borrowed money from her boyfriend to pay her supervision fees. After Ms. Hilfort paid in full, Defendant McNair did not seek a violation-of-probation warrant.

292. Because of this experience and Defendant McNair's continued insistence on receiving payment, Ms. Hilfort fears that her probation will be revoked and extended, and that she will be arrested and jailed, if she does not pay off her supervision fees before her probation term ends.

293. Defendant McNair has informed Ms. Hilfort that if she does not pay her debts in full by the end of her probation term, CPS will "violate" her, and Ms. Hilfort's probation supervision will be extended. Ms. Hilfort understands a probation violation to mean jailing.

294. Defendant McNair (while employed with CPS) drug tested Ms. Hilfort on November 7, 2017, even though Ms. Hilfort's offenses had nothing to do with drugs or alcohol. At this point in time, Ms. Hilfort was on pay-only supervised probation in her general-sessions case.

295. The drug screen came back positive and Defendant McNair told Ms. Hilfort that the company would seek an arrest warrant alleging to the court that Ms. Hilfort violated her probation. Defendant McNair told Ms. Hilfort that she would be required to pay a $2,500 secured financial condition of release after arrest.

296. On November 8, 2017, Defendant McNair sought an arrest warrant by filing an affidavit alleging violation of Ms. Hilfort's Circuit Court probation for the positive drug screen.

297.     On November 14, 2017, Defendant McNair sought an arrest warrant by filing an affidavit alleging violation of Ms. Hilfort's General Sessions probation for the same positive drug screen.

298.     On February 6, 2018, Ms. Hilfort was arrested on the violation-of-probation warrants. A friend who is a bondsman posted her bond the same day and loaned her the $250 normally required up-front as a nonrefundable premium. Her friend is allowing her to pay him back in installments over time.

299.     On February 22, 2018, Ms. Hilfort was sentenced to 60 days in jail for her General Sessions violation of probation, and her probation was revoked and extended for an additional 11 months and 29 days of pay-only probation "until all fines, costs and fees are paid in full," according to the order.

300.     At sentencing, when the General Sessions court asked if she could pay $25 a week on her newly-imposed court fines and fees, she said "yes" after being informed by her public defender that if she did not agree to make the weekly payment, the County would jail her that day, instead of allowing her two weeks to prepare for her 60-day jail sentence.

301.     Ms. Hilfort reported to jail on March 19, 2018 to begin serving her 60-day sentence. Her mother, Plaintiff Tanya Mitchell, is taking care of Ms. Hilfort's four young children. Ms. Hilfort is scared that something may happen to her kids if her mother becomes sick while Ms. Hilfort is in jail. Ms. Mitchell recently spent several days in the intensive care unit for cardiac problems in March 2018, and those health issues could recur at any time.

302.     On March 27, 2018, Ms. Hilfort was sentenced to 60 days in jail for violating probation in the Circuit Court case, to be served concurrently with her sentence in the General Sessions case. Her probation was revoked for her Circuit Court case and extended for an additional

period of up to 11 months and 29 days of pay-only probation "until all fines court costs pd. [sic] in full," according to the order.

303.    On April 26, 2018, three days after the filing of the initial complaint, Giles County released Ms. Hilfort from jail, prior to the completion of her VOP jail sentence, without explanation.

304.    On July 9, 2018, Ms. Hilfort was arrested in Lawrence County on a warrant recently issued for an alleged incident from July 2017.  Ms. Hilfort borrowed money from a family member to pay a bondsman $300 so that she would be released from the Lawrence County jail.  She owes her family member $300 and also owes the bondsman another $300, and committed to repaying both from her next paycheck.

305.    On July 10, 2018, Ms. Hilfort informed a CPS probation officer about the arrest, as required by the Rules of Probation.

306.    On July 11, 2018, Ms. Hilfort learned that a violation-of-probation arrest warrant had been issued with a $2,500 bond amount on it.  She believes that she is being alleged to have violated probation because she was arrested in Lawrence County.

307.    Ms. Hilfort will have to pay $2,500, or a $287.50 nonrefundable fee (ten percent of the bond, plus an additional $37.50 fee) to a private bail bonds company, to be released.

308.    No one asked Ms. Hilfort if she could afford to pay that amount of money.

309.    Ms. Hilfort cannot afford to pay $2,500 to buy her release from jail in the event that she is arrested.  She cannot afford even $287.50.  Although she was able to get a job in mid-June 2018, Ms. Hilfort struggles to provide basic necessities for her family, including herself, her four children, and her mother.  She currently owes debts totaling nearly $1,000, and cannot afford the

electricity bill or groceries. Ms. Hilfort cannot afford to pay any amount of money to get out of jail in Giles County if she is arrested on the violation-of-probation warrant.

310. If Ms. Hilfort is arrested and cannot pay the conditions for her release, she will be kept in jail until, at the earliest, the Thursday after she is arrested, when she will be taken to court for a violation-of-probation hearing.

311. Ms. Hilfort is afraid of being arrested and spending days or weeks in jail because she cannot pay for her release. She believes she will lose her job if arrested and detained in jail, because she has shifts five days a week, on weekdays, and if she is in jail, she will not be able to go to work. Ms. Hilfort will also be separated from her four young children who depend on her.

### E.   Plaintiff Lucinda Brandon

312. Lucinda Brandon is a 31-year-old single mother of three children under the age of ten. She lives in Lawrence County, Tennessee.

313. Ms. Brandon was on supervised probation with PSI from September 30, 2015 to May 18, 2017. During that time, Ms. Brandon worked at manufacturing plants in Giles, Murray, and Marshall counties in Tennessee. She lived paycheck to paycheck, struggling to pay rent and utility bills and to provide basic necessities, such as clothing, food, and medical care, for herself and her children. Ms. Brandon also experienced periods of unemployment while on supervised probation with PSI.

314. In September and October 2015, Ms. Brandon pled guilty to two misdemeanor charges of driving on a suspended license and one misdemeanor charge of failure to appear for a court date for one of the traffic charges. She was sentenced to one period of 11 months and 29 days of supervised probation and two six-month terms of supervised probation. All of these terms ran concurrently.

315.    For all three convictions, Ms. Brandon owed a combined total of approximately $1,300 in court costs and $10 in fines. Defendant Thompson instructed her to pay $45 a month to PSI in supervision fees.

316.    Defendant Thompson also instructed Ms. Brandon to report to PSI. She began reporting on September 30, 2015, primarily meeting with Defendant Thompson. Ms. Brandon also met twice at the end of her probation with Defendant Bledsoe.

317.    From the beginning of her term on supervised probation, Ms. Brandon made payments to the company whenever she could because she was terrified that she would be jailed. Defendant Thompson repeatedly told Ms. Brandon that she would be "violated" if she did not make the payments Defendant Thompson demanded, meaning that she would be arrested and jailed.

318.    Defendant Thompson's insistence on payment was frequent, including around the birthdays of Ms. Brandon's young children, when Ms. Brandon wanted to provide her children presents. Defendant Thompson repeatedly informed her that if she did not bring in payments, the company would "violate" her.

319.    Ms. Brandon sacrificed basic necessities to pay for probation. For example, she was unable to afford rent because she was making payments to PSI. To avoid homelessness, Ms. Brandon and her children moved in with her mother. Ms. Brandon's mother has physical disabilities and survives on limited government benefits, but Ms. Brandon was forced to rely on her for food and shelter.

320.    While living with her mother, Ms. Brandon continue to struggle to meet the basic necessities of life. When her children were sick and required treatment, Ms. Brandon had to borrow money from family to pay for medicine. She often relied on family to pay for gas, clothes, and

food, and frequented a local food pantry so her children could eat. While on probation, Ms. Brandon sometimes ate only one meal a day herself to ensure her kids had enough food.

321. Ms. Brandon repeatedly told Defendant Thompson that she was unable to make the payments the company demanded. Defendant Thompson let her know she had to pay or she would go to jail, telling her repeatedly that making payments is a condition of probation and if she didn't comply, she would be "violated."

322. Even though Defendant Thompson knew Ms. Brandon was struggling to make payments and support her family, Defendant Thompson never mentioned the existence of a supervision fee reduction or waiver form and never provided Ms. Brandon such a form. Ms. Brandon had no idea such a form even existed, so she could not ask for it.

323. In February 2016, as Ms. Brandon neared the end of her two six-month supervised-probation terms Ms. Brandon was scared she would be arrested and jailed for nonpayment. Ms. Brandon decided to use her tax return to pay the remainder of the court debt for the two cases for which her probation was about to end, even though she needed the money for food, rent, and utilities. Instead of paying for those necessities, she paid the County approximately $500. After that payment, Ms. Brandon still owed approximately $500 in court debt for her remaining failure to appear charge. She continued on supervised probation in that case.

