## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | |
|---|---|
| KAREN MCNEIL, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:18-cv-00033 |
| COMMUNITY PROBATION SERVICES, LLC; *et al.*, | Judge Campbell/Magistrate Judge Frensley |
| Defendants. | JURY DEMAND |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS AND
## COUNTY DEFENDANTS' UNOPPOSED JOINT MOTION
## FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Karen McNeil, Lesley Johnson, Indya Hilfort, Lucinda Brandon, the Estate of Tanya Mitchell, and Victor Gray (collectively, "Named Plaintiffs"), by and through their counsel, along with Defendants Giles County and Giles County Sheriff Kyle Helton in his official capacity (the "County Defendants") respectfully submit this Memorandum of Law in Support of their Joint Motion for Final Approval of a Class Action Settlement and Consent Decree between the Named Plaintiffs and County Defendants.[1] The Court previously granted the Parties' Motion for Preliminary Approval, preliminarily certifying a class for settlement purposes, appointing Atticus Administration, LLC as the Claims Administrator ("Atticus"), and approving the proposed method of providing notice to absent Class Members. Dkt. 447 (Preliminary Approval Order). Atticus did not receive any requests for exclusion, and only one Class Member submitted an objection. The

---

[1] Plaintiffs and the County Defendants will be referred to throughout this Motion as "the Parties."

Parties' motion for final approval is unopposed, and the private defendants have agreed not to appeal an order granting final approval. Dkt. 446 (Stipulation Among All Parties) ¶¶ C(1)–(2) ("[A]ll parties agree not to file opposition to [] final approval of the Consent Decree [] or the Settlement Agreement between the Plaintiffs and County Defendants[.] . . . Based on this stipulation, all Parties agree not to appeal an order entering the Consent Decree and approving the Agreement."). Each of the relevant factors for determining whether to grant final approval weighs in favor of approval of the Consent Decree and Settlement Agreement ("the Agreement"). Accordingly, the Court should issue final approval, certify the Classes, and award the requested Attorneys' Fees and Service Payments.

## I. Factual and Procedural Background

### A. History of the Litigation[2]

In this litigation against CPS Defendants,[3] PSI Defendants,[4] and County Defendants, Named Plaintiffs Karen McNeil, Lesley Johnson, Indya Hilfort, Lucinda Brandon,[5] the Estate of Tanya Mitchell,[6] and Victor Gray[7] represent a putative class of people who were on probation in

---

[2] This section is substantively identical to Section I of Memorandum in Support of Plaintiffs' and County Defendants' Joint Motion for Preliminary Approval of Class Action Settlement. Dkt. 444 at 3–7.

[3] "CPS Defendants" includes Defendant Community Probation Services, LLC, Defendant Community Probation Services, L.L.C., Defendant Community Probation Services, and Defendant Patricia McNair.

[4] "PSI Defendants" includes Defendant Progressive Sentencing, Inc., Defendant PSI-Probation II, LLC, Defendant PSI-Probation, L.L.C., Defendant Tennessee Correctional Services, LLC, Defendant Timothy Cook, Defendant Markeyta Bledsoe, and former Defendant Harriet Thompson.

[5] Ms. Brandon was substituted for original Named Plaintiff Sonya Beard on April 19, 2019. Dkt. 253.

[6] The Estate of Tanya Mitchell was substituted for Ms. Mitchell's damages claims on March 23, 2021. Dkt. 432.

[7] Victor Gray was added as a Named Plaintiff on April 30, 2021. Dkt. 439.

connection with a misdemeanor offense in Giles County on or after April 23, 2017, through March 31, 2021, for alleged violations of their due process and equal protection rights under the U.S. Constitution and their rights under Tennessee law. Named Plaintiffs Brandon, McNeil, Johnson, Gray, and the Estate of Tanya Mitchell represent a second class of people who were on probation in connection with a misdemeanor offense in Giles County from April 23, 2015 to March 31, 2021, who paid fees to CPS Defendants and/or PSI Defendants. Finally, Plaintiffs Hilfort and Gray represent all people who are or will be convicted of a misdemeanor offense in Giles County and who are required to make payments and/or who are sentenced to probation.

Plaintiffs also brought a bail claim challenging the use of pre-determined secured money bail amounts on misdemeanor violation-of-probation warrants. Dkt. 41 (Corrected First Amended Complaint); Dkt. 42 (Motion and Mem. in Support of Motion for Temporary Restraining Order and Motion for Preliminary Injunction). The Court granted a Temporary Restraining Order, Dkt. 45, and then a class-wide preliminary injunction on the bail claim, and the Sixth Circuit affirmed the decision. *McNeil v. Cmty. Prob. Servs., LLC*, Case No. 1:18-cv-00033, 2019 WL 633012 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019). As part of seeking a preliminary injunction, Plaintiffs engaged in significant discovery, including written discovery and taking and defending fifteen depositions, which included the deposition of Plaintiff Hilfort. *See* Ex. 1 (Decl. of E. Rossi) ¶¶ 10, 18, 21.