324. On June 24, 2016, Defendant Thompson instructed Ms. Brandon that she would have to submit to a drug screen. During this drug screen, as with the others, Defendant Thompson told Ms. Brandon she had to urinate with the door open while Ms. Thompson watched her. Using the bathroom while another person watched and in view of anyone who happened to walk down the hallway made Ms. Brandon feel humiliated.

66

325.    Based on the in-house drug-testing kit, Defendant Thompson told Ms. Brandon that she had tested positive for marijuana. In accordance with PSI policy, Defendant Thompson offered Ms. Brandon an opportunity to avoid being arrested and jailed on a violation-of-probation arrest warrant by instead paying for a "Drug Education Program" course that PSI offers in-house and which cost $75—an amount that must be paid up-front to the company before a person can enroll in the class. If Ms. Brandon could pay the amount required to participate in the course, Ms. Brandon would be able to avoid arrest, jailing, and a revocation and extension of her supervised probation. But if Ms. Brandon could not make the payment upfront, she would be prohibited from taking the class, and the company would seek an arrest warrant.

326.    Terrified of being arrested, jailed, and separated from her family, Ms. Brandon borrowed money to make a $100 cash payment to PSI on July 13, 2016, instead of paying for food and rent for her family. Defendant Thompson allocated $75 toward the "Class" and $25 to "Supervision."

327.    Ms. Brandon completed the "Drug Education Program" on September 7, 2016. Defendant Thompson, on behalf of PSI, was the "Program Facilitator" of the program. The class took place at the PSI office. Because Ms. Brandon managed to pay the company to take the class, no arrest warrant issued relating to the alleged positive drug screen.

328.    Throughout Ms. Brandon's probation, Defendant Thompson continually instructed Ms. Brandon that she had to make payments to PSI and the court and failure to do so would result in a "violation," meaning that she would be arrested and jailed.

329.    Ms. Brandon experienced extreme stress and anxiety about the possibility of going to jail simply for inability to pay. She made payments to PSI because she was afraid of going to jail. Ms. Brandon believed her children and her mother would suffer without her income, and she

knew she would lose her job if she were arrested and jailed. She was scared that her children being placed in foster care if she went to jail.

330.     Defendant Thompson knew, because Ms. Brandon repeatedly told her, that Ms. Brandon had diverted money needed to support herself and her family so that she could make payments to the company and the court. Even so, on September 16, 2016, as Ms. Brandon's term on supervised probation was ending, Defendant Thompson sought a warrant for Ms. Brandon, alleging that she violated her probation by failing to make payments to the court and the company. Defendant Thompson omitted crucial information from the sworn affidavit alleging nonpayment about Ms. Brandon's efforts to pay and the hardship she experienced as a result of being required to make payments under threat of arrest and jail. The violation-of-probation warrant states that Ms. Brandon owed PSI $250.00 in fees and $512.50 in court debt.

331.     Ms. Brandon appeared in court for a revocation hearing on November 10, 2016.

332.     On that day, Ms. Brandon's probation for her remaining case, a term of 11 months and 29 days, was revoked and extended. Due to the violation, Ms. Brandon's court debt increased from $512.50 to $618.50. She was told that "probation may be terminated once financial obligation to court is met." In other words, as soon as Ms. Brandon managed to pay her court debt—which increased to $618.50 as a result of the nonpayment warrant—her probation would be terminated immediately. The probation company led her to believe, contrary to Tennessee law, that she would also have to pay all of her supervision fees before her probation would be terminated.

333.     Ms. Brandon continued to incur more supervision fees as a result of the alleged violation for nonpayment and the resulting revocation and extension. PSI continued to charge her monthly fees that increased her probation debt because she could not afford to pay enough money to get off of probation.

334.    On January 26, 2017, while Ms. Brandon was on supervised probation solely because she was unable to make the required payments, Defendant Thompson drug tested Ms. Brandon. Defendant Thompson informed Ms. Brandon that she had tested positive for marijuana on the in-house drug test.

335.    On February 13, 2017, Defendant Thompson petitioned for a violation-of-probation arrest warrant, alleging non-reporting, a positive drug screen for marijuana, nonpayment of court debt, and nonpayment of supervision fees to PSI as grounds for violation. The violation-of-probation arrest warrant stated that Ms. Brandon owed $618.50 in court debt and $355 in fees to PSI.

336.    Defendant Thompson failed to include crucial information in the sworn affidavit about the reasons Ms. Brandon missed some appointments. For example, the company's probation notes show that on many of the dates Ms. Brandon allegedly did not report, she called the probation office and spoke personally with Defendant Thompson to explain that she was unable to report because she did not have any transportation to Pulaski. None of that information was presented in the affidavit Defendant Thompson swore.

337.    The money bond on the warrant was set at $1,500 without notice and without an inquiry or findings concerning her ability to pay or the need to detain her prior to a hearing. Ms. Brandon has no idea how the monetary amount was determined, but she knew that if she were arrested, she would have to pay that much money to get out of jail.

338.    Ms. Brandon could not afford to pay $1,500 or even the premium required by a commercial bonding company to get out of jail after arrest. Instead, Ms. Brandon's mother, who survives on limited government benefits, paid the non-refundable premium of $150 out of her government check to a private bonding company so that Ms. Brandon would not be jailed after

arrest. Ms. Brandon's mother had to forgo basic necessities like food in order to loan Ms. Brandon the money she needed to get out of jail.

339. Ms. Brandon's court date for the alleged violation of probation was set for March 30, 2017.

340. On March 30, 2017, Ms. Brandon was told by her public defender that the prosecutor wanted her to serve 90 days in jail for the positive drug screen, non-reporting, nonpayment of PSI fees and court debt. Ms. Brandon did not want to go to jail because she did not want to be separated from her children or lose her job. The public defender refused to advocate for a lesser sentence, so Ms. Brandon decided to proceed pro se.

341. Ms. Brandon informed the district attorney that she had just begun a new job the week prior and pleaded for an alternative to jail.

342. Ultimately, Ms. Brandon convinced the General Sessions Court to reset the violation-of-probation revocation hearing to May 18, 2017. In exchange for not being jailed that day, Ms. Brandon agreed to report biweekly to probation, pass at least two drug tests, and pay all fines and costs in full before May 18, 2017, or else serve a 90-day jail sentence.

343. Desperate to avoid jail, Ms. Brandon made payments toward PSI fees and court debt. Ms. Brandon forwent necessities like food, clothes, and gas, to pay the debts, and relied on family members to make ends meet. On May 17, 2017, a day before the deadline to either pay in full or go to jail for 90 days, Ms. Brandon made her last payments toward more than $1,000 in combined fees to PSI and court debt.

344. Ms. Brandon's probation was terminated.

**F. Plaintiff Victor Gray**

345. Plaintiff Victor Gray is 54 years old. He lacks stable housing, but lives in a motel he pays weekly in Lawrence County.

346. On November 7, 2019, Mr. Gray pled guilty in Giles County Circuit Court to a misdemeanor charge. He was sentenced to probation for 11 months and 29 days, assessed over $1,000 in court fines and fees, and ordered to pay at least $45 per month in probation supervision fees.

347. Mr. Gray was assigned to PSI for probation "supervision," and met with Defendant Markeyta Bledsoe soon after being sentenced to probation.

348. Because Mr. Gray was incarcerated, he did not have a job in November 2019 when he began reporting to PSI probation. After his release, he immediately attempted to find employment, but was unable to find a job that paid him sufficiently for him to maintain his housing.

349. Throughout the COVID-19 pandemic, Mr. Gray has struggled to maintain consistent employment.

350. Throughout his probation, Mr. Gray regularly updated Ms. Bledsoe about his employment status. He told her that he was unemployed at several points and that, even when he was employed, he was not receiving sufficient income to cover basic necessities such as food and shelter. He has relied on his church for food and temporary shelter, and regularly gone without a phone.

351. During his time on probation, Mr. Gray lost his housing after he stopped being able to afford his utilities and then his rent payments. He lived with family, on the streets, and when he could afford it, like now, he pays weekly to live in a series of motels.

352. Ms. Bledsoe required him to regularly update her as to where he was living, so he regularly informed her that he was homeless throughout his probation period.

353. Mr. Gray does not remember ever being offered a supervision fee waiver or reduction by Ms. Bledsoe or PSI.

354. Mr. Gray has made small payments to PSI for his supervision fees, but he has been unable to pay the majority of his fees and any of his court costs.

355. Despite the fact that Mr. Gray's charge was not related to drugs, he was drug tested while he was on probation. He was forced to take the drug test while someone was listening through the door. It was a humiliating experience.