After Plaintiffs propounded their initial discovery requests, the parties engaged in significant discovery for several months. *See* Ex. 1 ¶¶ 18, 21, 33-49. In addition to vigorously litigating the sufficiency of Defendants' discovery responses, Plaintiffs defended the depositions of two Named Plaintiffs, prepared for the depositions of additional Plaintiffs and witnesses, responded to numerous interrogatories and requests for production, and engaged in significant

3

third-party discovery. *Id*. ¶¶ 68-75. On April 18, 2019, CPS Defendants moved for summary judgment, raising qualified immunity as to Plaintiffs' constitutional claims. Dkts. 245, 251. The Court denied CPS's summary judgment motion as premature, Dkt. 283, but stayed oral discovery generally and written discovery as to CPS pending appeal of that order, Dkts. 296, 304. On August 14, 2019, during the stay, PSI moved for summary judgment. Dkt. 300. The Court denied the motion as premature. Dkt. 361. The Sixth Circuit subsequently affirmed the district court's denial of CPS Defendants' motion. *McNeil v. Cmty. Prob. Servs, LLC*, Case No. 19-5660, 803 Fed. App'x 846 (6th Cir. Feb. 28, 2020).

Throughout the first discovery stay, Plaintiffs continued to engage in substantial written discovery with County Defendants and PSI Defendants. Plaintiffs served additional requests for production and interrogatories, engaged in numerous meet and confers to obtain additional responsive documents and information in response to those requests, and gathered information from numerous third parties. Ex. 1 ¶¶ 57-65. Altogether, Plaintiffs received over 76,000 documents, consisting of over 450,000 pages, from County Defendants, CPS Defendants, and PSI Defendants. *Id*. ¶ 65. Plaintiffs also responded to additional discovery requests. *Id*. ¶ 73.

On May 14, 2020, PSI refiled its motion for summary judgment. Dkt. 363. The discovery stay was lifted on June 2, 2020. Dkt. 367. But CPS quickly filed two Rule 12 motions, challenging jurisdiction and the sufficiency of Plaintiffs' claims, and sought another stay of discovery pending resolution of those motions. Dkts. 369, 370, 374. The Court granted the stay. Dkt. 382. The parties fully briefed the motions, and on February 3, 2021, the Court issued decisions on the companies' dispositive motions, allowing several of Plaintiffs' claims to proceed. Dkts. 414–417.

On September 14, 2020, named Plaintiff Tanya Mitchell passed away unexpectedly. Dkt. 408. On January 12, 2021, Plaintiffs moved to substitute Ms. Mitchell's estate for Ms. Mitchell as

class representative for Ms. Mitchell's damages claims. Dkts. 410, 413. The Court granted that motion on March 23, 2021. Dkt. 432. That same day, Plaintiffs filed a motion for leave to file a Third Amended Complaint, seeking to add Victor Gray as a class representative for Ms. Mitchell's remaining injunctive claims. Dkt. 433. On April 30, that motion was granted. Dkt. 439.

Plaintiffs and County Defendants began settlement discussions in January 2020 and entered into mediation in the summer of 2020 with mediator Carlos Gonzalez. Ex. 1 ¶ 93. Plaintiffs and County Defendants engaged in multiple telephonic meetings with Mr. Gonzalez, and he attended an in-person meeting with County Defendants and other Giles County officials in October 2020. *Id*. ¶ 94. The mediation process resulted in an agreement in principle between Named Plaintiffs and County Defendants for damages and injunctive relief. *Id*. ¶ 96. On May 7, 2021, the Giles County Commissioners Court voted to authorize the entry of a Settlement Agreement and Consent Decree, ending private probation in Giles County. *Id.* The Commissioners also approved a monetary settlement of $2 million. *Id*.

Named Plaintiffs and County Defendants concluded that settlement is desirable to avoid the time, expense, and inherent uncertainties of litigation and to resolve finally and completely all pending and potential claims relating to the conduct alleged in this litigation.[8] These parties further believe that the Settlement Agreement offers significant benefits to Class Members and is fair, reasonable, adequate, and in the best interest of all Class Members, defined as:

- Class A: All people (1) who are or will be convicted of a misdemeanor offense in Giles County and (2) who are required to make payments and/or who are sentenced to probation, represented by Named Plaintiffs Indya Hilfort and Victor Gray.

---

[8] As part of the Settlement Agreement with County Defendants, Named Plaintiffs have agreed to dismiss with prejudice their claims against the PSI Defendants and CPS Defendants if the Court approves the Agreement. *See* Dkt. 446 (Stipulation Among All Parties).

- Class B: All people who were on probation in connection with a misdemeanor offense in Giles County on or after April 23, 2017 through March 31, 2021, represented by all Named Plaintiffs.

- Class C: All people who paid CPS Fees and/or PSI Fees (as defined in the Settlement Agreement) while on probation in connection with a misdemeanor offense in Giles County on or after April 23, 2015 through March 31, 2021, represented by Karen McNeil, Lesley Johnson, Lucinda Brandon, Estate of Tanya Mitchell, and Victor Gray.

On July 26, 2021, the Court granted preliminary approval of the Settlement Agreement and Consent Decree. Dkt. 447; Ex. 2 (Settlement Agreement); Ex. 3 (Consent Decree).