356. Ms. Bledsoe insisted that Mr. Gray could not leave the state unless he obtained permission from her first.

357. Eventually, Mr. Gray obtained a temporary job through an agency in Lawrenceburg, TN. He has held that job continuously since, and he now earns approximately $1,600 per month before taxes.

358. On November 4, 2020, Ms. Bledsoe, acting in her capacity as Mr. Gray's PSI probation officer, alleged that Mr. Gray had violated the terms of his probation solely because he had not completed paying his court costs. When seeking the warrant, Ms. Bledsoe did not provide any information about the reasons Mr. Gray did not pay all of his fees and costs, including his struggles with housing and employment.

359. Because of court closures related to the COVID-19 pandemic, Mr. Gray still has not had a court hearing on the pending alleged violation of his probation. Mr. Gray is scheduled to appear before Giles County General Sessions Judge Richardson on April 27, 2021 to resolve the pending alleged violation of probation for nonpayment only.

360. Ms. Bledsoe has told Mr. Gray that he must remain on supervised probation with PSI until the violation of probation matter is resolved.

## VII.    CLASS ACTION ALLEGATIONS

361. The named Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

B.     **Class Definitions**

362.     The Classes are defined as follows:

a.     Damages Class

All persons who, since April 23, 2014, and until the trial of this cause, (1) have incurred court-imposed financial obligations arising from a traffic or misdemeanor case in Giles County General Sessions or Circuit Court; and (2) have been assigned to be supervised on probation in that case by Community Probation Services, LLC, Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., or Tennessee Correctional Services, LLC.

b.     Declaratory and/or Injunctive Relief Class[18]

All persons who, at any time since April 23, 2014, (1) have incurred, or will incur, court-imposed financial obligations arising from a traffic or misdemeanor case in Giles County General Sessions or Circuit Court; and (2) are currently being supervised, or will be supervised, on probation in that case by Community Probation Services, LLC, Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI Probation, L.L.C., or Tennessee Correctional Services, LLC.

363.     The names, case numbers, probation documents, dates of imprisonment, financial receipts, and relevant records of the class members are in Defendants' possession and are easily ascertainable.

C.     **The Prerequisites of Rule 23(a) Are Satisfied**

364.     *Numerosity*.  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable.  On information and belief, the Declaratory and Injunctive Class includes over 200 members at any given time, and the Damages

---

[18] Named Plaintiffs Indya Hilfort and Victor Gray seek certification of this Declaratory and/or Injunctive Relief Class. Even in the event that Plaintiffs Hilfort and Gray complete their probation sentences while this action is pending, they may nonetheless continue to advance the interests of such a class. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980).  Those who still owe debts to Defendants or who will incur such debts will be subjected to the same material ongoing policies and practices absent the relief sought in this Complaint.

Class includes thousands of members. The Classes, as defined above, meet the numerosity requirement.

365. *Commonality*. The claims of the Class members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and factual questions—the answers to which will drive resolution of the litigation—may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, and include, but are not limited to, the following questions:

**Common Questions**

   a.    Whether Giles County's decision to abandon the tradition of engaging a neutral probation officer and instead contract with a for-profit, user-funded probation officer that has the same duties and powers of a traditional probation officer and also has a personal financial interest in the management and outcome of every case it supervises violates federal law;

   b.    Whether a contract creating a probation company with a direct financial stake in the management and outcome of every probationer's case it supervises violates state law;

   c.    Whether a government and private actors can place and keep people on onerous probation plans that involve extra fees and serious intrusions on liberty based on a person's poverty;

   d.    Whether a government and a private company, working together, can circumvent state debt-collection protections and engage in practices that no private creditor could lawfully undertake;

   e.    Whether it is lawful to use legal process purportedly concerning probation violation and probation judgments with a motive to earn profit;

f.      Whether the policies and practices of the Private Defendants violate the constitutional and statutory rights of Plaintiffs and the putative classes;

g.      Whether Defendants have imposed imprisonment, repeated threats of imprisonment, onerous probation conditions, revocation or withholding of drivers' licenses, intrusive drug tests, extra fees, and other restrictions on individuals' liberty;

h.      Whether Defendants have placed and kept individuals on supervised probation solely because they could not afford to pay their court debts and probation fees without an inquiry to determine whether or not their failure to pay was willful;

i.      Whether Defendants have failed to inform probationers of their right to a determination by a neutral officer of probationers' ability to pay court costs, fines, and fees;

j.      Whether Defendants have taken and converted to their own use monetary payments to which they had no legal right;

k.      Whether Giles County has a policy and practice of using a predetermined schedule to determine the amount of money required to secure post-arrest release;

l.      Whether Giles County requires that scheduled amount of money to be paid up front before it will release a person from its jail;

m.      Whether, when, and how any official considers or determines what conditions of pretrial release should be and whether, for example, any official considers ability to pay, makes findings concerning ability to pay, and offers non-financial conditions of release for those unable to pay;

n.      What standard post-arrest procedures Giles County performs on misdemeanor arrestees; for example, whether Giles County uses any other alternate procedures for

promptly releasing indigent people determined otherwise eligible for release but who are unable to afford a monetary payment;

o.      Whether a secured "bail schedule" setting generic amounts of money required up front to avoid post-arrest detention without any inquiry or findings into a person's ability to pay violates the Fourteenth Amendment's due process and equal protection provisions; and

p.      Whether Defendants have sought arrest warrants and probation revocation judgments with an ulterior motive to collect additional fees.

366.    These and numerous other common legal and factual questions arise from one central scheme and set of policies and practices: the for-profit contractual relationships between the County and the companies that govern misdemeanor probation supervision practices.  The Defendants operate this scheme openly and in materially the same manner every day.  The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the classes are entitled to the constitutional relief that they seek.

367.    *Typicality*.  The claims of the named Plaintiffs are typical of the unnamed Class members because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class members were injured by the same wrongful practices in which Defendants engaged, namely failing to comply with the basic constitutional and statutory provisions detailed below.

368.    *Adequacy of Representation*.  The requirements of Rule 23(a)(4) are satisfied in that each named Plaintiff has a sufficient stake in the litigation to prosecute its claims vigorously

on behalf of the Class members, and each named Plaintiff's interests are aligned with those of the proposed Classes. There are no defenses of a unique nature that may be asserted against any named Plaintiff individually, as distinguished from the other members of the Classes, and the relief sought is common to the Classes. No named Plaintiff has any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and no named Plaintiff has any conflict with any other member of the Class. Plaintiffs have retained competent counsel experienced in class action litigation to represent them and the Classes in this litigation.

369.    Plaintiffs are represented by attorneys from Civil Rights Corps and Hughes Socol Piers Resnick & Dym Ltd., Barrett Johnston Martin & Garrison, LLC, and Attorney Kyle Mothershead, all of whom have experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.

370.    Counsel have devoted a significant amount of time and resources to becoming intimately familiar with Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.

371.    The interests of the members of the Classes will be fairly and adequately protected by the Plaintiffs and their attorneys.

D.    **The Prerequisites of Rule 23(b)(2) and (b)(3) Are Satisfied**

372.    Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up their probation and debt-collection scheme, have acted and/or refused to act on grounds generally applicable to the Declaratory/Injunctive Class. Thus, a declaration that people in the Declaratory/Injunctive Class are entitled, as a matter of federal law, to a neutral probation officer without a personal financial conflict of interest in their cases would benefit every member of the proposed Class. The same applies to legal rulings on the other claims,

including: that the Contracts are void; that the arrangement and the Defendants' policies violate the Equal Protection Clause by imposing onerous probation conditions due to poverty and by imposing debt-collection methods far more onerous than any private creditor could lawfully impose; that CPS and PSI abuse process by commandeering specific legal processes for the ulterior motive of earning profit; and that the policy, pattern, and practice of threatening to arrest and jail people for nonpayment (and actually doing so), and threatening to revoke and extend their supervised probation term (and actually doing so), without informing them of their rights or inquiring into their ability to pay constitutes an extortion enterprise in blatant violation of racketeering laws.

373.    Injunctive relief compelling the Defendants to comply with Plaintiffs' constitutional and statutory rights will similarly protect each member of the Declaratory/Injunctive Class from being again subjected to the Defendants' unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct.  Therefore, declaratory and injunctive relief with respect to the Class seeking equitable relief is appropriate.

374.    Class treatment under Rule 23(b)(3) is also appropriate because common questions of law and fact predominate in this case.  This case turns, for every Plaintiff, on what Defendants' policies and practices are and on whether those policies are lawful.