### B. The Terms of the Settlement

In the interest of avoiding protracted and costly litigation, the parties have agreed to a proposed Consent Decree that accomplishes the following:

1. An end to user-funded probation in Giles County (whether run by a third party or the County);

2. An end to the practice of keeping people in Giles County on supervised probation solely because they have not paid all of their probation fees;

3. Implementation of use of a financial affidavit to ensure that the County does not collect legal financial obligations ("LFOs") or restitution from people who cannot afford to pay;

4. Waiver of past debts and notice thereof;

5. The recall of outstanding misdemeanor violation-of-probation ("VOP") warrants and notice thereof;

6. Restrictions on the reissuance of past VOP warrants;

7. Restrictions on the reassessment of ability to pay during probation terms;

8. An end to pre-hearing detention for people arrested on misdemeanor VOP warrants;

9. Restrictions on drug tests and reporting requirements for people on probation; and

10. Requirements to train system actors on the new practices.

6

Further, and subject to court approval, the Parties' Settlement Agreement provides that the County will pay $2 million in class damages, Attorneys' Fees, and Service Payments. The Parties propose that payments out of the Settlement Fund be allocated as follows: First, an award of 10% of the common fund will be paid in attorneys' fees and costs (the "Attorneys' Fee Award") from the Settlement Fund. Second, an additional $120,000 total will be distributed among Named Plaintiffs Hilfort, Brandon, the Estate of Tanya Mitchell, McNeil, Johnson, and Gray as payments for the service they provided in representing the classes in this litigation. Third, each class member will receive equal portions of the Settlement Fund, calculated as follows:

- The Settlement Fund, minus proposed Service Payments and Attorneys' Fees, is equal to $1,680,000.

- Out of a class of 3,892 people, Notice was mailed successfully to 3,405 Class Members in Class B and/or Class C. An initial payment will be allocated for all 3,892 people, but payment will be made to only the 3,405 people who successfully received Postcard Notice. If any of the 487 Class Members whose Postcard Notice was returned undeliverable update their address prior to the first check cashing deadline (which is 90 days after the payments are made, *see* Dkt. 444-2 at 22), Atticus will distribute payment to them. Otherwise, the payments allocated to those 487 individuals will revert to the Settlement Fund.

- Each member of Class B will be entitled to receive an initial Cash Award equal to 80% of $1,680,000 (the Settlement Fund minus attorneys' fees and service payments), divided by the total number of people in Class B. Prior to receiving the class lists, the Parties estimated that the initial cash award for individuals in only Class B would be $363. Ex. 1 ¶ 101. In fact, the initial payment sent to members of Class B will be $394.74. Ex. 4 (Declaration of Christopher Longley re Class Notice and Settlement Administration) ("Longley Declaration") ¶ 14.

- Each member of Class C will be entitled to receive an initial Cash Award equal to 20% of $1,680,000, divided by the total number of people in Class C. Prior to receiving the class lists, the Parties estimated that the initial cash award for individuals in only Class B would be $105. *See* Ex. 1 ¶ 101. In fact, the initial payment sent to members of Class B will be $125.89. Ex. 4 ¶ 14.

- Individuals who are members of both Class B *and* Class C will thus receive an initial Cash Award of $520.60. *Id.* The Parties originally estimated that such individuals would receive an initial Cash Award of $468. Ex. 1 ¶ 101.

7

- If money reverts to the Settlement Fund after the deadline to cash the initial checks has passed, the Settlement Administrator will make a second payment to each Settlement Class Member who cashed a check or accepted payment from the Settlement Administrator through another means. Each member of Class B who cashed their initial checks or otherwise accepted their initial payment will be entitled to a second Cash Award equal to 80% of the reverted settlement funds divided by the total number of people in Class B who cashed their initial checks or otherwise accepted their initial payment. Each member of Class C who cashed their initial checks or otherwise accepted their initial payment will be entitled to a second Cash Award equal to 20% of the reverted settlement funds divided by the total number of people in Class C who cashed their initial checks or otherwise accepted their initial payment. The Settlement Administrator will not, however, issue payments equal to less than $25.00.

- If any additional funds remain in the Settlement Account after the second distribution, they will be donated to Free Hearts in Nashville, Tennessee. *See* Ex. 2 at 17.

## II. ARGUMENT

### A. The Settlement is Fair, Reasonable, and Adequate

A class action settlement should be approved if it is "fair, reasonable, and adequate." Fed. Rule Civ. P. 23(e)(2). In the Sixth Circuit, the following factors guide that analysis:

(1) the risk of fraud or collusion;
(2) the complexity, expense and likely duration of the litigation;
(3) the amount of discovery engaged in by the parties;
(4) the likelihood of success on the merits;
(5) the opinions of class counsel and class representatives;
(6) the reaction of absent class members; and,
(7) the public interest.

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007); *see also Hosp. Authority of Metropolitan Gov't of Nashville & Davidson Cty., Tennessee v. Momenta Pharms., Inc.*, No. 3:15-CV-01100, 2020 WL 3053467, at *2 (M.D. Tenn. May 29, 2020). These factors are intended especially to protect the interests of absent class members, "who by definition are not present during the negotiations." *Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 309 (6th Cir. 2016). Law and public policy "strongly

favor the settlement of class action litigation." *Sheick v. Automotive Component Carrier LLC*, 2010 WL 4136958, at *14 (E.D. Mich. Oct. 18, 2010) (collecting cases). "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are "notoriously difficult and unpredictable" and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003). Here, the Agreement is fair and reasonable to all class members and all of the factors weigh in favor of final approval.