375.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Damages Class.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by hundreds or thousands of Giles County residents.  To the extent that individual damages will vary, they will

vary depending in large part on the amount of time that a person was subjected to the unlawful scheme and the amount of money extorted from them. Determining damages for individual class members can thus typically be handled in a ministerial fashion based on easily verifiable records in the Defendants' possession. If need be, individual hearings on class-member specific damages based on special circumstances and particular hardships endured as a result of Defendants' extortion scheme can be held after class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

376.    Plaintiffs make the following claims, and seek the following relief and hereby demand a jury trial in this cause for all matters so appropriate.

## VIII.  CLAIMS

### COUNT 1: DISMISSED

### COUNT 2: DISMISSED

### COUNT 3: DISMISSED

### COUNT 4: DISMISSED

### COUNT 5:

**The Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings and Probation Case Decisions Violates Plaintiffs' Right to a Neutral Probation Officer Under the Due Process Clause of the Fourteenth Amendment.**

**Brought under 42 U.S.C. § 1983 by Named Plaintiffs Karen McNeil, Lesley Johnson, and Indya Hilfort on behalf of themselves and all others similarly situated against Giles County for damages.**

377.    Plaintiffs incorporate by reference the allegations in paragraphs 1–376.

378. Defendants, under color of state law, caused Plaintiffs, citizens of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law. Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

379. CPS, its employees, and Giles County enacted policies, customs, and/or procedures that permit non-neutral actors with direct pecuniary interests in the outcome of probationers' cases to dictate the outcomes of those cases. As a direct result of the policies, customs, and/or procedures enacted by these Defendants, Plaintiffs are unfairly deprived of their constitutional right to due process of law under the United States Constitution. *See* U.S. Const. amend. XIV § 1.

380. The Due Process Clause of the Fourteenth Amendment prohibits government officials exercising judicial or enforcement functions from having a personal financial interest in the cases prosecuted and decided by them in our legal system. The County has contracted with two private, for-profit corporations to perform a traditional court function—probation—and, critically, made the resolution of Plaintiffs' cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of these private entities.

381. Under the Defendant County and Defendant companies' scheme, CPS and its employees can both influence what conditions are imposed for people assigned to them for supervision, determine whether and when those conditions have been violated, and decide whether and when to initiate revocation proceedings.[19] They can make rules and determine whether and when to petition for revocation based on technical or perceived violations of those rules or other

---

[19] As noted earlier, people kept on supervised probation because they cannot afford to pay their court debts in full are also forced to abide by additional restrictions on their liberty, which the Defendants call conditions of probation, and which are imposed solely because of individuals' wealth status.

conditions. Then, the companies serve as the main witness at the violation proceedings, and often the allegations of employees of the companies are treated as evidence. Finally, the companies meet privately with the district attorney and the judge and recommend a resolution or sanction in the case. These recommendations include whether the person should be placed back on supervised probation for an extended period of time (and charged additional fees) and/or jailed.

382. In contrast to the longstanding, traditional role of the probation officer—such as the role performed by Tennessee State Probation Officers and United States Probation Officers—the companies and their employees have a direct financial stake in every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation. The companies have a personal financial interest in conducting their functions as probation officers in a way that maximizes their personal profit and not as neutral public court officers.

383. Because these non-neutral actors profit significantly from the decisions about whether to place and keep people on supervised probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide before and during revocation hearings, and what sanction to recommend—including extending the person's term on supervised probation, there is a clear risk that those financial interests will affect its judgment when it participates in those decisions.

384. There is also overwhelming evidence that these financial interests have had and continue to have an impact on every decision the Private Defendants make. Because these private entities have a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the County's and companies' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

385.     Defendants directly and proximately caused these violations of Plaintiffs' rights. Defendants knew or reasonably should have known that depriving people of property under color of law, without due process or legal authority for the deprivation, violated Plaintiffs' constitutional rights.  Defendants caused, authorized, condoned, ratified, approved, and knowingly participated in the policies and practices as described above.

386.     Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

## COUNT 6:

### The Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings and Probation Case Decisions Violates Plaintiff's Right to a Neutral Probation Officer Under the Due Process Clause of the Fourteenth Amendment.

### Brought under 42 U.S.C. § 1983 by Named Plaintiff Indya Hilfort on behalf of herself and all others similarly situated against CPS and Giles County for equitable relief.

387.     Plaintiff incorporates by reference the allegations in paragraphs 1–386.

388.     Defendants, under color of state law, caused Plaintiff, a citizen of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

389.     CPS, its employees, and Giles County enacted policies, customs, and/or procedures that permit non-neutral actors with direct pecuniary interests in the outcome of probationers' cases to dictate the outcomes of those cases. As a direct result of the policies, customs, and/or procedures enacted by these Defendants, Plaintiff is unfairly deprived of their constitutional right to due process of law under the United States Constitution.  *See* U.S. Const. amend. XIV § 1.

390.     The Due Process Clause of the Fourteenth Amendment prohibits government officials exercising judicial or enforcement functions from having a personal financial interest in the cases prosecuted and decided by them in our legal system.  The County has contracted with two private, for-profit corporations to perform a traditional court function—probation—and, critically, made the resolution of Plaintiff's case contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of these private entities.

391.     Under the Defendant County and Defendant companies' scheme, CPS and its employees can both influence what conditions are imposed for people assigned to them for supervision, determine whether and when those conditions have been violated, and decide whether and when to initiate revocation proceedings.[20]  They can make rules and determine whether and when to petition for revocation based on technical or perceived violations of those rules or other conditions.  Then, the companies serve as the main witness at the violation proceedings, and often the allegations of employees of the companies are treated as evidence.  Finally, the companies meet privately with the district attorney and the judge and recommend a resolution or sanction in the case.  These recommendations include whether the person should be placed back on supervised probation for an extended period of time (and charged additional fees) and/or jailed.

392.     In contrast to the longstanding, traditional role of the probation officer—such as the role performed by Tennessee State Probation Officers and United States Probation Officers—the companies and their employees have a direct financial stake in every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation.   The

---

[20] As noted earlier, people kept on supervised probation because they cannot afford to pay their court debts in full are also forced to abide by additional restrictions on their liberty, which the Defendants call conditions of probation, and which are imposed solely because of individuals' wealth status.

companies have a personal financial interest in conducting their functions as probation officers in a way that maximizes their personal profit and not as neutral public court officers.

393.    Because these non-neutral actors profit significantly from the decisions about whether to place and keep people on supervised probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide before and during revocation hearings, and what sanction to recommend—including extending the person's term on supervised probation, there is a clear risk that those financial interests will affect its judgment when it participates in those decisions.

394.    There is also overwhelming evidence that these financial interests have had and continue to have an impact on every decision the Private Defendants make.  Because these private entities have a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the County's and companies' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

395.    Defendants directly and proximately caused these violations of Plaintiff's rights. Defendants knew or reasonably should have known that depriving someone of property under color of law, without due process or legal authority for the deprivation, violated Plaintiff's constitutional rights.  Defendants caused, authorized, condoned, ratified, approved, and knowingly participated in the policies and practices as described above.

396.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiff's rights, and should be punished and deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

**COUNT 7:**

**The Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings and Probation Case Decisions Violates Plaintiffs' Right to a Neutral Probation Officer Under the Due Process Clause of the Fourteenth Amendment.**

**Brought under 42 U.S.C. § 1983 by Named Plaintiffs Lucinda Brandon, Victor Gray, and Tanya Mitchell (through her estate) on behalf of themselves and all others similarly situated against PSI and Giles County for damages.**

397. Plaintiffs incorporate by reference the allegations in paragraphs 1–396.

398. Defendants, under color of state law, caused Plaintiffs, citizens of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law. Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

399. PSI, its employees, and Giles County enacted policies, customs, and/or procedures that permit non-neutral actors with direct pecuniary interests in the outcome of probationers' cases to dictate the outcomes of those cases. As a direct result of the policies, customs, and/or procedures enacted by these Defendants, Plaintiffs are unfairly deprived of their constitutional right to due process of law under the United States Constitution. *See* U.S. Const. amend. XIV § 1.

400. The Due Process Clause of the Fourteenth Amendment prohibits government officials exercising judicial or enforcement functions from having a personal financial interest in the cases prosecuted and decided by them in our legal system. The County has contracted with two private, for-profit corporations to perform a traditional court function—probation—and, critically, made the resolution of Plaintiffs' cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of these private entities.

401. Under the Defendant County and Defendant companies' scheme, PSI and their employees can both influence what conditions are imposed for people assigned to them for

supervision, determine whether and when those conditions have been violated, and decide whether and when to initiate revocation proceedings.[21] They can make rules and determine whether and when to petition for revocation based on technical or perceived violations of those rules or other conditions. Then, the companies serve as the main witness at the violation proceedings, and often the allegations of employees of the companies are treated as evidence. Finally, the companies meet privately with the district attorney and the judge and recommend a resolution or sanction in the case. These recommendations include whether the person should be placed back on supervised probation for an extended period of time (and charged additional fees) and/or jailed.