### 1. The Circumstances and Terms of the Agreement Demonstrate Lack of Fraud or Collusion in its Creation

"Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *IUE-CWA v. Gen'l Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006). Named Plaintiffs and County Defendants employed a neutral mediator, Carlos Gonzalez, who is experienced in litigation regarding private probation practices, to assist the parties in reaching agreement. The negotiations took place over more than a year, and resulted in an agreement that reflects significant compromise of both parties' initial positions. Throughout the period of negotiations, Plaintiffs and County Defendants also engaged in extensive discovery that resulted in the parties seeking intervention of the Court to resolve discovery disputes, further demonstrating that these parties were not engaging in any form of collusion. Ex. 1 ¶¶ 35, 41-42, 58-59, 62, 64; *cf. Dick v. Sprint Comms. Co.*, 297 F.R.D. 283, 295 (W.D. Ky. 2014) (noting that "extensive motion practice" between the parties and a lack of any "allegation[s] of fraud or collusion" weighed in favor of approving settlement). A settlement like this one that is reached through arms-length negotiations is entitled to a presumption of fairness. *See 4 Newberg on Class Actions* § 13:43 (5th ed.). There is no suggestion, let alone evidence, that the negotiations were not conducted at arms length. *IUE-CWA*, 238 F.R.D. at 599. "Absent evidence of fraud or collusion, such settlements are not to be trifled with."

*Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992). Thus, this factor weighs in favor of final approval.

### 2. The Litigation Would be Expensive and Time-Consuming to Pursue Through Trial

The complexity, risks, and costs of additional litigation in this case are great. As the length and history of this litigation plainly demonstrate, the Parties have vigorously litigated this case at every stage over the course of over three years. Plaintiffs' counsel has already expended over 10,000 hours on behalf of the Plaintiff Classes and incurred over $190,000 in costs. Ex. 1 ¶ 133. And although Plaintiffs have completed paper discovery with County and PSI Defendants and the Parties engaged in an initial round of depositions before the Preliminary Injunction hearing, substantial discovery remains. Plaintiffs have taken no depositions in this case beyond those relevant to Count 15 (the bail claim), and all written discovery with CPS Defendants has effectively been on pause since the first stay of discovery in June 2019, with only limited discovery occurring before then. If the litigation continued, it would require a significant expenditure of time to complete written discovery with CPS Defendants, prepare for and conduct depositions against three sets of Defendants and third-party witnesses, and defend the remaining Plaintiff depositions and additional witnesses subjected to supervised probation by Defendants. Any trial in this case would likely be lengthy and complex given the multiple sets of Defendants, significant number of witnesses, the volume of evidence needed to demonstrate that the constitutional violations resulted from policies and practices of the Defendants, and the need for expert witness testimony. This case, like all litigation, presents additional costs for the Named Plaintiffs themselves, including the

10

significant burdens of preparing for and participating in a multi-week trial, as well as the emotional toll of sharing the details of their personal lives and financial struggles publicly.

### 3. The Parties Have Engaged in Sufficient Discovery to Ensure Fairness of the Agreement and Claims Process

Although substantial discovery remains in this case, the Parties have exchanged a significant amount of information: more than sufficient to ensure the fairness of the Agreement and claims process. First, the Parties engaged in significant written and oral discovery prior to the preliminary injunction hearing, including conducting 15 depositions. Ex. 1 ¶¶ 10, 21. On October 30, 2018, after discovery formally opened, PSI Defendants produced 90,000 pages of documents. *Id.* ¶ 34. In March 2019, CPS Defendants produced over 120,000 pages of documents. *Id.* ¶ 36. Plaintiffs propounded additional discovery requests in April 2019 and June 2019. *Id.* ¶¶ 39, 43. Over the course of the litigation, Plaintiffs received over 76,000 documents consisting of more than 450,000 pages from the County Defendants, CPS Defendants, and PSI Defendants, and spent substantial time responding to discovery requests from Defendants, including defending the depositions of Named Plaintiffs Indya Hilfort, Tanya Mitchell, and Lucinda Brandon, and producing documents consisting of over 6,100 pages. *Id.* ¶¶ 66–73.

The discovery received to date is more than sufficient to justify approval of the Agreement. Plaintiffs have reviewed a large number of documents from all Defendants to assess the strength of their claims, to confirm municipal liability and the companies' policies and practices, the likely number of individuals in the class, and the amount of financial injury suffered by Class Members.