402.    In contrast to the longstanding, traditional role of the probation officer—such as the role performed by Tennessee State Probation Officers and United States Probation Officers—the companies and their employees have a direct financial stake in every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation. The companies have a personal financial interest in conducting their functions as probation officers in a way that maximizes their personal profit and not as neutral public court officers.

403.    Because these non-neutral actors profit significantly from the decisions about whether to place and keep people on supervised probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide before and during revocation hearings, and what sanction to recommend—including extending the person's term on supervised probation, there is a clear risk that those financial interests will affect its judgment when it participates in those decisions.

---

[21] As noted earlier, people kept on supervised probation because they cannot afford to pay their court debts in full are also forced to abide by additional restrictions on their liberty, which the Defendants call conditions of probation, and which are imposed solely because of individuals' wealth status.

404.    There is also overwhelming evidence that these financial interests have had and continue to have an impact on every decision the Private Defendants make.  Because these private entities have a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the County's and companies' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

405.    Defendants directly and proximately caused these violations of Plaintiffs' rights. Defendants knew or reasonably should have known that depriving people of property under color of law, without due process or legal authority for the deprivation, violated Plaintiffs' constitutional rights.

406.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

## COUNT 8:

**The Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings and Probation Case Decisions Violates Plaintiff's Right to a Neutral Probation Officer Under the Due Process Clause of the Fourteenth Amendment.**

**Brought under 42 U.S.C. § 1983 by Named Plaintiff Victor Gray on behalf of himself and all others similarly situated against PSI and Giles County for equitable relief.**

407.    Plaintiff incorporates by reference the allegations in paragraphs 1–406.

408.    Defendants, under color of state law, caused Plaintiff, a citizen of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

409.     PSI, its employees, and Giles County enacted policies, customs, and/or procedures that permit non-neutral actors with direct pecuniary interests in the outcome of probationers' cases to dictate the outcomes of those cases. As a direct result of the policies, customs, and/or procedures enacted by these Defendants, Plaintiff is unfairly deprived of her constitutional right to due process of law under the United States Constitution.  *See* U.S. Const. amend. XIV § 1.

410.     The Due Process Clause of the Fourteenth Amendment prohibits government officials exercising judicial or enforcement functions from having a personal financial interest in the cases prosecuted and decided by them in our legal system.  The County has contracted with two private, for-profit corporations to perform a traditional court function—probation—and, critically, made the resolution of Plaintiff's case contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of these private entities.

411.     Under the Defendant County and Defendant companies' scheme,  PSI and its employees can both influence what conditions are imposed for people assigned to them for supervision, determine whether and when those conditions have been violated, and decide whether and when to initiate revocation proceedings.[22]  They can make rules and determine whether and when to petition for revocation based on technical or perceived violations of those rules or other conditions.  Then, the companies serve as the main witness at the violation proceedings, and often the allegations of employees of the companies are treated as evidence.  Finally, the companies meet privately with the district attorney and the judge and recommend a resolution or sanction in

---

[22] As noted earlier, people kept on supervised probation because they cannot afford to pay their court debts in full are also forced to abide by additional restrictions on their liberty, which the Defendants call conditions of probation, and which are imposed solely because of individuals' wealth status.

the case. These recommendations include whether the person should be placed back on supervised probation for an extended period of time (and charged additional fees) and/or jailed.

412.    In contrast to the longstanding, traditional role of the probation officer—such as the role performed by Tennessee State Probation Officers and United States Probation Officers—the companies and their employees have a direct financial stake in every decision they make regarding case supervision, enforcement of conditions and rules, and revocation of probation. The companies have a personal financial interest in conducting their functions as probation officers in a way that maximizes their personal profit and not as neutral public court officers.

413.    Because these non-neutral actors profit significantly from the decisions about whether to place and keep people on supervised probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, what testimony to provide before and during revocation hearings, and what sanction to recommend—including extending the person's term on supervised probation, there is a clear risk that those financial interests will affect its judgment when it participates in those decisions.

414.    There is also overwhelming evidence that these financial interests have had and continue to have an impact on every decision the Private Defendants make. Because these private entities have a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, the County's and companies' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

415.    Defendants directly and proximately caused these violations of Plaintiff's rights. Defendants knew or reasonably should have known that depriving someone of property under

color of law, without due process or legal authority for the deprivation, violated Plaintiff's constitutional rights.

416.    Defendants' actions were willful, deliberate, and malicious, and involved reckless or callous indifference to Plaintiff's rights, and should be punished and deterred by an award of punitive or enhanced damages against Defendants as permitted by law.

### COUNT 9:

### Defendants' Use of Jail, Threats of Jail, and an Onerous Probation System to Collect Debts Owed to the County Violates Equal Protection and Due Process Because It Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor is the Government As Compared to Those Who Owe Money to Private Creditors

### Brought under 42 U.S.C. § 1983 by Named Plaintiffs Karen McNeil, Lesley Johnson, and Indya Hilfort on behalf of themselves and all others similarly situated against Giles County for damages.

417.    Plaintiffs incorporate by reference the allegations in paragraphs 1–416.

418.    Defendants, under color of state law, caused Plaintiffs, citizens of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

419.    The United States Supreme Court has held that when governments seek to recoup costs from indigent defendants, they may not take advantage of their position—including their access to police, jails, and courts of law—to engage in unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  *See James v. Strange*, 407 U.S. 128 (1972).

420.    Defendants enacted policies, customs, and/or procedures that coerced payment of debts owed to the government.  Not only do the County and the company keep indigent people on standard and overly onerous probation supervision lasting years, but by imposing imprisonment,

repeated threats of imprisonment, onerous probation conditions, revoked or suspended drivers' licenses,[23] intrusive drug tests, extra fees, and other restrictions on Plaintiffs' liberty, the County and the company take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor. The County deprives Plaintiffs of these protections even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments.

421.    Many people like the Plaintiffs who owe money to the County have to borrow money, ration public benefits, convert federal means-tested disability checks into money orders to pay the company, and go further into debt to make the payments Defendants demand. Other non-government creditors are not permitted to jail debtors, threaten to jail them, or compel their repeated arrest and court appearances for years for nonpayment.

422.    Defendants' coercive debt-collection system constitutes invidious discrimination and violates fundamental principles of equal protection of the laws.

## COUNT 10:

### Defendants' Use of Jail, Threats of Jail, and an Onerous Probation System to Collect Debts Owed to the County Violates Equal Protection and Due Process Because It Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor is the Government As Compared to Those Who Owe Money to Private Creditors

### Brought under 42 U.S.C. § 1983 by Named Plaintiff Indya Hilfort on behalf of herself and all others similarly situated against Giles County for equitable relief.

423.    Plaintiff incorporates by reference the allegations in paragraphs 1–422.

---

[23] It is the policy and practice of the County to initiate the revocation and suspension, and subsequently prevent the reinstatement, of Tennessee driving privileges for unpaid court debt and traffic debt, respectively, without informing debtors of any legal mechanism to avoid this consequence because of their inability to pay. This practice is the subject of two lawsuits filed by undersigned counsel in the Middle District of Tennessee. *Thomas, et al. v. Haslam, et al.*, Case No. 3:17-cv-00005 (court debt) and *Robinson, et al. v. Purkey, et al.*, Case No. 3:17-cv-01263 (traffic debt)

424.     Defendants, under color of state law, caused Plaintiff, a citizen of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

425.     The United States Supreme Court has held that, when governments seek to recoup costs from indigent defendants, they may not take advantage of their position—including their access to police, jails, and courts of law—to engage in unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  *See James v. Strange*, 407 U.S. 128 (1972).

426.     Defendants enacted policies, customs, and/or procedures that coerce payment of debts owed to the government.  Not only do the County and the company keep indigent people on standard and overly onerous probation supervision lasting years, but by imposing imprisonment, repeated threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses,[24] intrusive drug tests, extra fees, and other restrictions on Plaintiff's liberty, the County and the company take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor.  The County deprives Plaintiff of these protections even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments.

---

[24] It is the policy and practice of the County to initiate the revocation and suspension, and subsequently prevent the reinstatement, of Tennessee driving privileges for unpaid court debt and traffic debt, respectively, without informing court debtors of any legal mechanism to avoid this consequence because of their inability to pay.  This practice is the subject of two lawsuits filed by undersigned counsel in the Middle District of Tennessee.  *Thomas, et al. v. Haslam, et al.*, Case No. 3:17-cv-00005 (court debt) and *Robinson, et al. v. Purkey, et al.*, Case No. 3:17-cv-01263 (traffic debt).