### 4. The Merits of Plaintiffs' Claims, Benefits to the Class from the Agreement, and Inherent Risks of Litigation Favor the Agreement

The Agreement represents a balancing by Plaintiffs of the merits of their claims, the benefits of the Agreement, and the risks of litigation. Although Plaintiffs believe that their

remaining claims have significant merit, and the Court found as much during the preliminary injunction proceedings and dispositive motion practice, *see* Dkts. 224–25; 414–417, there is always uncertainty in litigation, especially where, as here, novel legal theories are being advanced. Moreover, as discussed *supra* the financial benefits of the Agreement—including a damages award and waiver of outstanding court debts—are fair to the class. Ex. 1 ¶¶ 99, 102. The proposal to provide an average award to all Class Members is both fair and reasonable: any attempt to calculate individualized damages would be impossible, given that the companies' records are not accurate and given the limitations of the County's computer system. The Agreement also allows this compensation to come now, rather than after potentially years of further litigation, which is of significant benefit to the indigent class members, many of whom are in need of cash today to address basic needs. *See Phillips v. Humana Health Plans of Kentucky, Inc.*, 238 F.3d 423, *5 (6th Cir. Dec. 15, 2000) (noting that settlements often account for the time value of money); *Amos v. PPG Indus., Inc.*, 2015 WL 4881459, at *4 (S.D. Ohio Aug. 13, 2015) (finding relevant that many members of the settlement class, which consisted primarily of elderly and/or disabled individuals, may not survive protracted litigation); *see also In re MQVP, Ind.*, 477 Fed. Appx. 310, 314 (6th Cir. Apr. 13, 2012) (recognizing the time value of money in assessing the fairness of a settlement). Of course, to the extent that any absent class members disagreed with that choice, they were free to exclude themselves. None of them did.

Moreover, the detailed provisions of the Consent Decree afford Class Members numerous benefits that would be difficult or impossible to achieve through litigation. In addition to ending Defendants' unconstitutional practices, the Consent Decree confers significant financial benefits to Class Members in the form of immediate forgiveness of millions of dollars of outstanding debts and fines. Additionally, outstanding misdemeanor violation-of-probation warrants will not be

12

executed. This relief will protect Class Members' financial resources, ensure that they will not be kept on probation solely to pay fees, and prevent them from being assessed fees they cannot afford.

Despite significant successes previously achieved in this case, in the absence of a settlement, Plaintiffs would face substantial risks in litigating liability and damages, certifying a class, and obtaining the breadth of injunctive relief achieved through the Agreement. The Agreement thus offers fair and substantial relief in light of the significant challenges and risks associated with pursuing such claims individually or through further litigation.

### 5. The Class Representatives and Class Counsel Approve of the Agreement

Class Counsel and all of the Named Plaintiffs believe that the settlement is fair, reasonable, and adequate for all concerned. The judgment of experienced counsel who have evaluated the strength of their evidence weighs in favor of approving the Agreement. Class Members will achieve through this Agreement much of what they originally hoped to achieve, while preventing costly, protracted litigation. The Named Plaintiffs and Class Counsel are particularly pleased that the Agreement provides for permanent injunctive relief, which will ensure that no one else will be forced to experience what the Named Plaintiffs allege they endured.

### 6. The Absent Class Members Have Embraced the Agreement

Out of a class of 3,892 identified individuals, only one objection was received, and no one opted out of the Agreement. Ex. 4 ¶¶ 8, 13. This extraordinarily positive response, especially for a class consisting almost entirely of indigent former probationers, weighs heavily in favor of approval. *Compare Olden v. Gardner*, 294 Fed. Appx. 210, 217 (6th Cir. Sept. 18, 2008) (the fact that "[o]ut of nearly 11,000 absent class members, only 79 objected to the settlement, and only 54 are involved in this appeal . . . permit[s] the inference that most of the class members had no qualms with [the settlement].").

13

### 7. The Public Interest Supports Approval

The public interest strongly favors approval of the settlement. Protecting constitutional rights is always in the public interest. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). The proposed Settlement Agreement preserves the constitutional rights of individuals on probation in Giles County by ensuring that they are not subjected to harsher treatment based on inability to pay and that they will not be supervised by a probation officer with a financial incentive to make discretionary decisions in ways that restrict their liberty and result in longer periods on supervision and more debt. The settlement also involves the distribution of almost $2 million to indigent people whose constitutional rights were violated, and mandates that Giles County reform its probation practices to bring them into compliance with the Constitution and other applicable law. Moreover, the public interest is served by the fact that this settlement will avoid an enormous amount of litigation and expense. *See In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 372 (S.D. Ohio 1990) (noting that the public interest is served where, *inter alia*, "[t]ime-consuming and expensive litigation will be avoided, [and] the dispute will be resolved[.]"). This factor strongly supports approval of the Agreement.

### B. Class Notice Satisfied Due Process

Under Rule 23(e), this Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal[.]" Fed. R. Civ. P. 23(e)(1)(B). This Court has wide discretion in determining what constitutes reasonable notice under Rule 23(e), in form and method. *See Franks v. Kroger Co.*, 649 F.2d 1216, 1222–23 (6th Cir. 1981), *on reh'g,* 670 F.2d 71 (6th Cir. 1982); 7B Fed. Prac. & Proc. Civ. § 1797.6 (3d ed.). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). "The

notice should be reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007).

The Court approved the proposed notice program in the Preliminary Approval Order, and Atticus, supervised jointly by the Parties, executed the notice program in accordance with the provisions therein, with the exception of the courthouse Notice, which the County posted belatedly. The Declaration of Christopher Longley, Chief Executive Officer of Atticus Administration, LLC, details  (i) the class list preparations, (ii) the method of providing notice to the Class in accordance with the Settlement Agreement, (iii) the settlement websites and toll-free information line, (iv) the receipt and processing of claim forms, and (v) the receipt and validation of exclusion requests and settlement objections, all in adherence to the Court's preliminary approval order. *See* Ex. 4.