427.    Many people like the Plaintiff who owe money to the County have to borrow money, ration public benefits, convert federal means-tested disability checks into money orders to pay the company, and go further into debt to make the payments Defendants demand.  Other non-government creditors are not permitted to jail debtors, threaten to jail them, or compel their repeated arrest and court appearances for years for nonpayment.

428.    Defendants' coercive debt-collection system constitutes invidious discrimination and violates fundamental principles of equal protection of the laws.

## COUNT 11:

**Defendants' Use of Jail, Threats of Jail, and an Onerous Probation System to Collect Debts Owed to the County Violates Equal Protection and Due Process Because It Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor is the Government As Compared to Those Who Owe Money to Private Creditors**

**Brought under 42 U.S.C. § 1983 by Named Plaintiff Lucinda Brandon, Victor Gray, and Tanya Mitchell (through her estate) on behalf of themselves and all others similarly situated against Giles County for damages.**

429.    Plaintiffs incorporate by reference the allegations in paragraphs 1–428.

430.    Defendants, under color of state law, caused Plaintiffs, citizens of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

431.    The United States Supreme Court has held that, when governments seek to recoup costs from indigent defendants, they may not take advantage of their position—including their access to police, jails, and courts of law—to engage in unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  *See James v. Strange*, 407 U.S. 128 (1972).

432.     Defendants enacted policies, customs, and/or procedures that coerce payment of debts owed to the government.  Not only do the County and the company keep indigent people on standard and overly onerous probation supervision lasting years, but by imposing imprisonment, repeated threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses,[25] intrusive drug tests, extra fees, and other restrictions on Plaintiffs' liberty, the County and the company take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor.  The County deprives Plaintiffs of these protections even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments.

433.     Many people like the Plaintiffs who owe money to the County have to borrow money, ration public benefits, convert federal means-tested disability checks into money orders to pay the company, and go further into debt to make the payments Defendants demand.  Other non-government creditors are not permitted to jail debtors, threaten to jail them, or compel their repeated arrest and court appearances for years for nonpayment.

434.     Defendants' coercive debt-collection system constitutes invidious discrimination and violates fundamental principles of equal protection of the laws.

---

[25] It is the policy and practice of the County to initiate the revocation and suspension, and subsequently prevent the reinstatement, of Tennessee driving privileges for unpaid court debt and traffic debt, respectively, without informing debtors of any legal mechanism to avoid this consequence because of their inability to pay.  This practice is the subject of two lawsuits filed by undersigned counsel in the Middle District of Tennessee.  *Thomas, et al. v. Haslam, et al.*, Case No. 3:17-cv-00005 (court debt) and *Robinson, et al. v. Purkey, et al.*, Case No. 3:17-cv-01263 (traffic debt).

94

## COUNT 12:

**Defendants' Use of Jail, Threats of Jail, and an Onerous Probation System to Collect Debts Owed to the County Violates Equal Protection and Due Process Because It Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor is the Government As Compared to Those Who Owe Money to Private Creditors**

**Brought under 42 U.S.C. § 1983 by Named Plaintiff Victor Gray on behalf of himself and all others similarly situated against Giles County for equitable relief.**

435.    Plaintiff incorporates by reference the allegations in paragraphs 1–434.

436.    Defendants, under color of state law, caused Plaintiff, a citizen of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law.  Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

437.    The United States Supreme Court has held that, when governments seek to recoup costs from indigent defendants, they may not take advantage of their position—including their access to police, jails, and courts of law—to engage in unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  *See James v. Strange*, 407 U.S. 128 (1972).

438.    Defendants enacted policies, customs, and/or procedures that coerce payment of debts owed to the government.  Not only do the County and the company keep indigent people on standard and overly onerous probation supervision lasting years, but by imposing imprisonment, repeated threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses,[26] intrusive drug tests, extra fees, and other restrictions on Plaintiff's liberty, the County

---

[26] It is the policy and practice of the County to initiate the revocation and suspension, and subsequently prevent the reinstatement, of Tennessee driving privileges for unpaid court debt and traffic debt, respectively, without informing debtors of any legal mechanism to avoid this consequence because of their inability to pay.  This practice is the subject of two lawsuits filed by undersigned counsel in the Middle District of Tennessee. *Thomas, et al. v. Haslam, et al.*, Case No. 3:17-cv-00005 (court debt) and *Robinson, et al. v. Purkey, et al.*, Case No. 3:17-cv-01263 (traffic debt).

and the company take advantage of their control over the machinery of the County jail, and the prosecutorial, court, and police systems, to deny debtors the statutory protections that every other Tennessee debtor may invoke against a private creditor. The County deprives Plaintiff of these protections even though Tennessee law explicitly states that the debts owed to the County are subject to Tennessee law on civil judgments.

439.    Many people like the Plaintiff who owe money to the County have to borrow money, ration public benefits, convert federal means-tested disability checks into money orders to pay the company, and go further into debt to make the payments Defendants demand. Other non-government creditors are not permitted to jail debtors, threaten to jail them, or compel their repeated arrest and court appearances for years for nonpayment.

440.    Defendants' coercive debt-collection system constitutes invidious discrimination and violates fundamental principles of equal protection of the laws.

## COUNT 13:

### Defendants Violate Equal Protection and Due Process by Placing and Keeping People on Supervised Probation Solely Because They Cannot Afford to Pay Court Debts and Probation Supervision Fees

### Brought under 42 U.S.C. § 1983 by Named Plaintiffs Karen McNeil, Lesley Johnson, and Indya Hilfort on behalf of themselves and all others similarly situated against Giles County for damages

441.    Plaintiffs incorporate by reference the allegations in paragraphs 1–440.

442.    Defendants, under color of state law, caused Plaintiffs, citizens of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States, without due process of law. Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

443.    Giles County and the Private Defendants have a policy and practice of placing and keeping individuals on supervised probation with the CPS Defendants solely because they cannot

afford to pay their court debts and probation fees, without an inquiry to determine whether the failure to pay was willful. If a probationer can afford to pay her court debts in full, she will not be subjected to supervised probation by the private companies (sometimes, Defendants permit a probationer to purchase her way off of supervised probation only after a minimum period of time, typically four months, on supervised probation has passed). If the person is too poor to pay, the County and the Private Defendants have a policy and practice of keeping that person on supervised probation, including forcing the person to abide by conditions agreed upon by the companies and the County that seriously restrict the person's liberty and that subject the person to arrest and jailing if those conditions, as interpreted by the For-Profit Probation Defendants (including payment of extra fees to the company) are violated.

444.    The County has the ability to collect outstanding debts directly from the Plaintiffs by allowing them to make payments directly to the court or by using other debt-collection practices that are legal under Tennessee law.

445.    This policy and practice of altering punishment based solely on wealth status violates Due Process and Equal Protection.

## COUNT 14:

### Defendants Violate Equal Protection and Due Process by Placing and Keeping People on Supervised Probation Solely Because They Cannot Afford to Pay Court Debts and Probation Supervision Fees

### Brought under 42 U.S.C. § 1983 by Named Plaintiff Indya Hilfort on behalf of herself and all others similarly situated against CPS and Giles County for equitable relief

446.    Plaintiff incorporates by reference the allegations in paragraphs 1–445.

447.    Defendants, under color of state law, caused Plaintiff, a citizen of the United States, to be deprived of rights, privileges, and immunities secured by the United States Constitution and

the laws of the United States, without due process of law. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

448. Giles County and the Private Defendants have a policy and practice of placing and keeping individuals on supervised probation with the CPS Defendants solely because they cannot afford to pay their court debts and probation fees, without an inquiry to determine whether the failure to pay was willful. If a probationer can afford to pay her court debts in full, she will not be subjected to supervised probation by the private companies (sometimes, Defendants permit a probationer to purchase her way off of supervised probation only after a minimum period of time, typically four months, on supervised probation has passed). If the person is too poor to pay, the County and the Private Defendants have a policy and practice of keeping that person on supervised probation, including forcing the person to abide by conditions agreed upon by the companies and the County that seriously restrict the person's liberty and that subject the person to arrest and jailing if those conditions, as interpreted by the For-Profit Probation Defendants (including payment of extra fees to the company) are violated.

449. The County has the ability to collect outstanding debts directly from the Plaintiff by allowing her to make payments directly to the court or by using other debt-collection practices that are legal under Tennessee law.

450. This policy and practice of altering punishment based solely on wealth status violates Due Process and Equal Protection.