Notice was provided using a variety of media. First, in July 2021, before the notice period began, Atticus used records produced by CPS Defendants and PSI Defendants to identify an initial list of 3,906 Class Members. Ex. 4 ¶ 4. Address information was not provided or located for 91 of the people on the initial list. *Id.* ¶ 6. Thus, on August 16, 2021, Atticus sent Class Notice via First Class Mail to 3,815 Class Members. *Id.* Of the remaining 91 potential Class Members on the initial list, addresses were subsequently located through the Parties' research efforts for 77 individuals. *Id.* Atticus mailed notice to these 77 individuals in early October. *Id.* Following further review, Counsel for the Parties agreed that Atticus should remove the remaining 14 incomplete records from the Class List because they were confirmed to be duplicate or records that do not connect to any human (specifically, there was a record for "Screen Drug."). *Id.* Thus, the total number of

15

identified Class Members to whom notice was mailed was 3,892. *Id.* The mailed notice was sent in the format of a four-panel postcard. *Id.* ¶ 7. The Postcard Notice included an overview of the allegations, information about settlement benefits, rights and options available to Class Members, and how to access additional information. *Id.* Of the 3,892 postcards mailed, 841 were returned as undeliverable. *Id.* ¶ 8. Following address tracing and re-mailing, a total of 3,405 Class Notices—or 87.48% of the 3,892 Notices—were mailed successfully. *Id.*

Second, notice was provided via Facebook beginning on August 13, 2021. *Id.* ¶ 9. The Facebook page provided the long-form notice and the Postcard Notice. *Id.* It also included a link to the settlement website and information about how to contact Atticus directly. *Id.* The page was viewed 54,550 times.

Third, the content of the Postcard Notice was published in the *Pulaski Citizen* on August 18, 2021, and September 1, 2021. *Id.* ¶ 10.

Finally, Notice was posted at the Courthouse, as required by the Preliminary Approval Order, albeit belatedly. On November 16, two Notices, containing the content of the Postcard Notice, were posted on the counters in the Clerk's Office at the Giles County Courthouse. Ex. 5 (Declaration of Cassandra Crane) ¶ 4. Notice was also posted on November 16 on the bulletin board outside the General Sessions Courtroom. *Id.* ¶ 5. On November 18, notice was posted on the door to the Circuit Court courtroom. *Id.* ¶ 6. Given the belated postings, and out of an abundance of caution in the event there are Class Members who did not receive Notice via the other three media and who wish to update their names or addresses, the Parties jointly propose that the courthouse Notice remain posted for an additional 50 days until January 5, 2022.[9] Given that

---

[9] If any additional objections or opt-out requests are received during this period of time, the Parties will notify the Court promptly.

Notice was provided in three other media—mailing, Facebook, and newspaper, and considering that the Administrator has agreed to accept name and address changes up through the conclusion of the initial 90-day check-cashing period, even without the additional courthouse notice, the Notice program that was implemented fully satisfies Rule 23 and due process.

The deadline for requesting exclusion from or filing objections to the Agreement was October 15, 2021. Atticus received no exclusion requests and only one objection, which is attached as Exhibit D to the Longley Declaration.

The notice plan previously approved by the Court, and implemented by the parties, satisfied the requirements of due process and Rule 23. Following an additional 50-day courthouse notice period, the program will exceed those requirements and comply fully with this Court's Preliminary Approval Order, without delaying the timeline for distribution, if the Court issues final approval.

### C. The Named Plaintiffs' Service Payments Are Reasonable[10]

In accordance with the Settlement Agreement, the Named Plaintiffs will receive a Service Payment that is allocated based on the length of time they participated in the case and whether and to what extent they participated in discovery, including whether they submitted to a deposition. The proposed Service Payments are $25,000 for individuals who were deposed (Lucinda Brandon, the estate of Tanya Mitchell, and Indya Hilfort), $20,000 for the other original Named Plaintiffs (Karen McNeil and Lesley Johnson), and $5,000 for recently-added Named Plaintiff Victor Gray.

These Service Payments are reasonable. While the Sixth Circuit "has never explicitly passed judgment on the appropriateness of incentive awards," it has recognized that numerous courts of appeals "have stressed that incentive awards are efficacious ways of encouraging

---

[10] This section is substantively identical to Section IV of Memorandum in Support of Plaintiffs' and County Defendants' Joint Motion for Preliminary Approval of Class Action Settlement. Dkt. 444 at 17–20.

17

members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003); *accord Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010) ("Courts within the Sixth Circuit . . . recognize that, in common fund cases and where the settlement agreement provides for incentive awards, class representatives who have had extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled to by virtue of class membership alone."). Here, the Named Plaintiffs provided substantial support to Class Counsel throughout the course of litigation over more than three years. Ex. 1 ¶¶ 103-24. For example, they provided a significant amount of documents, much of which involved personal financial information; participated in the investigation and litigation, including helping counsel identify potential witnesses and substitute class representatives when necessary; prepared for and completed lengthy depositions, which involved responding to invasive questions about their personal finances, life choices, criminal history, and time on probation; and participated in an untold number of conversations with Class Counsel about their experiences and proposed relief. The Named Plaintiffs have remained committed to their roles in this case, even as they dealt with personal tragedy, housing and food insecurity, and medical issues, and even as they juggled immense familial responsibility. *Id.* ¶¶ 72, 110-11, 114, 117-18, 120-21, 124.