## COUNT 15:

### Defendants Violate Plaintiffs' Equal Protection and Due Process Rights By Jailing Them Solely Because They Cannot Afford A Monetary Payment

### Brought by Named Plaintiff Indya Hilfort on behalf of herself and all others similarly situated under 42 U.S.C. § 1983 against the County and the Sheriff for equitable relief

451. Plaintiff incorporates by reference the allegations in paragraphs 1–452 above.

452. The Fourteenth Amendment's Due Process and Equal Protection clauses have long prohibited keeping a person in jail because of the person's inability to make a monetary payment.

453. Defendants have a policy and practice of violating probationers' substantive right against wealth-based detention by enforcing secured financial conditions of release that are pre-printed on violation-of-probation arrest warrants and that are determined without an inquiry into or findings concerning ability to pay, without any pre-deprivation process, assessment of alternatives to detention, inquiry into whether the Plaintiffs pose a danger to the community or a risk of flight, or any findings regarding the need for detention in light of any particular government interest. Because the monetary amounts are predetermined without reference to the person's ability to pay, they operate to detain only those indigent misdemeanor-probationer arrestees who cannot afford them, but without any findings that pre-revocation, wealth-based detention is necessary to meet a compelling government interest. If the Plaintiff could pay the monetary amount, she would be released immediately.

454. These violation-of-probation warrants are routinely issued for the arrest of indigent misdemeanor probationers who, like Named Plaintiff Indya Hilfort, are supervised on probation only because they cannot afford to pay in full their court costs and probation fees.

## COUNT 16:

## Unjust Enrichment

## Brought by Named Plaintiffs Karen McNeil and Lesley Johnson on behalf of themselves and all others similarly situated against CPS for damages

455. Plaintiff incorporates by reference the allegations in paragraphs 1–454.

456. Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107,

and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

457. CPS Defendants took and converted to their own use monetary payments from Plaintiffs and proposed Class Members. Defendants extracted those funds in violation of Plaintiffs' federal and state constitutional rights to due process of law and equal protection of the laws. Defendants had no legal right to Plaintiffs' money and took these funds in violation of state law as related above. Under the circumstances presented here, Defendants' retention of Plaintiffs' money would result in unjust enrichment.

## COUNT 17:

## Unjust Enrichment

## Brought by Named Plaintiffs Lucinda Brandon, Victor Gray, and Tanya Mitchell (through her estate) on behalf of themselves and all others similarly situated against PSI for damages

458. Plaintiffs incorporate by reference the allegations in paragraphs 1–457.

459. Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

460. PSI Defendants took and converted to their own use monetary payments from Plaintiffs and proposed Class Members. Defendants extracted those funds in violation of Plaintiffs' federal and state constitutional rights to due process of law and equal protection of the laws. Defendants had no legal right to Plaintiffs' money and took these funds in violation of state law as related above. Under the circumstances presented here, Defendants' retention of Plaintiffs' money would result in unjust enrichment.

# COUNT 18:

## Unjust Enrichment

### Brought by Named Plaintiff Victor Gray on behalf of himself and all others similarly situated against PSI for equitable relief

461.    Plaintiff incorporates by reference the allegations in paragraphs 1–460.

462.    Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

463.    PSI Defendants took and converted to their own use monetary payments from Plaintiff and proposed Class Members.  Defendants extracted those funds in violation of Plaintiff's federal and state constitutional rights to due process of law and equal protection of the laws. Defendants had no legal right to Plaintiff's money and took these funds in violation of state law as related above.  Under the circumstances presented here, Defendants' retention of Plaintiff's money would result in unjust enrichment.

# COUNT 19:

## Abuse of Process

### Brought by Named Plaintiffs Karen McNeil, Lesley Johnson, and Indya Hilfort on behalf of themselves and all others similarly situated against Giles County, and CPS, for damages

464.    Plaintiffs incorporate by reference the allegations in paragraphs 1–463.

465.    Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

466. Defendants abused the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing" fees. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

467. When probationers are unable to pay what CPS demands, the company files revocation petitions and secures arrest warrants. Moreover, CPS participates through written documents, testimony, and informal ex parte conversations with Giles County prosecutors and judges to secure violation-of-probation judgments. The company refuses to convert a person's supervised probation to unsupervised probation unless she has paid all of her debts.

468. The company seeks violation-of-probation citation or arrest warrants for nonpayment even when it knows that the person did not pay because they were too poor to pay. The company and the County use these warrants as a way to extort additional money from impoverished probationers who are scared of being arrested and jailed.

469. The company and the County engage in all of these activities, and threaten probationers with arrest, jailing, and revocation if they do not make payments, with the ulterior motive of securing the additional court costs and fees that come as a matter of County policy and practice with each revocation violation.

470. The company also engages in an abuse of process throughout its probation supervision by using the order of probation not to do justice and assist probationers, but for the ulterior motive of making profit by setting fees, performing drug tests, and threatening to seek violation-of-probation warrants to extort money.

## COUNT 20:

## Abuse of Process

## Brought by Named Plaintiff Indya Hilfort on behalf of herself and all others similar situated against Giles, CPS, and Defendant McNair for equitable relief

471.     Plaintiff incorporates by reference the allegations in paragraphs 1–470.

472.     Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

473.     Defendants abused the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing" fees.  *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A*., 986 S.W.2d 550, 555 (Tenn. 1999).

474.     When probationers are unable to pay what CPS demands, the company files revocation petitions and secures arrest warrants.  Moreover, CPS participates through written documents, testimony, and informal ex parte conversations with Giles County prosecutors and judges to secure violation-of-probation judgments.  The company refuses to convert a person's supervised probation to unsupervised probation unless she has paid all of her debts.

475.     The company seeks violation-of-probation citation or arrest warrants for nonpayment even when it knows that the person did not pay because they were too poor to pay. The company and the County use these warrants as a way to extort additional money from impoverished probationers who are scared of being arrested and jailed.

476.     The company and the County engage in all of these activities, and threaten probationers with arrest, jailing, and revocation if they do not make payments, with the ulterior

motive of securing the additional court costs and fees that come as a matter of County policy and practice with each revocation violation.

477.    The company also engages in an abuse of process throughout its probation supervision by using the order of probation not to do justice and assist probationers, but for the ulterior motive of making profit by setting fees, performing drug tests, and threatening to seek violation-of-probation warrants to extort money.

## COUNT 21:

## Abuse of Process

## Brought by Named Plaintiffs Lucinda Brandon, Victor Gray, and Tanya Mitchell (through her estate) on behalf of themselves and all others similarly situated against Giles County, PSI, and Defendants Bledsoe and Thompson for damages

478.    Plaintiffs incorporate by reference the allegations in paragraphs 1–477.

479.    Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

480.    Defendants abused the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing" fees. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

481.    When probationers are unable to pay what PSI demands, the company files revocation petitions and secures arrest warrants. Moreover, PSI participates through written documents, testimony, and informal ex parte conversations with Giles County prosecutors and judges to secure violation-of-probation judgments. The company refuses to convert a person's supervised probation to unsupervised probation unless she has paid all of her debts.

482.     The  company  seeks  violation-of-probation  citation  or  arrest  warrants  for
nonpayment even when it knows that the person did not pay because they were too poor to pay.
The  company  and  the  County  use  these  warrants  as  a  way  to  extort  additional  money  from
impoverished probationers who are scared of being arrested and jailed.

483.     The  company  and  the  County  engage  in  all  of  these  activities,  and  threaten
probationers with arrest, jailing, and revocation if they do not make payments, with the ulterior
motive of securing the additional court costs and fees that come as a matter of County policy and
practice with each revocation violation.

484.     The  company  also  engages  in  an  abuse  of  process  throughout  its  probation
supervision by using the order of probation not to do justice and assist probationers, but for the
ulterior motive of making profit by setting fees, performing drug tests, and threatening to seek
violation-of-probation warrants to extort money.

## COUNT 22:

## Abuse of Process

### Brought by Named Plaintiff Victor Gray on behalf of himself and all others similarly situated against Giles County, PSI, and Defendant Bledsoe, for equitable relief

485.     Plaintiff incorporates by reference the allegations in paragraphs 1–484.

486.     Private Defendants, although acting under color of state law as defined by 42 U.S.C.
§ 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107,
and  therefore  they  are  not  entitled  to  state  governmental  immunity  under  the  Tennessee
Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

487.     Defendants  abused  the  legal  process  to  seek  arrest  warrants  and  probation
revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing"

fees.  *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999).

488.   When probationers are unable to pay what PSI demands, the company files revocation petitions and secures arrest warrants.  Moreover, PSI participates through written documents, testimony, and informal ex parte conversations with Giles County prosecutors and judges to secure violation-of-probation judgments.  The company refuses to convert a person's supervised probation to unsupervised probation unless she has paid all of her debts.