The total amount that will be awarded in Service Payments is $120,000, with the highest individual amount being $25,000. The total amount of Service Payments amounts to 6% of the total settlement, with the highest individual Service Payment representing 1.25% of the total settlement. And the Settlement Fund does not include the total amount of debt being forgiven, which Plaintiffs' counsel estimates could exceed $6.5 million dollars. Ex. 1 ¶ 102. Considering both the cash awards *and* the amount of debt forgiven, the service payments amount to 1.41% of

the total settlement, with the highest individual Service Payment representing .29%. The Service Payment amounts are proportional to the benefits received by the entire class, which include a significant cash award and automatic waiver of past court debts; automatic forgiveness of any remaining outstanding fees and debts; and a continuing benefit in the form of significant changes to the ways in which supervised probation is run in Giles County.

The service payments sought are also in line with similar awards given within this Circuit. *See* Order Granting Final Approval to Class Settlement at 10, *Rodriguez v. Providence Cmty. Corr., Inc.*, No. 15-01048 (M.D. Tenn. July 5, 2018), Dkt. 228 (approving $10,000 per named plaintiff in suit against private probation companies as "just compensation for the time and effort spent on bringing this action to a successful conclusion" where the case was stayed just seven months after filing and settlement occurred before discovery even opened); *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679, 694 (N.D. Ohio 2015) (approving $35,000 per named plaintiff where "the representative Plaintiffs responded to document requests and were deposed"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2946459, at *4 (E.D. Tenn. June 30, 2014) (collecting cases awarding $50,000 or more to each named plaintiff); *Boynton v. Headwaters, Inc.*, 2012 WL 12546853, at *3 (W.D. Tenn. Mar. 27, 2012) (approving $100,000 for each of two named plaintiffs and $10,000 each for other named plaintiffs).

The Named Plaintiffs have diligently and fairly represented their respective classes throughout this litigation. Several of the Named Plaintiffs have been actively litigating this case for over three years. They have assisted in the preparation of responses to numerous discovery requests, including turning over sensitive documents and information regarding their finances. Ex. 1 ¶¶ 67-68, 70. Three of the Named Plaintiffs were subjected to intense depositions that lasted between four and seven hours and included extensive discussions of personal history such as prior

19

criminal convictions; mental and physical health conditions; their families, including their young children; their financial situations; and traumatic encounters with law enforcement officers and in jail. *Id*. ¶ 72. All of them responded to detailed, intrusive interrogatories covering sensitive, personal topics such as every source of their income (including information regarding any money borrowed from anyone, who it was borrowed from, and whether it was paid back), their employment history, their monthly expenses, financial account information, credit card information, phone numbers, and history of interaction with the criminal legal system. *Id*. ¶ 70. Three Plaintiffs were on supervised probation during the pendency of this lawsuit, exposing them to publicity and the risk of retaliation at a time when their liberty depended on decisions made by the parties they sued. And even after the Named Plaintiffs were released from their terms of supervised probation, they continued to vigorously represent the interests of class members on supervised probation, including strongly advocating for injunctive relief that would prevent others from being subjected to the constitutional violations that they had endured. For all of these reasons, the Service Payments are reasonable.

### D. Class Counsel Should Be Awarded the Full Compensation Contemplated in the Settlement Agreement

In common fund cases, a fee award is appropriate if it is reasonable under the circumstances, in light of factors like the complexity of the legal questions involved, the results achieved, the efforts expended, and the importance of the matter at hand. *See Denney v. Phillips & Buttorf Corp.*, 331 F.2d 249, 251 (6th Cir. 1964); *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983); *Pergament v. Kaiser-Frazer Corp*., 224 F.2d 80, 83 (6th Cir. 1955). Collectively, these factors weigh in favor of approving the requested Attorneys' Fee Award. Class Counsel has litigated complex and novel questions of federal civil rights law over three years, including litigating and winning a temporary restraining order and preliminary injunction; engaging in

significant motions practice, including responding to multiple motions to dismiss, preparing lengthy evidentiary exhibits in response to multiple premature motions for summary judgment, and prevailing on their core legal claims; and briefing and winning two interlocutory appeals to the Sixth Circuit. Ex. 1 ¶¶ 48-55, 74-82.

Class Counsel has also participated in extensive discovery, propounding more than twenty sets of discovery requests to three sets of defendants, responding to multiple requests for discovery, turning over thousands of pages of documents, and reviewing more than 450,000 pages of materials received in discovery. *Id.* ¶¶ 10, 33, 39, 43-45, 62, 65, 67-68, 70. And, when two Named Plaintiffs could no longer participate in the litigation, Class Counsel expended significant energy locating class members who were willing to serve as substitute class representatives. *Id.* ¶ 132.