489.   The company seeks violation-of-probation citation or arrest warrants for nonpayment even when they know that the person did not pay because they were too poor to pay.  The company and the County use these warrants as a way to extort additional money from impoverished probationers who are scared of being arrested and jailed.

490.   The company and the County engage in all of these activities, and threaten probationers with arrest, jailing, and revocation if they do not make payments, with the ulterior motive of securing the additional court costs and fees that come as a matter of County policy and practice with each revocation violation.

491.   The company also engages in an abuse of process throughout its probation supervision by using the order of probation not to do justice and assist probationers, but for the ulterior motive of making profit by setting fees, performing drug tests, and threatening to seek violation-of-probation warrants to extort money.

# COUNT 23:

## Civil Conspiracy

**Brought by Named Plaintiffs Lucinda Brandon, Victor Gray, and Tanya Mitchell (through her estate) on behalf of themselves and all others similarly situated against Defendants Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., Tennessee Correctional Services, LLC, and Timothy Cook for damages**

492.    Plaintiffs incorporate by reference the allegations in paragraphs 1–491.

493.    Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq.*

494.    Defendants Progressive Sentencing, Inc., PSI-Probation II, LLC, PSI-Probation, L.L.C., Tennessee Correctional Services, LLC, and Timothy Cook acted in concert to accomplish the common and unlawful purposes of:

   a.    Acting under color of state law to deprive Plaintiffs and other probationers of the rights, privileges, and immunities secured by the United States Constitution and the laws of the United States without due process of law by:

      i.    Placing private, non-neutral actors with direct pecuniary interests in the outcome of probationers' cases in a position to dictate the outcome of those cases;

      ii.    Using imprisonment, threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses, intrusive drug tests, extra fees, and other restrictions on probationers' liberty to collect debts owed to the County;

      iii.    Placing and keeping individuals on supervised probation solely because they cannot afford to pay their court debts and probation fees, without determining whether the failure to pay was willful;

iv.     Permitting non-neutral actors with direct pecuniary interests in the drug testing of probationers to determine how many drug tests a probationer must endure and pay for, and when the probationer must take those drug tests;

v.      Taking and converting to their own use monetary payments from Plaintiffs and proposed class members to which Defendants had no legal right; and

vi.     Abusing the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing" fees.

495.    Defendants accomplished their common design via the unlawful means of contracting with the County to allow non-neutral, financially-interested individuals to serve a traditional government function, and extorting payments of court fines, costs, and various fees from Plaintiffs and proposed Class Members using, *inter alia* imprisonment and threats of imprisonment in violation of Tennessee and federal law.

496.    The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

497.    Defendants knew or should have known that Tennessee and federal law require individual consideration of each Plaintiff or proposed Class Member's ability to pay such court fines, costs, and fees, that placing and keeping a person on supervised probation solely for nonpayment of such civil debts violates Tennessee and federal law, and that Tennessee and federal law provide Plaintiffs and proposed class members with the right to have their probation supervised by a neutral officer of the court.

498.    Defendants knew of each other's common intent to contract with the County and subject Plaintiffs and proposed Class Members to onerous conditions of probation in violation of

Tennessee and federal law. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs Tanya Mitchell and Lucinda Brandon.

499.    The conspiracy among Defendants was a proximate and legal cause of harm to Plaintiffs and proposed class members. If Defendants had abided by the laws requiring probation officers to be free of financial conflicts of interest and prohibiting the use of supervised probation, arrest, and jailing to coerce payment from indigent individuals, Plaintiffs and proposed class members would not have suffered the unlawful deprivations of liberty and property described herein. Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## COUNT 24:

## Civil Conspiracy

**Brought by Named Plaintiffs Karen McNeil, Lesley Johnson, and Indya Hilfort on behalf of themselves and all others similarly situated against Defendants Community Probation Services, LLC, Community Probation Services, L.L.C., and Community Probation Services**

500.    Plaintiffs incorporate by reference the allegations in paragraphs 1–499.

501.    Private Defendants, although acting under color of state law as defined by 42 U.S.C. § 1983, are not employees of a government entity as defined by Tenn. Code Ann. § 29-20-107, and therefore they are not entitled to state governmental immunity under the Tennessee Governmental Torts Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*.

502.    Defendants Community Probation Services, LLC, Community Probation Services, L.L.C., and Community Probation services acted in concert to accomplish the common and unlawful purposes of:

a.    Acting under color of state law to deprive Plaintiffs and other probationers of the rights, privileges, and immunities secured by the United States Constitution and the laws of the United States without due process of law by:

i.        Placing private, non-neutral actors with direct pecuniary interests in the outcome of probationers' cases in a position to dictate the outcome of those cases;

ii.        Using imprisonment, threats of imprisonment, onerous probation conditions, revoked or withheld drivers' licenses, intrusive drug tests, extra fees, and other restrictions on probationers' liberty to collect debts owed to the County;

iii.        Placing and keeping individuals on supervised probation solely because they cannot afford to pay their court debts and probation fees, without determining whether the failure to pay was willful;

iv.        Permitting non-neutral actors with direct pecuniary interests in the drug testing of probationers to determine how many drug tests a probationer must endure and pay for, and when the probationer must take those drug tests;

v.        Taking and converting to their own use monetary payments from Plaintiffs and proposed class members to which Defendants had no legal right; and

vi.        Abusing the legal process to seek arrest warrants and probation revocation judgments with an ulterior motive to collect additional "supervision" and "drug testing" fees.

503.    Defendants accomplished their common design via the unlawful means of contracting with the County to allow non-neutral, financially-interested individuals to serve a traditional government function, and extorting payments of court fines, costs, and various fees from Plaintiffs and proposed Class Members using, *inter alia* imprisonment and threats of imprisonment in violation of Tennessee and federal law.

504.    The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

505.    Defendants knew or should have known that Tennessee and federal law require individual consideration of each Plaintiff or proposed Class Member's ability to pay such court fines, costs, and fees, that placing and keeping a person on supervised probation solely for nonpayment of such civil debts violates Tennessee and federal law, and that Tennessee and federal law provide Plaintiffs and proposed class members with the right to have their probation supervised by a neutral officer of the court.

506.    Defendants knew of each other's common intent to contract with the County and subject Plaintiffs and proposed Class Members to onerous conditions of probation in violation of Tennessee and federal law.  Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs Tanya Mitchell, Victor Gray, and Lucinda Brandon.

507.    The conspiracy among Defendants was a proximate and legal cause of harm to Plaintiffs and proposed class members.  If Defendants had abided by the laws requiring probation officers to be free of financial conflicts of interest and prohibiting the use of supervised probation, arrest, and jailing to coerce payment from indigent individuals, Plaintiffs and proposed class members would not have suffered the unlawful deprivations of liberty and property described herein.  Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court issue the following relief:

A.    An order certifying the classes described above;

B.    A declaratory judgment that subjecting the Plaintiffs to Defendants' conduct as alleged in the Counts listed above is unlawful;

C.    An order and judgment permanently enjoining the Defendants from enforcing the

above-described unconstitutional and illegal policies and practices against the Plaintiffs and the injunctive class of similarly situated people;

C.      A declaratory judgment that the contracts at issue are void;

D.      A judgment compensating the Plaintiffs and the class of similarly situated people they represent for the damages they suffered as a result of the Defendants' unconstitutional and unlawful conduct;

E.      A judgment granting the treble and punitive damages authorized by statute based on the Defendants' willful and egregious violations of the law;

F.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964, and any other relief this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: March 23, 2021

Respectfully Submitted,

s/ Elizabeth Rossi
Elizabeth Rossi* (*pro hac vice*)
Laura Gaztambide Arandes (*pro hac vice*)
Eric Halperin (*pro hac vice*)
Alexandria Twinem (*pro hac vice*)
Sumayya Saleh (*pro hac vice pending*)
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 200
Washington, DC 20006
Telephone: (202) 599-0953
Facsimile: (202) 609-8030
elizabeth@civilrightscorps.org
laura@civilrightscorps.org
eric@civilrightscorps.org
alexandria@civilrightscorps.org
sumayya@civilrightscorps.org


Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 982-8002
Facsimile: (615) 229-6387
kyle@mothersheadlaw.com

Matthew J. Piers (*pro hac vice*)
Chirag G. Badlani (*pro hac vice*)
Kate E. Schwartz (*pro hac vice*)
HUGHES SOCOL PIERS RESNICK &
DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, Illinois 60602
Telephone: (312) 580-0100
Facsimile: (312) 580-1994
mpiers@hsplegal.com
cbadlani@hsplegal.com
kschwartz@hsplegal.com

David W. Garrison, BPR 24968
Scott P. Tift, BPR 27592
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

*Attorneys for Plaintiffs and Proposed Classes*