The Attorneys' Fee Award sought is fair and reasonable. The settlement fund impacts thousands of Class Members and obtains millions of dollars in debt forgiveness, while the injunctive relief in the proposed Consent Decree ensures that no one in Giles County will endure violations of their federal constitutional rights.

In compensation for their efforts, Class Counsel is requesting a lump sum of $200,000 to cover their costs and fees. The Sixth Circuit permits courts to employ the percentage approach, which "more accurately reflects the results achieved," *see Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-16 (6th Cir. 1993), and a 10% recovery falls well below the range of percentage-of-fund awards routinely approved in this circuit, *see Gokare*, 2013 WL 12094887, at *4 (approving attorneys' fees worth 30.9% of settlement fund). *See also In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *3–4; *Bessey v. Packerland Plainwell, Inc.*, 2007 WL 3173972, at *4 (all approving attorneys' fees awards of 30% or greater); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *3–4 (E.D. Tenn. May 17, 2013) (approving attorneys' fees constituting one-third

of settlement fund); *Bessey v. Packerland Plainwell, Inc.*, 2007 WL 3173972, at *4 (W.D. Mich. Oct. 26, 2007) (approving an award of 33%, including costs and expenses, and noting that "[e]mpirical studies show that . . . fee awards in class actions average around one-third of recovery" (citation omitted)). Moreover, this amount represents a fraction of the attorneys' fees expended: Class Counsel have collectively worked over 10,000 hours on this case, and costs alone exceed $190,000. Ex. 1 ¶¶ 133-34. Counsel is foregoing a significant amount of fees given the nature of the case and in order to maximize the recovery to the class.

### E. The Court Should Certify the Class

The Court preliminarily certified the proposed classes. Dkt. 447 at 2. For all of the reasons the Parties previously explained, Dkt. 444 at 20–23, the Court should certify the proposed Settlement Classes. The Parties incorporate herein the arguments set forth in that memorandum.

### III. Conclusion

For all of the foregoing reasons, the Parties respectfully request that the Court (1) grant final approval of the Agreement; (2) certify the proposed Settlement Classes; and (3) authorize distribution of Class Members' Cash Awards, Named Plaintiffs' Service Payments and counsels' Attorneys' Fees.

Dated: November 23, 2021                  Respectfully Submitted,

/s/ *Elizabeth Rossi*                       Matthew J. Piers (*pro hac vice*)
Elizabeth Rossi (*pro hac vice*)         Kate E. Schwartz (*pro hac vice*)
Sumayya Saleh (*pro hac vice*)          HUGHES, SOCOL, PIERS, RESNICK &
CIVIL RIGHTS CORPS               DYM, LTD.
1601 Connecticut Ave. NW, Suite 800    70 W. Madison St., Suite 4000
Washington, DC 20009              Chicago, IL 60602
(202) 844-4975                    (312) 580-0100
elizabeth@civilrightscorps.org         mpiers@hsplegal.com
sumayya@civilrightscorps.org          kschwartz@hsplegal.com

22

David W. Garrison, BPR 24968
Scott P. Tift, BPR 27592
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Philips Plaza
414 Union St., Suite 900
Nashville, TN 37219
(615) 244-2202
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

*Attorneys for Plaintiffs*

/s/ *Cassandra M. Crane*
Cassandra M. Crane
Robyn Beale Williams
Farrar & Bates
211 Seventh Avenue, North
Suite 500
Nashville, TN 37219
(615) 254-3060
casey.crane@farrar-bates.com
robyn.williams@farrar-bates.com

Lucy D. Henson
Lucy D. Henson, PLLC
118 South Second St.
P.O. Box 333
Pulaski, TN 38478
(931) 424-8713
henson@midsouthlaw.com

*Counsel for County Defendants*

Kyle Mothershead, BPR 22953
The Law Office of Kyle Mothershead
414 Union St., Suite 900
Nashville, TN 37219
(615) 982-8002
kyle@mothersheadlaw.com

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 23, 2021, I electronically filed the foregoing Memorandum in Support of Named Plaintiffs' and County Defendants' Joint Motion for Preliminary Approval of a Class Action Settlement and Consent Decree using the CM-ECF System, which caused notice to be sent to via email to the following counsel of record:

Daniel H. Rader, IV
Andre S. Greppin
Moore, Rader, Clift & Fitzpatrick, P.C.
P.O. Box 3347
Cookeville, TN 38502
(931) 526-3311
danny@moorerader.com
andre@moorerader.com

*Counsel for CPS Defendants*

Brandt M. McMillan
Timothy N. O'Connor
Tune, Entrekin & White, P.C.
315 Deaderick St., Suite 1700
Nashville, TN 37238
(615) 244-2770
bmcmillan@tewlawfirm.com
toconnor@tewlawfirm.com

*Counsel for PSI Defendants*

Cassandra M. Crane
Robyn Beale Williams
Farrar & Bates
211 Seventh Avenue, North
Suite 500
Nashville, TN 37219
(615) 254-3060
casey.crane@farrar-bates.com
robyn.williams@farrar-bates.com

Lucy D. Henson
Lucy D. Henson, PLLC
118 South Second St.

24

P.O. Box 333
Pulaski, TN 38478
(931) 424-8713
henson@midsouthlaw.com

*Counsel for County Defendants*

<u>*/s/ Elizabeth Rossi*</u>